THE ZAPPIA LAW FIRM
A Professional Corporation
Edward P. Zappia (State Bar No. 175099)
ezappia@zappialegal.com
Gail Wise (State Bar No. 260644)
gwise@zappialegal.com
One Pacific Plaza
7777 Center Avenue, Suite 625
Huntington Beach, CA  92647
Telephone: 213-814-5550
Facsimile: 213-814-5560

Attorneys for Defendants,
CITY OF UPLAND and MARTIN THOUVENELL

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARCUS SIMPSON,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF UPLAND; BRIAN JOHNSON; MARTIN THOUVENELL; DOES 1-10 et al.,<br><br>Defendants. | Case No.:  5:18-cv-01024-PSG-SP<br>Hon. Phillip S. Gutierrez, Crtrm 6A<br><br>**COMPENDIUM OF DECLARATIONS AND EXHIBITS IN SUPPORT OF DEFENDANTS CITY OF UPLAND AND MARTIN THOUVENELL'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Filed concurrently with the Notice of Motion and Motion; Memorandum of Points and Authorities; Separate Statement of Genuine Disputes and Conclusions of Law; [Proposed] Order lodged concurrently herewith)<br><br>**Hearing**<br>Date: October 28, 2019<br>Time: 1:30 PM<br>Crtrm: 6A<br><br>Complaint Removed:      May 11, 2018<br>Current Trial Date:   December 10, 2019<br>Pretrial Conference: November 25, 2019 |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Defendant CITY OF UPLAND ("Defendant" and/or "CITY") hereby submits the attached Compendium of Exhibits in support of its Motion for Summary Judgment as follow:

## DECLARATIONS

A. Declaration of Former City Manager Martin Thouvenell

B. Declaration of Former Deputy City Manager Jeannette Vagnozzi

C. Declaration of Investigator Gary Wedge

D. Declaration of Former Chino Police Chief Karen Comstock

E. Declaration of Upland Police Lt. Cliff Mathews

F. Declaration of Chino Police Lt. Nick Marotta

G. Declaration of Montclair Officer Eric Rivera

H. Declaration of Human Resources Manager Morgan Fillion

I. Declaration of Ed Zappia

J. Declaration of Gail Wise

## EXHIBITS

| EXHIBIT | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 1. | 5/22/2017 | Montclair Officer Eric Rivera Interview Transcript |
| 2. | 5/24/2017 | 11/7/16 Email Exchange with Montclair Re Sweep |
| 3. | 5/24/2017 | 11/25/16 Email Exchange with Montclair Re Sweep |
| 4. | 3/12/2015 | Johnson Employment Agreement |
| 5. | 09/01/2016 | Lt. Promotional Eligibility List |
| 6. | 12/6/2016 | Staff Meeting Agenda |

COMPENDIUM OF DECLARATIONS AND EXHIBITS IN SUPPORT OF DEFENDANTS CITY OF UPLAND AND
MARTIN THOUVENELL'S MOTION FOR SUMMARY JUDGMENT

| EXHIBIT | DATE | DOCUMENT DESCRIPTION |
|---------|------|----------------------|
| 7. | 12/6/2016 | Staff Meeting Notes |
| 8. | 12/21/2016 | Kirk After Action Report to Simpson |
| 9. | 01/11/2017 | Simpson Text re Passed Over |
| 10. | 02/28/2017 | Simpson Notice of Investigation into Johnson |
| 11. | 03/14/2017 | Barrett Statement |
| 12. | 03/14/2017 | Barrett Handwritten Notes |
| 13. | 03/22/2017 | Harper Letter to Thouvenell with Complaints re Johnson |
| 14. | 04/03/2017 | Barett Statement |
| 15. | 04/03/2017 | Barrett Notes |
| 16. | 04/10/2017 | Marotta Memo to Comstock re Sweep |
| 17. | 04/11/2017 | Barrett Notes |
| 18. | 04/12/2017 | Barrett Statement |
| 19. | 4/12/2017 | Barrett Notes |
| 20. | 04/13/2017 | Confidential Summary of Facts |
| 21. | 04/19/2017 | Assignment to Paid Leave |
| 22. | 04/19/2017 | Simpson Performance Review |
| 23. | 03/01/1988 | UPD Policy No. 7.11 |
| 24. | 07/25/2017 | Wedge & Fobes IA Report 05-17 |
| 25. | 07/25/2017 | Wedge & Fobes IA Report 06-17 |

COMPENDIUM OF DECLARATIONS AND EXHIBITS IN SUPPORT OF DEFENDANTS CITY OF UPLAND AND
MARTIN THOUVENELL'S MOTION FOR SUMMARY JUDGMENT

| EXHIBIT | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 26. | 08/30/2017 | Notice of Proposed Termination |
| 27. | 10/11/2017 | Notice of Termination |
| 28. | 10/11/2017 | Simpson Resignation Email |
| 29. | 10/11/2017 | Gonzalez Exit Letter to Simpson |
| 30. | 10/23/2017 | Staff Report Showing Frozen Position |
| 31. | 10/27/2017 | Johnson Notice of At-Will Release |
| 32. | 08/30/2018 | Second Amended Complaint |
| 33. | 05/13/2019 | Simpson Response to Special interrogatories, Set One |
| 34. | 7/1/15-6/30/17 | Memorandum of Understanding |
| 35. | 08/01/2016 | Posting For Police Lieutenant Position |
| 36. | 8/23/2019 | Excerpts from Deposition of Brian Johnson |
| 37. | 6/1/2017 | Excerpts from Interview of Jacob Kirk |
| 38. | | INTENTIONALLY LEFT BLANK |
| 39. | 7/6/2017 | Excerpts from Interview of Anthony Yoakum |
| 40. | 7/6/2017 | Excerpts from Interview of Marcus Simpson |
| 41. | 5/15/2017 | Excerpts from Interview of Brian Johnson on 5/4/17 at 3:50 p.m. |
| 42. | 5/4/2017 | Excerpts from Interview of Brian Johnson on 5/4/17 at 4:00 p.m. |
| 43. | 11/3/2017 | Simpson Offer Letter from Cal Poly Pomona |

COMPENDIUM OF DECLARATIONS AND EXHIBITS IN SUPPORT OF DEFENDANTS CITY OF UPLAND AND
MARTIN THOUVENELL'S MOTION FOR SUMMARY JUDGMENT

| EXHIBIT | DATE | DOCUMENT DESCRIPTION |
|---------|------|----------------------|
| 44. | 9/3/2019 | Excerpts from Deposition of Marcus Simpson |
| 45. |  | Upland City Council Duties |

Dated:  September 9, 2019             Respectfully submitted,

THE ZAPPIA LAW FIRM,
A Professional Corporation


By: /s/ Edward Zappia
Edward P. Zappia
Brett M. Ehman
Gail E. Wise

Attorneys for Defendant
CITY OF UPLAND

# EXHIBIT A

## DECLARATION OF MARTIN THOUVENELL

I, Martin Thouvenell, declare as follows:

1.      I am currently retired from the City of Upland.  I was employed in various capacities at the City of Upland for over 30 years, including Chief of Police, before I first retired from the City in 2005.

2.      The facts contained in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the facts stated herein.

3.      In about July 2016 I was asked by the Upland City Council to temporarily act as the City Manager until such time as a new qualified permanent City Manager could be recruited and hired.  I thus acted as the Upland City Manager from about August 2016 until December 2018, when I retired again.

4.      I did not make or set policy for the City of Upland. The City Council sets policy for the City. As City Manager my duties included carrying out the direction and policy of the City Council, and oversight of day-to-day City operations, budget matters, department heads and personnel matters.

### The City's Dire Financial Condition in 2017 And
### The Freezing Of Positions

5.      As City Manager, I was regularly apprised of the City's budget and financial situation.  During my tenure from 2016 through 2018, the City was facing a severe financial crisis and potential insolvency.  The crisis was so dire that the County annexed the City's entire Fire Department (the "Annexation") and the City laid off 15% of its employees as part and parcel of the Annexation.   Approximately ten open positions were frozen throughout the City.

6.      As City Manager, I did not make the decision to freeze any positions, but made recommendations to the City Council as to which positions should be frozen as part of the overall process of making budget recommendations.  Budget recommendations were made jointly in consultation and with input from City Department heads, the Deputy City Manager Jeannette Vagnozzi and Finance Manager Londa Bock-Helms. Recommendations regarding the positions took into consideration numerous factors such

as the savings to be realized, the needs of the department, the needs of the City, the needs of the community, and the priority of positions, among others.

7.     The Police Department is the largest department in the City and has the largest budget.  During budget discussions in the Spring of 2017, the Police Department was asked to absorb a budget reduction of approximately $1.5 million.  Then Police Chief Brian Johnson requested a larger budget, but given the severe financial constraints faced by the City, the City could not provide the full amount requested by Johnson.

8.     The reductions in the Police Department and other city departments could not be achieved without freezing open positions.  We assessed that it was necessary to retain funding for as many line officers on the street as possible in order to minimize the impact of the cuts to law enforcement efforts in the community.  Thus, it was decided to freeze the open positions of Police Lieutenant and Police Captain.  These two positions were among the highest paid positions in the City, with base salaries of about $130,000 and $150,000, respectively, not including the cost of overtime and the substantial benefits for those positions, including retirement, medical, dental, life insurance, etc.

9.     The positions of Captain and Lieutenant have largely administrative duties.  By freezing those positions, the City was able to fund at least three patrol officers that it otherwise would not have been able to retain.  At the time the Lieutenant position was frozen, I was not even aware that Plaintiff was on an eligibility list.

10.     By the end of 2017, the City had begun to realize the savings from its cost-saving efforts, and by the beginning of 2018, there was sufficient funding to staff both the Captain and Lieutenant positions.  In or around October, 2017, I directed Deputy City Manager Vagnozzi and Finance Officer Londa Bock-Helms to prepare a staff report with recommended revisions to the 2017-2018 budget that I would then revise as necessary and issue to the Mayor and the City Council.  In that report, I noted that the Captain and Lieutenant positions had been frozen as cost-saving measures, and that there would be sufficient funding for those positions in the second half of the 2017-2018 fiscal year.  Attached as **<u>Exhibit 30</u>** hereto is a true and correct copy of that memo, with redactions.

DECLARATION OF MARTIN THOUVENELL

**The 2017 Investigations Into Chief Johnson, Sgt. Simpson,**

**Capt. Yoakum And Det. Teague**

11.     At the time I became Acting City Manager about August 2016, Brian Johnson was the Upland Chief of Police on a 3-year at-will employment contract from April 2015 through April 2018.  I frequently interacted with Chief Johnson, as I did with all City Department Heads, and as City Manager, I had to make budgetary decisions that affected the Police Department.  As with other Department Heads, I would discuss any operational or budgetary issues or questions Chief Johnson had, if he requested.  However, I did not interfere with or impose my opinions on Chief Johnson's duties of running the Police Department.  I did not make any decisions about which individuals should be promoted or not promoted within the Police Department.  With respect to Plaintiff, I was not involved in, nor did I give input into any decisions to promote or not promote anyone in the Police Department while I was City Manager.

12.     By March 22, 2017, I was already aware that numerous Police department employees had concerns with Chief Johnson, as evidenced by a letter sent to me by the Police Management Association's attorney delineating officer concerns. (**Exhibit 13**) As stated in **Exhibit 13**, police department officers, supervisors and managers had expressed their concerns to me about Chief Johnson. My recollection is that they expressed numerous and generalized concerns about Chief Johnson, such as Chief Johnson lacked leadership skills; Chief Johnson lacked communication skills; Chief Johnson lacked people skills; Chief Johnson wasn't honest; Chief Johnson was trying to impose LAPD/large department policies on a small department, and it wasn't working, etc. I received enough such concerns about Chief Johnson that I took them seriously, but did not consider generalized concerns about the Chief to be comparable to specific complaints of misconduct.  I could and would only investigate any officer on charges of misconduct if there was a specific allegation of misconduct or rules violations.  An officer expressing a concern that the Chief is not a good leader or not a good communicator is very different from an officer bringing forth a specific allegation of misconduct.  In fact, I did authorize two personnel investigations into allegations of misconduct by Chief Johnson upon receipt of sufficiently specific and credible allegations.

4

13.     However, I also believed that Chief Johnson was meeting unfair resistance from the ranks as an outside Chief seeking to bring needed change to the department, by seeking to implement higher standards and expectations, higher accountability, and objective metrics to measure officer performance.

14.     I am aware it has been alleged that in one to three meetings with various officers and/or their attorney that I <u>directed</u> the officers, including Plaintiff, to dig up dirt on Chief Johnson, as they wanted Chief Johnson fired.  That is unequivocally false and illogical.  First, I would never give any such directive.  That would be illegal, unethical, and simply poor management and undermining of police department management and operations.  Second, by March 2017 Chief Johnson had only one year remaining on his employment contract. I was hoping that Chief Johnson would complete his three-year term in April 2018, and the City could then just hire a new Chief,and avoid any potential employment claims that could arise from releasing/terminating Chief Johnson before his contract expired. I would <u>not</u> have wanted to unnecessarily initiate, encourage or cause the expense and disruption of investigating and/or releasing/terminating Chief Johnson with only a year left on his contract.  Third, as stated above, I told the Officers that expressing generalized concerns about Chief Johnson such as "poor leader," "poor communicator," "bringing too much change too fast," etc., did not constitute sufficient or specific cause to initiate a personnel investigation for misconduct.  I was not going to investigate generalized concerns.  I will only investigate specific allegations.  I did not direct or imply that they should therefore go out and look for specific violations.

15.     In or about early 2017 Chief Johnson was the subject of a personnel investigation into various allegations of rules violations and other alleged misconduct. John Hackworth was retained to conduct the investigation.

16.     On or around April 12, 2017, Chief Johnson advised me that his administrative assistant, Luz Barrett, had reported to him potential misconduct that she felt she may have been subjected to by Sergeant Marcus Simpson, Captain Anthony Yoakum and Detective Lon Teague.  Shortly thereafter, Ms. Barrett's memos or emails were forwarded to me in which she documented that she had been approached several times by Simpson, Yoakum and Teague about the ongoing Hackworth investigation against Chief Johnson.  Ms. Barrett

DECLARATION OF MARTIN THOUVENELL

(who acted as my Administrative Assistant on occasion and years earlier when I was the Police Chief) documented that she believed their contacts with her about the ongoing investigation against Chief Johnson were unethical, an effort to scare her, to influence her statements to the investigator, and an attempt to coerce her into spying on Chief Johnson in furtherance of their efforts to get Chief Johnson fired.  (**Exhibits 11, 14, 18**) Because the allegations potentially aggrieved Chief Johnson, I immediately researched and hired a qualified private investigator/retired Chula Vista Police Captain Gary Wedge to conduct an independent investigation.  Despite the expense of retaining an outside investigator, it was not realistic for the investigation to be done internally because too many officers had expressed concerns or opposition to Chief Johnson.

17.    Chief Johnson forwarded me his additional concerns about Simpson, and Yoakum to be considered in the investigation, since Chief Johnson would not be participating in the investigation, other than as a witness. (**Exhibit 20**) Nor would Chief Johnson be participating in any potential discipline decision of Sergeant Simpson because of his conflicts with Sergeant Simpson. Among the additional concerns was an allegation that Simpson provided false statements during a staff meeting about neighboring agencies' participation a probation and parole sweep. **(Exhibit 20)** Chief Johnson provided a memo from the Chino Police Department regarding that issue.  (**Exhibit 16**)

18.    I had no participation in the ensuing personnel investigations against Plaintiff, as I, too, was identified as a witness to some of the allegations.  My only involvement in Gary Wedge's personnel investigations against Plaintiff was to review his qualifications, interview him, retain his services, and then administratively facilitate the investigations as requested – ensuring that requested witnesses and documents were made available to him. I offered no opinions, input or influence in Gary Wedge's investigative process, findings, conclusions or recommendations.

19.    Once Gary Wedge completed his investigations in about July 2017, I directed Deputy City Manager Jeannette Vagnozzi the task of reviewing the

DECLARATION OF MARTIN THOUVENELL

investigations and making any warranted employment decisions. Ms. Vagnozzi had over 25 years' public sector management experience, and had only been employed by the City of Upland for about 2 years at the time. Thus, to my knowledge she was completely independent as she had no history or biases for or against any of the involved complainants, witnesses or accused. Again, this was because both Chief Johnson and I were witnesses and had conflicts. I considered retaining a retired police chief to independently review the investigations and make proposed employment decisions. However, I ultimately decided against that because I did not want to incur the additional expense, and because I believed Ms. Vagnozzi qualified for the task.

20.    At no time did I offer any opinions or input to Ms. Vagnozzi in reaching her employment decisions about Plaintiff. In fact, I purposely had not even seen the investigations by design. To the contrary, I specifically advised Ms. Vagnozzi that the decision would be hers alone given her independence of the allegations and persons involved.

21.    By the fall of 2017, the relationship between Chief Johnson and the rest of the UPMA had not improved and was worsening. It was my impression that, regardless of who was right or wrong, the police department was no longer functioning efficiently with Chief Johnson. Therefore, on October 27, 2017, I released Chief Johnson from employment due to the incompatibility of his management style with the implementation of the goals and policies of the City and the police. Attached as **Exhibit 31** is a true and correct copy of the Notice of At Will Release from Employment.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 5th day of September 2019 at the City of Upland.



Martin Thouvenell

7

# EXHIBIT B

## DECLARATION OF JEANNETTE VAGNOZZI

I, Jeannette Vagnozzi, declare as follows:

1.     I served as the Deputy City Manager for the City of Upland (the "City") from August 19, 2015 to January 2018, when I was reclassified as Assistant City Manager.  In November 2018 I was appointed Upland City Manager.  My duties as Deputy and Assistant City Manager included serving as City Clerk and directing Human Resources, Risk Management, Finance and Information Technology.  Prior to joining the City of Upland, I worked at the City of La Verne for 24 years and progressed through all levels of city government there until I became Assistant to the City Manager.

2.     As Deputy City Manager, I did not make or set policy for the City of Upland. I reported to the City Manager, who reported to the City Council, which is the policy-making body for the City

3.     The facts contained in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify to the facts stated herein.

### The City's Dire Financial Condition And The Freezing Of Positions

4.     As Deputy City Manager in 2017, I was intimately familiar with the City's budget and financial situation.  In or around the Spring of 2017, the City was facing a severe financial crisis and potential insolvency.  The crisis was so dire that the County annexed the City's entire Fire Department (the "Annexation") and the City laid off 15% of its employees as part and parcel of the Annexation.  In March, 2017, anticipated savings from the Annexation were not certain or final, and budgets of several departments were reduced, including that of the Police Department. Further, the Fire Department Annexation had initial costs of about $1.5 million to effectuate before anticipated savings would result in following years. Then Police Chief Brian Johnson requested a larger budget, but given the severe financial constraints faced by the City, the City could not provide the full amount requested by Johnson.

5.     Around this time, approximately ten open positions were frozen throughout the City.  In the Police Department alone, three or four positions were frozen, including the open positions for Police Lieutenant and Police Captain.  These two positions were among the highest paid positions in the City, with salaries of $130,000 and $150,000, respectively,

not including the cost of overtime and the substantial benefits for those positions, including retirement, medical, dental, life insurance, etc.  Accordingly, the savings achieved by freezing those positions were significant and necessary.

6.     Budget recommendations were made jointly in consultation and with input from City Department heads, the Deputy City Manager Jeannette Vagnozzi and Finance Manager Londa Bock-Helms. Neither I nor City Manager Thouvenell made the decision to freeze any positions, but made recommendations as to which positions should be frozen as part of the overall process of making budget recommendations. In making our recommendations regarding the positions, we took into consideration numerous factors such as the savings to be realized, the needs of the department, the needs of the City, the needs of the community, and the priority of positions, among others.

7.     In 2017, I did not know how many people were on the eligibility list for Lieutenant, did not know who was on it, and thus was not aware that Simpson was on it.  I was not involved in, nor did I have input into any decisions to promote or not promote Sgt. Simpson during his tenure with the Upland Police Department.  The Lieutenant position was not frozen in order to prevent Sgt. Marcus Simpson or anyone else the position, but rather, as explained above, by the group as one of the many cost-saving measures taken at that time.  The recommendations were made as part of a City-wise budget reduction, and not exclusive to the Police Department or the Lieutenant position.

8.     By the end of 2017, the City had begun to realize the savings from its cost-saving efforts, and by the beginning of 2018, there was sufficient funding to staff both the Captain and Lieutenant positions.  In or around October, 2017, I prepared a staff report regarding revisions to the 2017-2018 fiscal year budget in which I noted that the Captain and Lieutenant positions had been frozen as cost-saving measures, and that there would be sufficient funding for those positions in the second half of the 2017-2018 fiscal year. Attached as **Exhibit 30** hereto is a true and correct copy of that memo, with redactions.

### The 2017 Investigations Into Chief Johnson, Sgt. Simpson, Capt. Yoakum And Det. Teague

9.     In or about April 2017 I was aware that former Police Chief Brian Johnson was the subject of an Administrative Investigation conducted by Investigator John

3

Hackworth.  I had no input in the investigation, and was not interviewed in that investigation.  I also was not involved in any post-investigation disciplinary decision against Chief Johnson, if any.  I did not review this investigation, or any interview of Plaintiff in this investigation.

10.    In April 2017, two additional personnel investigations were conducted by an outside investigations firm, Wedge & Fobes Investigations.  One was into alleged misconduct by Sergeant Simpson alone.  The second was into alleged misconduct by Sergeant Simpson, Captain Anthony Yoakum and Detective Teague.  I had no personal knowledge of the events constituting the alleged misconduct at that time.  I was not involved with either of the investigations and had no input into them or into the findings, conclusions or recommendations of the investigators.  I was not a witness in either of the investigations and was not interviewed in them.

11.    Normally in Police Department disciplinary matters, a Disciplinary Review Board ("DRB") consisting of two superior officers and a peer would be convened to make non-binding recommendations as to the appropriate discipline as a result of any sustained findings in a personnel investigation.  The ultimate decision would be handled by the Chief of Police, who was Brian Johnson at the time.  However, Chief Johnson was also a witness in both investigations, so he was excluded from them and the discipline decision process.  Moreover, all of Simpson's other superior officers at the UPD (two Lieutenants, one Captain and one Chief) were witnesses in the investigations.  Thus, a DRB could not be formed in accordance with the policy.

12.    The next person who would normally take on the decision-making role above a Department Head would be the City Manager, who was Martin Thouvenell at the time.  However, he also was a witness in the second investigation and was excluded from both the investigations and discipline decision process.

13.    In about July 2017 when the Wedge investigation was completed, City Manager Thouvenell assigned me the task of independently reviewing the investigations and making any appropriate disciplinary decisions.  This was because I had no role in the events underlying the investigations,and had no special personal or professional relationship with those involved.

DECLARATION OF JEANETTE VAGNOZZI

14.    Upon being assigned this task, I understood the gravity of the task, as it involved the employment of three long-tenured Upland Police Officers, one of whom was a supervisor and the other who was the second-in-command. I also understood that any discipline decision I made could be subject to legal or administrative challenge. I therefore spent a substantial amount of time reviewing the investigations and making decisions that I believed were appropriate and warranted considering all of the evidence and circumstances.

15.    The allegations underlying the first investigation ("Investigation No. 05-17") were that Sgt. Simpson was dishonest in response to Chief Brian Johnson when asked at a staff meeting on December 6, 2016 about the status of a probation and parole compliance sweep that Simpson was organizing. It was reported that Simpson told Johnson that no other agencies could participate, including the Chino and Montclair Police Departments, and suggested that the sweep be postponed. However, both could and ultimately did participate. A memo and email exchange between Chino Chief Karen Comstock and Sgt. Nick Marotta of the Chino Police Department revealed that Chino PD had not been contacted to participate in the sweep at the time of the December 6 staff meeting. (**Exh. 16**) An email from Montclair Police Department Officer Eric Rivera to Upland Officer Jacob Kirk dated November 29, 2016 showed that Montclair had advised it could participate in the sweep well before Simpson made the statement that it could not. (**Exh. 3**)

16.    The allegations underlying the second investigation ("Investigation No. 6-17") were made by Senior Administrative Assistant to the Police Chief, Luz Barrett, on or about April 12, 2017. She reported that, during the ongoing investigation into allegations against Chief Johnson, Plaintiff made multiple inappropriate contacts with her. She reported that within a seven-minute period, Plaintiff, Sergeant Simpson and two other officers had come into her office, each one immediately after the other, to ask her whether she had been interviewed in the Johnson investigation, or how her interview went. She further reported that Plaintiff advised her that he had given her name to the interviewer so that she could be interviewed. Barrett provided contemporaneous handwritten notes and typewritten statements regarding the visits by the three officers. Some of the statements

indicated Ms. Barrett thought that the officers were trying to scare her or influence her testimony should she be interviewed in the Johnson investigation. Attached as **Exhibits 12, 15, 17 and 19** hereto are true and correct copies of Ms. Barrett's handwritten notes that were attached to the investigation as exhibits. Attached as **Exhibits 11, 14 and 18** are Ms. Barrett's typewritten statements, which were also attached to the investigation as exhibits.

17.    The investigators issued reports as to both investigations on or about July 25, 2017.

18.    The report of Investigation No. 05-17 consisted of one large volume containing 432 pages. It reflected interviews with approximately 25 individuals and contained numerous exhibits. It contained a lengthy narrative primary report of approximately 45 pages, and a supplemental report of witness statements prepared by Mr. Wedge's partner, Steve Fobes. There were over one hundred pages of exhibits, audio files of the interviews and interview transcripts of the key interviews. Attached hereto as **Exhibit 24** is a true and correct copy of the narrative primary report. Selected pages from the exhibits and transcripts that were attached to the report for Investigation No. 05-17 are attached hereto as follows:

a.  Attached as **Exhibit 2** hereto is a true and correct copy of a two-page email chain forwarded to me by Officer Eric Rivera of the Montclair Police Department that was attached to Investigation No. 05-17 as Exhibit 2.g.

b.  Attached as **Exhibit 3** hereto is a true and correct copy of a three-page email chain I received from Officer Rivera that was attached to Investigation No. 05-17 as Exhbit 2.h.

c.  Attached as **Exhibit 6** hereto is a true and correct copy of a Meeting Agenda for 12/6/16 that was attached to Investigation No. 05-17 as Exhibit 2.b.

d.  Attached as **Exhibit 7** hereto are true and correct copies of handwritten notes from a 12/6/16 staff meeting that were attached to Investigation No. 05-17 as Exhibits 2.c and 2.d.

DECLARATION OF JEANETTE VAGNOZZI

e. Attached as **Exhibit 8** hereto are true and correct copies of a one page email dated 12/21/16 with a two-page "Parole/Probation After Action Report" that were attached to Investigation No. 05-17 as Exhibit 2.k.iv.

f. Attached as **Exhibit 16** hereto are true and correct copies of a memo dated 4/10/17 with two pages of supporting emails that were attached to Investigation No. 05-17 as Exhibit 2.f.

g. Attached as **Exhibit 37** hereto are true and correct copies of excerpts from the transcript of the investigator's interview with Officer Jacob Kirk on June 1, 2017 that was attached to Investigation No. 05-17.

h. Attached as **Exhibit 39** hereto are true and correct copies of excerpts from the transcript of the investigator's interview with Captain Anthony Yoakum on July 6, 2017 that was attached to Investigation No. 05-17.

i. Attached as **Exhibit 41** hereto are true and correct copies of excerpts from the transcript of the investigator's interview with Chief Brian Johnson on May 4, 2017 that was attached to Investigation No. 05-17.

19.    The report of Investigation No. 06-17 consisted of two volumes, reflecting interviews with approximately 28 witnesses and numerous exhibits.  The report consisted of a lengthy narrative tailored to each of the three officers, each of which was over 130 pages long; hundreds of pages of exhibits; the audio files of the interviews; and interview transcripts for the key interviews.  Attached as **Exhibit 25** hereto is a true and correct copy of the narrative portion of the investigation with respect to Sergeant Simpson.  Selected pages from the exhibits and transcripts that were attached to the report for Investigation No. 06-17 are attached hereto as follows:

a. Attached as **Exhibit 9** hereto is a true and correct copy of a screen shot of a text message dated 1/11/17 that was attached to Investigation No. 06-17 as Exhibit 2.e.

b. Attached as **Exhibit 10** hereto is a true and correct copy of an interview notice to Marc Simpson dated 2/24/17 that was attached to Investigation No. 06-17 as Exhibit 2.b.

DECLARATION OF JEANETTE VAGNOZZI

c.  Attached as **<u>Exhibit 11</u>** hereto is a true and correct copy of a typewritten "Statement -- March 14, 2017" that was attached to Investigation No. 06-17 as Exhibit 2.q.i.

d.  Attached as **<u>Exhibit 12</u>** hereto is a true and correct copy of a page of handwritten notes titled "Mar 14" that was attached to Investigation No. 06-17 as Exhibit 2.r.i.

e.  Attached as **<u>Exhibit 14</u>** hereto is a true and correct copy of a typewritten "Statement – April 3 2017" that was attached to Investigation No. 06-17 as Exhibit 2.q.ii.

f.  Attached as **<u>Exhibit 15</u>** hereto is a true and correct copy of a page of handwritten notes titled "Apr 3" that was attached to Investigation No. 06-17 as Exhibit 2.r.ii.

g.  Attached as **<u>Exhibit 17</u>** hereto is a true and correct copy of a page of handwritten notes dated "Apr 11" that was attached to Investigation No. 06-17 as Exhibit 2.v.

h.  Attached as **<u>Exhibit 18</u>** hereto is a true and correct copy of a typewritten "Statement – April 12 2017" that was attached to Investigation No. 06-17 as Exhibit 2.q.iii.

i.  Attached as **<u>Exhibit 19</u>** hereto is a true and correct copy of two pages of handwritten notes titled "Apr 12" that were attached to Investigation No. 06-17 as Exhibit 2.r.iii.

j.  Attached as **<u>Exhibit 20</u>** hereto is a true and correct copy of a redacted document entitled "Confidential Summary of Facts" that was attached to Investigation No. 06-17 as Exhibit 2.a.

k.  Attached as **<u>Exhibit 40</u>** hereto are true and correct copies of excerpts from the transcript of the investigator's interview with Sergeant Marcus Simpson on June 7, 2017 that was attached to Investigation No. 06-17.

l.  Attached as **<u>Exhibit 42</u>** hereto are true and correct copies of excerpts from the transcript of the investigator's interview with Chief Brian Johnson on May 4, 2017 that was attached to Investigation No. 06-17.

8

DECLARATION OF JEANETTE VAGNOZZI

20.    The report of Investigation No. 05-17 sustained findings against Simpson of UPD policy violations involving truthfulness, conduct unbecoming, maintaining a favorable professional image and performance of duties.  The investigator found that Simpson was untruthful or misleading in his response to the questions asked by Chief Johnson about the participation of other agencies in the probation and parole sweep. (**Exh. 24** at COU 00000045-48)

21.    The report of Investigation No. 06-17 also sustained findings against Simpson of UPD policy violations involving truthfulness, insubordination, conduct unbecoming and respect for superiors and associates, among others.  The investigator found that Simpson, Yoakum and Teague knew an investigation had been initiated into Johnson; had been directed not to discuss it; did, in fact, ask Barrett about her interview; were attempting to influence the issues that Barrett would discuss if interviewed; that Barrett believed their actions were unethical and disrespectful to Chief Johnson and her; and that Simpson was not forthcoming in his investigative interview.  (**Exh. 25** at COU00000565-573) The investigator sustained allegations that Plaintiff violated numerous policies and procedures by (1) engaging in "conduct that reflected unfavorably on his professional image"; (2) engaging in conduct unbecoming an officer; (3) not being forthcoming during his IA interview; (4) being insubordinate in failing to follow a written directive ordering him not to discuss an administrative investigation; (5) making disrespectful and inappropriate comments about Chief Johnson in the presence of other employees; and (6) being disrespectful to Barrett. (**Exh. 25** at COU 00000573-576)

22.    After reviewing the materials, I agreed with the findings of the investigator with respect to Investigation No. 05-17.  I found it completely unacceptable for a Sergeant to lie to or mislead the Chief, especially about the status of an important operation like the sweep.  The accounts of multiple officers and the contemporaneous notes of Luz Barrett revealed that Simpson had been specifically asked about Chino PD's participation and stated that Chino PD could not participate (**Exh. 7**).  However, the email exchange between Chino Chief Comstock and Sgt. Nick Marotta revealed that it had not been asked. (**Exh. 16**).  Moreover, it was clear that when Simpson told Chief Johnson none of the agencies

could participate, Simpson knew that Montclair PD could. (**Exh. 3**.) I thus determined that the findings were supported by the evidence.

23.     I also agreed with the investigator's findings with respect to Investigation No. 06-17.  I found it unacceptable for a Supervisor Sergeant to be undermining the Chief, threatening and intimidating subordinates; to be involved with others' attempts to undermine the Chief; and to disobey the order not to discuss the investigation.  Barrett had reported that she felt they were trying to recruit her to help undermine the Chief (**Exhibit 11**), were trying to scare her or influence what she would say to the City's investigator if she was interviewed (**Exhibit 14**), or were trying to get information about the Chief from her in her capacity as the Chief's confidential Administrative Assistant (**Exhibit 18**). Indeed, Barrett had contemporaneously documented an incident on April 3, 2017 where Simpson told her he had given her name to an investigator. (**Exhs. 14 and 15**) Simpson did not deny making this statement. I thus determined that the findings were supported by the evidence.

24.     On or about August 30, 2017, I issued a Notice of Proposed Termination to Sergeant Simpson, a copy of which is attached hereto as **Exhibit 26.**  Neither Chief Brian Johnson nor City Manager Marty Thouvenell participated in or provided any input into my proposed decision to terminate Plaintiff's employment.

25.     I conducted a *Skelly* meeting with Sergeant Simpson on or about October 4, 2017.  Sergeant Simpson argued in the meeting that he should not be disciplined at all, or if he was to be disciplined, termination was too severe.  Notably, Simpson did not deny the substance of the allegations, but gave technical reasons why termination should not be imposed.  He contended that (1) the order not to discuss the investigation was invalid because it was given by HR, not a superior; (2) the allegations were only supported by one witness; (3) he had a long, unblemished history with the Department; and (4) various allegations of conflicts of interest of Chief Johnson, City Manager Thouvenell and of outside private counsel.  I considered Sergeant Simpson's input, but found it unpersuasive. As a high-ranking member of the Department, I expected a greater level of professionalism from him.   I then prepared a Notice of Termination that set forth the issues Sergeant

Simpson raised in the *Skelly* meeting and explained why I found them unpersuasive. Attached as **Exhibit 27** hereto is a true and correct copy of the Notice of Termination.

26.    On October 11, 2017, just minutes before I was about to issue the signed Notice of Termination to Sergeant Simpson, I received an email from him stating that he had decided to resign from his position as Police Sergeant.  I decided to accept his retirement in lieu of termination, and rescinded the signed termination.   Attached as **Exhibit 28** hereto is a true and correct copy of his email.

27.    Sgt. Simpson was thus allowed to resign rather than have a termination for cause entered into his personnel record.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 5th day of September 2019 at the City of Rancho Cucamonga, California.

Jeannette Vagnozzi

DECLARATION OF JEANNETTE VAGNOZZI

# EXHIBIT C

## DECLARATION OF GARY WEDGE

I, Gary Wedge, declare as follows:

1.     I am an investigator and principal of Wedge & Fobes Investigations, which conducts public & private sector personnel and administrative investigations, as well as other investigative functions such as background investigations, process serving, missing persons investigations, skiptracing and surveillance. Steve Fobes is my business partner. The facts contained in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the facts stated herein.

2.     Prior to becoming a private investigator in 2014, I had been employed in municipal law enforcement for more than 30 years and retired after attaining the rank of captain with the City of Chula Vista. My law enforcement experience encompassed line-level and supervisory patrol and investigative positions including K-9, juvenile crimes, sex crimes & child abuse, robbery/homicide, street team/gang suppression unit, and a regional multi-agency task force. As a mid-manager and then senior manager I was responsible for the administrative services division (professional standards, policy development and compliance, and administrative/internal investigations), as well as the City's animal care facility and animal control services, a 48-bed jail, and the communications/dispatch center. Until my retirement in 2013, I was responsible for the patrol/operations division, and also served as the department's public information officer.

3.     I hold a Bachelor's degree in Behavioral Science from National University. I am a graduate of the California Commission on Peace Officer Standards & Training (POST) Command College, and the West Point Leadership Program at the Los Angeles Police Department.

4.     In April 2017 I was hired by the City of Upland to conduct two administrative investigations into (1) an allegation that Sgt. Marcus Simpson was dishonest in response to Chief Brian Johnson when asked about the status of a probation and parole compliance sweep that Simpson was organizing ("Investigation No. 05-17"); and (2) misconduct alleged by the Police Chief's Administrative Assistant Luz Barrett against members of the police department, including Sgt. Simpson, Captain Anthony Yoakum, and Detective Lon Teague ("Investigation No. 06-17").

5.    The allegations of Investigation No. 05-17 included that Sgt. Simpson was dishonest in his response when Chief Johnson asked him about the status of a probation and parole compliance sweep (also known as an AB109 sweep) at a staff meeting on December 6, 2016.

6.    The allegations of Investigation No. 06-17 included that Sgt. Simpson, Captain Yoakum and Detective Teague failed to follow a written directive ordering them not to discuss a confidential administrative investigation against the Police Chief, and that Captain Yoakum and Sgt. Simpson tried to influence that investigation.  It was also alleged that Captain Yoakum and Sgt. Simpson made statements and engaged in other conduct to undermine and disparage the chief of police.

7.    Prior to April 2017, I had never been hired to perform any investigations for the City of Upland and did not know Captain Yoakum, Sgt. Simpson, Detective Teague, Chief Johnson, City Manager Martin Thouvenell, or any of the other individuals I ultimately interviewed as part of the investigation.  Nor did I personally know Deputy City Manager Jeannette Vagnozzi.  I had never been employed by the Upland Police Department and was unfamiliar with it.

8.    The investigations were conducted concurrently and took place over approximately three months, between April and July, 2017.

9.    In Investigation No. 05-17, my partner and I conducted interviews with approximately 25 individuals from the UPD and surrounding agencies.  We gathered exhibits encompassing approximately 125 pages and transcripts.  I prepared a report in which I sustained findings of violations of UPD policy sections pertaining to truthfulness, conduct unbecoming, maintaining a favorable professional image and performance of duties.  The exhibits, audio files, and transcripts of selected interviews were attached to the report.  Attached as **Exhibit 24** is a true and correct copy of the narrative portion of my investigative report setting forth my findings and the reasons for them. Selected pages from the exhibits and transcripts that were attached to the report for Investigation No. 05-17 are attached hereto as follows:

a.    Attached as **Exhibit 2** hereto is a true and correct copy of a two-page email chain forwarded to me by Officer Eric Rivera of the Montclair

3

DECLARATION OF GARY WEDGE

Police Department that was attached to my report for Investigation No. 05-17 as Exhibit 2.g.

b. Attached as **Exhibit 3** hereto is a true and correct copy of a three-page email chain I received from Officer Rivera that was attached to my report for Investigation No. 05-17 as Exhbit 2.h.

c. Attached as **Exhibit 6** hereto is a true and correct copy of a Meeting Agenda for 12/6/16 that was attached to my report for Investigation No. 05-17 as Exhibit 2.b.

d. Attached as **Exhibit 7** hereto are true and correct copies of handwritten notes from a 12/6/16 staff meeting that were attached to my report for Investigation No. 05-17 as Exhibits 2.c and 2.d.

e. Attached as **Exhibit 8** hereto are true and correct copies of a one page email dated 12/21/16 with a two-page "Parole/Probation After Action Report" that were attached to my report for Investigation No. 05-17 as Exhibit 2.k.iv.

f. Attached as **Exhibit 16** hereto are true and correct copies of a memo dated 4/10/17 with two pages of supporting emails that were attached to my report for Investigation No. 05-17 as Exhibit 2.f.

g. Attached as **Exhibit 37** hereto are true and correct copies of excerpts from the transcript of my interview with Officer Jacob Kirk on June 1, 2017 that was attached to my report for Investigation No. 05-17.

h. Attached as **Exhibit 39** hereto are true and correct copies of excerpts from the transcript of my interview with Captain Anthony Yoakum on July 6, 2017 that was attached to my report for Investigation No. 05-17.

i. Attached as **Exhibit 41** hereto are true and correct copies of excerpts from the transcript of my interview with Chief Brian Johnson on May 4, 2017 that was attached to my report for Investigation No. 05-17.

10. In Investigation No. 06-17, my partner and I conducted interviews with approximately 28 UPD personnel and gathered exhibits encompassing hundreds of pages. I prepared a report in which I sustained findings of violations of UPD policy sections

4

pertaining to truthfulness, insubordination, conduct unbecoming and respect for superiors and associates, among others.   The exhibits, audio files, and transcripts of selected interviews were attached to the report.   Attached as **Exhibit 25** hereto is a true and correct copy of the narrative portion of my investigative report setting forth my findings and the reasons for them with respect to Sgt. Simpson, without exhibits.   Selected pages from the exhibits and transcripts that were attached to the report for Investigation No. 06-17 are attached hereto as follows:

a. Attached as **Exhibit 9** hereto is a true and correct copy of a screen shot of a text message dated 1/11/17 that was attached to my report for Investigation No. 06-17 as Exhibit 2.e.

b. Attached as **Exhibit 10** hereto is a true and correct copy of an interview notice to Marc Simpson dated 2/24/17 that was attached to my report for Investigation No. 06-17 as Exhibit 2.b.

c. Attached as **Exhibit 11** hereto is a true and correct copy of a typewritten "Statement -- March 14, 2017" that was attached to my report for Investigation No. 06-17 as Exhibit 2.q.i.

d. Attached as **Exhibit 12** hereto is a true and correct copy of a page of handwritten notes titled "Mar 14" that was attached to my report for Investigation No. 06-17 as Exhibit 2.r.i.

e. Attached as **Exhibit 14** hereto is a true and correct copy of a typewritten "Statement – April 3 2017" that was attached to my report for Investigation No. 06-17 as Exhibit 2.q.ii.

f. Attached as **Exhibit 15** hereto is a true and correct copy of a page of handwritten notes titled "Apr 3" that was attached to my report for Investigation No. 06-17 as Exhibit 2.r.ii.

g. Attached as **Exhibit 17** hereto is a true and correct copy of a page of handwritten notes dated "Apr 11" that was attached to my report for Investigation No. 06-17 as Exhibit 2.v.

DECLARATION OF GARY WEDGE

h. Attached as **Exhibit 18** hereto is a true and correct copy of a typewritten "Statement – April 12 2017" that was attached to my report for Investigation No. 06-17 as Exhibit 2.q.iii.

i. Attached as **Exhibit 19** hereto is a true and correct copy of two pages of handwritten notes titled "Apr 12" that were attached to my report for Investigation No. 06-17 as Exhibit 2.r.iii.

j. Attached as **Exhibit 20** hereto is a true and correct copy of a redacted document entitled "Confidential Summary of Facts" that was attached to my report for Investigation No. 06-17 as Exhibit 2.a.

k. Attached as **Exhibit 40** hereto are true and correct copies of excerpts from the transcript of my interview with Sergeant Marcus Simpson on June 7, 2017 that was attached to my report for Investigation No. 06-17.

l. Attached as **Exhibit 42** hereto are true and correct copies of excerpts from the transcript of my interview with Chief Brian Johnson on May 4, 2017 that was attached to my report for Investigation No. 06-17.

11. During the investigation, no one attempted to influence or interfere with the fact-finding process, my findings or the preparation of my investigative report. No one had any input into the investigation other than my partner, Mr. Fobes, who conducted a number of the interviews.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 4ᵀᴴ day of September 2019 at the City of San Diego, California.

Gary Wedge

DECLARATION OF GARY WEDGE

# EXHIBIT D

### DECLARATION OF KAREN COMSTOCK

I, Karen Comstock, declare as follows:

1. In 2017, I was the Chief of Police in the Police Department of the City of Chino, California ("Chino PD"). Prior to becoming Chief, I had spent nearly my entire career with the City of Chino, and worked my way through the ranks to the position of Sergeant, Lieutenant, Captain and finally the Chief's position. I am currently retired.

2. The facts contained in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify to all facts stated herein.

3. During my time with the Chino PD, our agency cooperated closely and routinely with surrounding agencies on law enforcement initiatives, and especially with the Upland, Montclair and Ontario Police Departments. Chino PD would routinely assist those agencies with enforcement operations for pre-planned events or mutual-aid requests in any of those cities, and they would assist us, as well. Our four agencies jointly maintained a West End Mobile Field Force Team consisting of officers of all four agencies that could be activated by any one of the four Chiefs of Police to address civil disturbances or unusual occurrences in any of the four cities. Our agencies would also routinely cooperate on probation and parole sweeps to enforce compliance with probation and parole restrictions. If any of our four agencies were organizing such a sweep, it would not be out of the ordinary to ask for the assistance of any or all of the other three agencies.

4. As Chief, I attended monthly County Chiefs' meetings, where Chiefs from cities in San Bernardino County, the Sheriff, and the District Attorney would meet to discuss law enforcement efforts in our respective cities and to foster cooperation among our law enforcement agencies. The Chiefs of Chino, Upland, Montclair, and Ontario, among others, would attend those meetings. The Chiefs of these agencies always endeavored to help each other with law enforcement efforts and had a close working relationship. My relationship with Upland Police Department ("Upland PD") Chief Brian Johnson was no exception.

1

## Upland PD's Probation and Parole Sweep

5.    On December 8, 2016, Chino PD hosted the County Chiefs' meeting. At that meeting, Chief Johnson advised me that the Upland PD was conducting a parole and probation sweep on December 14, 2016. He asked if Chino could assist with the sweep, as he had been told that Chino was not available. I told Chief Johnson that Chino PD could help, and sent an email to Chino PD Lieutenant Mensen directing him to ensure that Chino PD sent personnel to participate in the sweep. A true and correct copy of my email is attached at **Exhibit 16** hereto in the email chain on page COU-0000078.

6.    On December 8, 2016, I also directed via email that then-Chino PD Sergeant Nick Marotta be asked if a previous request for assistance with the sweep had been made to our agency by Upland PD Sergeant Mark Simpson. A true and correct copy of my email is attached in the email string on page COU-0000077 of **Exhibit 16**. Sgt. Marotta responded that Chino had not received any previous requests.

7.    On or about April 7, 2017, I called Sergeant Marotta to ask him to prepare a memorandum regarding communication between the Upland PD and Chino PD regarding the probation and parole sweep, which he did. Attached as **Exhibit 16** is a true and correct copy of his memorandum, which is dated April 10, 2017. In that memorandum, Sergeant Marotta confirmed that no one at the Upland PD had requested Chino PD's assistance with the operation prior to December 8, 2017.

## Mentorship of Captain Yoakum

8.    I am aware that Upland PD Captain Anthony Yoakum contends that Chief Johnson disclosed his private, personnel information to me in a conversation in early 2017. As a Lieutenant at Chino PD, I was responsible for supervising, and also conducted internal affairs investigations for the Chino PD. I am thus familiar with the laws protecting police officer personnel information from disclosure. At no time did Chief Johnson make any disclosure to me regarding Captain Yoakum's personnel records.

DECLARATION OF KAREN COMSTOCK

9.      In early 2017, Chief Johnson contacted me and advised that Upland PD Captain Anthony Yoakum was underperforming as a Captain, and asked if there was a peer within my organization with whom Captain Yoakum might meet for coaching, mentoring, and advice.   My impression was that Chief Johnson wanted Captain Yoakum to obtain mentoring and insight in order to improve Captain Yoakum's performance and perspective and help him succeed.

10.      Chief Johnson did not provide me with any of Captain Yoakum's personnel documents.   Chief Johnson provided me with generalized concerns regarding Captain Yoakum's performance during our conversation.   Chief Johnson did not provide me with any specific details regarding the reasons he thought Captain Yoakum was underperforming, and it was clear that his request was purely for purposes of professional development and mentoring.   Indeed, because of my background with internal affairs investigations, had Chief Johnson attempted to provide any specific personnel information, I would have stopped him and not accepted it.

11.      After my discussion with Chief Johnson, I advised then Chino PD-Captain Simmons that he may be contacted by Captain Yoakum for coaching, mentoring or advice, but I do not know if Captain Yoakum ever made contact.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.   Executed this 5th day of September 2019 at the City of Long Beach, California.

KAREN COMSTOCK

DECLARATION OF KAREN COMSTOCK

# EXHIBIT E

# DECLARATION OF CLIFF MATHEWS

I, Cliff Mathews, declare as follows:

1.    I have been a sworn officer with the Upland Police Department for more than 28 years.  My current position is Captain, which includes substantial administrative duties including, but not limited to, reviewing and revising Police Department policies.  During the year 2017, my rank was Lieutenant.  I served as Acting Captain for part of the year.

2.    The facts contained in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify to all facts stated herein.

3.    Attached as **Exhibit 23** is a true and correct copy of Upland Police Department Policy No. 7.11 that was in effect through at least through September 12, 2017. Section V of the policy sets forth provisions regarding Disciplinary Review Boards ("DRB").  DRBs are formed to review personnel investigations and make non-binding recommendations as to officer discipline.

4.    Per Policy No. 7.11, a DRB for a Sergeant under investigation is to consist of two Lieutenants and a peer Sergeant who have not participated in the investigation or reporting of the incident under investigation.

5.    In 2017, Plaintiff Marcus Simpson was investigated for alleged disciplinary violations.  At that time, a DRB could not be formed pursuant to the terms of the policy because there was no one of superior rank that was not a witness or subject of the investigation into the violations alleged against him.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this __ day of September, 2019 at the City of Upland, California.

CLIFF MATHEWS

# EXHIBIT F

## DECLARATION OF NICHOLAS MAROTTA

I, Nicholas Marotta, declare as follows:

1.      I am currently a Police Lieutenant with the City of Chino Police Department ("Chino PD"). The facts contained in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the facts stated herein.

2.      Attached hereto as **Exhibit 16** is a true and correct copy of a memo I wrote on or about April 10, 2017 documenting the chain of communication between the Chino Police Department and the Upland Police Department in regard to a probation and parole sweep that occurred on December 14, 2016. Attached to the memo at **Exhibit 16** is a true and correct copy of a chain of emails that I sent or received in connection with Chino PD's participation in the sweep. At the time of the memos and the email, my rank was Police Sergeant. The facts stated in the memo and in the attached emails written by me are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 29th day of August 2019 at the City of Chino, California.

_____
NICHOLAS MAROTTA

# EXHIBIT G

## DECLARATION OF OFFICER ERIC RIVERA

I, Eric Rivera, declare as follows:

1.     I am a Police Officer in the City of Montclair Police Department.  I have personal knowledge of the facts stated herein and if called upon to testify would competently and truthfully testify to all facts stated in this declaration.

2.     Attached as Exhibit 1 hereto is a true and correct copy of transcript of an interview investigator Gary Wedge conducted with me that took place telephonically on or about May 22, 2017.  The transcript accurately reflects the statements I made during the interview.

3.     Attached as Exhibit 2 hereto is a true and correct copy of an email thread on which I was copied on or about November 7, 2016, which I subsequently forwarded to Montclair Police Chief Robert Avels on or about May 18, 2017.

4.     Attached as Exhibit 3 hereto is a true and correct copy of an email thread of correspondence I had with Upland Police Officer Jacob Kirk between November 25, 2016 and December 13, 2016, which I subsequently forwarded to Chief Avels on or about May 24, 2017.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___13 TH___, 2019 at Montclair, California.

OFFICER ERIC RIVERA

# EXHIBIT H

## DECLARATION OF MORGAN FILLION

I, Morgan Fillion, declare as follows:

1.    I am the Human Resources Manager with the City of Upland (the "City"). I am duly authorized as Custodian of Records for the City with the authority to certify the attached records.

2.    The facts contained in this declaration are based either (1) on my personal knowledge; or (2) upon records routinely maintained in the ordinary course of business at or near the time of the act, condition or event recorded by persons having knowledge of the events recorded and whose job duties include recording them. If called as a witness, I could and would competently testify to all facts stated herein.

3.    Attached as **Exhibit 4** hereto is a true and correct copy of the City of Upland's Employment Agreement with former Chief Brian Johnson signed on or about March 12, 2015.

4.    Attached as **Exhibit 5** hereto is a true and correct copy of a printout from the "Neogov" database showing the eligibility list and scores for the City of Upland Lieutenant promotional that opened in 2016.

5.    Attached as **Exhibit 10** hereto is a true and correct copy of a notice dated February 24, 2017 issued to former Sergeant Marcus Simpson by then Human Resources Manager Tanya Bragg entitled "Administrative Investigation Into Alleged Workplace Misconduct."

6.    Attached as **Exhibit 21** hereto is a true and correct copy of a Personnel Order/Reassignment to Paid Administrative Leave from Chief Brian Johnson to former Sergeant Marcus Simpson dated and signed April 19, 2017.

7.    Attached as **Exhibit 22** hereto is a true and correct copy of pertinent excerpts from Sergeant Marcus Simpson's performance review in April, 2017.

8.    Attached as **Exhibit 29** hereto is a true and correct copy of a letter dated October 11, 2017 from former Human Resources Manager Kelly Gonzales to former Sergeant Marcus Simpson.

9.      Attached as **Exhibit 31** hereto is a true and correct copy of the Notice of At-Will Release dated October 27, 2017 that was issued by former City Manager Martin Thouvenell to former Police Chief Brian Johnson.

10.     Attached as **Exhibit 34** hereto is a true and correct copy of the Memorandum of Understanding between the City of Upland and the Police Management Association in effect in 2017.

11.     Attached as **Exhibit 35** hereto is a true and correct copy of the posting for the promotional of the position of Police Lieutenant that opened on or about August 1, 2016.

I declare under penalty of perjury under the laws of the United States  that the foregoing is true and correct.  Executed this 5th day of September, 2019 at the City of Upland, California.


_____

MORGAN FILLION

# EXHIBIT I

**DECLARATION OF EDWARD ZAPPIA**

I, Edward Zappia, declare as follows:

1.      I am the principal at The Zappia Law Firm, a Professional Corporation, and lead counsel for Defendants City of Upland and Martin Thouvenell in this matter.   I am licensed to practice law in all courts in the State of California.  I am also authorized to practice law in the United States District Court, Central District of California.

2.      I have personal knowledge of the facts stated herein and if called upon to testify would competently and truthfully testify to all facts stated in this declaration.

3.      Plaintiff's Second Amended Complaint alleges at paragraph 32 that: "counsel for the City act[ed] as an investigator and refus[ed] to recuse himself as the Skelly officer."

4.      I did not act as the investigator, nor was I the Skelly officer.  Retired Police Captain Gary Wedge of Wedge & Fobes Investigations acted as the investigator.  Then Deputy City Manger Jeannette Vagnozzi acted as the sole Skelly officer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 5, 2019 at Huntington Beach, California.

_____
EDWARD ZAPPIA

DECLARATION OF EDWARD ZAPPIA IN SUPPORT OF DEFENDANTS CITY OF UPLAND AND MARTIN THOUVENELL'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT J

I, Gail Wise, declare as follows:

1.      I am an attorney at The Zappia Law Firm, a Professional Corporation and I am licensed to practice law in all courts in the State of California.  I am also authorized to practice law in the United States District Court, Central District of California.  I am lead counsel for Defendants City of Upland and Martin Thouvenell in this matter and will be their trial counsel.

2.      The facts contained in this declaration are based either (1) on my personal knowledge; or (2) upon records routinely maintained in the ordinary course of business at or near the time of the act, condition or event recorded by persons having knowledge of the events recorded and whose job duties include recording them.  If called as a witness, I could and would competently testify to the facts stated herein.

3.      Attached as **Exhibit 32** hereto is a true and correct copy of Plaintiff's Second Amended Complaint for Damages and Injunctive Relief filed on or about August 30, 2018 in this action.

4.      Attached as **Exhibit 33** hereto is a true and correct copy of pertinent excerpts of Plaintiff Marcus Simpson's Response to City of Upland's Special Interrogatories, Set One.

5.      On April 23, 2019, I took the deposition of Brian Johnson.  Attached as **Exhibit 36** hereto are true and correct copies of pertinent excerpts of the transcript of that deposition, which accurately reflect what was said at the deposition.

6.      Attached as **Exhibit 43** hereto are true and correct copy of pertinent documents from a document production made pursuant to a subpoena I issued in this matter, including: (i) a document entitled "Employment Offer for:  Marc Simpson" dated November 3, 2017; (ii) an offer letter dated November 3, 2017; and (iii) a declaration by the Custodian of Records of California State Polytechnic University, Pomona dated August 9, 2019

7.      Attached as **Exhibit 45** is a printout I made from a page of the City of

DECLARATION OF GAIL WISE IN SUPPORT OF DEFENDANTS CITY OF UPLAND AND MARTIN THOUVENELL'S

Upland's website listing the duties of the Upland City Council.

8.     On or about September 3, 2019, the deposition of Marcus Simpson was conducted.  Attached as **Exhibit 44** hereto are true and correct copies of pertinent excerpts of that deposition transcript.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 9, 2019 at Huntington Beach, California.

_____

GAIL WISE

DECLARATION OF GAIL WISE IN SUPPORT OF DEFENDANTS CITY OF UPLAND AND MARTIN THOUVENELL'S

EXHIBIT 1

TELEPHONIC INTERVIEW OF OFFICER ERIC RIVERA,
MONTCLAIR POLICE DEPARTMENT

BY GARY WEDGE

May 22, 2017

8:00 PM

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE

1

```
 1          (Proceedings begin at 8:00 PM)
 2              MR. GARY WEDGE:  Okay.  The date is Monday,
 3     May 22nd, 2017.  It's about 8 p.m.  I am on the
 4     phone with Officer Eric Rivera from Montclair PD.
 5     Officer Rivera, thank you for taking the time to
 6     talk to me.  And just before we begin, you're aware
 7     that this conversation is being recorded?
 8              OFC. ERIC RIVERA:  Yes, that's correct.
 9              MR. WEDGE:  And you're okay with that?
10              OFC. RIVERA:  Yes.  Not a problem.
11              MR. WEDGE:  Okay.  Okay, the questions I
12     want to ask you are regarding your agency's
13     involvement in an AB 109 sweep.  And that's what I'm
14     used to referring to them as.  You may call them
15     probation and parole sweeps, but do you know what
16     I'm talking about?
17              OFC. RIVERA:  Yes, I do.
18              MR. WEDGE:  Okay.  Back --
19              OFC. RIVERA:  Yeah.
20              MR. WEDGE:  Go ahead.
21              OFC. RIVERA:  Well, yeah, probation/parolee
22     compliance checks.
23              MR. WEDGE:  Yeah.
24              OFC. RIVERA:  That sweep, yeah.
25              MR. WEDGE:  Okay.  So back in November,
```

2

Transcription of Officer Eric Rivera, 5/22/2017
In re Audio Transcription of Interviews

1    there was a (0:01:00) series of email exchanges, or

2    that's actually when they began -- it sounds like

3    there might've been two email exchanges -- regarding

4    your agencies involvement with Upland PD, who was

5    coordinating this probation and parole compliance

6    check.  Do you recall that setup or that time when

7    you were assisting with them?

8              OFC. RIVERA:  I do.

9              MR. WEDGE:  How did you get involved in it,

10   if you remember?  And I realize it's been about

11   seven months now, so it's been a while.

12             OFC. RIVERA:  Yeah.  In the past, we worked

13   fairly well with the CRO team -- that's the

14   community response team.  One of their

15   officers -- I'm not sure if it was Jacob Kirk or

16   McCullough --reached out to myself, asking if our

17   team would be available to participate in a sweep or

18   a probation compliance -- probation/parolee

19   compliance check of numerous residences within their

20   city in response to the property crimes

21   (0:02:00) -- property crime-related investigations

22   and arrests.

23             MR. WEDGE:  Okay.  And you said that was

24   Upland PD Officer McCullough who reached out to you?

25             OFC. RIVERA:  Yeah, I believe it was either

                                                          3

1    McCullough or Jacob Kirk, whichever one's in the

2    email -- I don't have it in front of me -- that

3    would be the officer who I was working directly

4    with.

5            MR. WEDGE:  Okay.  It looks like -- and I'm

6    going by the information your chief gave me -- it

7    looks like the first email you guys got was on

8    November 7th from Andrew McCullough.  So you were

9    the one who he sent that email to?

10           OFC. RIVERA:  Correct.

11           MR. WEDGE:  Okay.  The chief said something

12   about Officer Weeder (ph.).  Was Officer Weeder

13   involved in that discussion also?

14           OFC. RIVERA:  Officer Weeder -- I'm not

15   sure.  Yeah, so it would've been -- around that

16   time, we started getting tested for various

17   positions.  Weeder went to the detective bureau.

18   But I believe, at that time, he was my teammate.

19           MR. WEDGE:  Got (0:03:00) it.

20           OFC. RIVERA:  So he would've been involved

21   as well.

22           MR. WEDGE:  Okay.  Do you remember if

23   Officer McCullough contacted you by phone,

24   initially, or was the initial contact via email?

25           OFC. RIVERA:  It was by phone, initially.

                                                    4

1           MR. WEDGE:  Okay.

2           OFC. RIVERA:  And at that time, I reached

3    out to my supervisor directly, and he just wanted to

4    know more details about exactly what the operation

5    was pertaining to.

6           MR. WEDGE:  And that's when you got the

7    email follow-up to that phone call?

8           OFC. RIVERA:  Yes, sir.

9           MR. WEDGE:  Okay.  So that would've been on

10   November 7th when you got the first email.  Do you

11   remember how long after you had your phone

12   conversation with -- I'm assuming it was a phone

13   conversation with McCullough?

14          OFC. RIVERA:  I don't recall.

15          MR. WEDGE:  Oh, okay.

16          OFC. RIVERA:  I couldn't say.  Yeah.

17          MR. WEDGE:  Okay.  No, that's fine.  But

18   how long after you had that first conversation with

19   McCullough did you get the email?

20          OFC. RIVERA:  I would say within

21   approximately one week.

22          MR. WEDGE:  Okay, (0:04:00) so probably the

23   first part of November, then.  That first email was

24   sent to you on November 7th.

25          OFC. RIVERA:  Yeah.

5

1      MR. WEDGE:  So probably the first week,

2    okay.  And then --

3      OFC. RIVERA:  Do you know what day November

4    7th was?

5      MR. WEDGE:  Boy.  What day of the week?

6      OFC. RIVERA:  Let me check.

7      MR. WEDGE:  Yeah, okay.  I don't know

8    offhand.

9      OFC. RIVERA:  We worked -- we worked

10   Tuesday through Friday and -- let's see.  November

11   7th was a Wednesday.

12     MR. WEDGE:  Okay.

13     OFC. RIVERA:  So it would've been the week

14   before, between Tuesday and Friday, or even possibly

15   the day before, which would've been the 6th.

16     MR. WEDGE:  Okay.  And then after you got

17   that first email, on November 25th, you got a second

18   email, it looks like.  Did you have any

19   conversations with either McCullough or anybody else

20   from Upland PD after the first email but before that

21   second email?

22     OFC. RIVERA:  Not that I recall.  I think

23   most of -- if it was, it was very brief (0:05:00)

24   and just saying that we were going to be involved.

25   And from that point, they were -- the officer -- or

6

1    McCullough was wanting our lineup of who was

2    involved for their operations plan.

3         MR. WEDGE:  Got it.  And ultimately, you

4    guys did help out with the sweep, correct?  That was

5    the one on December 14th.

6         OFC. RIVERA:  Yes, we did.

7         MR. WEDGE:  Did you, at any point in the

8    planning process, speak with anybody at Upland PD

9    other than Andrew McCullough or Jacob Kirk?

10        OFC. RIVERA:  No.

11        MR. WEDGE:  Did you --

12        OFC. RIVERA:  Not as it pertained to

13   planning.

14        MR. WEDGE:  Okay.  What do you mean "not as

15   it pertained to planning"?

16        OFC. RIVERA:  No, I mean, no.  Only once we

17   got there, we got briefed on what we were going to

18   do, but there wasn't -- there was no one else I

19   talked to other than McCullough and Kirk.

20        MR. WEDGE:  Okay.  I think that might be

21   all I have.  Can I get you to forward those two

22   emails to me?

23        OFC. RIVERA:  Sure. (0:06:00) I'll do that.

24   Let me get your email address.

25        MR. WEDGE:  Yeah.  And there's no rush.  I

7

Transcription of Officer Eric Rivera, 5/22/2017
In re Audio Transcription of Interviews

```
 1    mean, you've got -- it sounds like he's going to
 2    start rollcall pretty soon, so whenever you get a
 3    chance.
 4              OFC. RIVERA:  Yeah, no problem.
 5              MR. WEDGE:  Probably, the easiest one is
 6    garywedge -- it's just one
 7    word -- G-A-R-Y-W-E-D-G-E, no periods or anything.
 8    Garywedge@san -- S as in Sam, A, N as in
 9    Nancy -- .rr.com.
10              OFC. RIVERA:  Okay.  So
11    garywedge -- G-A-R-Y-W-E-D-G-E -- @san -- S-A-
12    N -- rr.com.
13              MR. WEDGE:  San.rr.com.
14              OFC. RIVERA:  San.rr.com.
15              MR. WEDGE:  Yeah, and did you get
16    the -- you cut out in the beginning.  You got the W
17    in Wedge -- Gary Wedge?
18              OFC. RIVERA:  Yes.  G-A-R-Y-W-E-D-G-E.
19              MR. WEDGE:  Perfect.  Okay.  I think that's
20    it.  Do you have any questions for me or anything
21    else that you think might be helpful for me?
22              OFC. RIVERA:  No. (0:07:00) I don't know
23    the nature of the investigation but if there's
24    anything else that I can help you with, please let
25    me know.
```

                                                    8

1          MR. WEDGE:  I will.  And again, I

2     appreciate your time and for taking time out of your

3     workday, particularly.  And if there's nothing

4     else --

5          OFC. RIVERA:  Okay.

6          MR. WEDGE:  -- it's about 8:10.  We're

7     going off tape.

8        (Proceedings concluded at 8:10 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1

2          C E R T I F I C A T I O N

3          I, Melissa Cannata, the court approved

4    transcriber, do hereby certify the foregoing is a

5    true and correct transcript from the official

6    electronic sound recording of the proceedings in the

7    above-entitled matter.

8

9

10

11                              February 20, 2019

12    _____        _____

13    MELISSA CANNATA                           DATE

14    TTA-Certified Digital Legal Transcriber CDLT-104

15

16

17

18

19

20

21

22

23

24

25

                                                      10

EXHIBIT 2

## Gary Wedge

| | |
|---|---|
| **From:** | Eric Rivera <erivera@cityofmontclair.org> |
| **Sent:** | Wednesday, May 24, 2017 8:58 PM |
| **To:** | garywedge@san.rr.com |
| **Subject:** | Fwd: Probation/Parole sweep |
| **Attachments:** | image001.png |

Sincerely, Eric

Begin forwarded message:

From: Eric Rivera <erivera@cityofmontclair.org<mailto:erivera@cityofmontclair.org>>
Date: May 18, 2017 at 10:53:02 AM PDT
To: Robert Avels <Ravels@cityofmontclair.org<mailto:Ravels@cityofmontclair.org>>
Subject: Fwd: Probation/Parole sweep

Sincerely, Eric

Begin forwarded message:

From: Jeffrey Wheater <jwheater@cityofmontclair.org<mailto:jwheater@cityofmontclair.org>>
Date: November 7, 2016 at 2:45:10 PM PST
To: "McCullough, Andrew" <2304@uplandpd.org<mailto:2304@uplandpd.org>>
Cc: Michael Zerr <mzerr@cityofmontclair.org<mailto:mzerr@cityofmontclair.org>>, Eric Rivera
<erivera@cityofmontclair.org<mailto:erivera@cityofmontclair.org>>, Brandon Kumanski
<bkumanski@cityofmontclair.org<mailto:bkumanski@cityofmontclair.org>>
Subject: RE: Probation/Parole sweep

I am no longer on the team and now in the detective bureau. I CC'd the new sergeant, Sgt Mike Zerr, and others so they
know about the sweep. If you need to reach out to them their emails will be there. Also I there will be a new member on
the team on the 15th, I would like to set up a meeting with you guys next week so you can meet him.

Detective Jeff Wheater
Detective Bureau
Montclair Police Department
4870 Arrow Hwy
Montclair, CA 91763
(909) 448-3646 - Desk
(909) 621-4413 - Fax
jwheater@cityofmontclair.org<mailto:jwheater@cityofmontclair.org>

[combo]
LAW ENFORCEMENT USE ONLY
WARNING: This communication with its contents may contain confidential and/or legally privileged information. It is
solely for the use of the intended recipient(s). Unauthorized interception, review, use, distribution or disclosure is

1

Exhibit 2
Page 1 of 2                                                COU-0000080

prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. Permission to forward or distribute anything from this communication to any non-law enforcement contacts must be sought thru the originator/originating agency of the information contained herein.

From: McCullough, Andrew [mailto:2304@uplandpd.org]
Sent: Monday, November 07, 2016 2:40 PM
To: Jeffrey Wheater
Subject: Probation/Parole sweep

Hey Jeff,

We are going to be having a probation/parole sweep in Upland on 12/14/16 from 1200-2200hrs. We were wondering if you and your team wouldn't mind helping out. Let me know if you guys can make it. Thanks!

Officer Andrew McCullough
Community Resource Officer
Upland Police Department
1499 W. 13th Street
Upland, California 91786
(909) 946-7624 ext. 3206
Fax: (909)931-4358
amccullough@uplandpd.org<mailto:amccullough@uplandpd.org>

[cid:1E0395DD-D1D4-4DDA-95ED-4476F23EC928]

2

Exhibit 2
Page 2 of 2

# EXHIBIT 3

2[h]

## Gary Wedge

**From:** Eric Rivera <erivera@cityofmontclair.org>
**Sent:** Wednesday, May 24, 2017 8:58 PM
**To:** garywedge@san.rr.com
**Subject:** Fwd: Parole and Probation Sweep

Sincerely, Eric

Begin forwarded message:

From: Eric Rivera <erivera@cityofmontclair.org<mailto:erivera@cityofmontclair.org>>
Date: May 18, 2017 at 10:56:46 AM PDT
To: Robert Avels <Ravels@cityofmontclair.org<mailto:Ravels@cityofmontclair.org>>
Subject: Fwd: Parole and Probation Sweep

Sincerely, Eric

Begin forwarded message:

From: "Kirk, Jacob" <jkirk@uplandpd.org<mailto:jkirk@uplandpd.org>>
Date: December 13, 2016 at 4:41:26 PM PST
To: Eric Rivera <erivera@cityofmontclair.org<mailto:erivera@cityofmontclair.org>>
Subject: Re: Parole and Probation Sweep

Yes, briefing is at 1200 hours

Sent from my iPhone

On Dec 13, 2016, at 4:28 PM, Eric Rivera <erivera@cityofmontclair.org<mailto:erivera@cityofmontclair.org>> wrote:

Briefing is at 1200? Just to confirm.

-----Original Message-----
From: Kirk, Jacob [mailto:jkirk@uplandpd.org]
Sent: Tuesday, December 13, 2016 3:41 PM
To: Eric Rivera
Subject: Re: Parole and Probation Sweep

Thanks

Sent from my iPhone

On Dec 13, 2016, at 3:33 PM, Eric Rivera <erivera@cityofmontclair.org<mailto:erivera@cityofmontclair.org><mailto:erivera@cityofmontclair.org>> wrote:

1

Exhibit 3
Page 1 of 3

COU-0000083

Kirk,

**Drop Troy with probation and add Detective Mair her information is directly below.**

From: Courtnie Mair
Sent: Tuesday, December 13, 2016 3:32 PM
To: Eric Rivera
Subject: RE: Parole and Probation Sweep

ID # 268, HT #714732, Phone # 909-721-2437

From: Eric Rivera
Sent: Tuesday, December 13, 2016 3:08 PM
To: Courtnie Mair
Subject: FW: Parole and Probation Sweep

Hey can you send me your ID Number, HT, and cell number for the upland obs plan

From: Eric Rivera
Sent: Thursday, December 08, 2016 10:29 AM
To: Michael Zerr
Subject: FW: Parole and Probation Sweep

Sent this on 11-29-16

From: Eric Rivera
Sent: Tuesday, November 29, 2016 11:05 AM
To: 'Kirk, Jacob'
Cc: Michael Zerr;
'troy.james@prob.sbcounty.gov<mailto:troy.james@prob.sbcounty.gov><mailto:troy.james@prob.sbcounty.gov>';
Chad Ebli
Subject: RE: Parole and Probation Sweep

We are in,

Officer Eric Rivera  ID Number 303, HT 741385, 909-229-1079 Officer Chad Ebli ID Number 296, HT 714710, 909-721-5877 Sergeant Mike Zerr, ID Number 239, HT 714737, 909-721-5872 Probation Officer James, J0144, HT 703808, 909-200-0235

Thanks,

Police Officer Eric Rivera
Crime Suppression Unit
Montclair Police Department
4870 Arrow Hwy
Montclair, CA 91763
(909) 229-1079 - Cell
(909) 448-3600 ex. 633 - Desk
(909) 621-4413 - Fax
erivera@cityofmontclair.org<mailto:erivera@cityofmontclair.org><mailto:erivera@cityofmontclair.org>
<image001.png>
LAW ENFORCEMENT USE ONLY

COU-0000084

WARNING: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, distribution or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. Permission to forward or distribute anything from this communication to any non-law enforcement contacts must be sought thru the originator/originating agency of the information contained herein.

From: Kirk, Jacob [mailto:jkirk@uplandpd.org]
Sent: Friday, November 25, 2016 12:45 PM
To: Eric Rivera
Subject: Parole and Probation Sweep

Hi Eric,

Here is the reminder email regarding the parole and probation sweep on 12/14/16. The sweep will start at 1200 hours and end at 2200 hours. We hope that you and your team can participate. If you can participate, can you please email me the name, ID number, HT number and cell phone number of the participating officers.

Thank you,

Jacob Kirk
Community Resource Officer
Upland Police Department
1499 West 13th Street
Upland, California, 91786
909.946.7624 ext-3363
909.931.4358 - Fax
jkirk@uplandpd.org<mailto:jkirk@uplandpd.org><https://outlook.uplandpd.org/owa/redir.aspx?C=kcFkAhNPPUO2RtxY HOsDC-Z6F-UjBtEit6V8Crr9sRn5j4IhPr9LKWJbs-IyWm6WKvCuxnIYw2c,&URL=mailto%3ajkirk%40uplandpd.org>

# EXHIBIT 4

## CITY OF UPLAND
## EMPLOYMENT AGREEMENT

This Employment Agreement (Agreement) is made and entered into by and between the City of Upland, California Municipal Corporation, hereinafter referred to as "the City", and Brian P. Johnson, "Employee". The terms and conditions agreed upon by the parties are expressed as follows:

## RECITALS:

A. The City desires to hire Employee to act and serve in the capacity of Chief of Police for the City of Upland under the terms and conditions of employment set forth in the Agreement.

B. Employee desires to become employed by the City of Upland as its Chief of Police under the terms and conditions of employment set forth in the Agreement.

## OPERATIVE PROVISIONS

NOW, THEREFORE, in consideration of the foregoing recitals, the terms and conditions set forth herein, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1. **Employment.** Employee agrees to enter the services of the City as of the effective date herewith and City agrees to pay Employee for services.

2. **Term of Employment**:

(a) **Initial Term** The initial term of employment for Employee under this Agreement shall commence on the Effective Date reflected by joint execution on April 20, 2015 and continue for a period of three (3) years to end, April 19, 2018 unless terminated at an earlier date as provided in this Agreement.

(b) **Second Term** Unless City or Employee has given the other party written notice at least 120 days before the end of the Initial Term that this Agreement shall be renewed for a Second Term, the Term and other provisions of this Agreement shall be automatically extended for a period of three (3) years.

(c) **At-Will Status** Notwithstanding any term of this employment agreement to the contrary, it is expressly understood and agreed by Employee, that Employee is employed at the pleasure of the City Manager and that this Agreement may be terminated at any time during the Initial Term or Second Term as provided in Exhibit 1 attached to and incorporated in this agreement.

EXHIBIT 4
Page 1 of 5

COU-00011375

3. **Responsibilities**. Employee agrees during the term of such employment:

(a) To devote Employee's full business time, attention, best efforts, skill and ability exclusively to the business of City and to perform such services as may be from time to time assigned to Employee by City: except as provided in paragraph 11 below;

(b) To comply with all rules, policies and orders which City may from time to time give or adopt; and

(c) To do his or her utmost to further enhance and promote the business and welfare of City.

4. **Notice of Termination**. In the event Employee terminates his/her employment with the City, he/she shall give the City a minimum of thirty (30) days written prior notice thereof, unless the parties otherwise agree.

5. **Compensation**. Employee's compensation shall be in accordance with the compensation plan of City applicable to Employee, as more fully described in Exhibit "1" and any attachment thereto, attached hereto and incorporated herein by reference.

6. **Modification of Position**. City reserves the right to substitute, change, amend or modify the Employee's position from time to time in its sole discretion; provided, however, that any such changes shall be without any loss in salary and retirement plan benefits to Employee.

7. **Benefits**. During the term of this Agreement, Employee shall be eligible to receive all benefits as they are normally provided to all City Executive Management Employees and referenced as "Executive Group Benefit Summary," and which is incorporated by reference herein. In addition to any and all benefits Employee is entitled to under the "City's Executive Group Benefit Summary," City and Employee further agree as follows:

(a) Employee waives any right to Retiree Health Insurance Reimbursement and Retiree Health Savings Account benefits for which he would otherwise be eligible pursuant to Articles 7 and 8 of the City of Upland Executive Management Employees Compensation and Benefit Plan last updated February 11, 2013.

(b) Professional Dues – The City agrees to budget and pay professional dues and subscriptions on behalf of Employee which are reasonably necessary for Employee's participation in national, regional, state, and local associations and organizations necessary and desirable for Employee's continued professional participation, growth, and advancement or for the good of the City.

(c) The City agrees to provide Employee, upon initial hire date of employment, with 40 hours of vacation leave for immediate use.

EXHIBIT 4
Page 2 of 5

COU-00011376

(d)    The City agrees to provide employee with a cellular phone and appropriate data package for conducting city business.

8.    **Additional Terms.**  City, in consultation with Employee, may set forth any such other terms and conditions of employment as they may determine from time to time, provided such terms and conditions are not inconsistent with or in conflict with the provisions of this Agreement, any regulations, rules, policies or procedures of City, or other applicable law.

9.    **Repealer**.    All provisions of resolutions of City in conflict with this Agreement are hereby superseded to the extent of such conflict.

10.    **Severability**.    If any provision of this Agreement is for any reason deemed by a court of competent jurisdiction to be unconstitutional, illegal, invalid, void, or otherwise unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way.

11.    **Entire Agreement**.    The foregoing contains the entire agreement of the parties and supersedes any and all other agreements, either oral or in writing, between the parties with respect to the employment of Employee by City and contains all of the covenants and agreements between the parties with respect to that employment.  Each party to this Agreement acknowledges that no representations, inducements, promises or agreements, oral or otherwise, have been made by either party, or anyone acting on behalf of either party, which are not embodied herein, and that no other agreement, statement or promise not contained in this Agreement shall be valid or binding on either party.

12.    **Modifications**.    Any modifications to the Agreement shall be effective only if in writing and signed by both parties hereto.

13.    **Governing Law.**    This Agreement shall be construed and governed in accordance with the laws of the State of California.

14.    **Attorney's Fees**.    If any legal action or other proceeding is brought for the enforcement of this Agreement, or to interpret any of the provisions hereof, or of any alleged dispute, breach, default, or misrepresentation in connection with any of the provisions hereof, the successful or prevailing party shall be entitled to recover reasonable attorney's fees and other costs incurred in said action or preceding, whether or not said action or preceding goes to final judgment, in addition to any other relief as may be entitled.

15.    **Effective Date.**    This Agreement shall only become effective, operative, and binding as against the parties on the date upon which both parties have signed the Agreement.

EXHIBIT 4
Page 3 of 5

COU-00011377

IN WITNESS WHEREOF, the City has caused this Agreement to be signed and duly executed on its behalf by its City Manager.  Employee has accepted the terms and conditions set forth in the Agreement effective as of the date of his signature below.

DATE: 3/12/2015

CITY OF UPLAND

BY: _Rod B. Butler_

CITY MANAGER

DATE: 3·12·15

EMPLOYEE

BY: _____

BRIAN P. JOHNSON

EXHIBIT 4
Page 4 of 5

COU-00011378

## EXHIBIT "1"

## COMPENSATION

**Base Salary**:

Employee shall receive, for services rendered pursuant to this Agreement, an annual base salary of $160,474 payable in twenty six (26) biweekly installments, subject to standard withholdings for taxes and the like, at the same time as other Employee's of the City are paid "Base Salary". Upon satisfactory completion of one year of service, Employee with automatically be moved up two steps (step 10) on the City's compensation table; upon satisfactory completion of second year, Employee will be move up to the (Step 12); and upon satisfactory completion of the third year, Employee will be moved to top step (Step 13). Without otherwise effecting its right to terminate employee and pay severance compensation as provided below.

**Severance Compensation:**

In the event Employee is otherwise willing and able to perform his/her duties hereunder, and the Employee is terminated by the City, a lump sum payment shall be paid, less any deductions required by law, as severance in an amount equal to the aggregate of six (6) months of Employee's: (i) then current Compensation, and (ii) compensable Benefits (as defined in Section 7, or as adjusted in accordance therewith). Provided, however, that (iii) compensable Leave which, as defined herein, does not and will not include sick time, and (iv) such accrued compensable Leave as the Employee may have accumulated; it being understood, however, by both Employee and City that severance benefits are subject to the terms and conditions of Government Code §53260, which limit severance payments to an amount equivalent to the remaining months on this Agreement.

**Termination for Cause:**

In the event the employee is terminated for cause, that person shall not be entitled to any additional contribution as set forth above in Severance Compensation of this Exhibit except for such base salary and benefits accrued and unpaid prior to termination.    Termination for cause shall consist of conviction of a felony, or a misdemeanor involving moral turpitude, a violation of city policy or substantive failure to follow a directive from the City Manager; however this shall not be deemed to create, establish or impose any "for cause" or due process grievance or appeal procedures. In the event of any termination for cause, the City and Employee expressly agree that the procedures set forth in California Government Code Section 3304(C) shall apply and that Employee shall have recourse to an administrative appeal with respect to such for cause termination.

EXHIBIT 4   [5]
Page 5 of 5

COU-00011379

# EXHIBIT 5



EXHIBIT 5
Page 1 of 2

COU-00011102

https://secure.neogov.com/employers/app_tracking/view_applicants.cfm?ExamPlanID=128...    3/7/2019



EXHIBIT 5

Page 2 of 2

COU-00011103

3/7/2019

EXHIBIT 6

## ADMINISTRATIVE STAFF MEETING
### December 6, 2016



### *AGENDA*

**CHIEF JOHNSON**
A.       **2017 Goals**
B.       **Daily Planner – Your Year in Review**
C.       **Power of Habit**
D.       **Sexual Harassment**

**OPERATIONS DIVISION** –Vacant
    A.    **Crime, Traffic, Quality of Life, Employee Wellness**

**SUPPORT SERVICES** - Captain Yoakum
    A.  **CLETS entries done by Records**
    B.  **FTA Overtime**
    C.  **DBH Test**

**ADMINISTRATIVE SERVICES** – Sergeant Tseng
    A.  **Budget**
    B.  **Recruitment Update**

**OTHER TOPICS**
    A.    **CRO Update - Simpson**

**ROUND TABLE DISCUSSION**

EXHIBIT 6
Page 1 of 1

COU-0000060

# EXHIBIT 7

## Dec 6

Poole
Tseng
Rainwater
Ansara
Dodt
Mathews
Blanco
Chani
Simpson
Kabayan
Loza
Chief
Duran
Yoakum
Luz

Kabayan - Recruitment
   17 vacancies 7 are sworn
   doing monthly written test for sworn
   6 for physical agility test
   bringing back signing bonus- looking into
  Marcelo- look into bringing in w/ time in service
     kabayan - HR not buying
  Simpson - laterals straight to Chief interview  1
     Chief - doesn't think good idea

EXHIBIT 7
Page 1 of 9
COU-0000062

Luz staff meeting
Dec 6th

Admin Services

A. went over overtime budget
- going to departments for next year costs
    ammo, taser, training, equipment
- new AQMD vehicle - for Code
- still have training money left


Other

• Simpson - Sweep next █████ Tuesday + Wednesday
    Close park (Chief - past 72 hour
    notice) public works - help clean
    - got list from parole + probation
    100 people
    - starting Monday - have city
    employee from 0900 am - 1700
    Pd employees after and on
    weekends
    - Don't pick up belongings on
    private property
    - no participation from other agencies
RII    SBSO, Chino, Montclair, Ontario, Claremont
Chief - everyone will assist in park closing
    - no feeding in memorial       Dec 6th
Rainwater - DREs - any interest
    able to wear DRE     County Chief's
                         uni  Dec 8th
    Chief - doesn't think good

EXHIBIT 7
Page 2 of 9
COU-0000063

EXHIBIT 7
Page 3 of 9
**COU-0000064**

2[d]

## Dec 6

Poole
Tseng
Rainwater
Ansara
Dodt
Mathews
Blanco
Chani
Simpson
Kabayan
Loza
Chief
Duran
Yoakum
Luz

Kabayan - Recruitment
17 vacancies, 7 are sworn
doing monthly written test for sworn
6 for physical agility test
bringing back signing bonus- looking into
Marcelo- look into bringing in w/ time in service
   kabayan - HR not buying
Simpson- laterals straight to Chief interview  1
   Chief- doesn't think good idea
   than LAPD- captain  reasons

EXHIBIT 7
Page 4 of 9
COU-0000065

Ansara - look into what we call laterals

Kabayan - now require written + physical
           would like to do away with

Simpson - guarantee to get thru process in
           5 or 6 weeks
               Kabayan - have had issues w/ medical

Blanco - use lighty duty officer to screen
          officer application

Simpson - need to drop minimum on shift
           Mathews - disagrees (would increase response times)

Chief - waiting on POA letter to lower minimum

Mathews - lower written T-score from 50

Ansara - be more specific (minimum to 5)
          bring out motors and 4 CRO's

Kabayan - recruit military - must give oral interview

Ansara - don't apply for grants (ordering in)
          grants only done on weekends

Poole - will check w/ OTS to do checkpoints
         on weekdays not weekends

Chief

A. Employees don't know goals
   WCs go back to shifts + keep inform
   employees become involved (give ideas)
   - each section come up with what they
     can do better

EXHIBIT 7
Page 5 of 9
COU-0000066

reduction in crime, traffic workplan,
employee wellness, engage community
B. have daily planning (weekly, monthly)
   daily to do list
● make goals
   put stop to negative talk
D. reminder - to look + listen to surroundings

Operations
A. 2017 Goals - do better as organization
   - New Healthy Lifestyle programs
     stay healthy + earn money

Support Services
A. dispatch would like ∧Records to do all evidence
     entries
   Kailene - okay for records to do
             except for weekends
   Chief - revisit well fully staffed (Records)
B. forgot why added

Yoakum - Chani working on Australia officer
         exchange
       - officers coming in early from shift
         (careful + tactful w/ public response) 3

EXHIBIT 7
Page 6 of 9
COU-0000067

2[d]

Department of Behavioral Health
Operate under CCRT—work at station
- handle incident + continue to engage(follow-up)
  8-4:30
- include in all paranoid calls (stop calling 911)
new-grant funded

EXHIBIT 7
Page 7 of 9
COU-0000068

2[a]

## Admin Services

A. went over overtime budget
   going to departments for next year costs
      ammo, taser, training, equipment
   new AQMD vehicle - for Code
   Still have training money left

## Other

- Simpson - Sweep next █████ Tuesday + Wednesday
   Close park (Chief - post 72 hour
      notice) public works - help clean
   - got list from parole + probation
      100 people
   - starting Monday - have city
      employee from 0900 am - 1700
      Pd employees after and on
      weekends
   - Don't pick up belongings on
      private property
   - no participation from other agencies
      SBSO, Chino, Montclair, Ontario, Claremont

## RII

Chief - everyone will assist in park closing
   - no feeding in memorial
Rainwater - DREs - any interest
      able to wear DRE pins w/
         uniform                          5

EXHIBIT 7
Page 8 of 9
COU-0000069

Ansara- Martinez injured (not getting paid)
       Yoakum - can help in Records
Dodt- digital radio - county putting up antennas
    in January
    - k-9 would like to send to Narcs
      school in March
    - June - having k-9 show at High School
Mathews- give badge 1 to Gutierrez when
      Mario retires
Kailene- get radios for cadets
      Yoakum - check out extras in morning
Chief- Police Foundation - wish list for mailer
    FOS from Simpson
    - Training for Drone program for PD
    (Blanco - will look into)

EXHIBIT 7
Page 9 of 9
COU-0000070

6

# EXHIBIT 8

**Gary Wedge**                                                              2/k7 IV

---

**From:**          Kirk, Jacob
**Sent:**          Wednesday, December 21, 2016 1:18 PM
**To:**            Simpson, Marc
**Subject:**       Sweep after action report
**Attachments:**   Sweep after action report.docx

Sarge,

Can you review this and let me know if you want me to add or redact anything.

Thanks,

Jake

*Jacob Kirk*
*Community Resource Officer*
*Upland Police Department*
*1499 West 13th Street*
*Upland, California, 91786*
*909.946.7624 ext-3363*
*909.931.4358 – Fax*
*jkirk@uplandpd.org*

EXHIBIT 8
Page 1 of 3

COU-0000168





CITY OF UPLAND
# POLICE DEPARTMENT

*"Proud to Serve"*

BRIAN P. JOHNSON | CHIEF OF POLICE

TO:        Captain Yoakum

FROM:   Officer Kirk

RE:        Parole/Probation Sweep After Action Report

On December 14th, 2016 the Upland Police Department in collaboration with the Chino Police Department, Montclair Police Department, San Bernardino County Probation, and California State Parole conducted a joint compliance check operation. In preparation for the operation, 95 target locations were compiled. These targets included subjects on active parole, post-release community supervision (PRCS), sex registrants and subjects with active arrest warrants. Our teams attempted contact at 78 locations, and successfully made contact at 29 individuals. Of those 29 individuals contacted, 10 arrests were made. The arrests included:

1) Possession of methamphetamine for sales and possession of heroin for sales.

2) Possession of methamphetamine for sales and a probation violation.

3) Possession of prescription drugs.

4) Possession of prescription drugs.

5) Possession of a controlled substance and drug paraphernalia.

6) Possession of a controlled substance and a probation violation.

7) Parole violation.




CITY OF UPLAND

# POLICE DEPARTMENT

*"Proud to Serve"*

BRIAN P. JOHNSON | CHIEF OF POLICE

8)  Possession of heroin and providing false information to a police officer.

9)  H&S 11368 warrant.

10) PC 261.5 (a) warrant.

The operation was successful. There were no reported injuries, no uses of force, no citizen complaints and no reports of property damage. Things that we learned to improve the logistics of future operations include; additional conformation (one day prior) of participating personnel, better planning for the transportation of prisoners, and the participation of additional outside agencies.

EXHIBIT 9

●●●○○ Verizon 🤚    4:36 PM    ⚹ 83% ▮▮▮▯

   

Tony        Marc

2(e)

iMessage
Wed, Jan 11, 7:12 PM

Marc Simpson

I want you both to know, in spite of being passed over, I will continue to be a loyal and hardworking employee.



Being disgruntled only effects me, thus it serves no purpose.

Tony Yoakum

Thank you Marc. We had every confidence that you would feel that way!



EXHIBIT

4

Wed, Jan 11, 8:42 PM

Marc, you were not passed over, so don't beat yourself up! Continue to grow and demonstrate your value to the organization and you will be rewarded!!

Tue, Jan 31, 7:29 PM

   

EXHIBIT 9
Page 1 of 1

COU-00000592

# EXHIBIT 10

2(b)



# MEMORANDUM

| | |
|---|---|
| **TO:** | Sgt. Marc Simpson |
| **FROM:** | Tanya Bragg, Human Resources Manager |
| **DATE:** | February 24, 2017 |
| **RE:** | **ADMINISTRATIVE INVESTIGATION INTO ALLEGED WORKPLACE MISCONDUCT** |

An administrative investigation is currently being conducted into alleged workplace misconduct.

You have been identified as a potential witness to the allegations. You are therefore required to report to Human Resources on **Tuesday, February 28, 2017 at 2 pm** to answer questions relating to this administrative investigation. You are obligated to answer questions as part of your job duties.

John Hackworth, Private Investigation will be the assigned investigator. You are expected to answer all of Mr. Hackworth questions completely and truthfully.

The investigative interview will be recorded. You will have access to the tape if requested. You have the right to bring your own device to record any and all aspects of the investigative interview.

You have the option to have a representative present during this interview. If you would like to exercise this option, please let me know at least 24 hours in advance of your interview. In order to ensure the integrity of the investigation, the representative cannot be a person who is subject to or involved in the investigation. Any costs associated with exercising this option are at your sole expense.

As investigations of this nature are confidential, you are not to discuss this matter, or to provide or share a copy of this Notice, with any other person (including employees of the City), except for your representative. Your discretion will allow the investigation to proceed without rumors and speculation about this matter.

EXHIBIT 10
Page 1 of 2

COU-00001687

The City affirms its policy and commitment to providing a positive work environment. The City forbids retaliation against any person who reports a complaint or participates in the investigation process. Therefore, you are prohibited from retaliating against any individual who participates in the complaint and investigation process. In addition, you are required to immediately report any actions, comments or conduct that you believe may constitute harassment, discrimination or retaliation towards you or any other employee.

Thank you for your cooperation. If you have any questions prior to the interview, please do not hesitate to call me at (909) 931-4174.


Sincerely,


Tanya R. Bragg,
Human Resources Manager


RECEIVED:

_2.28.2017_
Date

PERSONAL SERVICE WITNESSED BY: _____   DATE: 2/28/17

Employee's Signature

Note:
(Emailed on 2/24/17 and hard copy provided the day of the interview for signature)

2 | Page

EXHIBIT 10
Page 2 of 2

COU-00001688

# EXHIBIT 11

# Statement – March 14, 2017

The below statement may not have the exact wording but is my best recollection of the event.

On Tuesday morning, March 14, 2017 Captain Anthony Yoakum came into my office and said "I need to know whose side you are going to be on". I was not sure what he was talking about. He said "I'm drawing a line in the sand and I need to know where you stand".

Cpt Yoakum said he had been given a work performance plan by Chief Johnson the day before. He was coming to me to see if I would help him, I believe, to get things on Chief Johnson so that he would have a better case to get him fired.

I explained "Sir, I really like you as a person. We have come up thru the ranks together. You were a detective when I started working here, but I can't do that". I said along the lines of my loyalty lies with the Chief of Police.

He took that to mean Chief Brian Johnson. I said "Yes, I do like Chief Brian Johnson but I mean the Chief of Police." I explained that I am the secretary of the Chief of Police......today it is Brian Johnson, tomorrow it might be Marcelo Blanco and a year from now it could be someone else. My job is to help and be loyal to whoever holds that title.

He said that we have known each other for years and he could not believe that I hadn't warned him that Chief Johnson was going to give him the work performance plan. I only knew that the Chief wanted to talk to Cpt Yoakum. I did not know any details.

I then said "If I did say I would help you and 2 months from now you became Chief you would never trust me because of what I did to Chief Johnson". I explained that my loyalty has to be with the individual in that office. I said "I have not always like the person holding the title of Chief of Police but I have always respected the position". You have to learn to separate the two.

I know what my place and expectations are in this department. I was extremely offended that Cpt Yoakum would even ask me to do that. I felt it was disrespectful not only to me but also to the Chief of Police. I felt like he was trying to recruit me to help him undermine the Chief. As a Captain I expect more honesty and integrity from his actions. And I wonder who else he has approached. This is completely unethical and is part of the reason there is so much turmoil within the Department.

Luz Barrett

4-13-17

EXHIBIT 11
Page 1 of 1

COU-00001726

# EXHIBIT 12

2(r)i

Mar 14

Yoakum - drawing line in sand
        why I didn't warn
        told him outright (been direct)

EXHIBIT 12
Page 1 of 1

COU-00001730

EXHIBIT 13

# C|H

## CASTILLO HARPER APC

6848 Magnolia Ave. Ste. 100
Riverside, CA 92506
Tel: (909) 466-5600 | Fax: (909) 466-5610
www.CastilloHarper.com

Kasey A. Castillo
Brandi L. Harper
Michael D. McCoy
Joseph N. Bolander
Michael A. Morguess
Jamie R. Ramirez

March 22, 2017

**VIA PERSONAL SERVICE**

**City of Upland**
*Attn: City Manager Martin Thouvenell*
460 N. Euclid Ave.
Upland, CA 91786

Dear City Manager Thouvenell,

This Office represents the Upland Police Management Association (UPMA). It is in that capacity, and at their request, that we write you to convey the host of high-level concerns the UPMA currently faces in its daily dealings with Chief Brian Johnson. I am aware that you have been advised of, potentially, most of these issues. However, the UPMA is adamant that it be clearly delineated to you the scope, variety and consequences associated with his failure to lead.

The UPMA has serious concerns regarding retaliation it, and its members, may face as a result of the protected disclosures made herein. However, they authorize this correspondence for the good of the citizens of Upland and the Police Department. Reporting the Chief's misconduct in this manner is protected by the First Amendment, Labor Code Section 1102.5, the MMBA and other legal authorities, and we will act swiftly to redress any retaliation meted out by the Chief in the appropriate legal forum.

Attached hereto as ATTACHMENT A is a document produced by the UPMA and the Upland Police Officers' Association (UPOA) after a recent survey pertaining to Chief Johnson. You will find the document very inclusive, and very explicit.

In addition to the commentary noted therein, the UPMA would like to highlight the following for your consideration (again, noting that you may be potentially aware of all, or some, of this information). These themes and or incidents have repeatedly been cited by members of the Upland Police Department:

- On 1/21/2017, there were significant issues surrounding arrests and seizures at a medical marijuana dispensary (MMD) located at 1600 W. 9th Street. Witness officers were so concerned by these actions that they drafted memoranda documenting their observations

EXHIBIT 13
Page 1 of 17

COU-00008276 1

to preserve what they witnessed, and note their concerns, lest it one day become an issue *for them.*

- The Chief routinely berates his subordinates (of all levels) in front of anyone and everyone. Members of the Department should not have to discern whether the Chief is "in a good mood" before deciding whether or not to speak with him. He has called employees names, cursed at them, and spoken poorly about them, in and out of their presence, to others. He has openly threatened termination during angry rants.

- The Chief makes false promises, and when asked about them, becomes angry, defensive, and makes counter-accusations. He demonstrates poor communication, and then faults others for his deficiencies.

- The members of the Department are constantly reminded of *his accomplishments* in order to bolster his own ego, and promote his status within the community. After commenting to the Department that its "lack of diversity" was akin to that of "Ferguson PD," the Chief recently asked a new sergeant to contact the media and see if they would do a story about her being the "first female sergeant in Upland's history." He also has touted his promotion of the "first Armenian American sergeant." Given his outward and public comments about the promotions of these two individuals *in advance of the testing process*, he has detracted from their accomplishments, and made it about *himself*, causing some to wonder about the validity of those promotions. That is patently unfair to both of those sergeants to have been praised and recognized based on their *gender* and *ethnicity* instead of their job performance, and has consequently damaged the morale of those who applied, wondering if they were possibly not the right "diverse" fit for the position.

- The Chief has instituted policies that repeatedly change, some seemingly overnight. There is no consistency. Some indisputably create busy work, while others are even more problematic. Once such example is having officers drive around certain crime areas with their emergency lights on as a crime deterrent. Notwithstanding the need to have the adjustments made to the vehicles to accomplish this, vehicle code requirements are also a consideration. Having officers drive with their emergency lights on without an actual emergency could potentially put the organization and officer in a position of liability, especially when no actual data has been produced showing its effectiveness.

- The Chief undermines his employees in all facets of the Department, directly affecting morale and employees' perception of their own competence, regardless of their tenure and experience. By doing so, he has created a hostile work environment in which members of the Department are more fearful of the actions of their own chief than the criminals on the street.

- The Chief has a demonstrated willingness to violate policy and MOUs at will, and when informed of these violations, accuses those bringing it to his attention that they are "undermining him," "don't care about the Department," or infer, *or directly comment*, that they must not want to be promoted.

EXHIBIT 13
Page 2 of 17

COU-00008277

- The Chief outwardly states that he refuses to learn the Department's radio codes. Officers have witnessed that he *still* doesn't know the geography of the city. This not only causes the obvious officer safety concerns, it sets a horrible example---one of "Do as I say, not as I do."

- There are very real concerns the Chief has violated the Peace Officers' Bill of Rights (POBR), and Penal Code section 135.5 during the course of Internal Affairs investigations.

- There are very real concerns that the Chief has violated rights pertaining to freedom of speech associated with the Department's Facebook page, and then has lied and covered his mistakes, scapegoating others.

- The Chief has labeled those who lateral to another Department to leave this hostile atmosphere as "organizational terrorists," and has become angry when others try to dissuade officers from leaving in the hopes of retaining tenured, and experienced personnel.

The UPMA wants to advise you that these are truly only a snapshot of the day-to-day encounters the members of this Department deal with. They cite to a consistent and patterned lack of integrity and knowledge. Chief Johnson has developed a reputation as a "positional bully."

It is the UPMA's hope that these concerns will be addressed expeditiously, fairly, and thoroughly. Please feel to contact me for further in the spirit of cooperation and transparency. Further specificity requires a different forum due to confidentiality and privacy rights of individuals. I can be reached at any of the contact information on the first page of this correspondence, or directly via email at Brandi@CastilloHarper.com.

Best,

CASTILLO HARPER, APC

Brandi L. Harper | Partner
Brandi@CastilloHarper.com

EXHIBIT 13
Page 3 of 17

COU-00008278

EXHIBIT 13
Page 4 of 17

Exhibit A

COU-00008279

On February 24, 2017, a joint meeting of the Upland Police Officers' Association (UPOA) and the Upland Police Management Association (UPMA) was held to address issues that have effected both memberships. An employee satisfaction survey was completed which included questions about Chief Johnson.  All members were encouraged to leave comments, be it positive or negative. The results of the survey are especially concerning since UPD has a patrol force that has majority of patrol officers with less than 4 years on.  At this point in their careers, new hires should be oblivious to the inter-workings of the police department.  At the time of the survey, none of the management has trust in Chief Johnson, are satisfied with his leadership, or believe the PD is headed in positive direction.





EXHIBIT 13
Page 5 of 17

COU-00008280





EXHIBIT 13
Page 6 of 17

COU-00008281





EXHIBIT 13
Page 7 of 17

COU-00008282



***Direct quotes from members of the UPOA and UPMA:***

➢ Chief Johnson does not care about the health and well being of officers as much as he cares about what, "looks good to him."

➢ Constant changing of things without any consideration or thought, needs to stop.

➢ Chief Johnson cares more about his own opinion of himself than the employees of this Department and the Department itself.

➢ Chief Johnson SELECTED sergeants based on his own set of narrow ideas rather than qualifications. Example: Boasted that he would be the first chief to promote a female to sergeant. He lied about the entire process.  He wants sycophants.

➢ The chief is not in touch with the needs of the city or UPD.

➢ The chief has created too much busy work for detectives, community resource officers and his staff.

➢ We need to improve our pay and benefits.  We need to strive to be more than just average- pay, benefits and equipment.

➢ At times I feel we are doomed.

➢ Rules don't apply to the chief, only others.  John Wayne's an operation at a MMD and illegally searched a computer, this proves he is not worthy of being a leader.

EXHIBIT 13
Page 8 of 17

COU-00008283

➢ Integrity issues, liar and untrustworthy.

➢ Too much change, too quick.  Attempting to turn us into LAPD.

➢ Only wants to do things his way, not willing to look at our way of doing business.

➢ Needs to learn to communicate better.

➢ Simply put, he is a liar or he has a terrible memory.

➢ He needs to learn to take criticism for the betterment of the Department.

➢ I feel he [chief] has drive, but it is misdirected at times.

➢ Micromanager

➢ I have a problem with his cowboy mentality dealing with marijuana dispensaries.

➢ He clearly acts as if he does not trust anyone at the PD.

➢ #Not my chief.

➢ He thinks he is the only one that can solve problems.

➢ Needs to have more faith in the foundation of this organization.

➢ I feel our relationship is too broken and too far gone to fix.

➢ Either he leaves or I and others leave.

➢ The trust is gone, there is no way I can feel he is ever being truthful.

➢ Lied about going outside for promotions.

➢ Lied about uniforms changes and blames others for changes.

➢ Lies about employees and their performance.

➢ Has attempted to create division by pitting employees against each other. Continually claims he is hearing rumors about what people are saying about him.

➢ Lies about employees and creates a, "you're either with me or against me attitude."

➢ Community Resource Officers are tasked with social work and non police work.  They are of no help to the Department.

EXHIBIT 13
Page 9 of 17

COU-00008284

- Not a good leader.

- New positions are a positive, but current chief and his thought process are destroying the Department.

- Positional bully.

- Not trustworthy.

- If I didn't have as much time at the Department I would leave.

- He has a foul mouth.

- I believe he has brought strong leadership to the PD.

- The communication between his lieutenants and sergeants is not good. He brings up ideas in briefing without consulting his leadership.  This creates trust issues at all levels.

- When Thouvenell hired me he told me, "never lie", take your lumps and keep going.  I have heard Chief Johnson lie on several occasions, i.e. POA meeting at the high school.

- Chief Johnson can improve on his communication; he's headed in the right direction. He needs to let people know what that direction is.

- Skipped the most qualified Sgt for Lt because the Sgt had the balls to speak up and tell the chief what he was doing wrong.

- In a staff meeting he inappropriately yelled and falsely blamed a member for something. The member was not even present to defend or counter the lie.

- He has cursed in my presence, but it did not offend me.

- Extreme narcissist.

- During initial meeting with his leadership he compared UPD to Ferguson PD.

- Bean counter.

- Rules by intimidation.

- Only wants to hear good news.  If you confront him with bad news he'll call you negative.

- I believe Chief Johnson intentions are good, but then things come up that shifts his focus and makes his implementation/direction contrary to what he originally wanted.

EXHIBIT 13
Page 10 of 17

COU-00008285

➢ The chief has done some good things. At times it appears the community has come before us and that could be the reason for the low morale.

➢ It's not right that we have great cops with so much time on wanting to leave.

➢ Retention should be our #1 priority. Shouldn't call those that are leaving work place terrorists. Isn't' he a lateral too, does that make him a work place terrorist? Didn't he leave to Anaheim PD.

➢ Hard to be positive when morale is so low.

➢ Nine officers potentially more are trying to leave. Things need to change. Sends a bad signal to newer officers.

➢ I don't believe Chief Johnson has any leadership skills.

➢ Chief Johnson is a good speaker, but a terrible communicator.

➢ He can't admit when he is wrong. He never accepts accountability without blaming others.

➢ He is a bully who yells and belittles when he does not get his way.

➢ The low amount of communication to the lower level of patrol is concerning. Leadership starts from the top down. We should look up to our leaders. We don't have his trust and we don't trust him.

➢ With officers leaving it will cause more to leave and puts UPD in a bad light.

➢ There is ZERO stability. Another re-org is in the works.

➢ Communication is abysmal from the chief.

➢ He hasn't made an effort to know his staff.

➢ He clearly does not trust his employees.

➢ He never thinks he is wrong and is unwilling to listen to others.

➢ Although the chief has done some good stuff, we are not heading in a positive direction.

➢ He expects too much out of employees. He overloads them with work. We are a small to medium sized agency, not LAPD. We don't have unlimited resources.

EXHIBIT 13
Page 11 of 17

COU-00008286

➢ Lacks integrity.

➢ We do not have organizational terrorist.  If we do, it's only since his arrival.

➢ He is/has ruined our agency.

➢ He's running this PD like it's LAPD and it just doesn't work.

➢ No progressive discipline.

➢ We've had more Skelly hearings in the last 18 months than we've had my entire career.

➢ I don't like his leadership and don't want him as my chief.

➢ The chief has a foul mouth and likes to belittle employees

➢ I have seen him anger easily and act unprofessional.

➢ If we continue on this path the Department will implode.

➢ He seems to contradict his principles by his actions.

➢ He's forcing me to consider leaving the Department.

➢ Chief Johnson is destroying this department. We will loose people because of the way he is leading.

➢ He has exhibited extremely poor judgment and shouldn't be chief.

➢ Classless leader, during briefing he told the shift that WC's and Sgt's on weekends were going to be changed because they were "starving for leadership."  Not good to say in front of troops.

➢ The lack of communication in this Department is terrible.

➢ Commissioned a study that revealed a need for transparency and communication- that is not the case now.

➢ The chief makes decisions and implements them without seeking input from others.  The most recent occurrence was promotion of Sal to FTO, but there are many others.

➢ When sergeants and lieutenants speak of leaving, you know the chief is the problem.

➢ Chief Johnson's lack of communication and leadership style has lowered morale.

EXHIBIT 13
Page 12 of 17

COU-00008287

➢ During a briefing, Chief Johnson was confronted about some issues at the PD.  Johnson became angry and started shouting down those with questions.

➢ We witnessed Johnson yelling at sergeants and lieutenants. This was very awkward for us and even more unprofessional.

➢ I try to avoid all contact with the chief.  He doesn't come across as a genuine person.

➢ An outside chief was a chance for positive change within this organization.  Johnson's changes have been negative and lowered morale and employee satisfaction.

➢ He has put this Department in a time machine and turned the dial to the past rather than towards the future.

➢ I believe Chief Johnson has done a lot of things that have benefitted this organization. However, some his actions recently including poor officer safety techniques and the incident with the political signs have cause me to lose faith in his ability to lead the department in a positive direction. I think Upland could be a great department with the right leader, and I have lost faith that Chief Johnson is that leader.

➢ Only since Johnson's arrival have I not looked forward to coming to work.  As a leader I feel he is quick to criticize and short on praise.

➢ He does some weird stuff (i.e. one-man search warrants, going to calls with his family in a Hawaiian shirt), but he's brought some good stuff.  I have no definitive opinion.

➢ Chief Johnson has no leadership skills; he has a management style which is horrible. Management and Leadership do not coexist with him.

➢ He has failed to adjust from a large PD to a small PD.

➢ He obviously doesn't realize that people remember what he says or does.  And when confronted with an issue, he says, "that's not what I meant" or it was a "lack of communication."  Lied about going outside for promotions.

➢ Chief Johnson has destroyed morale and this department.  The ship has capsized and only a matter of time before everyone leaves or we are absorbed the the Sheriff's Department.

➢ I've never thought about leaving, but I am definitely exploring my options because I can't work much longer under this administration.

➢ When conducting your next survey, don't use the word "trust" and Johnson's name in the same sentence; it's insulting to the origin of the word and exactly the opposite.

EXHIBIT 13
Page 13 of 17

COU-00008288

➤ I was forced to have a meeting with the chief. During the meeting the chief frequently raised his voice and attempted to intimidate me as he called me negative. The chief told me the negativity was not good because it was getting back to City Hall and that was not good for the "organization."

➤ He first states that we should be pushing the organization for forward, but then states, "If people don't like working here, they can go somewhere else." That comment had so much managerial brio, it laid the foundation of his true character that he preaches one thing and practices another (hypocrite.)

➤ I walked past the chief's office and heard him shouting at Yoakum. I don't know the specifics of the conversation but heard the chief say (summarizing): this should have fucking been done already. I was surprised how loud his voice was and thought is was inappropriate for the head of the department to use the word fuck without consideration of anyone who was walking by or in the adjacent area.

➤ The department is headed in the wrong direction.

➤ Johnson's leadership is the worst I have seen in the many years I have been here.

➤ I have never seen morale so bad and so many people leaving the department.

➤ As far as trust, I do not trust Chief Johnson at all.

➤ He has lied to all of us several times since he has been Chief.

➤ When it came time to change informs, the uniform committee researched all possibilities and the chief put together the uniform he wanted and disregarded the wishes of all involved and then said that it was the committee that put the uniform together. NOT TRUE.

➤ What kind of leader conducts an MMD investigation alone and without informing anyone?

➤ The chief has misappropriated the training budget for his pet projects and now we don't have a training budget.

➤ He told us he's been the subject of three investigations. Really? What has he done that we don't know about? That's a big problem.

➤ The chief has belittled many people in various meetings I have been a part of. No one can express their opinion if it is not the same as Chief Johnson's or they risk getting yelled at.

EXHIBIT 13
Page 14 of 17

COU-00008289

➢ He asked for opinions on how to improve our division which I gave and then was told that it was not possible and asked why I would say that.  Because he asked....

➢ I have witnessed him yell and curse at Captain Yoakum on one occasion.  Not professional.

➢ I could go on; this guy is not fit to lead our organization because he is not a leader.  He has lost the respect of most of our employees and has failed miserably at making this a better place.  I don't think too many of us want him to remain chief.  He does not lead by example at all. The guy could not function as a first year patrol officer. He still does not know our radio codes.

➢ The morale within the department is extremely low.

➢ It seems the morale issue has been caused by a breakdown in communication.  Chief Johnson needs to do a better job communicating his plans and ideas of where he wants the department to go.

➢ I believe UPD is headed in the right direction but there there will be substantial hurdles to overcome.

➢ Very disappoint to see low morale.

➢ He [Chief Johnson] has no leadership abilities.

➢ Mr. Johnson has lied on two occasions that I have personally been a part of.  When confronted with these lies he has become upset and he acts in an unprofessional manner.  He used bullying tactics in an attempt to make the situation go away.  I will respect his rank; however, I can NEVER respect a person who has integrity issues.  If the men and women of this department cannot trust him, how can the community?

➢ Mr. Johnson continues to violate policy with no repercussion. Twice he failed to follow written policy for the FTO testing process because he was not happy with the results.  He changed the passing grade from 70% to 90% and didn't tell anyone until the testing was over.

➢ Mr. Johnson thinks because he's came from LAPD we should all conform to his style. He decided to come here.  He continuously tries to compare our PD to LAPD and just because we do not operate like them, he belittles his officers and our department.

➢ Mr. Johnson lacks a successful communication style.  He has ideas and instead of entrusting his staff, he brings them straight to the patrol level.  His style incites uncertainty and chaos.  He has caused more problems than he solved.

EXHIBIT 13
Page 15 of 17

COU-00008290

➢ Mr. Johnson stated when he arrived here he did not agree with our promotional process. He did not agree that the staff should have an input into the promotional process in regards to staff evaluations because they are subjective.  He instead took it upon himself to include himself in the staff evaluations even though he has never worked with anyone in this department.  He tainted the promotional process in a way as to get the result HE wanted.  Once again, I cannot trust a person has integrity issues.  He has set up this department to fail because he is going to promote those who help him, not those who are actually qualified for the promotion.

➢ There are a lot more issues, I just can't think of them at this moment.  The biggest issue this department faces is Mr. Johnson has clearly shown that he is a LIAR and cannot be trusted.

➢ If I were to fall in the line of duty DO NOT have Mr. Johnson speak at my funeral or speak to my family.  I do not want him attending my funeral.

➢ While Chief Johnson has attempted to make changes to improve the department, it seems as though he frequently reacts/makes changes without considering the long term consequence or other unintended negative results.  This leads to additional changes, causing more uncertainty among line personnel.

➢ There is also a <u>huge</u> communication problem from admin/mgmt to line personnel.

     o   No explanation of some changes and the reason behind said changes and the desired outcome.
     o   No explanation of results of promotional testing process to department members. No announcement of who has been promoted or received a special assignment. We have learned through social media posts; or by the chief proclaiming at several community meetings he would be promoting the first female sergeant very soon. No announcement has been made to department personnel regarding this promotion; lacks transparency and furthers questions and distrust.

➢ The Chief frequently assigns additional work, projects and tasks which he wants completed in very short order.  Then assigns additional work and wants it all completed in the same time frame or deadline- on top of the normal work.  His expectations for personnel which have less bodies doing the same daily workload, previously done by many more people, in addition to extra projects and duties seems unrealistic.

➢ The chief hasn't made an effort to learn our "ten-codes." He also seems to continue to implement additional forms, questionnaires and terms/categories for work based on "LAPD" versions, seemingly due to his comfort with them, even if they are duplicating work previously done by others and lead to additional burdensome "busy work.

EXHIBIT 13
Page 16 of 17

COU-00008291

➢ Based on the recent promotional process I am more likely to seek employment at another agency because I do not fit into Johnson narrow views.  I will have more opportunity for promotion and special assignments at another agency.

➢ I trusted Chief Johnson when he said he wasn't planning on make UPD into LAPD east and that he was willing to embrace our existing culture.  Over time we have seen our uniforms, our policies and our procedures change and begin to mirror LAPD. Sometimes it makes me wonder if the Chief is making these decisions because it is what's best for Upland PD, or it's what's best for Chief Jonson's legacy.  At the end of the day, if the changes the Chief experiments with don't work out or prove to be poor decisions, Chief Johnson gets to retire again and move on with his life. Those of us who aren't at that point in our careers, are forced to then live with the staffing choices and polices he put into place.

➢ I was present with my supervisor when he belittled me and said, why is he asking for a signature, he's just an officer?

➢ Johnson jumped to a conclusion about an incident and accused me of lying.  When the investigation proved I was correct, he never apologized or admitted he was wrong, the incident just disappeared.  He lacks accountability for his own wrongdoing.

➢ It is unfortunate that so many seasoned officers are leaving UPD because of Johnson.

➢ Even though I do not work directly for the chief, I avoid all contact with him.  Based on my limited contacts with the chief I find him to be dishonest, disingenuous and self-serving.

➢ How is that the top two persons on the sergeants list can't pass tests for field training officer or detective, but a year later are qualified to be sergeants? These promotions are based on the desires of the chief, not those that are most qualified and good for the PD.

➢ Am I thinking about leaving?  Yes, I'm already in the process.  I don't want to leave but Johnson has forced my hand because of his dishonesty, sanctimonious attitude and poor leadership.

EXHIBIT 13
Page 17 of 17

COU-00008292

# EXHIBIT 14

# Statement – April 3, 2017

The below statement may not have the exact wording but is my best recollection of the event.

On Monday, April 3, 2017 sometime in the afternoon, Sergeant Marc Simpson said he needed to speak to me.  We went into the upstairs PD breakroom.  He said that he had just left from an interview with the private investigator that the City had hired.  He wanted to give me a heads-up because he had given my name to the Investigator and I should be expecting a call for an interview from the City.  When I asked what for he said "the copies that you made and gave to the Officer's Attorney".  I said "Okay" then he stated that he knew I was just doing what I was told to do. He was implying that the Chief told me not to copy certain things from the files for the attorney.  I didn't ask him to elaborate because I did not think that it was appropriate that he even approached me.

He also said something about the recordings of the MMD.  I either looked confused or said "Ugh….okay" so he elaborated and said that they (not sure who they are but I am assuming the Detectives) knew I was directed by Chief Johnson to put the recordings in the other office so that he could alter or change or mess with the video. I am not 100% sure on the exact words but I believe the message was that I enabled the Chief to do something illegal to the DVR by placing the equipment in the office so that nobody would see him.  I did not go into any further explanations or discussions with him, as I felt he was fishing for information.

I was never given any direction by the Chief.  I didn't even know the DVR was being brought upstairs. Chief Johnson was nowhere in sight when I made the decision of where to place the video.  I believe they were trying to scare me or influence what I would say to the city investigator if I was interviewed.

I believe it was unethical for anyone to approach me.  As a supervisor I believe he should have known better.

Luz Barrett

4-13-17

EXHIBIT 14
Page 1 of 1

COU-00001727

# EXHIBIT 15

2(n)ii

Apr 3

Simpson - went to breakroom
- inform me he gave my name
to investigator
- for making copies
- said "I know you were
only doing what you were
told to do." (by Chief)
- for MMD video put in
Tseng office (recordings edited)

EXHIBIT 15
Page 1 of 1

COU-00000627

# EXHIBIT 16



*City of Chino*
Criminal Investigations Bureau
# MEMORANDUM

*Office of the Chief of Police*
*Karen C. Comstock*

*Wes Simmons, Captain*
*Keith Bussard, Captain*

**TO:**      Karen C. Comstock, Chief of Police

**FROM:**   Nick Marotta, Sergeant

**ATTN:**   Bill Covington, Lieutenant

**DATE:**   April 10, 2017

**SUBJECT:**  Upland Police Department Operation on December 14, 2016

On April 7, 2017, I received a phone call from Chief Comstock requesting me to author a memorandum documenting the chain of communication between the Chino Police Department and the Upland Police Department in regards to a probation and parole sweep that occurred on December 14, 2016. The purpose of this memorandum is to document the chain of communication to the best of my recollection.

On December 8, 2016, I was cc'd on an email from Chief Comstock to Lieutenant Mensen. Chief Comstock wrote, "Chief Johnson informed me that UPD is putting together a Parole and Probation sweep in their City on Wednesday, December 14th. The operational briefing is at UPD at 1500 hours. Can we please ensure we send some personnel to assist with their operation? Sorry for the late notification. I will explain later."

This email served as my first notification that the Upland Police Department was conducting a probation and parole sweep on December 14th. Prior to this email, I was not contacted by anyone from the Upland Police Department requesting our assistance. I was later cc'd on additional correspondence from Chief Comstock regarding this operation, one of which read, "Please contact Sergeant Mark Simpson. Can you ask Nick, if Mark made a previous request for assistance? Prior to mine?"

Sergeant Mark Simpson did not contact me, however, this question raised my interest and to ensure that I was factual in my answer to Chief Comstock, I checked my cell phone and desk phone for any missed phone calls or messages. I did not have either. I then spoke with Corporal

*"We, the members of the Chino Police Department, are dedicated to the safety of our community through teamwork and problem-solving partnerships; providing excellent service with dignity and respect."*

EXHIBIT 16
Page 1 of 4

COU-0000075

McArdle to ensure that he had not received the request.  Corporal McArdle told me that he had not received a request from anyone at the Upland Police Department asking for our assistance in this operation.

I then replied directly to Chief Comstock's email stating, "No Chief, we did not receive any previous requests."  Chief Comstock thanked me and that concluded our correspondence.

I later contacted Sergeant Mark Simpson and offered our assistance with the operation.  Sergeant Simpson apologized for the miscommunication about the operation; however, I do not recall his exact comments.  I offered the assistance of our personnel and confirmed the date and time of the operation.

The original email chain of communication is attached to this memorandum.

*"We, the members of the Chino Police Department, are dedicated to the safety of our community through teamwork and problem-solving partnerships; providing excellent service with dignity and respect."*

EXHIBIT 16
Page 2 of 4                                                         COU-0000076

## Covington, Bill

**Subject:**                    FW: Assistance to UPD

**From:** Marotta, Nicholas
**Sent:** Monday, April 10, 2017 10:19
**To:** Covington, Bill <bcovington@chinopd.org>
**Subject:** Fw: Assistance to UPD

Lt. Covington,

On Friday night, I received a phone call from Chief Comstock requesting that I author a memorandeum regarding my communication with the Upland Police Department back in December of 2016.  I authored the memorandum and attached it to this email.  The Chief did not want anyone to know about it so I am only sharing with you as my supervisor and requesting your assistance with proof reading, printing and providing the memorandum to the Chief with the attached email chain.  The Chief requested that the memo was turned into her by Thursday.  Please call me and I will explain further.

Nick

**om:** Comstock, Karen
**Sent:** Thursday, December 8, 2016 8:45 AM
**To:** Marotta, Nicholas
**Cc:** Simmons, Wes; Bussard, Keith; Mensen, Kevin
**Subject:** Re: Assistance to UPD

Thank you

Sent from my iPad

> On Dec 8, 2016, at 8:45 AM, Marotta, Nicholas <NMarotta@chinopd.org> wrote:
>
> No Chief we did not receive any previous requests.
>
> Sent from N. Marotta's iPhone
>
>
>> On Dec 8, 2016, at 08:43, Comstock, Karen <kcomstock@chinopd.org> wrote:
>>
>> Please contact Sergeant Mark Simpson.  Can you ask Nick, if Mark made a previous request for assistance?  Prior to mine?
>>
>> Sent from my iPad
>>
>>> On Dec 8, 2016, at 8:39 AM, Simmons, Wes <WSimmons@chinopd.org> wrote:
>>>
>>> Hello Chief,
>>>
>>> Sergeant Marotta said they will assist. Can you get a name and number for the person who is organizing so Nick can work out

EXHIBIT 16
Page 3 of 4                    COU-0000077

the logistics directly with them?

>>>

>>> Sincerely,

>>> Wes

>>

>>> -----Original Message-----

>>> From: Comstock, Karen

>>> Sent: Thursday, December 08, 2016 08:35

>>> To: Mensen, Kevin <KMensen@chinopd.org>

>>> Cc: Marotta, Nicholas <NMarotta@chinopd.org>; Simmons, Wes <WSimmons@chinopd.org>; Bussard, Keith <kbussard@chinopd.org>

>>> Subject: Re: Assistance to UPD

>>>

>>> My apologies - The operational briefing is at 12:00 p.m.

>>>

>>> Sent from my iPad

>>>

>>>> On Dec 8, 2016, at 8:33 AM, Comstock, Karen <kcomstock@chinopd.org> wrote:

>>>>

>>>> Kevin,

>>>>

>>>> Chief Johnson informed me that UPD is putting together a Parole and Probation sweep in their City on Wednesday, December 14th.   The operational briefing is at UPD at 1500 hours.   Can we please ensure we send some personnel to assist with their operation?

>>>>

>>>> Sorry for the late notification.  I will explain later.

>>>>

>>>> Thank you -

>>>>

>>> Chief

EXHIBIT 16
Page 4 of 4

COU-0000078

# EXHIBIT 17

2(v)

Apr 11 - Yoakum asked for time
off slip back. I said
why if you left early.
~~He insisted~~ I told him
this minor - pick your
battles. He insisted so
I gave him slip back. He
said this was a fight
to the end. I warned
not to go against Chief
"no disrespect but you
are just a captain"
Repeated this is "Fight
to end" and no backing
down now. Too late.

EXHIBIT 17
Page 1 of 1                    COU-00000640

EXHIBIT 18

# Statement – April 12, 2017

The below statement may not have the exact wording but is my best recollection of the event.

On Wednesday, April 12, 2017 at about 11:33 am Detective Teague came to my office. He said "Good morning Luz". I replied "Good morning". He asked "How are you doing?" I said "Fine." Det Teague then asked me "So when are you going to be interviewed?" I said "I haven't been called to be interviewed. Why am I supposed to be interviewed?" He said "No. I was just wondering." He might have said a few more things but I stopped paying attention because I felt that he was trying to pump me for information and I hoped he would leave if I ignored him. He left.

On Wednesday, April 12, 2017 at about 11:36 am Captain Yoakum came into my office. He asked me "How are you doing." I said "I'm doing just fine. Why?" He said he just wanted to make sure I was okay and wanted me to know that I would be okay. He then asked "So when are you being interviewed?" I said "Nobody called me to schedule an interview". He said something like that was weird because he knew the Chief was being interviewed today. I said "Okay." He said a few more things but I stopped listening in the hope that he would see that I was busy and leave. He left.

On Wednesday, April 12, 2017 at about 11:40 am Sergeant Marc Simpson came to my office. He asked me how my interview went?" I said "I haven't been interviewed and I don't have an interview schedule." I said "More than just you must have given the investigator my name because a few people have come to ask me about my interview." We discussed the turmoil that this situation was causing to the Department as a whole. The only thing that is being accomplished is that the employees are unhappy and that this situation was going to end up exploding and destroying everybody in its wake.

I don't know if they were trying to scare me or try to get information from me but I didn't appreciate it.

Luz Barrett

4-13-17

EXHIBIT 18
Page 1 of 1

COU-00001728

# EXHIBIT 19

<u>Apr 12</u>

11:33 am  Teague - asked if I had
been interviewed
- I responded "was I
suppose to be"
- he was just wondering

11:36 am  Yoakum - am I okay
- I respond "why"
- reassure me I will
be okay
- when am I being
interviewed
- not scheduled or
informed.

11:40 am  Simpson - asked how interview wei
- respond - I wasn't
- more people must
have given investigator
my name
- asked what he was
hoping for with all
this
1

EXHIBIT 19
Page 1 of 2

COU-00000628

Simpson (cont) - Chief leaves today - no Chief Your
CM goes outside again
- couldn't be worse than Johns
- Chief gets cleared, will like
you even less
- causing turmoil, PD will
implode
- really think about what
trying to accomplish
- employees unhappy - bad
working environment

2

EXHIBIT 19
Page 2 of 2

COU-00000629

# EXHIBIT 20

2(a)

**Confidential Summary of Facts for**

**City Manager and City Attorney**

**April 13, 2017**

**Captain Yoakum**

1. Released Confidential Information from SBSD (documented in formal counseling memo)
2. Failed to notify COP that he made the unilateral decision to send a detective to supervisor school. The detective isn't reachable on the current list and an officer (who is reachable) was passed over, which caused unnecessary consternation in the workplace (documented informal counseling memo)
3. ████████████████████████████████████████████████████████████
4. See Memo from Luz Barrett (undermining organization and interference with personnel investigation)
5. Involved in possible criminal collusion, insubordination, intimidation and/or creating a hostile work environment (See Memo from Luz Barrett involving Yoakum, Simpson, Teague)

**Sgt Marc Simpson**

1. Provide false statements during staff meeting about AB 109 Sweep ( See Chino Memo)
2. Admitted he documented false information about COP in an email to Chief
3. See Memo from Luz Barrett (undermining organization and interference with personnel investigation)
4. Admitted to knowing that UPMA and/or UPOA illegally tape-recorded COP during a private labor/management meeting
5. Involved in possible criminal collusion, insubordination, intimidation and/or creating a hostile work environment (See Memo from Luz Barrett involving Yoakum, Simpson, Teague)
6. Admitted that he allowed a false rumor about the COP hiring from outside the organization to fester for approximately 18 months, which undermined the COP (Jan 31, 2017, meeting with Capt Yoakum)

EXHIBIT 20
Page 1 of 1

COU-00001685

# EXHIBIT 21




CITY OF UPLAND
# POLICE DEPARTMENT
*"Proud to Serve"*
BRIAN P. JOHNSON | CHIEF OF POLICE

April 19, 2017

**TO:**     Sergeant Marc Simpson

**FROM:**    Police Chief Brian Johnson

**SUBJECT:**    PERSONNEL ORDER/REASSIGNMENT TO PAID ADMINISTRATIVE LEAVE

Effective immediately, you are reassigned to Administrative Leave, with pay and pending investigation, until further notice. Your Peace Officer powers are suspended until further notice. You are not to act in any official police capacity, nor represent yourself as a police officer while on paid administrative leave. You shall not involve yourself in any criminal or civil investigation. You are not authorized to use or attempt to use any Department equipment, computers or investigative resources.

The basis for this reassignment is that the Department has received credible evidence to warrant investigation into allegations that you engaged in conduct unbecoming an officer and which may have sought to undermine or adversely impact department operations. You will remain on paid leave pending investigation of these allegations. You will be provided further notice in advance of your investigative interview. In the meantime, you are ordered not to discuss this matter, or any other departmental business with any department personnel, or any potential witness, until the investigation is complete and you are relieved of this order.

Your work hours will remain the same, Monday through Thursday, 7 a.m. to 5 p.m. You shall remain at your residence during these assigned work days and hours. If you must leave your residence, you shall contact the Office of the Chief of Police to leave a number where you can be reached. The location shall not be more than one hour drive to the Police Department.

You shall remain away from all police facilities. Should you have business at any of these facilities, you shall contact the Support Services Commander prior to such business.

If you have any questions, please contact me directly, at (909) 931-4365.

BRIAN P. JOHNSON
Chief of Police

COU-00010797




CITY OF UPLAND
# POLICE DEPARTMENT

*"Proud to Serve"*

BRIAN P. JOHNSON | CHIEF OF POLICE

NOTICE OF REASSIGNMENT TO PAID ADMINISTRATIVE LEAVE ON APRIL 19, 2017

Received _____          Date: _4-19-2017_
            Sgt. Marc Simpson               April 19, 2017

Witness _____          Date: _4/19/17_
                                            April 19, 2017

EXHIBIT 21
Page 2 of 2

**COU-00010798**

# EXHIBIT 22

# CITY OF UPLAND

## PERFORMANCE APPRAISAL FORM

### LIEUTENANT/SERGEANT

APR 2 0 2017

| EMPLOYEE<br>Marcus Simpson | TITLE<br>Sergeant |
|---|---|
| RATING PERIOD<br>FROM:  2/1/16          TO:  2/1/17 | DUE DATE<br>2/1/17 |
| RATER'S NAME<br>Lieutenant Alan Ansara | DEPARTMENT<br>Police |

Month Evaluation ☐ Regular Employee Annual Review

☐ Probationary Employee ☐ Review for Regular Status ☐Other

## INSTRUCTIONS

Using the scale below, compare the performance of the employee being rated against the performance criteria listed for each factor. Select the letter which best indicates your perception of that individual's performance on each of the criterion and enter it in the box provided. Then enter a letter indicating a composite, or overall evaluation for the factor. Your complete evaluation should not necessarily reflect an average of the criteria rating since some criterion are more important than others. Cite examples of past performance to support your evaluation.

| | | |
|---|---|---|
| O | Outstanding | - Exemplary performance far exceeding performance criteria. |
| E | Exceeds Expectation | - Performance which exceeds the level supervisor normally expects. |
| M | Meets Expectation | - Generally meets supervisor's expectation on performance criteria. |
| B | Below Expectation | - Inconsistent performance on criteria, falling short of what normally is expected – requires remedial attention. |
| U | Unsatisfactory | - Unacceptable performance which must receive immediate attention. |
| NA | Not Applicable | - Evaluation of the factor or criterion is inappropriate for the employee being rated. |

**FACTOR A:      COMMITMENT TO DEPARTMENTAL GOALS AND APPLICATION OF LEADERSHIP SKILLS**
Performance Criteria:

| | |
|---|---|
| E | Takes an active role in goal setting and project planning of the department. |
| E | Departmental needs, plans and goals are communicated to subordinates. |
| E | Subordinates are properly directed and encouraged to participate in the planning of projects and setting of work objectives. |
| E | Established plans, projects and work objectives are consistent with departmental needs, goals, and resources. |
| E | Innovative ideas are advanced and encouraged from subordinates in solving problems and improving the effectiveness of the unit(s). |
| E | Composite Evaluation for Factor. |

Cite examples of past performance to support your evaluation.

**Sgt. Simpson worked as both a field supervisor and Special Services Sergeant during this rating period.  Most recently, he has stepped up and filled both rolls effectively after being assigned as the 4-10 Swing Sergeant due to manpower issues beyond his control.  He routinely discusses department goals in briefing and effectively communicates other pertinent information he learns from other personnel, crime stat meetings and staff meetings.**

**He routinely passes on information from subordinates up the chain of command when appropriate.  A recent example of this was early notice to staff of several officers plans to lateral to another agency.  This is important to the department because it allows us to plan based on possible unforeseen negative impact on staffing levels.**

**Marc also effectively communicates new staffing ideas based on his knowledge of department needs and goals.  An example of this during this rating period was his proposal at a staff meeting to lower the shift minimums to five officers in order to open special assignments.  His proposal was quickly seconded by other Lieutenants and Sergeants in the meeting and subsequently taken to the UPOA and adopted for the January 2017 shift schedule.**

EXHIBIT 22
Page 1 of 3

COV-00009514

**FACTOR M:   ASSIGNMENT AND SUPERVISION OF SUBORDIANTE PERSONNEL.**

Performance Criteria

| | |
|---|---|
| O | Assignments are made in a fair and impartial manner considering the needs of the unit(s) and the capabilities of the employees. |
| O | Subordinates understand instructions and job assignments with few and only minor misunderstandings. |
| E | Problems or deviations arising in established plans, schedules and work activities are confronted promptly and corrected or discussed with appropriate supervisor. |
| E | Desired results (quantity and quality work expected from unit(s)) are explained and accomplished through unit personnel. |
| O | Superior is provided periodic feedback on subordinate's performance. |
| O | Composite Evaluation for Factor. |

Cite examples of past performance to support your evaluation.

**Sgt. Simpson takes the time to learn his subordinates strengths and weaknesses. He bases decisions on assignments on this knowledge while balancing the need to develop them. His recommendation for our two most recent CRO officers demonstrates this. The officers selected had very different strengths and weaknesses. Having both in the CRO unit improves the flexibility of the unit and allows those officers to work with, and learn the skills or their peers. He regularly provides me with feedback on performance and training needs.**

**FACTOR N:   COMPLIANCE WITH BUDGETS AND EXPENDITURE CONTROLS.**

Performance Criteria

| | |
|---|---|
| M | Budget recommendations are based upon substantial needs. |
| M | Budget recommendations and expenditures reports are documented and submitted at agreed upon time. |
| M | Purchase requests are in line with established needs and within budget initiations. |
| M | Controllable costs are kept within budget limitations. |
| M | Composite Evaluation for Factor. |

Cite examples of past performance to support your evaluation.

**For most of this rating period Sgt. Simpson was in charge of the departments weapon and ammunition procurement. He consistently balanced the needs of the department with the realty of our budget.**

**FACTOR O:   OTHER FACTORS IMPORTANT TO SUPERVISOR.**

Performance Criteria

| | |
|---|---|
| O | I have worked as the departments Special Services Sergeant in the past and observed several others in that role besides Sgt. Simpson. He is to be commended for his ability to effectively do the jobs of two individuals at the same time. It is yet another example of his outstanding work ethic and leadership skill. |
| E | Sgt. Simpson is ready for the role of Lieutenant with our department. He would be a major asset to the organization in that role. |
| B | Failed to coordinate with outside agencies on a large probation sweep. |
| | |

Cite examples of past performance to support your evaluation.     **Noted in prior factor ratings.**

## OVERALL PERFORMANCE RATING

Based upon preceding evaluation, but not necessarily an average of the factors since some are more important than others, carefully read the criteria for each of the performance levels and check the term which bests describes the employee's overall performance of the evaluation period.

| | | |
|---|---|---|
| ☐ | **Outstanding** | Exemplary overall performance observing recognition normally occurring in less than 5% of the workplace. |
| ☒ | **Exceeds Expectation** | Performance exceeding the supervisor's expectation on nearly all performance factors. |
| ☐ | **Meets Expectation** | Performance generally meeting supervisor's expectation on most performance criteria. |
| ☐ | **Below Expectation** | Erratic performance falling short of that expected on most factors. Special review recommended in 60 days. **Use of this overall rating requires completion of Item 1 below.** |
| ☐ | **Unsatisfactory** | Unacceptable performance. **Use of this overall rating requires completion of Item 1 below.** |

1.     For better performance on the present job, this employee should concentrate on the following performance factors.

**Continue to look for those opportunities to challenge yourself in areas of becoming better in management and leadership.**

EXHIBIT 22
Page 2 of 3

COV-00009519

2.        For long-term development this employee should consider the following course of action.

**Now that you are moving into a new assignment in the Detective Bureau, you have an exciting opportunity to improve its operations. Use this time to again show your ability to lead and make the department run more efficiently.**

Recommendation required at end of Probationary Period.

I RECOMMEND:        ☐ Regular Appt.            ☐ Probation Termination

                    ☐ Probation Termination      ☐ Deferral of Regular Appt. for      months.

RATER'S SIGNATURE: _____        DATE: 4-13-17

COMMENTS OF EMPLOYEE:



SIGNATURE OF EMPLOYEE: _____        DATE: 4-19.17
        (Signature indicates only that appraisal has been reviewed with employee)

SIGNATURE OF DEPARTMENT HEAD: _____        DATE: 4.19.17

SIGNATURE OF HUMAN RESOURCES DIRECTOR: _____        DATE: 5-16-17

EXHIBIT 22
Page 3 of 3

COV-00009520

EXHIBIT 23

| Chapter | 7 |
|---|---|
| Section | 7.11 |
| Title | Professional Standards and Evaluations |
| Subject | Personnel Investigations |
| Effective Date | 03/01/1988 |
| Revision Date | 02/23/2011 |
| Revised By | Captain Ken Bonson |
| Authorized By | Chief Jeff Mendenhall |

## I. POLICY

The following procedure supplements City Administrative Directive #55, Disciplinary Procedures, by describing the method of conducting investigations into complaints of alleged misconduct made against members of this Department, and defining other circumstances where a personnel investigation may be conducted.

## II. ORIGIN AND RECORDING OF COMPLAINT

A. Although not all inclusive, the following are declared to be acts of misconduct which subject an employee to disciplinary action:
   1. Commission of a criminal offense;
   2. Violation of the requirements of the City or Department Codes of Conduct;
   3. Violation of City or Department policies, rules, standards, or procedures; or
   4. Conduct which may tend to reflect unfavorably upon the employee, the Department, or the City.

B. A personnel complaint is defined as an allegation of misconduct by an employee received from any source.

C. Due to the critical nature of such complaints, all personnel investigations in which the concerned employee has been notified as required by II.E.3 of this policy, will be completed in not more than 30 calendar days from the date the complaint was received, unless the Division Commander responsible for the investigation determines to extend the investigation.

EXHIBIT 23
Page 1 of 6

D.  The primary responsibility for investigating allegations of misconduct shall rest with the concerned employee's Division Commander.   However, if he wishes the Professional Standards Unit to conduct the investigation, he may request the Chief of Police to assign the investigation to Professional Standards.

  1.  The following circumstances, although not exclusive, constitute justification for the concerned Division Commander to request the Professional Standards Unit to assume responsibility for the personnel investigations.

    a.  Insufficient supervisory personnel available to the concerned Division Commander.

    b.  Adequate investigation facilities are not readily available to the concerned Division Commander;

    c.  Personnel of more than one Division are involved in the allegation;

    d.  The personnel complaint or the investigation is of such a nature that it would be impractical for the investigation to be conducted or completed by the concerned Division Commander.

    e.  An employee is arrested for a criminal offense; or

    f.  The special skills of personnel in another Division, Section, or Unit may be needed to satisfactorily complete the investigation.

  2.  Final responsibility for conducting the personnel investigation shall be determined by the Chief of Police.

E.  Method of Reporting:

  1.  A personnel compliant form received from any citizen will be a Citizen Complaint number through the office of the Chief of Police.  It will be assigned to the Professional Standards Unit for investigation.  No copy shall be placed in the employee's personnel file unless notice is to be given to the employee as set forth in Section E.4 below.

  2.  A report of misconduct reported by a supervisor of the Upland Police Department will be completed in the form of a memorandum from that supervisor to their Division Commander.  If the Division Commander agrees that misconduct likely did occur they will forward the memorandum to the Chief of Police for assignment to the Professional Standards Unit.  An Internal Affairs number will be assigned to this type of investigation.

EXHIBIT 23
Page 2 of 6

         a. Such memorandum shall not be prepared unless the alleged misconduct is of a nature which, if true, would normally result in written reprimand, suspension, demotion, or termination disciplinary action, as outlined in City Administrative Directive #55 or City Merit Rules.

3. Under normal circumstances, a memorandum will be given to the involved employee, advising of the inquiry and that such employee shall be informed of the progress of the investigation when appropriate.  However, when in the judgment of the Police Chief, the matter under investigation is of such nature as to require confidentiality, notification of involved personnel as to the existence of the inquiry may be deferred until such time as deemed appropriate by the Chief.

## III. <u>INVESTIGATION PROCEDURE</u>

A. All employees shall promptly report, in writing, any illegal activity or misconduct by fellow employees to their Division Commander directly or through channels.  In the event of a conflict of interest, established channels may be bypassed.

B. Whenever possible, a Watch Commander or Field Supervisor shall speak to the complainant to determine how best the agency can serve them.  If the complainant does not want to file a formal complaint, and the alleged misconduct is not of a serious nature, the complaint can be handled at an informal level.

1. A complainant is under no obligation to speak to any Department employee about an allegation of misconduct.  If the complainant refuses to speak to a supervisor about the allegation of misconduct they shall be given a personnel complaint form if they want one.

C. A supervisor becoming aware of misconduct by an employee shall take appropriate action to prevent aggravation of the incident, and immediately report the matter to his Division Commander.

D. A Division Commander becoming aware of misconduct by an employee shall:

1. Cause a memorandum, as described in Section II-E, to be prepared, when required, which will include, but need not be limited to:

         a. A description of the conversation between the Supervisor and the complainant and/or informant.

EXHIBIT 23
Page 3 of 6

b. A list of the specific actions which are the subject of the complaint.

2. If the misconduct is of such an emergent nature as to necessitate immediate action, the employee's Division Commander, or in his absence, the Chief of Police, shall be notified.

3. If the misconduct does not necessitate immediate action, all supporting documents, along with the completed memorandum, shall be forwarded as soon as practicable.

E. The Division Commander responsible for the personnel investigation may assign the investigation to personnel of the appropriate rank, who will:

1. Interview all complainants and/or informants;

2. Interview all witnesses;

3. Interview all officers and employees concerned; and

4. Submit a report of the complete investigation to the concerned Division Commander.

5. A polygraph examination shall not be offered or conducted in a personnel investigation without the express authorization of the Police Chief.

F. The Professional Standards Unit will determine a finding and forward the completed report to the concerned Division Commander.  It will be the responsibility of the concerned Division Commander to review the report and recommend personnel action.

1. Findings are classified as follows:

a. Unfounded: When the investigation shows the act or acts complained of did not occur or did not involve our employee.

b. Not Sustained: When the investigation fails to disclose sufficient facts to prove or disprove the allegations made in the complaint.

c. Sustained: When the investigation discloses sufficient facts to prove the allegation made in the complaint.

d. Exonerated:  The acts in the complaint occurred but the investigation shows such acts to be justified, lawful and proper.

G. Upon approval by the Police Chief, the completed report and all other pertinent documents will be forwarded to the appropriate Division Commander for preparation of:

1. A record of warning; or

EXHIBIT 23
Page 4 of 6

2. A Memorandum of Disciplinary Action proposing suspension, demotion, or dismissal in accordance with City Administrative Directive #55, Disciplinary Procedures.

## IV. FINAL DISPOSITION OF COMPLAINTS

A. The concerned Division Commander shall:
1. In cases requiring corrective, disciplinary, or procedural action, consult City Administrative Directive #5 to ensure compliance.
2. Notify or cause notification to be made to all involved employees of the disposition of the complaint.
3. Cause a copy of the completed report to be placed in the employee's personnel file.

## V. DISCIPLINARY REVIEW BOARD (DRB)

A. The DRB is established to provide the Division Commander with an advisory board to assist in giving stability, consistency, fairness and timely information to the department's disciplinary process.
1. The DRB is authorized to review disciplinary reports, refer such reports back to Division Commanders for further investigation and to recommend the degree and severity of disciplinary action to the Division Commander. The DRB will not conduct investigations or public hearings.
2. In addition to the regular DRB hearings outlined in this policy, the DRB shall meet on an as needed basis to review disciplinary procedures of other agencies to ensure that the department is applying consistent and fair discipline.
3. The DRB will consist of a lieutenant who will chair the DRB, a sergeant, and an officer. All will be entitled to one vote. In order for a peer to serve on the DRB the involved employee must sign an authorization allowing the department to provide the investigative documents to the peer. Without such authorization the DRB will conduct the review without the employee peer.
   a. If the involved employee is a Detective, the DRB will consist of a lieutenant, a sergeant, and a peer Detective. As above, the involved employee must sign an authorization allowing the peer to participate.
   b. If the involved employee is a Sergeant, the DRB will consist of two lieutenants and a peer Sergeant. As above, the involved employee must sign an authorization allowing the peer to participate.

EXHIBIT 23
Page 5 of 6

      c. If the involved employee is a lieutenant, the DRB will consist of a Captain from an uninvolved division and a peer Lieutenant. As above, the involved employee must sign an authorization allowing the peer to participate.

4. Members of the DRB shall not have participated in the investigation or reporting of the incident under investigation.  If a member of the DRB is a participant in the investigation, an alternate of the same rank, shall be selected to participate in the board's review.

5. After review the DRB will arrive at a recommendation including the number of hours in cases of suspension, and submit it to the Division Commander.  Such recommendations are advisory only but will be included in the permanent record of the disciplinary report.

6. After the Division Commander arrives at a decision regarding the appropriate discipline, the involved employee will be notified of the proposed discipline. The memorandum will further advise the involved employee that they have the right to a Skelly hearing before the Chief of Police.

B. In lieu of the above process, the employee under investigation has the right to waive the DRB review of the investigation, in which case the Division Commander will decide the appropriate discipline without any DRB recommendation.

EXHIBIT 23
Page 6 of 6

# EXHIBIT 24

# Upland Police Department

# ADMINISTRATIVE INVESTIGATION 05-17

---

## Sgt. Marcus Simpson

---

### INVESTIGATORS:

Gary Wedge
Steve Fobes

*Wedge & Fobes Investigations*
*CA LIC 28833*

July 25, 2017

# CONFIDENTIAL

EXHIBIT 24
Page 1 of 49

COU-0000001



B i n d e r   C o n t e n t s

1  Investigation

2  Investigative Documents

3  Administrative Documents

4  Policy & Procedure; Personnel Rules

5  Transcripts

6  CD of Digital Files

7

8

EXHIBIT 24
Page 2 of 49

COU-0000002

**1**

EXHIBIT 24
Page 3 of 49

COU-0000003

## Employee

Simpson, Marcus
Police Sergeant

## Persons Interviewed

Ansara, Alan
Police Lieutenant, *(retired)*
Upland Police Department
(909) 944-8615

Avels, Robert
Chief of Police
Montclair Police Department
(909) 621-4771

Barrett, Luz
Sr. Administrative Assistant
Upland Police Department

Berdnick, Paul
Police Lieutenant
Ontario Police Department
(909) 395-2942

Blanco, Marcelo
Police Lieutenant
Upland Police Department

Chani, William
Police Sergeant
Upland Police Department

Cusimano, Joe
Undersheriff
San Bernardino Sheriff's Department
(909) 884-0156

Dodt, Don
Police Sergeant
Upland Police Department

Duran, Maurice
Police Sergeant
Upland Police Department

Guzman, Jesse
Deputy Sheriff
San Bernardino Sheriff's Department
Rancho Cucamonga station

Hovey, Joshua
Police Officer
Ontario Police Department
(909) 395-2001

Johnson, Brian
Chief of Police
Upland Police Department

Kabayan, Anthony
Police Sergeant
Upland Police Department

Kaylor, Brad
Chief of Police
Ontario Police Department
(909) 395-2001

Kirk, Jacob
Police Officer
Upland Police Department

Lorenz, Mike
Acting Captain
Ontario Police Department
(909) 395-2897

Wedge & Fobes Investigations

GW

COU-0000004

Loza, Kailene
Police Records Supervisor
Upland Police Department

Marotta, Nick
Police Sergeant
Chino Police Department
(909) 334-3000

Mathews, Cliff
Acting Captain
Upland Police Department

McCullough, Andrew
Police Officer
Upland Police Department

Poole, John
Police Lieutenant
Upland Police Department

Rainwater, Michael
Police Sergeant
Upland Police Department

Rivera, Eric
Police Officer
Montclair Police Department
(909) 621-4771

Tseng, Jim
Police Sergeant
Upland Police Department

Yoakum, Anthony
Police Captain
Upland Police Department

## Allegations

It is alleged that, during a department staff meeting on 12/6/16, Sgt. Marc Simpson was
dishonest in his response to Chief Johnson when asked about the status of a probation
and parole compliance sweep, (also known as an *AB109* sweep).

## Summary

On 12/6/16 a department staff meeting was held for sworn and civilian supervisors and
managers.  During that meeting, Chief Johnson asked Sgt. Simpson about the status of
a probation and parole compliance sweep scheduled for the following week that
Simpson had been tasked with coordinating.  In his response, Simpson told Johnson
that no agencies were available to participate.  (Simpson delegated responsibility for
coordinating the sweep to officers Andrew McCullough and Jacob Kirk, who were
assigned to the Community Resource Officer (CRO) team, but he was kept apprised of
developments throughout the planning process.)

Because a few days earlier Chief Johnson had spoken with San Bernardino County
Undersheriff Joe Cusimano, who told Johnson his agency (SBSD) would assist with the
sweep, Johnson questioned Simpson further, also asking specifically about Chino PD.
Although Johnson had not spoken with Chino Police Chief Karen Comstock about the
sweep, he said Chino PD had always been willing to assist Upland PD with special

GW

COU-0000005

operations.  Simpson told Johnson that neither the sheriff's department nor Chino PD could participate.

On more than one occasion before the 12/6/16 staff meeting Chief Johnson had asked Simpson about the status of the sweep.  Those conversations led Johnson to believe that, while Simpson was making progress on planning the sweep, he was busy with various other tasks and wanted to postpone the sweep.  Based on their relatively brief discussion at the staff meeting Johnson believed Simpson was again doing the same.

During a county chiefs meeting two days later Chief Johnson spoke with Chief Comstock, as well as Ontario Police Chief Brad Kaylor and Montclair Police Chief Robert Avels.  Chief Avels told Chief Johnson Montclair PD was able to assist with the sweep, Chief Kaylor said Ontario PD could not, and Chief Comstock told Johnson that nobody from Chino PD had been contacted about participating.

Based on the administrative investigation conducted as a result of Sgt. Simpson's statements during the 12/6/16 staff meeting, it was determined that some neighboring agencies *were* contacted about the sweep before that meeting occurred: SBSD/Rancho Cucamonga station and Ontario PD, both who *could not* participate, and Montclair PD, who *could* participate.  (The San Bernardino County Probation department was also contacted in advance but did not participate as an agency, though at least one probation officer, assigned to Chino PD, did assist.)  Ultimately, State Parole, Montclair PD, and Chino PD participated in the sweep, which occurred on the scheduled date, (12/14/16)

Although when interviewed for the administrative investigation Sgt. Simpson denied that he was asked specifically about Chino PD, notes taken during the meeting by Sr. Administrative Assistant Luz Barrett indicate Simpson said there was no participation (in the sweep) from the sheriff's department, Chino PD, Montclair PD, Ontario PD, and Claremont PD.  Additionally, at least two people at the 12/6/16 meeting other than Barrett and Chief Johnson recalled that Simpson said he contacted Chino PD.

*Binder Contents*

1. **Investigation**

    a. Primary report prepared by Private Investigator Gary Wedge;
    b. Supplemental report of witness statements prepared by Private Investigator Steve Fobes.

2. **Investigative Documents**

    a. *Confidential Summary of Facts for City Manager and City Attorney* from Chief Johnson dated April 13, 2017, (redacted);

b. Meeting agenda for 12/6/16;
c. (2) pages of handwritten notes from 12/6/16 staff meeting, (excerpts from attachment 2[d], including:
   i. One page list of meeting attendees;
   ii. One page with notes based on comments made by Sgt. Simpson.
d. (6) pages of handwritten notes from 12/6/16 staff meeting;
e. (2) page excerpt from Sgt. Simpson's 2/1/16 – 2/1/17 performance appraisal, (signed on 4/19/17);
f. Two-page memo from Chino Police Sergeant Nick Marotta to Chino Police Chief Karen Comstock dated 4/10/17, with two pages of supporting emails;
g. Two-page email exchange between Officer Andrew McCullough and Montclair Police Detective Jeff Wheater beginning 11/7/17, (forwarded to P.I. Wedge by Montclair Police Officer Eric Rivera);
h. Three-page email exchange between Officer Jacob Kirk and Montclair Police Officer Eric Rivera beginning on 11/25/16, (forwarded to P.I. Wedge by Montclair Police Officer Eric Rivera);
i. Probation and parole sweep-related documents received from Officer McCullough after 6/1/17 administrative interview, including:
   i. One-page email from Jacob Kirk to Andrew McCullough dated 12/8/16, subject, *"Sweep Stuff,"* with four-page team assignments for 3/10/16 Probation Sweep, (duplicate of attachment 2[j]iii);
   ii. One-page email from Andrew McCullough to Marc Simpson dated 12/13/16, with four-page team assignments for 12/14/16 Probation/Parole Sweep;
   iii. Calendar entry from Scott Sellers to Andrew McCullough dated 12/13/16, subject, *"Tentative: SMASH Sweep"*;
   iv. One-page email from Scott Sellers to Andrew McCullough dated 12/14/16, subject, *"Re: Tentative: SMASH Sweep"*;
   v. One-page email from Andrew McCullough to Anthony Yoakum dated 12/14/16, subject, *"Probation / Parole Sweep,"* with results of the sweep;
   vi. Two-page email from Andrew McCullough to Jacob Kirk dated 12/14/16, subject, *"FW: Probation / Parole Sweep,"* forwarding results of sweep (attachment 2[i]v);
   vii. Six-page team assignment for 12/14/16 Probation / Parole Sweep.
j. Probation and parole sweep-related documents received from Officer Kirk after 6/1/17 administrative interview, including:
   i. One-page email from Jacob Kirk to (Probation Officer) Luis Miranda dated 12/8/16, subject, *"RE: Sweep for 12/14/16"*;
   ii. Two-page email from Jacob Kirk to Luis Miranda dated 12/8/16, subject, *"RE: Sweep for 12/14/16,"* (continuation of email exchange in attachment 2[j]i);

    iii.  One-page email from Jacob Kirk to Andrew McCullough dated 12/8/16, subject, *"Sweep Stuff,"* with four-page team assignments for 3/10/16 Probation Sweep, (duplicate of attachment 2[i]i);

    iv.  One-page email from Jacob Kirk to John Bonhus dated 12/8/16, subject, *"LA Clear,"* with five pages of subjects identified for contact during sweep;

    v.  One-page email from Jacob Kirk to Andrew McCullough dated 12/8/16, with two pages of Parole / Probation Sweep Participants;

    vi.  Two-page email from Jacob Kirk to Luis Miranda dated 12/12/16, subject, *"RE: Sweep for 12/14/16,"* (continuation of email exchange in attachment 2[j]ii);

    vii.  One-page email from Jacob Kirk to 'war-room@laclear.com' dated 12/12/16, subject, *"Inquiry or Critical Event Form,"* with three pages of subjects identified for contact during sweep;

    viii.  Two-page email from Jacob Kirk to Eric Rivera dated 12/13/16, subject, *"RE: Parole and Probation Sweep"*;

    ix.  Three-page email from Jacob Kirk to Eric Rivera dated 12/13/16, subject, *"RE: Parole and Probation Sweep,"* (continuation of email exchange in attachment 2[j]viii);

    x.  Two-page list of Parole / Probation Sweep Participants;

    xi.  Five-page operational plan for 12/14/16 Probation/Parole Sweep.

  k.  Documents found during audit of Sgt. Simpson's City email account, including:

    i.  Two-page email exchange between Sgt. Simpson and Kevin Cushman Jr. dated 11/3/16, subject, *"RE: Upland Warrants"*;

    ii.  One-page email from Sgt. Simpson to Officer McCullough dated 11/15/16, subject, *"Accepted: SMASH Sweep"*;

    iii.  One-page email from (Dispatch Supervisor) Graham Hendrickson to Sgt. Simpson dated 12/14/16, subject, *"Upland PD using 9-SBLW1 today"*;

    iv.  One-page email from Officer Kirk to Sgt. Simpson dated 12/21/16, subject, *"Sweep after action report,"* with two page *"Parole / Probation After Action Report."*

  l.  One-page email from Sgt. Simpson, (*msimpson1971@gmail.com*) to HR Manager Kelly Gonzales dated 4/19/17, subject, *"Evals."*

## 3. Administrative Documents

  a.  Administrative Leave notice for Sgt. Simpson dated 4/19/17;

  b.  Sgt. Marcus Simpson signed interview notice dated 6/1/17;

  c.  Employee Interview Rights read to Sgt. Simpson during 6/7/17 administrative interview;

  d.  Sr. Administrative Assistant Luz Barrett signed interview notice dated 5/3/17;

Wedge & Fobes Investigations

GW

COU-0000008

   e. Lt. Marcelo Blanco signed interview notice dated 5/17/17;
   f. Sgt. William Chani signed interview notice dated 5/24/17;
   g. Sgt. Don Dodt signed interview notice dated 5/4/17;
   h. Sgt. Maurice Duran signed interview notice dated 5/22/17;
   i. Sgt. Anthony Kabayan signed interview notice dated 5/4/17;
   j. Officer Jacob Kirk signed interview notice dated 5/30/17;
   k. Police Records Supervisor Kailene Loza signed interview notice dated 5/4/17;
   l. Acting Captain Cliff Mathews signed interview notice dated 5/4/17;
   m. Officer Andrew McCullough signed interview notice dated 5/30/17;
   n. Lt. Jim Poole signed interview notice dated 5/24/17;
   o. Sgt. Mike Rainwater signed interview notice dated 5/4/17;
   p. Sgt. Jim Tseng signed interview notice dated 5/4/17;
   q. Captain Anthony Yoakum signed interview notice dated 6/27/17;
   r. Witness admonishment read to Captain Yoakum during 7/6/17 interview.

## 4. Policy & Procedure; Personnel Rules

   a. UPD Policy Manual section 7.01, *Professional Standards and Evaluations: Code of Conduct/Code of Ethics.*

## 5. Transcripts[1]

   a. Transcript of 5/4/17 interview of Chief Brian Johnson;
   b. Transcript of 5/4/17 interview of Sr. Administrative Assistant Luz Barrett;
   c. Transcript of 5/9/17 interview of Chief Brian Johnson;
   d. Transcript of 5/9/17 interview of Sr. Administrative Assistant Luz Barrett;
   e. Transcript of 6/1/17 interview of Officer Andrew McCullough;
   f. Transcript of 6/1/17 interview of Officer Jacob Kirk;
   g. Excerpts of transcript of 6/7/17 interview of Sgt. Marcus Simpson, (pages 1-54, and pages 171-172);
   h. Transcript of 7/6/17 interview of Captain Anthony Yoakum;
   i. Excerpt of transcript of 7/6/17 interview of Sgt. Marcus Simpson, (pages 1-13).

## 6. CD of Digital Files[2]

   a. Audio of 5/4/17 interview of Chief Brian Johnson;
   b. Audio of 5/4/17 interview of Sr. Administrative Assistant Luz Barrett;
   c. Audio of 5/8/17 interview of Sgt. Jim Tseng;

---

[1] Transcript excerpts of the 6/7/17 Simpson interview, (5[g]), and the 7/6/17 interview, (5[i]), were taken from the full transcript in a separate administrative investigation, (UPD IA 06-17)

[2] Audio of the interviews of Poole, (6[k]), Chani, (6[q]), Duran, (6[r]), Ansara, (6[x]) and Simpson, (6[y] and 6[cc]), includes statements relevant to a separate administrative investigation, (UPD IA 06-17)

Wedge & Fobes Investigations               GW

COU-0000009

d.   Audio of 5/8/17 interview of Sgt. Michael Rainwater;
e.   Audio of 5/8/17 interview of Sgt. Don Dodt;
f.   Audio of 5/9/17 interview of Chief Brian Johnson;
g.   Audio of 5/9/17 interview of Sr. Administrative Assistant Luz Barrett;
h.   Audio of 5/9/17 interview of Acting Captain Cliff Mathews;
i.   Audio of 5/9/17 interview of Sgt. Anthony Kabayan;
j.   Audio of 5/9/17 interview of Police Records Supervisor Kailene Loza;
k.   Audio of 5/9/17 interview of Lt. John Poole;
l.   Audio of 5/17/17 interview of San Bernardino County Undersheriff Joe
     Cusimano;
m.   Audio of 5/17/17 interview of Montclair Police Chief Robert Avels;
n.   Audio of 5/18/17 interview of Lt. Marcelo Blanco;
o.   Audio of 5/18/17 voice mail from Montclair Police Chief Robert Avels;
p.   Audio of 5/22/17 interview of Montclair Police Officer Eric Rivera;
q.   Audio of 5/25/17 interview of Sgt. William Chani;
r.   Audio of 5/25/17 interview of Sgt. Maurice Duran;
s.   Audio of 5/30/17 interview of Ontario Police Chief Brad Kaylor;
t.   Audio of 5/30/17 interview of Ontario Acting Police Captain Mike Lorenz;
u.   Audio of 5/30/17 voice mail from Ontario Acting Police Captain Mike
     Lorenz;
v.   Audio of 6/1/17 interview of Officer Andrew McCullough;
w.   Audio of 6/1/17 interview of Officer Jacob Kirk;
x.   Audio of 6/7/17 interview of retired police lieutenant Alan Ansara;
y.   Audio of 6/7/17 interview of Sgt. Marcus Simpson, (two parts);
z.   Audio of 6/15/17 interview of Ontario Police Officer Joshua Hovey;
aa. Audio of 6/21/17 interview of San Bernardino County Deputy Sheriff Jesse
     Guzman;
bb. Audio of 7/6/17 interview of Captain Anthony Yoakum;
cc. Audio of 7/6/17 interview of Sgt. Marcus Simpson.

## Investigation

In April 2017 I was contracted by the City of Upland to conduct an administrative
investigation into alleged misconduct by Police Sergeant Marcus Simpson.

On 4/19/17 I met with Chief Brian Johnson, who told me Sgt. Simpson was dishonest in
his response when asked about the status of a task Simpson had been previously
assigned.  Specifically, during a department staff meeting on 12/6/16, Johnson asked
Simpson about the status of a probation and parole compliance sweep planned for the
following week.  In response, Simpson told Johnson that no agencies were available to
participate in the sweep and suggested that it be cancelled or postponed.

Chief Johnson was surprised by Sgt. Simpson's response because he (Johnson) had
spoken with San Bernardino County Undersheriff Joe Cusimano a few days earlier, and

Cusimano offered to assist with the sweep.  Johnson asked Simpson specifically about the sheriff's department, and then also asked about Chino PD, who has always been willing to participate in Upland PD's enforcement operations.  Simpson told Johnson neither agency could participate, and said the same when asked if other surrounding agencies were available.

Two days later at a county chiefs meeting Johnson spoke with police chiefs from Montclair PD, Ontario PD, and Chino PD.  Upon doing so he learned that Montclair PD, considered a "surrounding agency," was able to assist, but that Chino PD had not been contacted about the sweep.

Chief Johnson told me that on more than one occasion before the 12/6/16 staff meeting he asked Simpson about the status of the sweep.  Although Simpson said he was making progress, those conversations led Johnson to believe Simpson was busy with other tasks and wanted to postpone the sweep.  Based on their relatively brief discussion at the staff meeting Johnson believed Simpson was again doing the same.

During a subsequent conversation with Chief Johnson he gave me a two-page memo dated 4/10/17 from Chino Police Sergeant Nick Marotta to Chino Police Chief Karen Comstock.  I reviewed the memo, in which Sgt. Marotta said he was not contacted prior to 12/8/16, (the date of the county chiefs meeting), by anyone from Upland PD requesting assistance with a probation and parole compliance sweep.  Marotta also checked with Chino Police Corporal McArdle, who said he, too had not been contacted by anyone from Upland PD.

Attached to the memo was a two-page email exchange between Chief Comstock and Sgt. Marotta dated 12/8/16.  In her initial email, Chief Comstock said she was informed by Chief Johnson that Upland PD was coordinating a parole and probation sweep for the following Wednesday, 12/14/17.  During a subsequent email, also dated 12/8/16, Chief Comstock gave Simpson's name as the person to contact, and also asked Sgt. Marotta to check if Simpson made a previous request for assistance.  Marotta replied that no such request was received.

A copy of the memo prepared by Sgt. Marrotta, and the two-page email thread can be found in attachment 2[f].

Chief Johnson also gave me a one-page *Confidential Summary of Facts* dated 4/13/17 that he had prepared for City Manager Thouvenell listing possible acts of misconduct by Sgt. Simpson.  The first allegation on that six-point list was, *"Provide (sic) false statements during staff meeting about AB 109 sweep (see Chino memo)."*

A copy of the document is included with my report as attachment 2[a].[3]

---

[3] The summary has been redacted because one point on the list is sensitive and unrelated to any pending administrative investigation.

---

Wedge & Fobes Investigations

GW

COU-0000011

During our conversation Chief Johnson also spoke about Sgt. Simpson's most recent performance appraisal, which was given to Simpson by Captain Yoakum.  In the appraisal, Yoakum made a comment about the sweep.  I later obtained a copy of the appraisal, (for the 2/1/16 – 2/1/17 period), and saw a *"Below Expectation"* rating under *"Factor O: Other Factors Important to Supervisor."*  The remark for this particular rating had the comment, *"Failed to coordinate with outside agencies on a large probation sweep."*  The performance appraisal was signed by Yoakum on 4/13/17, and by Simpson on 4/19/17.

A two-page excerpt from the performance appraisal, showing the sweep-specific comment on one page and the signatures on the other, can be found in attachment 2[e].

Finally, Chief Johnson told me his secretary, Sr. Administrative Assistant Luz Barrett, had taken notes during the 12/6/16 staff meeting.  I later requested and received two pages of handwritten notes, (attachments 2[c]I and 2[c]ii).

The first page of notes, dated *"Dec 6,"* included a list of 15 names, presumably individuals who were in attendance at the meeting.  On the second page were several comments adjacent to Sgt. Simpson's name, including the remark, *"No participation from other agencies SBSO, Chino, Montclair, Ontario, Claremont."*  Also on the second page was what appeared to be a Post-It note in the lower right corner with the notation, *Dec 6th, County chiefs Dec 8th."*

On 5/4/17 I interviewed Sr. Administrative Assistant Barrett and Chief Johnson for additional details about the 12/6/16 staff meeting.

*Statement of Sr. Administrative Assistant Luz Barrett, (5/4/17)*

I interviewed Ms. Barrett in the chief's conference room.  The interview was recorded and later transcribed, and can be found in attachments 6[b] and 5[b], respectively.

Ms. Barrett has been employed by the City of Upland for 14 years and began as a records clerk in the police department.  For the last 12 years, Barrett has been senior administrative assistant to the chief.

Referring to copies of the handwritten notes I was previously given, (below), Barrett confirmed both pages referred to the 12/6/16 staff meeting at which she was present, that she personally wrote the notes during that meeting, and that the names listed on page one were the employees in attendance.  Barrett also said the notes she kept of that meeting were in handwritten form only, (i.e., not typewritten).

Wedge & Fobes Investigations

GW

COU-0000012

UPD IA 05-17
Simpson



*Attachment 2[c]i*



*Attachment 2[c]ii*

I asked Ms. Barrett if she recalled a discussion at the 12/6/16 meeting about a probation and parole compliance sweep.  Barrett said she did recall such a discussion, but did not know if the topic was on their meeting agenda.  *(I requested and later received from Barrett a copy of the meeting agenda, which can be found in attachment 2[b].  Although there was no reference to a probation and parole compliance sweep, under "Other Topics," Sgt. Simpson was on the agenda for a "CRO Update.")*

Barrett told me that when Chief Johnson asked Sgt. Simpson about the sweep, Simpson said he couldn't get surrounding agencies to participate, (or something similar).  In response, Johnson told Simpson he had previously spoken with other chiefs about the sweep, and they expressed their willingness to assist.  Simpson replied that he had contacted the agencies, but they said "No."  Johnson asked Simpson for the names of those he (Simpson) had spoken with, but who said they could not participate, so Johnson could follow-up with their chiefs later that week at a county chiefs meeting.

I asked Barrett if Simpson said he had actually contacted the other agencies, and she replied, "Yes."  When asked by Chief Johnson for a list of the agencies he contacted, Simpson told Johnson he had "reached out" to the surrounding agencies, and identified

those agencies by name.  Referring to the notes she took during the 12/6/16 staff meeting, and specifically, her comment, *"No participation from other agencies, SBSO, Chino, Montclair, Ontario, and Claremont,"* I asked Barrett if those were the agencies Simpson identified by name, and she again said, "Yes."

*(During a subsequent phone interview with Barrett on 7/18/17, which was not recorded, I asked Barrett if she wrote "Chino" on the list of agencies who could not participate because Sgt. Simpson specifically identified Chino PD by name, or if she did so in response to Chief Johnson asking Simpson about Chino PD, but she could not recall.)*

I also asked Barrett if Simpson ever identified by name the individual at each agency he had spoken with.  Barrett said he did not, explaining that when Chief Johnson asked for this information Simpson could not remember with whom he spoke.  Barrett specifically recalled Simpson making this statement because she thought it was odd he couldn't remember the name of at least one person.

Barrett said after the staff meeting concluded, Chief Johnson told her he wanted a list of agencies who could not participate so he could follow-up with them at the county chiefs meeting later that week.

Barrett said when Johnson returned from the county chiefs meeting he was upset and embarrassed because other chiefs had no idea what he was talking about when asked why they couldn't participate in the sweep, telling Johnson nobody from Upland had contacted them.

Barrett and I then discussed the second page of handwritten notes, and specifically, the comments next to Simpson's name.  Barrett said the comment in parenthesis, *"Chief – post 72 hour notice,"* was made by Chief Johnson when Simpson spoke about closing the park; the remaining comments, she said, were made by Simpson.  When I pointed out to Barrett that some of the comments were more typically associated with cleaning homeless encampments and not a probation and parole compliance sweep, she said Simpson and the officers were doing both.

I asked Barrett about the Post-It note in the lower right-hand corner of her meeting minutes on which the comments, *"Dec 6th,"* and *"County chiefs Dec 8th"* were written, (attachment 2[c]ii).  Barrett said she wrote the note to remind her that Johnson wanted the list of agencies Simpson said he contacted.

Finally, I asked Barrett about what appeared to be two highlighted comments on her notes: *"Simpson – sweep next Tuesday and Wednesday,"* and, *"No participation from other agencies SBSO, Chino, Montclair, Claremont."*  Barrett said she highlighted those comments and made copies of her notes so Chief Johnson could have the information when he went to the county chiefs meeting on 12/8/16.

Wedge & Fobes Investigations

GW

COU-0000014

For additional details refer to the complete interview audio.

_Statement of Chief Brian Johnson, (5/4/17)_

I interviewed Chief Johnson at the Upland Police Department.  The interview was
recorded and later transcribed, and can be found in attachments 6[a] and 5[a],
respectively.

Chief Johnson and I spoke about the staff meeting on 12/6/16 in which a probation and
parole compliance sweep (scheduled for 12/14/16) was discussed.  During that
meeting, at which both civilian and sworn supervisors and managers were present,
including Sgt. Simpson, Johnson asked Simpson about the status of the sweep.
Johnson said planning for that sweep began about four to six weeks prior, (in response
to a verbal directive by Johnson), and before the staff meeting was held, he had
previously asked Simpson how the sweep was coming along.  Johnson said he had
been trying to get the sweep planned for a long time, and Simpson kept trying to
postpone it.

_(During a subsequent interview on 5/9/17, Chief Johnson clarified that planning for the
probation and parole compliance sweep actually began at least six to eight weeks
before the 12/6/16 staff meeting.  Johnson also said he asked Simpson about the status
of the sweep at least once, but perhaps as many as three times before the meeting
occurred.  Simpson told Johnson he had "a lot on his plate," but he was making
progress.)_

When Johnson asked Simpson about the status of the sweep during the 12/6/16 staff
meeting, Simpson essentially tried to convince him they should cancel the sweep,
saying he (Simpson) was not getting a lot of cooperation from the other agencies.
Simpson also told Johnson something similar to, "Everybody's saying they can't
participate."

Because Chief Johnson had spoken with (San Bernardino County) Undersheriff Joe
Cusimano only a few days prior to the 12/6/16 staff meeting and was told the sheriff's
department would assist with the sweep, Johnson asked Simpson, "So you're telling me
the sheriff's (department) can't play?"  Although Johnson was not certain, he said
Simpson answered either that he could not get ahold of anyone from that agency, or
that he did not remember who he spoke with.

Johnson told Simpson he had recently talked to the undersheriff, who agreed to assist,
and then asked specifically about Chino PD, (_"So you're saying Chino PD can't help?"_).
(Johnson explained he has a close working relationship with Chino PD, and they are
always willing to participate in Upland PD's operations.)  Simpson replied, "Yeah, Chino
can't help."

---

Wedge & Fobes Investigations

GW

COU-0000015

*(During a subsequent conversation with Chief Johnson on 7/10/17, which was not recorded, I asked Johnson if he identified other agencies by name. Although he was not certain, after asking Simpson specifically about the sheriff's department and Chino PD, Johnson believes he referred to the other agencies collectively and asked Simpson, "You're telling me none of the surrounding agencies can participate?")*

Knowing he would see police chiefs from neighboring agencies later that week at the monthly county chiefs meeting, Johnson told Simpson he would find out why the agencies weren't able to participate.

Chief Johnson told me that, although Sgt. Simpson's comments led him to believe he had spoken with someone from the sheriff's department, Ontario PD, Chino PD, and Montclair PD, Simpson never identified anyone by name.

I asked Chief Johnson if Sgt. Simpson said he *did not* contact any of the agencies, and he told me, "No."

Chief Johnson said his interaction about the probation and parole compliance sweep lasted two or three minutes only. He could not recall if anyone else at the meeting offered any input during that discussion.

Two days later, at the monthly meeting of county police chiefs, Johnson spoke with chiefs from neighboring jurisdictions: Brad Kaylor, (Ontario PD), Robert Avels, (Montclair PD), and Karen Comstock, (Chino PD). Chief Kaylor told Johnson Ontario PD had another operation planned for the same date and therefore could not participate. (Johnson was unsure if Kaylor said somebody had "reached out" to their agency, or if he said only that their agency already had an operation planned.) Chief Avels, in turn, said Montclair PD *could* participate. (Again, Johnson could not recall if Montclair PD had been contacted by anyone from UPD, or if Avels simply said they could assist.) Finally, after checking with her staff, Chief Comstock said nobody from Chino PD had been contacted about the sweep by Sgt. Simpson. Chief Comstock asked her staff to prepare a memo about the absence of a request for assistance from Upland PD, which she then gave to Chief Johnson, who later gave it to me, (attachment 2[f]). *(Later in the interview Johnson referred to a text message or email he had received from Chief Comstock soon after the 12/8/16 chiefs meeting. Although Johnson said neither he nor Comstock had that message any longer, the memo he later received from Comstock and gave to me was essentially the same information.)*

I asked Chief Johnson if anyone spoke with Sgt. Simpson about the probation and parole compliance sweep after the 12/6/16 meeting. Although he did not say to the extent any discussion (about the sweep) between Captain Yoakum and Sgt. Simpson occurred, Johnson spoke about a performance appraisal Simpson received from (now retired) Lt. Ansara. The appraisal was initialed by Captain Yoakum, and then given to Johnson. Johnson wasn't comfortable with the content of that appraisal and returned it

---

to Yoakum for further review.  When Yoakum re-submitted the appraisal, Johnson saw it included a comment that Simpson did not handle the sweep appropriately.  Although he was not certain, Johnson believes he, (Johnson), spoke with Simpson about the sweep sometime after returning from the county chiefs meeting.

*(During my investigation I reviewed Sgt. Simpson's latest performance appraisal and copied the page with the comment to which Chief Johnson referred.  I also copied the signature page showing the appraisal was signed by Captain Yoakum on 4/13/17, and Simpson on 4/19/17.  Copies of both pages can be found in attachment 2[e]).*

I also asked Chief Johnson if there was any follow-up to his concern that Simpson made, in Johnson's words, a "false statement," or, "a statement not based in facts."  Johnson said he and Captain Yoakum might have discussed what Simpson did, but at that time he (Johnson) decided to let it go.  However, after other issues surfaced, (re: UPD IA 06-17), Johnson made the decision to initiate an investigation into Simpson's conduct at the 12/6/16 staff meeting.

I asked Chief Johnson if he had any conversation with his assistant, Luz Barrett, after the 12/6/16 staff meeting.  Johnson said he did, asking Barrett if she had taken notes during the meeting so he could ensure his memory was accurate.

During the interview Chief Johnson and I discussed the handwritten notes taken by Barrett to which he referred, (attachments 2[c]i and 2[c]ii), and later given to me.  The first page of notes, (identified as "1" in the lower right corner), was a list of those who attended the 12/6/16 staff meeting.  The second page, (identified by what appeared to be a Post-It note in the lower right corner), included various notes attributed to Sgt. Simpson, (included again as an image below for reference):[4]

---

[4] Ms. Barrett initially gave me two pages of handwritten notes: page 1, (per the bottom right hand corner), listing those who attended the meeting, and page 5, showing notes of Sgt. Simpson's comments.  The two pages of handwritten notes were in black & white, (attachments 2[c]i and 2[c]ii), and included on the bottom right corner of page 5, what appeared to be a Post-It note with the comments, *"Dec 6th,"* and *"County Chiefs Dec 8th."*  I later requested and received from Barrett color copies of all notes taken during the meeting, (attachment 2[d]).  The color copies did not have the Post-It note.



*Attachment 2[c]ii*

Referring to the comments (adjacent to the name *Simpson*), *"Sweep next Tuesday & Wednesday,"*[5] and several remarks beneath it, I asked Chief Johnson to clarify if everything referred to the same probation and parole compliance sweep. Johnson believed some of the remarks referred to a sweep at Memorial park, (for which Simpson was also responsible), while the last comment, *"No participation from other agencies SBSO, Chino, Montclair, Ontario, Claremont,"* specifically referred to the probation and parole compliance sweep.

Finally, because Johnson did not identify *Claremont* during our discussion, (but it appeared in Barrett's notes), I asked him about that agency. Noting that Claremont is in Los Angeles County, Johnson said they generally would not send officers to assist with

---

[5] The Tuesday following the 12/6/16 staff meeting was on 12/13/16, and Wednesday was on 12/14/16, which is when the probation and parole compliance sweep occurred.

COU-0000018

a probation and parole compliance sweep in Upland.  Therefore, to ensure that the agencies listed on Barrett's notes were, in fact, specific to the probation and parole compliance sweep and *not* the Memorial park sweep, I asked Johnson if other agencies would typically assist with the latter.  Johnson believed the park sweep was conducted only by City of Upland personnel, (police department and public works).

For additional details refer to the complete audio of both interviews.  (A copy of the 5/9/17 interview audio and transcript can be found in attachments 6[f] and 5[c], respectively.)

### *Statement of Sr. Administrative Assistant Luz Barrett, (5/9/17)*

After reviewing Barrett's statements during her 5/4/17 interview, I again spoke with her about the 12/6/16 staff meeting.  Once again the interview was recorded and later transcribed, and can be found in attachments 6[g] and 5[d], respectively.

I asked Ms. Barrett if the two pages of handwritten notes we previously discussed were the entirety of notes taken during the 12/6/16 staff meeting.  Barrett said they were not, and at my request later gave me six pages of handwritten notes from the meeting, (two were pages we had already discussed).[6]  The six pages of notes are included in my report as attachment 2[d].

Barrett and I also briefly discussed the comments adjacent to Simpson's name that apparently referred to two different operations.  Although she was uncertain to which operation *"Closing the park"* referred, saying "…a lot of times they go so fast I get a little confused" when taking minutes, Barrett  was confident about the conversation between Johnson and Simpson as it relates to the probation and parole compliance sweep.  Again, Barrett said the conversation stands out because Johnson asked her to give him the information (about which agencies were contacted) for the 12/8/16 county chiefs meeting.

Finally, because Chief Johnson was uncertain why "Claremont" was included in the list of agencies (identified in Barrett's notes) Simpson reportedly said could not participate in the probation and parole compliance sweep, I asked Barrett if she knew why Claremont appeared on that list.  Barrett replied, "The reason I wrote it down was because Simpson said it."  Barrett explained Johnson asked Simpson if he had reached out to surrounding agencies; when Simpson said that he had, Johnson asked which agencies he had contacted, and Barrett wrote down the names Simpson identified.

For additional details, refer to the complete interview audio.

---

[6] Except for the Post-It note in the lower right corner of the page on which Simpson's comments appeared, the two-page excerpt of meeting notes Barrett and I discussed during the 5/4/17 interview were identical to the duplicate pages in the full six-page document I later received.

*Statement of San Bernardino Undersheriff Joe Cusimano, (5/17/17)*

Because Chief Johnson said he spoke with Undersheriff Cusimano about participating in the sweep before the 12/6/16 staff meeting, I interviewed Cusimano by phone. The conversation was recorded and can be found in attachment 6[l].

Undersheriff Cusimano said he has spoken with Chief Johnson many times about various requests for assistance, but did not specifically recall a conversation in which Johnson asked for the Sheriff's Department to participate in a parole & probation sweep.

In an attempt to determine whether other individual agencies had been contacted about participating in the sweep before the 12/6/16 staff meeting, if at all, I also interviewed Montclair Police Chief Robert Avels.  Chief Johnson spoke with Avels at the county chiefs meeting on 12/8/16.

*Statement of Montclair Police Chief Robert Avels, (5/17/17)*

I spoke with Montclair Police Chief Robert Avels by phone; the conversation was recorded and can be found in attachment 6[m].

Although he could not recall the date on which he and Chief Johnson spoke, Chief Avels said they did speak about an AB109 sweep at a county chiefs meeting, (which he believes was held at Chino PD).  Chief Johnson asked Chief Avels if Montclair PD could assist with the sweep.  At the time they spoke Chief Avels did not know that someone from Upland PD had contacted Montclair PD and asked for their assistance, but after the meeting learned from the crime suppression supervisor, Sgt. Mike Zura, that such a request had been made about one week prior.  Chief Avels did not know to whom at his agency the request was made, but believed it was either Officer Chad Edley or Officer Eric Rivera.  Chief Avels said he would ask these officers to call me.

On 5/18/17 I received a voice mail from Chief Avels confirming that one person involved in Montclair PD's assistance with the sweep was crime suppression officer Eric Rivera. Chief Avels directed Officer Rivera to cooperate with my investigation and not discuss the investigation with anyone.

In his voice mail, Chief Avels also said Officer Rivera sent him two emails related to planning for the AB109 sweep.  The first email had been sent to Montclair officer Jeff Reeder, who was assigned to their Crime Suppression team at the time, by Upland officer Andrew McCullough on November 7, 2016.  A subsequent email was sent by Upland Officer Jacob Kirk on November 25, 2016, and listed a date for the sweep as December 14 (2016).  On November 29, 2016, in an email to Officer Kirk, Officer Rivera confirmed Montclair PD's participation in the sweep.

Wedge & Fobes Investigations

GW

COU-0000020

Audio of the voice mail from Chief Avels can be found in attachment 6[o].

Following my conversation with Chief Avels, I interviewed Officer Rivera.

### Statement of Montclair Officer Eric Rivera, (5/22/17)

I spoke with Officer Rivera by phone; the interview was recorded and can be found in attachment 6[p].

Officer Rivera told me he recalled Upland PD coordinating a probation and parole compliance sweep, saying he was first contacted by Officer McCullough or Officer Kirk. The initial contact was made by phone, but subsequent communications with McCullough and Kirk occurred via email. The first follow-up email Rivera received, (per Chief Avels' voice mail, dated 11/7/17), was sent by McCullough about one week after that phone conversation. Rivera did not recall any phone conversations with McCullough between the first and second emails, (the latter being sent on 11/25/17).

Recalling Chief Avels' voice mail that the first email request was sent to (Montclair) Officer Wheater by Officer McCullough, I asked Rivera if Wheater was involved in the planning. Rivera said he was, explaining their department was testing for various positions at the time the sweep was being planned. Although Wheater ultimately went to the detective bureau, when Montclair was first contacted to assist with the sweep he and Rivera were teammates.

At my request Officer Rivera sent me the two emails to which Chief Avels referred, (attachments 2[g] and 2[h]). The first email, dated 11/7/17, was sent from Officer McCullough to Officer Wheater. In that email, McCullough said Upland PD was coordinating a sweep, (to occur on 12/14/17), and asked for Montclair PD's participation. Wheater replied later that day, advising McCullough he was no longer on the team. Montclair Sgt. Mike Zerr was copied on Wheater's response.

The second email sent to me by Officer Rivera was actually a thread of several emails that began on 11/25/17. The thread began with an email on that date from Officer Kirk to Officer Rivera. Kirk reminded Rivera of the sweep on 12/14/17. Apparently Montclair's participation was not confirmed at that time, as Kirk told Rivera, "If you can participate, please send me the name(s)…of the participating officers." On 11/29/17, Montclair confirmed their participation, identifying the officers who would assist. The remainder of this particular email thread included information about the participating officers, and the last dated exchange occurred on 12/13/17, (from Kirk to Rivera), confirming the time that briefing was scheduled to begin.

For additional information, refer to the complete interview audio and emails sent to me by Officer Rivera.

Wedge & Fobes Investigations

GW

COU-0000021

Because Chief Johnson identified Ontario Police Chief Brad Kaylor as one of the individuals he spoke with at the county police chiefs meeting on 12/8/16, I interviewed Chief Kaylor as well.

### Statement of Ontario Police Chief Brad Kaylor (5/30/17)

I interviewed Chief Kaylor by phone.  The interview was recorded and can be found in attachment 6[s].

I asked Chief Kaylor if he recalled attending the county chiefs meeting on 12/8/16. Although Chief Kaylor did not have an independent recollection of the meeting, his calendar showed he did, in fact, attend.

Chief Kaylor did not recall a conversation at the county chiefs meeting about assisting Upland PD with a probation and parole sweep, but did say that such a conversation in passing with Chief Johnson sounded familiar.  Chief Kaylor initially believed he told Chief Johnson they would be willing to assist.

Chief Kaylor did not know if Chief Johnson's request at the chiefs meeting was the first time he heard that Upland PD was coordinating a parole and probation compliance sweep.  Similarly, Chief Kaylor did not remember if anyone else had previously contacted his agency about the sweep, but said it was possible they had.

I told Chief Kaylor that Chief Johnson recalled he (Kaylor) said Ontario PD had another operation planned for the same date Upland was conducting their sweep, and would therefore be unable to participate.  Chief Kaylor could not remember making such a statement, nor could he recall what operation they had planned.  Chief Kaylor did say when such a request is made he would typically contact the lieutenant who would be asked to coordinate their agency's participation in this kind of an operation, and identified that individual as (now acting Captain) Mike Lorenz.

### Statement of Ontario Police Acting Captain Mike Lorenz (5/30/17)

I spoke with Captain Lorenz by phone.  The interview was recorded, and can be found in attachment 6[t].

Captain Lorenz told me he was the lieutenant assigned to the Special Operations division in December 2016, and in that capacity was responsible for Ontario PD's gang unit and their AB109 unit.

I asked Captain Lorenz if Upland PD contacted him asking for his agency to assist with a probation and parole compliance sweep in December 2016 that they (Upland) were coordinating.  Lorenz said if they did so he was unaware, adding that any such request would typically make its way to him.  Lorenz also said the request could have gone to

Wedge & Fobes Investigations

GW

COU-0000022

Ontario police Lt. Paul Berdnick, who is responsible for the narcotics task force.  Lorenz explained two Upland police officers are assigned to that task force, so Upland PD's request for assistance from Ontario PD would likely have gone through one of these individuals to Berdnick, who in turn would then pass along the information to Lorenz. Lorenz said it was possible that an operation could have been coordinated in Berdnick's division without him, (Lorenz), knowing about it.

Finally, I asked Captain Lorenz if his agency had another operation planned for December 14, 2016, the date Upland PD's probation and parole compliance sweep was scheduled to occur.  Lorenz said his agency is engaged in some kind of operation daily, but would check to determine specifically what they had planned for that date.

Later that day I received a voice mail from Captain Lorenz who told me his agency had its own probation and parole compliance sweep on December 14th.[7]  Lorenz also told me he spoke with two officers who were assigned to Ontario PD's gang unit in December, and neither recalled a request from Upland PD to assist with Upland's sweep.

Audio of the voice mail from Captain Lorenz can be found in attachment 6[u].

Although in his voice mail Captain Lorenz did not name the two gang officers with whom he spoke, during a subsequent conversation with Lorenz he identified these individuals as Sgt. Brice Devey and Detective Larry Bounomo.  I did not follow-up with either officer to confirm their statements to Lorenz.

*Statement of Ontario Police Lt. Paul Berdnick, (6/1/17)*

I spoke with Lt. Berdnick by phone; the interview was not recorded.

Lt. Berdnick told me he is responsible for the Upland-Ontario joint narcotics task force, and in December 2016 had two officers from Upland PD assigned to his team, Darryl Hall and George Snyder, (Hall is still with Upland PD, but Snyder is not).

Lt. Berdnick said he did not recall assisting Upland PD with a parole and probation compliance sweep in December 2016, nor did he recall being asked to do so, (though he believes such a request would have been unlikely because his team is undercover). Berdnick said he spoke with Officer Hall, who also did not recall being asked to participate in the sweep.

On 6/1/17 I interviewed both Community Resource Officers who were assigned to CRO when the probation and parole compliance sweep was planned, Andrew McCullough and Jacob Kirk.

---

[7] In his 5/30/17 voice mail, Captain Lorenz did not clarify if his agency's sweep on 12/14/16 was separate from the sweep conducted by Upland PD.  On 6/2/17, Lorenz told me the sweeps were, in fact, separate.

Wedge & Fobes Investigations

GW

COU-0000023

## Statement of Officer Andrew McCullough, (6/1/17)

I interviewed Officer McCullough in a conference room at Upland City Hall.  The interview was recorded and later transcribed, and can be found in attachments 6[v] and 5[e], respectively.

McCullough acknowledged the interview was being recorded and that the signature on the notice he received from HR Manager Kelly Gonzales was his.

Officer McCullough has been a sworn police officer with the City of Upland for about ten years and is currently assigned to the Community Resource Officer (CRO) team. Before becoming a police officer, McCullough was a police cadet for about three years.

McCullough said although there are currently four officers assigned to CRO, the two newest members began about five or six months prior, near the start of the New Year. In November and December 2016, only McCullough and Officer Jacob Kirk were on the team, and Sgt. Simpson was their supervisor.

I asked Officer McCullough if in November and December 2016 he was involved in the planning of a probation and parole compliance sweep.  McCullough said he was, and believed the decision to conduct a sweep originated as a result of information shared during crime stats meetings.  Sgt. Simpson gave McCullough and Kirk a certain time frame in which to conduct the sweep, (a directive McCullough believed came from Chief Johnson), so McCullough and Kirk selected a date for the operation.

I also asked Officer McCullough to explain Sgt. Simpson's involvement in the planning process for the sweep.  McCullough said Simpson was involved in discussions with McCullough and Kirk about what needed to be done and would periodically check to ensure those tasks were accomplished, but otherwise he did not know Simpson's role in that process.

Officer McCullough said he and Officer Kirk performed different tasks to plan the sweep. For example, Kirk obtained from probation or parole, a list of subjects they could contact during the sweep, while McCullough conducted the necessary computer work on each person and organized the teams of officers who would be participating.

I asked Officer McCullough if Sgt. Simpson asked him to call specific agencies as part of the planning process.  Answering, "Not Simpson,"[8] McCullough said someone mentioned they should contact Rialto PD, (which they did not do), and Pomona PD, (who could not participate).  McCullough also said they were asked to contact *surrounding* agencies, so he called friends from Rancho Cucamonga, (SBSD), and

---

[8] The transcript indicates Officer McCullough answered, "I don't know, not *since then,*" (00:13:47).  However, after reviewing the audio, I determined McCullough actually said, "I don't know, not *Simpson.*"

Wedge & Fobes Investigations

GW

COU-0000024

Ontario PD.  McCullough said they also reached out to Probation, Parole, Montclair PD, and Chino PD.

McCullough identified the people he personally contacted to assist with the sweep as Officer Josh Hovey, (Ontario PD), and Deputy Jesse Guzman, (SBSD/Rancho Cucamonga station).  Hovey had recently broken his hand and was off work when McCullough first sent him a text message about the sweep, but told McCullough he would contact other members of his (Hovey's) team to find out if they could assist.  Eventually, Hovey sent McCullough a text message saying nobody was able to participate.  Guzman, in turn, told McCullough, also via text, that he had to contact his supervisor for authorization to participate.  About one week after the initial request was made, Guzman told McCullough they could not assist with the sweep.

McCullough believes Officer Kirk contacted Chino PD, saying "I think I remember him telling me they didn't call him back," but he did not recall who contacted Montclair PD, (i.e., Kirk or him).[9]  McCullough was also "almost positive" he, (McCullough), did not contact Pomona PD, and he could not remember if anyone, (i.e., he or Kirk), contacted Claremont PD.  However, McCullough said that other than the two people he contacted, (Hovey and Guzman), he could not say for certain who called whom.

Officer McCullough told me he did not have a specific recollection of anyone telling him they *could* participate.

I asked Officer McCullough if he remembered having any conversation with Sgt. Simpson, telling him that certain agencies could or could not participate.  McCullough said he and Officer Kirk would update Simpson when they received information from agencies who were asked to assist.  For example, when McCullough found out from Ontario PD and Rancho Cucamonga (SBSD) that they were not able to assist, (confirmation that was given to him no more than one week before the sweep occurred), he shared this information with Simpson the same day.  Although he did not remember any agency specifically saying they *would* participate, McCullough assumed he and Kirk would update Simpson with that information as well.

Officer McCullough said he and Kirk were told they needed to contact about one hundred subjects, and therefore assembling enough teams of officers was problematic.  Eventually they prepared packets (of subjects to contact) for seven teams, with ten parolees/probationers per team, and kept information on thirty additional subjects in case any team finished their assigned contacts early.  Because some officers did not show up on the day of the sweep, McCullough said they ultimately had six teams.

---

[9] At the time of this interview I had not yet spoken with Sgt. Simpson, who later said Chino PD was not contacted until after Chief Johnson attended the county chiefs meeting on 12/8/16.  Therefore, I did not ask McCullough when he believed Officer Kirk contacted that agency, (i.e., during the initial planning, or just before the sweep occurred).

I asked McCullough if he also shared with Sgt. Simpson, information about the number of subjects they had selected to contact.  McCullough recalled that he and Kirk told Simpson they had identified 60 subjects.  McCullough believes Simpson then shared this information with Chief Johnson because Simpson later returned and told them Johnson wanted at least one hundred contacts.

I asked Officer McCullough if either he, or to his knowledge, Officer Kirk, ever gave Simpson any reason to believe they were not prepared to, or did not want to conduct the sweep.  McCullough said that, despite the tremendous amount of work to prepare and conduct a sweep, they *were* prepared

Officer McCullough and I also discussed the email exchange forwarded to me by Montclair Officer Eric Rivera, (attachment 2[g]).  I told McCullough the exchange apparently began on November 7 with an email (about the sweep) he sent to Officer Jeff Wheater.  McCullough said that although he does not know Wheater personally, he knew to contact Wheater because they had served search warrants together in the past.  McCullough recalled very little about subsequent conversations with officers from Montclair PD, whether via text message, email or phone, but at some point learned that Rivera was coordinating Montclair's participation in the sweep.

As the interview concluded I asked Officer McCullough if he maintained files of the planning process, including information about what agencies were contacted and who could, or could not participate.  McCullough said he did not document which agencies they contacted, but he did have the operational plan listing the agencies who ultimately participated.  I asked McCullough to send me that information, as well as any other document, (emails, etc.), related to the sweep.

For additional details, refer to the complete interview audio.

### *Statement of Officer Jacob Kirk, (6/1/17)*

Following my conversation with Officer McCullough I interviewed Officer Kirk in a conference room at Upland City Hall.  The interview was recorded and later transcribed, and can be found in attachments 6[w] and 5[f], respectively.

Kirk acknowledged the interview was being recorded and that the signature on the notice he received from HR Manager Kelly Gonzales was his.

Officer Kirk began his law enforcement career with the City of Culver in 2004, and since 2006 has been a police officer with the City of Upland.  In November 2015 Kirk was assigned to the Community Resource Officer (CRO) team.

Kirk told me that in November 2016 he and Officer McCullough, who is also assigned to CRO, were tasked with coordinating a probation and parole compliance sweep; that

COU-0000026

directive came from their supervisor at the time, Sgt. Simpson.  Kirk said he and McCullough were told to compile a list of parolees and probationers within the city of Upland, and contact neighboring jurisdictions to participate in the operation.  Kirk believes he and McCullough had about one month to prepare for the sweep, and therefore were likely first tasked with doing so in early- to mid-November.  The sweep was scheduled for December 14th.

I asked Officer Kirk about his role in the planning process.  Kirk said Sgt. Simpson asked him and McCullough to call surrounding agencies, which they did.  Specifically, Kirk said he contacted Probation, Parole, and Montclair PD, while (he thinks) McCullough called Chino PD and the sheriff's department.  Although Kirk said Chino is not one of the surrounding agencies, he recalls that they were brought up at some point in the planning process, but did not remember when.  Kirk does not believe he (Kirk) called any other agencies.

Officer Kirk and I then discussed the email exchange between Montclair Police Officer Eric Rivera and him, (attachment 2[h]).  Referring to an email from Kirk to Rivera dated November 25 reminding Rivera of the sweep, I told Kirk the content of that email led me to believe there was prior contact between the two.  Kirk said he and Rivera spoke before the November 25 email because Rivera wanted more information for his sergeant, and then Kirk later sent a reminder about the operation.

Officer Kirk said while Montclair PD and Parole participated in their sweep, only one probation officer did so as well, and that individual was attached to Chino PD.  Kirk explained he had asked Probation to participate, but one of their supervisors said they could not because of other commitments and essentially requested more time.  Ontario PD, in turn, was also unable to assist.

I asked Officer Kirk if he told Sgt. Simpson that Ontario PD could not participate.  Kirk could not recall whether he or McCullough gave this information to Simpson, but did say there was a conversation with Simpson early in the planning process in which the information was shared.  Kirk also said he told Simpson that Probation was not able to participate after receiving notification from a female supervisor at that agency.  Within a few days before the sweep, Kirk recalled, he and McCullough were at Memorial Park with Sgt. Simpson addressing a homeless encampment issue when he gave this information to Simpson.  Simpson told Kirk he would contact the Probation supervisor, and called her from Memorial Park.

I asked Officer Kirk if he ever told Sgt. Simpson the sweep had to be "put down" for a while or re-scheduled, and he told me, "No."  Similarly, Kirk did not remember hearing Officer McCullough tell Simpson they could not do the sweep, nor did he recall Simpson saying that *he* wanted to cancel or re-schedule the operation.  Kirk did say, however, that he told Simpson conducting the sweep was going to be difficult because they were not getting support from the Probation department.

As the interview concluded I asked Officer Kirk to send me any documents or emails related to the sweep, including notes Kirk said he typically keeps of tasks to complete when given assignments.

For additional details refer to the complete interview audio.

After the interview I received from officers Kirk and McCullough various emails and documents related to the probation and parole compliance sweep, including team composition, subjects to be contacted, and the operational plan.  One document, a five-page operational plan sent to me by Officer Kirk, (attachment 2[j]xi), listed the participating agencies only as Upland PD, Montclair PD, CDC Parole, and San Bernardino County Probation – Chino PD was not included.  Additionally, a two-page document titled *Parole/Probation Sweep Participants* attached to a 12/8/16 email from Kirk to McCullough, (also given to me by Kirk), identified participating agencies and the individual officers representing each agency, (attachment 2[j]v).  Chino PD appeared last on that list, with the notation, *"Sending 7 officers."*  Although in itself not dispositive, at the very least both documents suggest Chino PD was a late addition to the sweep.

With the exception of the aforementioned documents, there was nothing else that helped to establish specifically when, and by whom, individual agencies were contacted.  Regardless, I have included all documents for reference, (attachments 2[i] – 2[j]).

### Statement of Ontario Police Officer Josh Hovey, (6/15/17)

Because Officer McCullough said he contacted Officer Josh Hovey, (Ontario PD), and Deputy Jesse Guzman, (San Bernardino Sheriff, Rancho Cucamonga), to determine if their agencies could assist with the probation and parole compliance sweep, I interviewed Hovey by phone.  The interview was recorded and can be found in attachment 6[z].[10]

Officer Hovey said he was, in fact, contacted by Officer McCullough to assist with Upland PD's probation and parole compliance sweep.  Although he could not recall when this contact first occurred, (other than based on my comment that it would have likely been in November 2016), Hovey said his agency was given "plenty of notice" and guessed it was four weeks in advance of the sweep.  Hovey also could not recall if this request was made via text message or by phone.  At my request Hovey checked his text messages but could not find such an exchange, saying he regularly deletes them.

After contacting his sergeant, Hovey notified McCullough that Ontario PD could not assist with the sweep because they already had an operation planned for that same

---

[10] The audio quality of this particular interview is poor.

Wedge & Fobes Investigations

GW

COU-0000028

date.  Hovey did not recall when he made this notification, (i.e., how soon after the initial request for assistance, or how close to the scheduled date of the sweep).

For additional information refer to the complete interview audio.

*Statement of San Bernardino Sheriff's Deputy Jesse Guzman, (6/21/17)*

Following my conversation with Officer Hovey I interviewed Deputy Guzman by phone. The interview was recorded and can be found in attachment 6[aa].

Deputy Guzman said he is currently assigned to the Rancho Cucamonga station, and in November/December 2016 was a member of the Multiple Enforcement Team, (MET). MET, he explained, is tasked with addressing Crime Free Multi-Housing issues, gang-related activity, and some narcotics investigations.

I asked Deputy Guzman if he knows Upland PD Officer McCullough.  Guzman said he did, explaining that they went to the law enforcement academy together about ten years prior and remain in contact with one another.

Deputy Guzman told me he was contacted by Officer McCullough, likely by phone, and asked if MET could assist with a probation and parole compliance sweep.  Guzman told McCullough he would check with his chain of command and get back to him.  At least two weeks later McCullough called Guzman checking on the status of his request. Guzman told McCullough MET could not assist because their team had another operation planned for the same day on which Upland PD's sweep was scheduled.

I asked Deputy Guzman if he knew when Officer McCullough first contacted him, but he did not. Guzman also did not recall how far in advance of the sweep the initial request was made.

Deputy Guzman said he did not exchange emails about the sweep with Officer McCullough, but would check his text message history in an attempt to determine when the initial request was made.  Guzman later contacted me to say he did not have any text messages about the sweep.

For additional information refer to the complete interview audio.

*Statement of Chino Police Sgt. Nick Marotta, (7/13/17)*

I spoke with Sgt. Marotta by phone about the memo he wrote to Chief Comstock regarding the lack of contact from anyone at Upland PD to participate in the probation and parole compliance sweep, (attachment 2[f]).  The interview was not recorded.

Wedge & Fobes Investigations

GW

COU-0000029

Sgt. Marotta told me he was assigned to the Special Enforcement Team in November 2016 and would have been the person responsible for coordinating his agency's participation in the sweep. When Marotta was cc'd on a 12/8/16 email from Chief Comstock to Lt. Mensen asking that Chino PD send officers to assist Upland PD with a sweep on 12/14/16, it was Marotta's first notification that a sweep was being conducted. Marotta contacted Simpson, and Chino PD ultimately assisted with the sweep.

Marotta told me it was possible that the request for assistance went elsewhere in his department, (they have 110 sworn officers), so he checked with their detective supervisor, Sgt. Adam Whitham, where such requests are sometimes directed. Marotta also checked with (then) Corporal Joe McArdle, who was responsible for the Special Enforcement Team in Marotta's absence. Neither Whitham nor McArdle had been contacted by anyone from Chino PD.

For additional details refer to the memo prepared by Sgt. Marotta.

During the investigation my business partner, Private Investigator Steve Fobes, and I interviewed those individuals reportedly at the 12/6/16 staff meeting, (per Sr. Administrative Assistant Barrett's notes). Where noted, statements taken by P.I. Fobes have been summarized herein. Complete statements can be found in Fobes' supplemental report in attachment 1[b].

*Summarized statement of Sgt. Jim Tseng to P.I. Fobes (5/8/17)*

Sgt. Tseng recalled a staff meeting, though not necessarily on 12/6/16, at which a discussion about an AB109 sweep occurred. Tseng did not specifically recall Chief Johnson asking Simpson about the status of the sweep, but did recall Simpson saying that neighboring agencies did not want to participate. Tseng also did not remember Simpson asking Johnson to cancel the sweep, of if Johnson asked Simpson if he had contacted specific agencies.

Based on the discussion between Chief Johnson and Sgt. Simpson, Sgt. Tseng believed Simpson had contacted neighboring agencies, saying, "He's usually very thorough."

For additional details refer to the supplemental report prepared by P.I. Fobes, as well as the complete interview audio, (attachments 1[b] and 6[c], respectively).

*Summarized statement of Sgt. Michael Rainwater to P.I. Fobes, (5/8/17)*

Sgt. Rainwater recalled attending the 12/6/16 staff meeting, and to a limited extent, the AB109 sweep discussion. Rainwater also recalled Chief Johnson asking Sgt. Simpson about the status of the sweep. Although he did not remember Simpson's exact response, Rainwater said it was something to the effect of not having the manpower to

conduct the sweep.  Rainwater did not recall Simpson asking Johnson to postpone or cancel the sweep, nor could he recall if Johnson asked Simpson about contacting the neighboring agencies.

For additional details refer to the supplemental report prepared by P.I. Fobes, as well as the complete interview audio, (attachments 1[b] and 6[d], respectively).

*Summarized statement of Sgt. Don Dodt to P.I. Fobes, (5/8/17)*

Sgt. Dodt did not recall attending the 12/6/16 staff meeting or any discussion about a probation and parole compliance sweep.  Dodt did remember a meeting in which Simpson said that none of the neighboring agencies wanted to participate, and also recalled Simpson saying he contacted Ontario PD, Montclair PD, and Chino PD.  Dodt did not recall Chief Johnson asking Simpson about contacting specific agencies, nor did he recall Simpson asking Johnson to cancel or postpone the sweep.

Based on the conversation between Johnson and Simpson, Dodt believed Simpson contacted neighboring agencies and was told no agency was able to assist.

For additional details refer to the supplemental report prepared by P.I. Fobes, as well as the complete interview audio, (attachments 1[b] and 6[e], respectively).

*Summarized statement of Acting Captain Cliff Mathews to P.I. Fobes, (5/9/17)*

Acting Captain Mathews said he did not recall attending the 12/6/16 staff meeting but did remember discussions about an AB109 sweep at several different meetings during the previous year.  At one meeting Chief Johnson asked Sgt. Simpson about the status of the sweep.  Simpson essentially told Johnson he contacted neighboring agencies but was having a difficult time getting the agencies to participate.  Mathews did not recall which agencies Simpson said he contacted, but explained the agencies he likely *would* have contacted were Ontario PD, Montclair PD, Chino PD, Claremont PD, and the Sheriff's Department.  Mathews also recalled Simpson suggesting to Johnson that they cancel or postpone the sweep.

For additional details refer to the supplemental report prepared by P.I. Fobes, as well as the complete interview audio, (attachments 1[b] and 6[h], respectively).

*Summarized statement of Sgt. Anthony Kabayan to P.I. Fobes, (5/9/17)*

Sgt. Kabayan did not specifically recall the 12/6/16 staff meeting, but did remember a discussion about an AB109 sweep, and Chief Johnson asking Sgt. Simpson about the status of that sweep.  In response, Simpson told Johnson he had contacted neighboring agencies, and that Chino PD and Rancho Cucamonga Sheriff's Department were not able to assist.  Kabayan did not recall Simpson trying to postpone or cancel the sweep.

Wedge & Fobes Investigations

GW

COU-0000031

For additional details refer to the supplemental report prepared by P.I. Fobes, as well as the complete interview audio, (attachments 1[b] and 6[i], respectively).

*Summarized statement of Records Supervisor Kailene Loza to P.I. Fobes, (5/9/17)*

Records Supervisor Loza did not recall the 12/6/16 staff meeting, nor did she initially recall a discussion about an AB109 sweep.  However, Loza said Sgt. Simpson spoke about such a sweep at some meeting, and recalled that he said neighboring agencies did not want to participate.  Loza also recalled Chief Johnson questioning Simpson about his statement that no agencies were able to assist with the sweep, but she did not recall Simpson's response.  Loza also did not remember Simpson asking Chief Johnson to postpone or cancel the sweep.

For additional details refer to the supplemental report prepared by P.I. Fobes, as well as the complete interview audio, (attachments 1[b] and 6[j], respectively).

*Summarized statement of Lt. John Poole to P.I. Fobes, (5/9/17)*[11]

Lt. Poole did not recall any conversation about an AB109 sweep, even after P.I. Fobes asked him several questions that could possibly refresh his memory.

For additional details refer to the supplemental report prepared by P.I. Fobes, as well as the complete interview audio, (attachments 1[b] and 6[k], respectively).

*Statement of Lt. Marcelo Blanco, (5/18/17)*

I interviewed Lt. Blanco in a conference room at Upland City Hall.  Blanco said he received the interview notice and signed it in my presence.  The interview was recorded, and can be found in attachment 6[n].

Blanco said he has been with the Upland Police Department for about 26 years, initially as volunteer and then police cadet.  He has been a sworn officer for 21 years, and was promoted to lieutenant in September 2016.  Before his promotion, Blanco supervised the CRO team; Sgt. Simpson assumed responsibility for the team thereafter.

I asked Blanco if he recalled a staff meeting where a parole and probation sweep was discussed.[12]  Blanco said various sweeps are discussed at staff meetings and crime stats meetings, but he did not specifically recall such a discussion at the 12/6/16 staff

---

[11] Lt. Poole's statement includes information relevant to a separate administrative investigation, (UPD IA 06-17). Although the complete interview audio, (attachment 6[k]), is included with my report, only the statements relevant to this investigation, (UPD IA 05-17), are included in the narrative.  The complete statement can be found in UPD IA 06-17.

[12] Also referred to as an AB109 sweep throughout the interview.

meeting where he was listed as an attendee.  As I continued to provide reported details of the discussion, however, Blanco said certain things sounded familiar.  For example, I asked Blanco if he recalled Simpson ever being asked at a staff meeting about the status of a probation and parole sweep.  Blanco answered, "I can vaguely imagine," explaining AB109 sweeps were one of Chief Johnson's priorities and were discussed "more than once" at meetings.

Next, I asked Blanco if he recalled a specific discussion about an AB109 sweep when Simpson was asked about the status of that sweep, and Simpson reportedly said other agencies did not want to participate.  Blanco replied, "Vaguely," but could not recall if the exchange occurred at a crime stats meeting or at a staff meeting.  I also asked Blanco if he recalled during that discussion, Simpson trying to get Chief Johnson to cancel or postpone the sweep.  Once again Blanco said it did "jog" his memory there was some discussion about such a statement, but he could not be "100 percent" certain. Blanco also said this would be a typical recommendation if he was unable to get other agencies to participate.  However, Blanco could not recall whether Simpson specifically said the agencies did not *want* to participate, weren't *available* to participate, or that he had not contacted the agencies.

I asked Blanco if he recalled Simpson saying he contacted certain agencies.  Blanco said contacting surrounding agencies was something Simpson would ordinarily do to prepare for such a sweep, but he did not remember Simpson saying he had done so, or identifying those agencies by name.  Blanco also said he did not remember Simpson saying he made personal contact with other agencies, but offered that Luz Barrett would have taken notes and have some record of the meeting.

I also asked Blanco if he recalled Chief Johnson asking Simpson if he contacted specific agencies.  Blanco replied, "Not specifically, (but) I know how the chief operates so I can see him doing that."

As the interview continued I asked Blanco if, based on his vague recollection of the 12/6/16 meeting he got the impression Simpson was trying to get out of doing the sweep or had not contacted other agencies.  Presumably referring to the sweep, Blanco said Simpson "thrives" on that kind of activity, and he could not imagine Simpson trying to get out of it.

Finally, I asked Blanco if he recalled Chief Johnson saying to Simpson during the 12/6/16 meeting anything similar to, "So you're telling me the agencies around here can't participate?"  Again, Blanco said he had a "very vague recollection" that Johnson "would have" made such a statement, but had no other information

For additional details, refer to the complete interview audio.

Wedge & Fobes Investigations

GW

COU-0000033

*Statement of Sgt. Bill Chani (5/25/17)*[13]

I interviewed Sgt. Chani in a vacant office at the Upland police department.  Chani acknowledged receipt of the interview notice and signed it in my presence.  The interview was recorded and can be found in attachment 6[q].

Sgt. Chani has been a police officer for the city of Upland for 21 years, and is currently a patrol supervisor assigned to the weekend midnight shift.  Chani has been a sergeant for about two and one-half years.

I initially asked Sgt. Chani about the December 6th staff meeting during which a probation/parole compliance sweep was discussed.  Chani did not specifically remember the meeting, but "vaguely" recalled mention that such an operation was pending.

Chani said he did not remember who was tasked with coordinating the sweep, nor could he recall a conversation between Simpson and Chief Johnson during that meeting.  However, Chani did recall that "nobody wanted to get involved," or that there was "minimal or no participation" from outside agencies.  Finally, Chani said he did not recall Chief Johnson asking if individual agencies could participate in the sweep, nor if anyone else at the meeting said anything in response to the comment about little to no participation.

For additional details refer to the complete interview audio.

*Statement of Sgt. Maurice Duran, (5/25/17)*[14]

I interviewed Sgt. Duran in a vacant office at the Upland Police Department.  Duran confirmed he received the interview notice and signed it in my presence.  The interview was recorded, and can be found in attachment 6[r].

Sgt. Duran has been a police officer with Upland PD for about 13 years and was promoted to sergeant in January 2016.

Sgt. Duran and I initially discussed the 12/6/16 staff meeting at which the parole and probation compliance sweep was discussed; Duran was listed as an attendee at that

---

[13] Sgt. Chani's statement includes information relevant to a separate administrative investigation, (UPD IA 06-17). Although the complete interview audio, (attachment 6[q]), is included with my report, only the statements relevant to this investigation, (UPD IA 05-17), are included in the narrative.  The complete statement can be found in UPD IA 06-17.

[14] Sgt. Duran's statement includes information relevant to a separate administrative investigation, (UPD IA 06-17). Although the complete interview audio, (attachment 6[r]), is included with my report, only the statements relevant to this investigation, (UPD IA 05-17), are included in the narrative.  The complete statement can be found in UPD IA 06-17.

Wedge & Fobes Investigations                                                                      GW

COU-0000034

meeting.  Duran did not specifically recall being at a meeting when such a discussion occurred, nor did he recall any conversation about the sweep itself.

### Statement of Retired Lt. Alan Ansara, (6/7/17)[15]

I interviewed Ansara in a conference room at Upland City Hall.  The interview was recorded, and can be found in attachment 6[x].

I asked Ansara if he recalled a discussion during a staff meeting on 12/6/16 about a probation and parole compliance sweep.  Ansara said he did, and also recalled Chief Johnson asking Sgt. Simpson about the status of that sweep.  When Johnson asked Simpson who was going to participate, Simpson told him that not many people were coming.

Lt. Ansara also recalled a conversation about other agencies being contacted, but he could not remember which agencies were mentioned.  Ansara also recalls Chief Johnson asking Simpson about *specific* agencies.  Although he does not recall the exact conversation or who mentioned which agency, Ansara did remember Ontario and Claremont were both identified as agencies that were not going to participate.  Ansara also believes the chief brought up Pomona, which Ansara remembers because Upland PD and Pomona PD don't typically work together on projects.  Ansara did not remember Chino PD or the San Bernardino Sheriff's Department being mentioned.

I asked Lt. Ansara if, based on what he remembers about the discussion during the 12/6/16 staff meeting, he believed agencies had been contacted and he replied, "Yes." Although he did not recall which agencies *were* contacted, Ansara did say that some were, and some were not.

For additional details refer to the complete interview audio.

### Statement of Captain Anthony Yoakum, (7/6/17)

I interviewed Captain Yoakum in a conference room at Upland City Hall.  Yoakum was represented by his attorney, Brandi Harper, (Castillo Harper), and the interview was recorded and later transcribed, (attachments 6[bb] and 5[h], respectively).

Captain Yoakum and I discussed the 12/16/16 staff meeting at which Sgt. Simpson was reportedly asked for the status of a probation and parole compliance sweep.  Although Yoakum did not recall being at a meeting on that specific date, he did say the sweep

---

[15] Lt. Ansara's statement includes information relevant to a separate administrative investigation, (UPD IA 06-17). Although the complete interview audio, (attachment 6[x]), is included with my report, only the statements relevant to this investigation, (UPD IA 05-17), are included in the narrative.  The complete statement can be found in UPD IA 06-17.

Wedge & Fobes Investigations

GW

COU-0000035

was discussed at different times in different meetings.  Yoakum also said Chief Johnson asked Simpson about the status of the sweep on several different occasions.

I asked Captain Yoakum if he recalled Sgt. Simpson telling Chief Johnson during any meeting where the probation and parole compliance sweep was discussed that no agencies *were available* to participate, or no agencies *wanted* to participate in the sweep; Yoakum did not recall such a comment.  I also asked Yoakum if he recalled Simpson trying to get Johnson to postpone or cancel the sweep.  Yoakum said it sounded familiar, but he did know why or remember any details of that particular comment.

I asked Captain Yoakum if he recalled Sgt. Simpson saying that he had contacted certain agencies.  Although Yoakum again did not specifically recall Simpson making such a statement, he did say it was a topic that would have been discussed.   Yoakum also said he could not recall Simpson identifying any agencies by name, but believes the direction given Simpson was to contact surrounding agencies.  Yoakum identified those agencies as the sheriff's department in Rancho Cucamonga, Ontario PD, Montclair PD, and Claremont PD.

I also asked Captain Yoakum if he recalled Chief Johnson asking Sgt. Simpson if he contacted anyone from Chino PD.  Yoakum said the question was asked, but he could not remember if it was asked in the 12/6/16 meeting, nor did he recall any other details about that part of the discussion.  Yoakum also did not recall Johnson asking Simpson about the sheriff's department, Ontario PD, Montclair PD, or Claremont PD, but assumes he (Johnson) would have done so because they were the surrounding agencies.  I asked Yoakum if, based on the interaction between Johnson and Simpson he had an opinion whether or not Simpson contacted the agencies identified.  Because the sweep occurred, Yoakum said, he assumed Simpson did.

Captain Yoakum and I also discussed a performance appraisal for Simpson in which a below standard rating was given because Simpson "Failed to coordinate with outside agencies on a large probation sweep," (attachment 2[e]).  Yoakum did not recall a discussion with Chief Johnson about the appraisal, or that Johnson asked him to review the appraisal, but said it was possible that such a conversation occurred.  Yoakum said he and (now retired) Lt. Ansara authored the appraisal, but he (Yoakum) wrote the sweep-specific comment.[16]

I asked Captain Yoakum if he had any conversations with Sgt. Simpson about the sweep.  Yoakum said he and Simpson discussed the comment in Simpson's appraisal when he gave him the appraisal, but he could not recall the extent of their conversation.[17]  Yoakum also did not remember what Simpson said about the sweep-

---

[16] On the transcript, Lt. Ansara is identified as, *"Unintelligible."*
[17] Captain Yoakum signed the appraisal on 4/13/17, and Sgt. Simpson signed it on 4/19/17

Wedge & Fobes Investigations

GW

COU-0000036

specific comment, nor did he know if Simpson wrote any response to that comment or the appraisal in general.

For additional details refer to the complete interview audio.

During my investigation I conducted an audit of Sgt. Simpson's City email account and found four sweep-related documents.  One document, dated 11/3/16, was an email sent to Simpson from Kevin Cushman, (unknown agency), and referred to a list of wanted people and probationers Simpson had requested and received, (attachment 2[k]i).  The initial email was dated 10/13/16, likely before planning for the Upland probation and parole sweep began, but in Simpson's response to Cushman on 11/3/16 he indicates the list of wanted people and probationers "…will be helpful with our SMASH Op that is upcoming."[18]  I also found an email response from Simpson to Officer McCullough on 11/15/16, "accepting" (on his calendar) a SMASH Sweep on 12/14/16, (attachment 2[k]ii).  Both emails indicate planning for the probation and parole compliance sweep, apparently also referred to as a *SMASH* sweep, began as early as 11/3/16.

In addition to the aforementioned documents I found two other emails.  One email, (attachment 2[k]iii), was sent by Upland Dispatch Supervisor Graham Hendrickson to PSAP Managers, (i.e., other public safety communications centers), on 12/14/16, advising that Upland PD was using a particular radio frequency "…for a multi-agency SMASH operation" that day, (Simpson was copied on that email).  The other email was sent by Officer Kirk to Sgt. Simpson on 12/21/16 with a two-page after action report, (attachment 2[k]iv).

### Statement of Sgt. Marcus Simpson, (6/7/17)

I interviewed Sgt. Simpson in a conference room at Upland City Hall.  Simpson was represented by his attorney, Michael McCoy, (Castillo Harper), and the interview was recorded and later transcribed, (attachments 6[y] and 5[g], respectively)[19].

Sgt. Simpson was first hired as a police officer by the City of Upland in 1994.  In 2000 Simpson left Upland and was hired by the San Bernardino County sheriff's department, where he remained until returning to Upland in 2008.  After returning to Upland PD Simpson was promoted to detective and then sergeant, and has held that position for about three years.  Before being placed on administrative leave (on 4/19/17) Simpson supervised the detective bureau, but had done so for only about four to six weeks.  Prior to that assignment, Simpson was a patrol supervisor and also responsible for the Community Resource Officer (CRO) team.

---

[18] Per officers McCullough and Kirk, SMASH is an acronym for *San Bernardino's Movement Against Street Hoodlums*
[19] The interview included questions about the probation and parole compliance sweep, as well as other matters relevant to a separate administrative investigation into allegations of misconduct by Sgt. Simpson, (UPD IA 06-17).  Although the entire interview audio is included with this report, I have included only excerpts from the transcript relevant to the sweep.  The remainder of the transcript can be found in UPD IA 06-17.

Wedge & Fobes Investigations

GW

COU-0000037

I asked Sgt. Simpson if he supervised the CRO team in November and December 2016.
Simpson said he did, and during that time was responsible for planning a probation and
parole compliance sweep.  Although he could not recall the exact date, Simpson said
Chief Johnson asked him to coordinate the sweep most likely in early November 2016.
Johnson told Simpson he wanted Upland's "sister cities" to assist with the sweep, and
identified by name Rancho Cucamonga, Ontario, Montclair, and Claremont.  Johnson
also told Simpson to ask Pomona if they wanted to assist because gang members from
that city were also in Upland.

Sgt. Simpson told me the only officers assigned to CRO when the sweep was being
planned were Andrew McCullough and Jacob Kirk.

Recalling the comments in Sr. Administrative Assistant Barrett's notes that appeared to
reference two separate operations, I asked Sgt. Simpson if CRO was planning some
other kind of sweep during the same time.  Simpson said they were, and described it as
a cleanup operation throughout the entire city that ultimately was conducted during the
general time frame as the probation and parole compliance sweep.  Simpson also said
no other agencies participated in the cleanup operation, adding that everyone who did
so worked for the City of Upland, (including the parks department and other city crews).

I asked Sgt. Simpson if he recalled a staff meeting in December 2016 at which the
probation and parole compliance sweep, ultimately conducted on 12/14/16, was
discussed.  Simpson said he did, and also recalled that Chief Johnson asked him about
the status of that sweep even before the 12/6/16 meeting occurred.  During
conversations with Johnson about the sweep before it was discussed at the staff
meeting, Simpson said he told Johnson CRO had about 100 subjects to be contacted,
and that the planning was progressing.  Simpson did not recall how many times
Johnson asked him about the sweep (prior to 12/6/16), but said it may have been more
than once.  Simpson also said that when asked about the sweep during any pre-staff
meeting discussion(s), he never gave Johnson an indication he (Simpson) and his team
did not want to conduct the sweep.

I asked Sgt. Simpson if he personally was involved in planning the sweep, or if he
delegated the tasks to officers McCullough and Kirk.  Simpson initially said he delegated
all planning, (doing nothing himself), but then corrected his statement and said he
contacted Chino PD and spoke with one of their sergeants.  Simpson also said he
contacted Chino PD one or two days before the sweep, (and therefore, after the 12/6/16
staff meeting).

Sgt. Simpson said that, other than Chino PD, he did not personally contact any
agencies to participate in the sweep, but did receive a call from the (San Bernardino
County) Probation department a day or two before the sweep occurred.  Simpson
explained that when he was first tasked with planning the sweep, he directed Officer

Kirk to contact Probation.  Apparently Kirk was having a difficult time reaching someone from Probation, and after several emails back and forth, (during which Probation kept requesting more information), Probation decided not to assist and called Simpson.

Next, Sgt. Simpson and I discussed his contact with the sergeant from Chino PD. Simpson said he did not specifically recall how the contact occurred, (i.e., whether Chief Johnson gave Simpson's phone number to the Chino sergeant, who in turned called Simpson, or because Simpson knew someone at that agency), but somehow the connection was made.

I asked Sgt. Simpson if he knew which agencies his CRO officers contacted while planning the sweep.  Based on what he was told by those officers, Simpson explained, Officer McCullough spoke with someone from the Rancho Cucamonga (SBSD) Sheriff's Department, Ontario PD, Montclair PD, and Claremont PD.  McCullough also tried to contact Pomona PD but his call was not returned.  Officer Kirk, in turn, contacted the Probation department, and possibly Parole, (though Simpson was not certain about the latter).

When Simpson answered this question I saw he was referring to a document for the information.  I asked Simpson if he kept notes throughout the planning process, or if the document to which he referred was something he prepared in anticipation of the interview I was conducting.  Simpson's reply was disjointed, if not non-responsive:

> *"I just, for whatever, I remember how the investigation occurred, mostly because at the end of the investigation, or at the, at the, at the staff meeting and conversations with the chief I started keeping notes on a lot of our contacts."*

When I asked Simpson for copies of the notes to which he referred in his answer, Mr. McCoy interjected and said the notes Simpson had with him during the interview were theirs, and implied they would not provide them.  I then clarified my request, telling Simpson I was referring to the notes he kept after his conversation with Chief Johnson. I also asked Simpson if he began keeping notes of who was contacted after the staff meeting.  Simpson said the notes he kept were actually just a summary of "how things played out" with the probation and parole compliance sweep, but Simpson believed he no longer had those notes.

During the interview Simpson answered with specificity which officer contacted which agency.  In an attempt to determine how he knew this information, despite the considerable period of time that had passed since the sweep was planned, I asked Simpson if he asked Kirk and McCullough after the 12/6/16 staff meeting which agencies they contacted; Simpson said he did.  Simpson also said because Kirk, McCullough and him shared the same office he kept up with the planning and made sure he knew who Kirk and McCullough had contacted.

---

Wedge & Fobes Investigations

GW

COU-0000039

I asked Sgt. Simpson if updates were given to him by Kirk and McCullough at the time
they found out an agency could or could not participate, or if that information was
shared during a conversation in which a collective update was given.  Simpson could
not recall specifically how the updates occurred, but at some point the information was
given to him.

Referring to the list of agencies he identified earlier in the interview I asked Sgt.
Simpson about each agency.  Simpson said the Rancho Cucamonga (SBSD) Sheriff's
Department was not able to participate but he did not recall when he was notified, nor
did he know when that agency was first contacted.  Simpson did say the initial request
for assistance was made "well before" the 12/6/16 staff meeting.

I then asked Sgt. Simpson about Ontario PD.  Simpson said Ontario PD "Refused to
participate," because it did not benefit their police department, but he did not recall
when that conversation occurred.

Simpson said Montclair PD was able to participate in the sweep, but once again did not
know when they were first contacted about doing so.  Claremont PD, in turn, could not
participate because they had another operation planned, and Pomona PD did not return
the call requesting their participation.

Finally, I asked Sgt. Simpson about the attempts to enlist the assistance of Probation for
the sweep.  Simpson could not recall how many emails or phone calls were exchanged
between that agency and Officer Kirk, but with the exception of one probation officer
assigned to Chino PD, ultimately the Probation department did not participate.[20]

Sgt. Simpson and I then discussed the staff meeting that occurred on 12/6/16.  Simpson
said he could not recall if Chief Johnson asked him the status of the sweep during that
meeting, or if Simpson provided an update without Johnson's prompting.

I asked Simpson if he recalled what he said when giving that update.  Simpson said he
did, and answered with the following:

> *"Not verbatim, obviously, but I remember I explained to him that Rancho
> Cucamonga, they could not assist because they had too many injuries.  I
> explained that Ontario didn't wanna help us because it didn't benefit their city.
> Montclair said they could help us.  I don't remember what I told him about
> Claremont.  I explained that we were not having any luck with Pomona, explained
> that Probation was not able to assist because of their long prerequisites, and
> Parole would be assisting also."*

---

[20] A team assignment roster sent to me by Officer McCullough, (attachment 2[i]vii), actually showed three
probation officers participating in the sweep, but I did not ask, or otherwise determine where they were from

Wedge & Fobes Investigations                                                            GW

COU-0000040

I asked Simpson if he said anything to Chief Johnson about postponing the sweep. Simpson replied, "Yes," saying he asked Johnson if they could delay the sweep until they got more assistance.

I also asked Simpson if he told Johnson that no agencies wanted to participate, or that no agencies were *able* to participate, and he said, "No." I then asked Simpson if during that discussion he made a statement similar to, "We're not getting a lot of cooperation," or "Everybody's saying they can't participate." Simpson replied, "I may have, I don't know. I don't wanna commit to that, but that's pretty much the facts of it."

I then asked Sgt. Simpson if he remembered what Chief Johnson said in response to his (Simpson's) statement. Simpson explained Johnson was upset that other agencies weren't participating. Johnson remarked that he had an upcoming meeting with other chiefs, and referring to "Rancho, Ontario, and Claremont," also said he'd make sure those agencies would participate.

I asked Sgt. Simpson if he recalled Johnson saying something similar to, "So you're telling me all the agencies around here can't participate?" Simpson did not remember Johnson making that statement, saying also that such a statement would not be the truth, ("That's not what I told him"). I also asked Simpson if Johnson asked, "So the sheriff can't play?" In response, Simpson replied, "I don't remember."

I asked Sgt. Simpson if he told Chief Johnson that he personally had reached out to other agencies and he told me, "No." I also asked Simpson if he recalled Johnson identifying individual agencies by name, and then asking him if he had contacted those agencies. Simpson replied, "I don't know why he would because I'd already given him the update, so no."

Next, I asked Sgt. Simpson if Chief Johnson specifically asked him about Chino PD, and he replied, "No, he did not." Simpson also said he never told Johnson that Chino PD could not help, adding, "(There was) no reason for me to mention Chino; I had no idea that Chino was to be involved." Specifically, Simpson denied Johnson saying, "So you're telling me Chino can't participate."

Although Simpson previously answered he did not know why Johnson would ask him about individual agencies when Simpson had already given him an update, opining it would be redundant for Johnson to do so, I asked about certain agencies nonetheless. I also explained to Simpson it would not be unusual for someone to follow-up by asking, "So you contacted (agency name)" when told that agency could not participate, and he replied, "No, that's not how it occurred." Additionally, Simpson said he did not remember Johnson asking about Rancho Cucamonga (SBSD), Ontario PD, or any other agencies. Simpson also said that during their discussion, he did not tell Johnson who they *did not* contact.

I asked Sgt. Simpson if Officer McCullough or Officer Kirk ever told him they did not have enough officers for the sweep. Simpson said he, McCullough and Kirk had conversations in which it was said they would like to have more people, which is why he asked Johnson in the staff meeting if they could delay the sweep.

Noting that Sgt. Simpson thought he no longer had the notes to which he referred earlier in the interview, I asked Simpson if he had *anything* in writing related to the sweep such as emails, text messages or handwritten notes. In response, Simpson replied, "None that I know of." I also asked Simpson when he began keeping notes about who was participating in the sweep and who McCullough and Kirk contacted. Simpson explained Chief Johnson called him from the (12/8/16) chiefs meeting, upset, and asked if he had contacted Chino PD. Simpson told Johnson he had not, but said he would check with the CROs. In response, Johnson told Simpson he (Johnson) "looked like an idiot" because they had not contacted Chino PD. Simpson was surprised because Johnson never asked him to do so.

After the chiefs meeting, ("one or two days" before the sweep, per his earlier statement), Simpson spoke with someone from Chino PD.

*(During a subsequent interview on 7/6/17 I asked Sgt. Simpson for additional information about the phone call he received from Chief Johnson on 12/8/16, when Johnson was at the county chiefs meeting. Specifically, I asked Simpson if he recalled Johnson telling him in that conversation that Chino PD never received a call. Simpson did not recall such a statement, and also said Johnson did not ask him about any other agencies during their conversation.)*

As our discussion about the probation and parole compliance sweep concluded, I asked Simpson if there was anything he wanted to add. Simpson told me that after he received the call from Chief Johnson he spoke with officers Kirk and McCullough, and asked them if they knew anything about contacting Chino PD; both said, "No."

*(Simpson initially said he asked his CROs about their knowledge of contacting Chino PD after the staff meeting instead of after the chiefs meeting. When I asked why he would ask them about Chino before the chief called him, Simpson corrected his previous statement and said he spoke with Kirk and McCullough after the chiefs meeting.)*

After Sgt. Simpson and I finished discussing the other administrative investigation, (re: UPD 06-17), Simpson said he was already counseled by Chief Johnson and Captain Yoakum about the *"Chino incident."* Simpson said he, Johnson and Yoakum talked about the sweep, and during that conversation Johnson said he "thought" he told Simpson to contact Chino PD; Simpson told Johnson that Johnson did not make such a statement. Johnson also told Simpson it was, "water under the bridge," and that it was no longer an issue, but a negative comment was then placed in Simpson's yearly

evaluation.  Simpson now questioned why Johnson would allow him to work for six months if he was accused of lying.[21]

For additional details, refer to the complete interview audio.

### Statement of Sgt.Marcus Simpson, (7/6/17)[22]

On 7/6/17 I conducted a follow-up interview of Sgt. Simpson, and once again the interview was held in a conference room at Upland City Hall.  The interview was recorded and later transcribed, and can be found in attachments 6[cc] and 5[i], respectively.  Simpson was again represented by his attorney, Michael McCoy, (Castillo Harper).

Next, I asked Sgt. Simpson about the most recent performance appraisal he had been given, and showed him the last two pages from that document, (attachment 2[e]).  Referring to the *"Below Expectation"* rating he received for *"Failing to coordinate with outside agencies on a large probation sweep,"* I asked Simpson if he had a conversation with Captain Yoakum about that particular entry.  Simpson thought they did, but recalled only that he told Yoakum during their conversation he was going to write a rebuttal because he disagreed with the remark.  Simpson also sent an email to HR Manager Gonzales asking how long he had to write a response but was then placed on administrative leave one or two days later.

*(During my audit of Sgt. Simpson's City email account I did not find the email Simpson said he sent to HR Manager Gonzales, but the audit was complete before his interview occurred.  Also, I did not clarify with Simpson if he sent the mail from home.  I did ask HR Manager Gonzales to check her Outlook history for such an email, and on 7/24/17 I received from her a one-page email dated 4/19/17, subject, "Evals."  In the email, which Simpson sent to Gonzales from his personal email address, Simpson asked if he had the right to respond to comments in an evaluation, and how long he had to do so.  A copy of the email can be found in attachment 2[l]).)*

Simpson said the appraisal in which the *"Below Expectations"* rating appeared was actually the second evaluation he received for the same performance period.[23]  When asked if both evaluations were essentially the same, Simpson said the second appraisal he received, (the one with the sweep-related remark), was actually *better,* though he believed some of the positive comments (from the first appraisal) had been removed.

---

[21] The two-page excerpt from the interview transcript in which Simpson again spoke about the sweep is included as attachment 5[g].

[22] The interview included questions about the probation and parole compliance sweep, as well as other matters relevant to a separate administrative investigation into allegations of misconduct by Sgt. Simpson, (UPD IA 06-17).  Although the entire interview audio is included with this report, I have included only excerpts of the interview transcript relevant to the sweep.  The remainder of the transcript can be found in UPD IA 06-17.

[23] This statement was actually made by Mr. McCoy, but Simpson agreed with McCoy's statement.

Next, I tried to clarify Sgt. Simpson's previous statements about keeping notes after the 12/6/16 staff meeting.  I told Simpson that during the 6/7/17 interview he was apparently referring to notes when I asked him certain questions about the sweep.  I also told Simpson that during the same interview he spoke about keeping notes that were a summary of "how things played out," and started doing so after the staff meeting in which the probation and parole compliance sweep was discussed.  Although I understood Simpson to say during the 6/7/17 interview that the notes he kept included information about the sweep, he clarified his previous answer, saying instead he "kept notes on a lot of things" so he could give information to the troops.  Simpson also said the notes were not specific to the sweep-related discussion that occurred during the 12/6/16 staff meeting.

When Simpson clarified the notes he kept were not specific to the sweep-related discussion,(as previously noted, a discussion that happened six months prior), I asked how he was able to specifically recall, with apparent certainty, which CRO officer, Kirk and McCullough, contacted which agency.  Simpson replied, "Two officers I have to keep track of, and I just remembered.  It's not hard to remember who was assigned to what."  Simpson also said he had conversations with Kirk and McCullough during the planning process and again after receiving the phone call from Chief Johnson on 12/8/16, but not after the staff meeting two days earlier.

For additional details, refer to the complete interview audio.

During his 6/7/17 interview Sgt. Simpson said that after Chief Johnson called him from the chiefs meeting, he (Simpson) asked officers McCullough and Kirk if they knew anything about contacting Chino PD.  I spoke with both officers by phone to follow-up on Simpson's statement; neither conversation was recorded.

### Statement of Officer Andrew McCullough, (7/19/17)

I asked Officer McCullough if he recalled a conversation with Sgt. Simpson a few days before the probation and parole sweep in which Simpson asked if he knew anything about contacting Chino PD.  McCullough replied, "I believe so," (though he was not certain), but also assumed Chino PD was mentioned during a discussion about *all* agencies participating in the sweep.  He did not recall Sgt. Simpson asking a question specific to Chino PD.

### Statement of Officer Jacob Kirk, (7/19/17)

Officer McCullough said the last few days before the probation and parole sweep occurred were very busy, but he did not recall Sgt. Simpson asking him if he knew anything about contacting Chino PD.

Wedge & Fobes Investigations

GW

COU-0000044

| Analysis and Conclusions |
| --- |

In early November, 2016, Chief Johnson directed Sgt. Simpson to coordinate a probation and parole compliance sweep. At the time, Simpson supervised Community Resource Officers Jacob Kirk and Andrew McCullough, and delegated responsibility for planning the sweep to them. Throughout the planning process Kirk and McCullough kept Simpson apprised of their progress, and told Simpson when agencies could, or could not, participate.

During a staff meeting on 12/6/16, Chief Johnson asked Sgt. Simpson the status of the sweep, which was planned for the following week. Simpson told Johnson that no other agencies could participate, (or something similar), and suggested that they postpone the sweep.

Because of a recent conversation with San Bernardino County Undersheriff Joe Cusimano about assisting with the sweep, (and Cusimano's tentative commitment to do so), and a strong working relationship with Chino PD, Johnson was surprised by Simpson's response, and specifically asked Simpson about contacting both agencies, identifying each agency by name. When asked about Chino PD, Simpson answered, "Chino can't help," (or something similar). Johnson's assistant, Luz Barret, who was also present during the discussion, took notes of Simpson's comments, writing, *"No participation from other agencies,"* and listing each agency Simpson said could not participate *as* they were identified; Chino PD was on that list.

Based on an email exchange between Chief Karen Comstock and Sgt. Nick Marotta, (Chino PD), as well as Sgt. Simpson's own statement, there is no dispute that Chino PD had *not* been contacted to participate in the probation and parole compliance sweep at the time of the 12/6/16 staff meeting. What is in dispute is whether during that meeting Sgt. Simpson *said* or otherwise led Chief Johnson to believe Simpson *had* contacted Chino PD.

When interviewed, Simpson denied that Johnson asked him if he contacted Chino PD, or that he told Johnson he *had* contacted Chino PD, saying he did not know that he was supposed to do so. Simpson also said when first tasked with coordinating the sweep Johnson told him to contact "sister cities" to participate, and Johnson identified by name Rancho Cucamonga, Ontario, Montclair, and Claremont. Johnson also told Simpson to ask Pomona if they wanted to assist because gang members from that city were also in Upland.

Although Barrett could not recall whether Simpson specifically identified Chino PD by name, or if she included that agency on the list when Johnson asked Simpson if he had contacted Chino PD, based on Barrett's statement and her notes, Johnson's statement, and the statements of two other meeting participants, (sergeants Dodt and Kabayan),

it's clear Simpson's response led Johnson and others to believe Chino PD had been contacted, and that Chino PD could not participate.

In Barrett's notes of the 12/6/16 meeting, comments attributable to Simpson clearly referred to two separate operations: the probation and parole compliance sweep, and a clean-up event at Memorial Park. Although Barret was somewhat uncertain about which notes applied to which operation, based on Simpson's statement that the park cleanup included only Upland personnel, it's apparent the *"No participation form other agencies,"* comment, and the list of agencies that followed, applied to the sweep.

The conversation between Chief Johnson and Sgt. Simpson after the county chiefs meeting on 12/8/16 was another indication Chino PD had been specifically identified during the probation and parole compliance sweep discussion on 12/6/16. Simpson said Johnson called him from the chiefs meeting, upset, and told Simpson he made Johnson look like an idiot because nobody from Chino PD had been contacted. Likewise, Barrett said Johnson was upset when he returned from the chiefs meeting, saying to Barrett essentially what he said to Simpson. At the very least this suggests Johnson believed Simpson had contacted Chino PD when he spoke with Chief Comstock at the meeting.

In support of his position, (that Chino PD's participation in the sweep was not discussed at the 12/6/16 staff meeting), Simpson said he asked officers Kirk and McCullough if they knew anything about contacting Chino PD after he spoke with Johnson on 12/8/16, but neither officer recalled such a conversation.

As the various witness statements and supporting emails indicate, Simpson knew by 12/6/16 that Montclair PD *could* participate, but that Rancho Cucamonga (SBSD) and Ontario PD could not. Simpson also knew that the Probation Department had been contacted, but confirmation of their participation, or notification that they could not participate, had not yet been received.

Although it was not the focus of this investigation, Simpson's response during the staff meeting suggested Montclair PD could not participate when he knew they could, (based on an email exchange between officers Kirk, McCullough, and Montclair PD beginning on 11/7/16). Again, when asked about the status of the sweep, Simpson told Johnson that none of the surrounding agencies could participate. Johnson could not recall if he identified individual agencies by name, (other than Chino PD and the Sheriff's Department), or referred to the agencies collectively when he challenged Simpson on Simpson's response, but Barrett's notes also indicate Montclair PD was mentioned and could not participate.

Although I believe Sgt. Simpson did indicate during the 12/6/16 staff meeting that Chino PD had been contacted and could not participate in the sweep, any attempt to explain *why* he did so would be speculation. Chief Johnson did say Simpson spoke about

"having a lot on his plate" and had postponed previous suggestions to coordinate a sweep, while Simpson himself acknowledged that during the 12/6/16 staff meeting he tried to get Johnson to postpone the sweep because other agencies weren't available to assist.  Officers McCullough and Kirk also said conducting the sweep would be difficult given the limited participation, though they denied telling Simpson they were not prepared to do so.

| Disposition |
| --- |

The following violations have been alleged and are disposed of herein:

**Upland Police Department Policy Manual:**

**7.01(I) – Professional Standards and Evaluations *(Code of Conduct/Code of Ethics – Policy):*** All department employees shall conduct their professional and private lives in a manner that presents a favorable image of the community, the Police Department, and the individual.  Courteous and businesslike demeanor shall be observed at all times.

**Sustained.** Sgt. Simpson engaged in conduct that reflected unfavorably on his professional image when he was untruthful or misleading in his response to questions asked by Chief Jonson and when interviewed during the internal affairs investigation that followed.

_____

**7.01(IV)A – Professional Standards and Evaluations *(Code of Conduct/Code of Ethics [Duty] – Performance of Duties):*** Members of the Department shall be held strictly accountable for the proper performance of duties assigned to them, and for adherence to the rules and regulations adopted for the good order of the Department.

**Sustained.** Sgt. Simpson failed to adhere to the rules and regulations of the Upland Police Department policy manual when he was untruthful or misleading in his response to questions asked by Chief Johnson and when interviewed during the internal affairs investigation that followed.

_____

**7.01(IV)Q(1) – Professional Standards and Evaluations *(Code of Conduct/Code of Ethics [Duty] – Conduct Unbecoming an Officer):*** Sworn employees shall not conduct themselves in a manner or participate in any activity which, if it were known to the public, would tend to bring discredit upon or reflect poorly on, the professional image of the police department.

**Sustained.** Sgt. Simpson engaged in conduct that was unbecoming an officer when he was untruthful or misleading in his response to questions asked by Chief Johnson and when interviewed during the internal affairs investigation that followed.

_____

**7.01(IV)R – Professional Standards and Evaluations *(Code of Conduct/Code of Ethics [Duty] – Truthfulness):*** All employees of the Department are required to be truthful. No employee shall give a false or misleading statement; write a false or misleading police report; or give a false or misleading statement during an internal affairs investigation.

**Sustained.** Sgt. Simpson was untruthful or misleading in his response to questions asked by Chief Johnson and when interviewed during the internal affairs investigation that followed.

_____

Sgt. Simpson's conduct was also contrary to the *Law Enforcement Code of Ethics,* (included in section 7.01 (VIII) A of the Upland Police Department policy manual), which reads, in part:

> *"Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department."*

_____

Sgt. Simpson's conduct was also contrary to the *Code of Professional Conduct and Responsibility for Police Officers,* (included in section 7.01 (IX) of the Upland Police Department policy manual):

Canon Four, section 4.9:

> *"Peace Officers shall, at all times, conduct themselves in a manner which does not discredit the Peace Officer profession or their employing agency."*

Canon Six, section 6.3:

> *"Peace Officers shall conduct themselves so as to set exemplary standards of performance for all law enforcement personnel."*

Wedge & Fobes Investigations

GW

COU-0000048

EXHIBIT 24
Page 49 of 49

COU-0000049

EXHIBIT 25

# Upland Police Department

# ADMINISTRATIVE INVESTIGATION 06-17

---

## Captain Anthony Yoakum *(In separate binder)*
## Sergeant Marcus Simpson
## Detective Lon Teague *(In separate binder)*

---

### INVESTIGATORS:

Gary Wedge
Steve Fobes

*Wedge & Fobes Investigations*
*CA LIC 28833*

July 25, 2017

# CONFIDENTIAL

*Binder 1 of 2*

EXHIBIT 25
Page 1 of 144

COU-00000433



**B**
**i**
**n**
**d**
**e**
**r**

**C**
**o**
**n**
**t**
**e**
**n**
**t**
**s**

1    Investigation

2    Investigative Documents

3    Administrative Documents

4    Policy & Procedure; Personnel Rules

5    CD of Digital Files

6    Transcripts *(Binder 2)*

7

8

EXHIBIT 25
Page 2 of 144

COU-00000434

1

EXHIBIT 25
Page 3 of 144

COU-00000435

UPD IA 06-17
Simpson

---

**Employees**

Yoakum, Anthony
Police Captain

Simpson, Marcus
Police Sergeant

Teague, Lon
Police Detective

---

**Persons Interviewed**

Ansara, Alan
Police Lieutenant, *(retired)*
Upland Police Department
(909) 944-8615

Barrett, Luz
Sr. Administrative Assistant
Upland Police Department

Bierbaum, Steve
2052 Windemere Way
Upland, CA 91784
(626) 253-5700

Blanco, Marcelo
Police Lieutenant
Upland Police Department

Bonhus, John
Police Detective
Upland Police Department

Boyd-Weatherby, Jamaar
Former city prosecutor
City of Upland
Jones-Mayer law firm
3777 N. Harbor Blvd.
Fullerton, CA 92835
(714) 446-1400

Bunkers, D.D.S., John
2220 E. Route 66, #107
Glendora, CA 91740
(626) 857-4702

Chani, William
Police Sergeant
Upland Police Department

Clark, Alaina
Police Officer
Upland Police Department

Crandall, Jackie
Administrative Assistant
Upland Police Department

Duran, Maurice
Police Sergeant
Upland Police Department

Grady, Marsie
Code Enforcement Officer
Upland Police Department

Heilman, Vera
Code Enforcement Officer
Upland Police Department

Hilliard, Christopher
Police Detective
City of Upland

Holzer, Geneva
Police Cadet
Upland Police Department

Johnson, Brian
Chief of Police
Upland Police Department

---

Wedge & Fobes Investigations

1

EXHIBIT 25
Page 4 of 144

GW

COU-00000436

UPD IA 06-17
Simpson

Kiel, Sylvia
Police Records Specialist
Upland Police Department

Mathews, Cliff
Acting Captain
Upland Police Department

McKinzie, Christy
(909) 232-2813

Nutt, Richard
1338 Fuchsia St.
Upland, CA 91784

Poole, John
Police Lieutenant
Upland Police Department

Sellers, Scott
Police Detective
Upland Police Department

Shiflett, Desiree
Code Enforcement Officer
Upland Police Department

Stanley, Jeff
Police Detective
Upland Police Department

Thouvenell, Martin
Interim City Manager
City of Upland

Tseng, Jim
Police Sergeant
Upland Police Department

Wilson, Cache
12780 Blossom Ave.
Yucaipa, CA 92399
(909) 518-6692

Wyman, Aaron
Police Detective
City of Upland

---

*Allegations*

It is alleged that Captain Anthony Yoakum, Sgt. Marcus Simpson, and Detective Lon Teague failed to follow a written directive ordering them to not discuss a confidential administrative investigation, and that Yoakum and Simpson tried to influence that investigation.  It is also alleged that Captain Yoakum and Sgt. Simpson made statements and engaged in other conduct to undermine and disparage the chief of police.  Finally, it is alleged that Detective Teague's conduct toward another employee was inappropriate after his scheduled attendance at a training seminar was cancelled.

---

*Summary*

On or about 2/9/17 an administrative investigation involving allegations of misconduct by Chief Johnson was initiated.  Captain Yoakum was identified as a witness in that investigation and received a written notice directing him to appear for an interview, and ordering him to not discuss the matter with anyone.  Sgt. Marcus Simpson and Detective Lon Teague were also identified as witnesses and received similar directives.

---

Wedge & Fobes Investigations

2

EXHIBIT 25
Page 5 of 144

GW

COU-00000437

Yoakum signed his notice on 3/28/17, Simpson signed his on 2/28/17, and Teague, on 3/1/17.

On 4/12/17, Chief Johnson was interviewed for the investigation. On that same day, within a seven-minute period, Detective Teague, Captain Yoakum, and Sgt. Simpson went into the office of Chief Johnson's secretary, Sr. Administrative Assistant Luz Barrett, one immediately after the other left, to ask her when she was going to be interviewed, or how her interview went. Because of their interaction with Barrett on 4/12/17, as well as other allegations of misconduct, Yoakum and Simpson were placed on administrative leave, while Teague remained at work but subject to the investigation.

When Yoakum, Simpson and Teague were interviewed for the investigation in which they were the subjects, Teague said he asked Barrett about her interview but did so out of curiosity. Yoakum and Simpson, in turn, either could not recall, (Yoakum), or denied, (Simpson) asking Barrett about her interview. Despite apparent knowledge that Chief Johnson was being interviewed that same day, written notes taken by Barrett following the interaction, and corroboration (of Barrett's statement) by two other employees, Yoakum, Simpson and Teague all essentially denied discussing in advance going to Barrett's office to ask about her interview.

Sr. Administrative Barrett kept notes of another interaction with Sgt. Simpson. On 4/3/17, Simpson spoke with Barrett and told Barrett he just left an interview with the private investigator the City had hired. Simpson also told Barrett he gave the investigator her name and that she should be expecting a call. When Barrett asked why, Simpson identified at least two issues that he (Simpson) apparently believed were part of the investigation, and told Barrett he knew she was "just doing what (she) was told to do." Simpson also implied Barrett had enabled Chief Johnson to do something unlawful.

Although he denied making certain statements to Barrett during their interaction on 4/3/17, Simpson said he spoke with her because he was directed by City Manager Thouvenell to solicit from employees, complaints against Chief Johnson. Simpson is the Upland Police Management Association (UPMA) president, and had previously reported to Thouvenell, allegations of misconduct by Johnson. Thouvenell told Simpson and others who were present that he could not investigate general complaints, and needed more information.

Despite what one person at that meeting perceived to be a clear distinction between asking someone to give details about their complaint and actually discussing an underlying investigation, Simpson apparently used Thouvenell's request to justify his conversations with other employees about the Johnson investigation. When interviewed Simpson said he had spoken with several employees, but did so based on Thouvenell's request and in his capacity as UPMA president.

COU-00000438

Simpson also reportedly asked other employees if they had been interviewed for the investigation, including at least one civilian who is not a member of the Upland Police Officers Association or the UPMA.

Officers and civilian employees interviewed for the investigation said Simpson also made comments that were critical of Chief Johnson, but typically did so during association meetings.  Although the extent to which these comments were made, and the forum in which they were made could not be determined, at least two such incidents occurred independent of association business.  Simpson reportedly sought from employees other information about Johnson that was potentially unfavorable as well.

| Binder Contents |
| --- |

1. **Investigation**

    a. Primary report prepared by Private Investigator Gary Wedge;
    b. Supplemental report prepared by Private Investigator Steve Fobes.

2. **Investigative Documents**

    a. *Confidential Summary of Facts for City Manager and City Attorney* from Chief Johnson dated April 13, 2017, (redacted);
    b. Interview notice signed by Sgt. Marcus Simpson on 2/28/17;
    c. Interview notice signed by Detective Lon Teague on 3/1/17;
    d. Interview notice signed by Captain Anthony Yoakum on 3/28/17;
    e. Screen shot of text message sent to Chief Johnson and Captain Yoakum by Sgt. Simpson on 1/11/17 at 7:12 PM re: *"...being passed over"*;
    f. Email inadvertently sent to Chief Johnson by Sgt. Simpson, dated 1/27/17, subject, *"Don't erase #6"*;
    g. Entry from Chief Johnson's Outlook calendar dated 1/31/17, with various handwritten notes;
    h. Screen shot of text message sent to Chief Johnson and Captain Yoakum by Sgt. Simpson on 1/31/17 at 9:23 PM, re: conversation with Detective Teague;
    i. Email sent to Chief Johnson by Sgt. Simpson, dated 2/2/17, subject, *"Letter"*;
    j. Email from Sgt. Simpson to Chief Johnson dated 3/6/17, subject, *Re: your Request,"* followed by five-page email exchange between Chief Johnson and UPOA attorney John Bakhit (Mastagni Holstedt) beginning on 3/3/17;
    k. Screen shot of text message sent to Captain Yoakum by Sr. Administrative Assistant Luz Barrett on 2/2/17 at 3:39 PM re: meeting in chief's office;
    l. Email exchange between Forensic Specialist Colleen Sellers and Captain Yoakum beginning 2/3/17, subject, *"Re: UPD17021018,"* and forwarded to P.I. Wedge by Cadet Geneva Holzer on 5/25/17;

COU-00000439

m. Two-page undated memo sent to Lt. Ansara by Detective Stanley regarding case #17021018, (includes one page interview of Cadet Geneva Holzer);

n. One-page memo sent to City Manager Thouvenell by (now retired) Lt. Alan Ansara, dated 2/8/17, subject, *"Allegation of Misconduct"*;

o. Screen shot of text message sent to Captain Yoakum by Sr. Administrative Assistant Luz Barrett on 2/15/17 at 4:33 PM, re: chief wanting to see Yoakum;

p. One-page memo sent to City Manager Thouvenell by (then) City Prosecutor Jamaar Boyd-Weatherby, dated 2/20/17, subject, *"Conversations with Lieutenant Alan Ansara and Detective Lon Teague"*;

q. Three pages of *typewritten* notes by Sr. Administrative Assistant Luz Barrett, including:

    i. One-page document titled *"Statement – March 14, 2017"* signed by Barrett on 4/13/17;

    ii. One-page document titled *"Statement – April 3, 2017"* signed by Barrett on 4/13/17;

    iii. One-page document titled *"Statement – April 12, 2017"* signed by Barrett on 4/13/17;

r. Four pages of *handwritten* notes by Sr. Administrative Assistant Luz Barrett, including:

    i. One-page document titled *"Mar 14"*;

    ii. One-page document titled *"Apr 3"*;

    iii. Two-page document titled *"Apr 12,"* with the notations *"11:33 am Teague,"* *"11:36 am Yoakum,"* and *"11:40 am Simpson"*;

s. Three-page article from *The Sentinel* publication dated 5/7/17, titled *"Power struggle in Upland Police Department Nets Two Top Cops Suspensions"*;

t. One-page undated post from Facebook regarding administrative investigation involving unnamed captain, sergeant, and detective;

u. Two-page email sent to Chief Johnson by Christy McKinzie on 5/18/17, subject, *"Various Issues"*;

v. One-page handwritten note by Sr. Administrative Assistant Barrett dated Apr 11;

w. Emails found during audit of Captain Yoakum's city email account, including:

    i. One-page email from Captain Yoakum to (Information Technology Technician) Rami Asad dated 2/7/17, subject, *"help"*;

    ii. Calendar entry for 2/8/17 appointment at 4:00 PM, subject, *"UPOA/UPMA Meeting – Chief, Yoakum"*;

    iii. Two-page email from Chief Johnson to Captain Yoakum dated 3/17/17, subject, *"Leadership Development"*;

    iv. One-page email from Anthony Yoakum, lawfam2@gmail.com, to Anthony Yoakum dated 3/19/17 at 6:35 PM, subject, *"Paperwork,"* with two-page attachment titled, *"Confidential 3"*;

     v. One-page email from Anthony Yoakum, lawfam2@gmail.com, to Anthony Yoakum dated 3/19/17 at 6:48 PM, subject, *"more paperwork,"* with six-page attachment titled, *"Captain Daily to do list"*;

     vi. One-page email from Anthony Yoakum to ayoakum551@gmail.com dated 3/20/17, with four-page attachment titled, *"Confidential"*;

     vii. One-page email from Captain Yoakum to Luz Barrett dated 3/30/17, subject, *"Re: Detective Teague"*;

     viii. One-page email from Anthony Yoakum to ayoakum551@gmail.com dated 4/10/17, with one-page attachment titled, *"Additional incidents since PIP meeting."*

   x. Emails found during audit of Sgt. Simpson's city email account, including:

     i. One-page email from Sgt. Simpson to Sgt. Robert Steenerson dated 3/10/17, subject, *"FW: Citizen's Complaint,"* with attached one page memo from Simpson to Steenerson, (redacted);

     ii. One-page email from Marc Simpson to Marc Simpson dated 1/12/17 at 4:46 PM, subject, *"Don't erase 3"*;

     iii. One-page email from Marc Simpson to Marc Simpson dated 1/12/17 at 4:54 PM, subject, *"Don't erase 4"*;

     iv. Five-page email from Marc Simpson to Marc Simpson dated 3/9/17, no subject, but first line in body of email, *"Facebook Post"*;

     v. One-page email from Marc Simpson to msimpson1971@gmail.com dated 3/17/17, no subject, but with a nine-page attachment, *"Facebook Post"*;

     vi. One-page undated draft email with the first line in the body of the email, *"On February 7…"*

   y. Documents given to P.I. Wedge by Sgt. Simpson during Simpson's 7/6/17 interview, including:

     i. One-page list of *"Employees Contacted,"* (excerpt from 2[y]vi);

     ii. Two-page untitled document with the first of six categorized entries titled, *"September 2016 meeting on Lieutenants schedule,"*;

     iii. Two-page email exchange between Captain Bonson and Chief Johnson dated 6/9/17, subject, *"Re: Recent Church Burglaries"*;

     iv. Three-page memo from Lt. Mathews to Lt. Ansara dated 3/16/17, subject, *"Re: Command Concerns"*;

     v. Seventeen-page document titled, *"Direct quotes from members of the UPOA and UPMA"*;

     vi. Thirty-five page untitled document detailing complaints about Chief Johnson.

   z. Three-page letter from attorney Brandi Harper to City Manager Thouvenell dated 3/22/17.

## 3. Administrative Documents

   a. Administrative Leave notice for Captain Anthony Yoakum dated 4/19/17;

   b. Administrative Leave notice for Sgt. Marcus Simpson dated 4/19/17;

COU-00000441

c.  Internal Investigation notice for Detective Lon Teague dated 4/19/17;
d.  Captain Anthony Yoakum signed interview notice dated 6/1/17 for 6/7/17 interview;
e.  Employee Interview Rights read to Captain Yoakum during 6/7/17 administrative interview;
f.  Sgt. Marcus Simpson signed interview notice dated 6/1/17 for 6/7/17 interview;
g.  Employee Interview Rights read to Sgt. Simpson during 6/7/17 administrative interview;
h.  Detective Lon Teague signed interview notice dated 6/1/17 for 6/7/17 interview;
i.  Employee Interview Rights read to Detective Teague during 6/7/17 administrative interview;
j.  Captain Anthony Yoakum signed interview notice dated 6/27/17 for 7/6/17 interview;
k.  Employee Interview Rights read to Captain Yoakum during 7/6/17 administrative interview;
l.  Sgt. Marcus Simpson signed interview notice dated 6/27/17 for 7/6/17 interview;
m.  Employee Interview Rights read to Sgt. Simpson during 7/6/17 administrative interview;
n.  Detective Lon Teague signed interview notice dated 6/27/17 for 7/10/17 interview;
o.  Employee Interview Rights read to Detective Teague during 7/10/17 administrative interview;
p.  Sr. Administrative Assistant Luz Barrett signed interview notice dated 5/3/17;
q.  Lt. Marcelo Blanco signed interview notice dated 6/27/17;
r.  Detective John Bonhus signed interview notice dated 5/4/17;
s.  Sgt. William Chani signed interview notice dated 5/24/17;
t.  Officer Alaina Clark signed interview notice dated 5/22/17;
u.  Administrative Assistant Jackie Crandall signed interview notice dated 5/17/17;
v.  Sgt. Maurice Duran signed interview notice dated 5/22/17;
w.  Code Enforcement Officer Marsie Grady signed interview notice dated 5/17/17;
x.  Code Enforcement Officer Vera Heilman signed interview notice dated 5/22/17;
y.  Detective Christopher Hilliard signed interview notice dated 5/4/17;
z.  Cadet Geneva Holzer signed interview notice dated 5/22/17;
aa. Records Specialist Sylvia Kiel signed interview notice dated 7/3/17;
bb. Acting Captain Cliff Mathews signed interview notice dated 6/1/17;
cc. Lt. John Poole signed interview notice dated 5/24/17;
dd. Detective Scott Sellers signed interview notice dated 5/4/17;
ee. Detective Scott Sellers signed interview notice dated 6/27/17;

EXHIBIT 25
Page 10 of 144

COU-00000442

    ff.  Code Enforcement Officer Desiree Shiflett signed interview notice dated 5/18/17;

    gg. Code Enforcement Officer Desiree Shiflett signed interview notice dated 7/3/17;

    hh. Detective Jeff Stanley signed interview notice dated 5/4/17;

    ii.  Sgt. Jim Tseng signed interview notice dated 5/4/17;

    jj.  Detective Aaron Wyman signed interview notice dated 5/4/17;

    kk. Peace Officer Standards and Training (POST) training history for Captain Yoakum as of 4/26/17;

    ll.  POST training history for Sgt. Simpson as of 4/26/17.

## 4.  Policy & Procedure; Personnel Rules

    a.  UPD Policy Manual section 7.01, *Professional Standards and Evaluations: Code of Conduct/Code of Ethics.*

## 5.  CD of Digital Files[1]

*CD 1:*

    a.  Audio of 6/7/17 interview of Detective Lon Teague;

    b.  Audio of 6/7/17 interview of Sgt. Marcus Simpson, (two parts);

    c.  Audio of 6/7/17 interview of Captain Anthony Yoakum, (four parts);

    d.  Audio of 7/6/17 interview of Captain Anthony Yoakum, (two parts);

    e.  Audio of 7/6/17 interview of Sgt. Marcus Simpson;

    f.  Audio of 7/10/17 interview of Detective Lon Teague, (two parts);

*CD 2:*

    g.  Audio of 6/5/17 interview of Acting Captain Cliff Matthews;

    h.  Audio of 4/24/17 interview of Sr. Administrative Assistant Luz Barrett, (four parts);

    i.  Audio of 6/19/17 interview of Cache Wilson;

    j.  Audio of 5/25/17 interview of Cadet Geneva Holzer;

    k.  Audio of 7/6/17 interview of Code Enforcement Officer Desiree Shiflett;

    l.  Audio of 5/4/17 interview of Chief Brian Johnson, (two parts);

    m. Audio of 5/9/17 interview of Chief Brian Johnson;

    n.  Audio of 5/26/17 interview of Christy McKinzie;

    o.  Audio of 6/19/17 interview of City Manager Martin Thouvenell, (two parts);

    p.  Audio of 5/18/17 interview of Code Enforcement Officer Desiree Shiflett;

    q.  Audio of 5/18/17 interview of Code Enforcement Officer Marsie Grady;

    r.  Audio of 5/25/17 interview of Code Enforcement Officer Marsie Grady, (two parts);

    s.  Audio of 5/25/17 interview of Code Enforcement Officer Vera Heilman;

    t.  Audio of 6/5/17 interview of Detective Aaron Wyman;

---

[1] Audio of the interviews of Chani, (6[kk]), Duran, (6[nn]), Poole, (6[ff]), Ansara, (6[cc]) and Simpson, (6[b] and 6[e]), includes statements relevant to a separate administrative investigation, (UPD IA 05-17).

8

EXHIBIT 25
Page 11 of 144

COU-00000443

u.  Audio of 6/5/17 interview of Detective Christopher Hilliard;

*CD 3:*

v.  Audio of 6/5/17 interview of Detective Jeff Stanley, (two parts);
w.  Audio of 6/5/17 interview of Detective John Bonhus;
x.  Audio of 6/5/17 interview of Detective Scott Sellers;
y.  Audio of 7/10/17 interview of Detective Scott Sellers;
z.  Audio of 5/1/17 interview of Dr. John Bunkers;
aa. Audio of 5/18/17 interview of Administrative Assistant Jackie Crandall;
bb. Audio of 4/26/17 interview of former city prosecutor Jamaar Boyd-Weatherby;
cc. Audio of 6/7/17 interview of retired Lt. Alan Ansara;
dd. Audio of 7/6/17 interview of Lt. Marcelo Blanco;
ee. Audio of 5/25/17 interview of Lt. Marcelo Blanco;
ff. Audio of 5/27/17 interview of Lt. John Poole;
gg. Audio of 5/4/17 interview of Sr. Administrative Assistant Luz Barrett, (two parts);
hh. Audio of 5/9/17 interview of Sr. Administrative Assistant Luz Barrett;
ii. Audio of 6/1/17 interview of Officer Alaina Clark;
jj. Audio of 7/6/17 interview of Police Records Specialist Sylvia Kiel;
kk. Audio of 5/25/17 interview of Sgt. Bill Chani;
ll. Audio of 6/5/17 interview of Sgt. Jim Tseng;
nn. Audio of 5/25/17 interview of Sgt. Maurice Duran;
oo. Audio of 6/5/17 interview of Steve Bierbaum.

## 6.  Transcripts[2]

a.  Transcript of 4/24/17 interview of Sr. Administrative Assistant Luz Barrett, (four parts);
b.  Transcript of 5/4/17 interview of Chief Brian Johnson, (two parts);
c.  Transcript of 5/4/17 interview of Sr. Administrative Assistant Luz Barrett, (two parts);
d.  Transcript of 5/9/17 interview of Chief Brian Johnson;
e.  Transcript of 5/9/17 interview of Sr. Administrative Assistant Luz Barrett;
f.  Transcript of 6/7/17 interview of Captain Anthony Yoakum, (four parts);
g.  Transcript of 6/7/17 interview of Sgt. Marcus Simpson, (two parts);
h.  Transcript of 7/6/17 interview of Captain Anthony Yoakum, (two parts);
i.  Transcript of 7/6/17 interview of Sgt. Marcus Simpson.

---

[2] Transcripts of the 6/7/17 Simpson interview, (6[g]), and the 7/6/17 interview, (6[i]), also include statements relevant to a separate administrative investigation, (UPD IA 05-17).

COU-00000444

| Investigation |
| --- |

In April 2017 I was contracted by the City of Upland to conduct an administrative investigation into alleged misconduct by members of the police department, including Captain Anthony Yoakum, Sgt. Marcus Simpson, and Detective Lon Teague.

On 4/19/17 I met with Chief Brian Johnson, who told me that Captain Yoakum, Sgt. Simpson and Detective Teague went into the office of his secretary, Sr. Administrative Assistant Luz Barrett, all on the same day, one right after the other, and asked her if she had been interviewed for a pending administrative investigation.  Johnson was the subject of the investigation about which they asked, and their interaction with Barrett occurred on the same day Johnson himself was being interviewed.  Yoakum, Simpson and Teague were witnesses in that investigation, and had previously been ordered to not to discuss the investigation with anyone.
Chief Johnson also told me that Sgt. Simpson spoke with Barrett about the same investigation on another date, this time providing more detail, and suggesting to Barrett he knew her role in alleged misconduct by Johnson was done at Johnson's direction. Captain Yoakum, in turn, spoke with Barrett on a different date as well after meeting with Johnson, and referring to his conversation with Johnson, told Barrett he was, "drawing a line in the sand."

Chief Johnson said Barrett kept notes of her interactions with Yoakum, Simpson and Teague, and later prepared memos that she gave to Johnson.

Chief Johnson shared some details about the investigation in which he was the subject of misconduct allegations, saying he was involved in a medical marijuana dispensary (MMD) enforcement action during which a DVR was seized.  Johnson subsequently viewed contents of the DVR to prepare his report, not knowing at the time that a warrant was required to do so.

Chief Johnson spoke about other performance and conduct-related issues as well.  For example, during a staff meeting in December 2016, when Johnson asked Simpson about the status of a probation and parole compliance sweep Simpson was responsible for coordinating, Simpson was dishonest in his response.[3]

Simpson also wrote a factually inaccurate statement about Johnson in an email Simpson intended to send to himself for documentation, but inadvertently sent to Johnson instead.  During a meeting with Simpson about that email, while discussing another matter Simpson told Johnson his (Johnson's) comments were recorded at a general membership meeting of the Upland Police Officers Association, (UPOA), and Upland Police Management Association, (UPMA), suggesting Johnson was inconsistent in his remarks.  Johnson told me that if a recording was made, it was done without his, (Johnson's), knowledge or consent.

---

[3] A separate administrative investigation was initiated for that allegation, (UPD IA 05-17).

EXHIBIT 25

COU-00000445

Johnson also believed Simpson failed to properly investigate an allegation of sexual harassment,[4] started a false rumor after meeting with Johnson that detectives could no longer wear casual clothes on a day when they had previously been allowed to do so, perpetuated and/or failed to correct a false rumor about Johnson hiring a ranking officer from outside of the organization, and generally engaged in conduct to undermine Johnson's authority as chief of police.

Chief Johnson said he believed Captain Yoakum was also engaging in conduct to undermine his authority as police chief.  In addition to Yoakum's comment about "drawing a line in the sand," on a different occasion, apparently referring to Johnson, Yoakum said to Barrett, "I'm not the corrupt one," or something similar.

Following my conversation with Chief Johnson I reviewed personnel files of Yoakum, Simpson, and Teague.  I also obtained copies of their POST (Peace Officer Standards and Training) training history.  Upon reviewing those documents I found both Yoakum and Simpson had completed the *Internal Affairs Investigation course,* (Yoakum in May 2009, and Simpson in September 2013), as well as the *Basic Supervision Course,* (May 2006 and March 2013, respectively).  Additionally, Yoakum completed several management-level programs, including *Basic Management Course,* (November 2010), *Role of the Police Chief,* (September 2012), *Executive Development,* (March 2014), and *Command College,* an 18-month intensive program to prepare law enforcement leaders for the future, (May 2014).  Simpson, in turn, attended the *Supervisory Leadership Institute,* also an intensive multi-session program, completing that course in April 2016.

Copies of the POST training history for Yoakum and Simpson can be found in attachments 3[kk] and 3[ll], respectively.

I also reviewed the department's *Internal Investigations Log* and *Citizen Complaint Log* to determine if Yoakum or Simpson had previously conducted administrative investigations.[5]  Since 1/1/15, Simpson has been assigned one *internal* complaint, (in 2015), and five *citizen* complaints, (two in 2015, and three in 2017).  Yoakum's name did not appear on either log, (though not entirely unexpected, as personnel records indicate he was promoted to captain in 2014).

I also obtained copies of the interview notices Captain Yoakum, Sgt. Simpson, and Detective Teague signed for the investigation into allegations against Chief Johnson.  The interview notices were essentially the same, and included the following statement:

> *"As investigations of this nature are confidential, you are not to discuss this matter, or to provide or share a copy of this Notice, with any other person (including employees of the City), except for your representative.  Your discretion will allow the investigation to proceed without rumors and speculation about this matter."*

---

[4] The underlying sexual harassment allegation was later investigated by P.I. Barry Aninag.

[5] I did not include a copy of the logs with my report.

EXHIBIT 25
Page 14 of 144

COU-00000446

Sgt. Simpson signed his notice on 2/28/17, Detective Teague signed his on 3/1/17, and Captain Yoakum, on 3/28/17.  Copies of the interview notices can be found in attachments 2[b], 2[c], and 2[d], respectively.

To better understand the nature of complaints against Chief Johnson, (for which an administrative investigation was initiated), and the extent of any conversations about that investigation Barrett reportedly had with Yoakum, Simpson, and Teague, I reviewed the investigation conducted by Private Investigator John Hackworth.  Upon doing so I found two allegations of particular interest: first, that Johnson made custodial arrests for violations of the municipal code at the scene of an MMD enforcement action when doing so was against department policy; and second, that Johnson later viewed the contents of a DVR seized during the same MMD incident without first obtaining a warrant to do so.

The allegations were of interest because per P.I. Hackworth's report, Yoakum and Simpson were apparently either present or otherwise involved to some extent when the underlying conduct from both allegations occurred yet failed to notify Johnson that his conduct was possibly against department policy or unlawful.  Specifically, both Yoakum and Simpson were present at the MMD incident and participated in a discussion with Johnson about the charges for which to arrest the suspects, (including the decision to do so for violations of the municipal code),[6] and Yoakum reportedly viewed contents of the DVR with Johnson, (Simpson was the supervisor to whom detectives reported their observations about the DVR).  Based on statements in Hackworth's report, several detectives either saw Johnson viewing contents of the DVR, or saw the DVR left unsecured in an office, yet essentially allowed what they believed to be a violation of department policy or the penal code to continue.  One detective, Lon Teague, even took pictures of the violation, (though he brought his concerns to the attention of Sgt. Simpson).

Because I reviewed the administrative investigation involving Chief Johnson, (conducted by P.I. Hackworth), I also had a basic understanding of the MMD incident, which occurred on 1/21/17.

During my conversations with Chief Johnson he gave me various documents, including a *Confidential Summary of Facts* that he prepared for City Manager Thouvenell and the City Attorney, (attachment 2[a]); a Performance Improvement Plan, (PIP), he gave to Yoakum that was later held in abeyance;[7] an email Sgt. Simpson apparently intended to send to himself for documentation, but inadvertently sent to Johnson, (attachment 2[f]); and the printout of a calendar entry from Outlook on which Johnson wrote notes after meeting with Yoakum and Simpson, (attachment 2[g]).  Attached to that calendar entry were two emails from Simpson to Johnson, and an email exchange between Johnson and UPOA attorney John Bakhit about the surreptitious recording of the association meeting, (attachments 2[i] and 2[j], respectively).

---

[6] Sgt. Simpson later denied he was present when Chief Johnson told officers to arrest the suspects for municipal code violations.

[7] I did not include a copy of the PIP with my report.

12

EXHIBIT 25
Page 15 of 144

COU-00000447

The *Confidential Summary of Facts* listed allegations of misconduct against Captain Yoakum and Sgt. Simpson.  Per Johnson, all but the following two allegations against Yoakum had previously been addressed:

1. *"See memo from Luz Barrett (undermining organization and interference with personnel investigation);*

2. *Involved in possible criminal collusion, insubordination, intimidation and/or creating a hostile work environment (See memo from Luz Barrett involving Yoakum, Simpson, Teague)"*

Allegations against Simpson included:

1. *"Provide false statements during staff meeting about AB109 sweep (See Chino memo);*

2. *Admitted he documented false information about COP in an email to Chief;*

3. *See memo from Luz Barrett (undermining organization and interference with personnel investigation);*

4. *Admitted to knowing that UPMA and/or UPOA illegally tape-recorded COP during a private labor/management meeting;*

5. *Involved in possible criminal collusion, insubordination, intimidation and/or creating a hostile work environment (See memo from Luz Barrett involving Yoakum, Simpson, Teague);*

6. *Admitted that he allowed a false rumor about the COP hiring from outside the organization to fester for approximately 18 months, which undermined the COP (Jan 31, 2017, meeting with Capt Yoakum)."*

The email Sgt. Simpson inadvertently sent to Chief Johnson, (*"From: "msimpson1971@gmail.com"*), was dated 1/27/17, (*"Subject: Don't erase 6"*), and included comments about a call for service to which Simpson had apparently responded and was later counseled for by Captain Yoakum.  Below the signature line, (on which Captain Yoakum's name appeared), were the following notes Simpson apparently wrote to himself for documentation:

*"I received the above written reprimand, which admittedly has some merit. Although I question the process.   Normally an incident briefing would be completed for this type of call.*

*The chief requires Ops Plan on the most mundane events.  Will he be disciplined for going solo on a non planned event.  He served a search warrant solo without telling anyone.  Put himself and others in harms way."*

COU-00000448

Finally, Johnson gave me a printout of an entry from his Outlook calendar for a 1/31/17 meeting on which he handwrote the following notes:

> *"Meeting w/ Marc (and) Tony*
>
> 1.  *Marc admitted I never said I wouldn't hire from outside "Not interested in hiring an LAPD"*
>
> 2.  *Admitted that email he sent had false statements about me serving a war by myself*
>
> 3.  *Said the mgt/labor meeting (summer) was illegally tape-recorded w/out my knowledge"*

Attached to the calendar entry was an email from Sgt. Simpson dated 2/2/17, in which Simpson told Johnson he spoke with their (association) attorney, and "they (were) in agreement with (Johnson's) request."  Johnson explained after Simpson told him the meeting was recorded, Johnson asked for a letter from the association saying they would not record any conversations with Johnson, or release any such recordings if later discovered, without Johnson's consent, (information also included in Simpson's email).

A second email from Simpson to Johnson, dated 3/6/17, advised Johnson the UPMA attorney "hoped" to have the requested letter prepared by the following day.  Following the email dated 3/6/17 was an email exchange between Johnson and Bakhit about the letter.  Although there was no indication in the email exchange that the letter would not be provided, Johnson said the letter has not been received.[8]

During my investigation I also conducted audits of the City email accounts used by Captain Yoakum and Sgt. Simpson.  Upon doing so I found several emails and documents of interest, as also discussed elsewhere in this report.  Of particular interest was an email Yoakum apparently sent to himself on 3/19/17 at 6:35 PM, subject, *"Paperwork,"* with a two-page attachment titled, *"Confidential 3,"* (attachment 2[w]iv).

Page one of the document was a list of *"Things to do"* in response to a meeting with Chief Johnson and (presumably) Yoakum's attorney.  The list included what appeared to be several written thoughts and opinions Yoakum had about Chief Johnson and tasks to which Yoakum had been assigned.  One statement on that list was *"Check John Maxwell's 21 irrefutable laws to use against him."*

The second page of the two-page document was titled, *"Possible ideas to deal with Chief,"* and included:

---

[8] Among the exchange between Chief Johnson and attorney Bakhit was an email dated 3/3/17 in which Bakhit told Johnson a letter requested at the "February 8th meeting" was attached.  Johnson told me the letter to which Bakhit referred in that email was for a different matter.

COU-00000449

> *"Document everything to cover ourselves and overburden him*
>
> *Work slowdown*
>
> *Gucklick and the Sentinel and other publications*
>
> *PIU*
>
> *Meet with City Council and educate them on this*
>
> *Meet with community groups, Upland Chamber, UCCC, Women of the IE*
>
> *Multiple complaints need to be made by individuals (then it can be a Hostile work environment)"*

Also on page two was the statement:

> *"I cannot fundamentally change who I am.  It is clear you don't want me as your Captain.  I have worked here for 30 years and the last two with you as your loyal ally."*

Another document of particular interest found during the Yoakum email audit was a four-page document titled *"Confidential Attorney/Client Privilege,"* (attachment 2[w]vi), that appeared to be Yoakum's response to the PIP ultimately held in abeyance.  Pages three and four of the document included what appeared to be more written thoughts and opinions about Chief Johnson and the tasks to which Yoakum was assigned.  On page four, Yoakum wrote:

> *"I have been his biggest supporter/ally, and he has ruined that.  Alienated me with this.  I will not sabotage him but will not bend over backwards like I have been doing.  Goes to he didn't have to handle this this way."*

Finally, I found Yoakum's documentation of, per the title, *"Additional incidents since the PIP meeting,"* (attachment 2[w]viii; addressed to *"Brandi,"* presumably Yoakum's attorney, Brandi Harper).

During the audit of Sgt. Simpson's City email account I found documents that appeared to be authored by Simpson in which there were detailed complaints against Chief Johnson.  For example, contained in a five-page email sent from Simpson *to* Simpson on 3/9/17 was documentation of an interaction Simpson had with Johnson about a Facebook post in September 2016, as well as Simpson's comments about Johnson's actions at the MMD incident on 1/21/17, which Simpson referred to in the email as, *"MMD Debacle,"* (attachment 2[x]iv).  The same *"Facebook Post"* and *"MMD Debacle"* statements were also found in a nine-page attachment to an email Simpson sent to

COU-00000450

himself on 3/17/17, (attachment 2[x]v).[9]  However, also in the attached document were
complaints about nine other incidents involving Johnson; based on the content of those
complaints, Simpson was personally involved in several.

Another email found during the audit was an undated, unsent draft Simpson wrote about
being contacted by Detective Bonhus at 5:00 PM on 2/7/17, (attachment 2(x)vi).  Per
Simpson's email, Bonhus told Simpson that Chief Johnson was seen viewing a DVR
seized during the MMD incident (on 1/21/17).

I also found two emails Simpson sent to himself, apparently for purposes of
documentation; both were sent on 2/12/17.  The first email, subject, *"Don't erase 3,"*
(attachment 2[x]ii), was sent at 4:46 PM, and included comments about being "passed
over" for promotion to lieutenant.  The second email, subject *"Don't erase 4,"*
(attachment 2[x]iii), was sent at 4:54 PM, and essentially included documentation about
Simpson's workload.

Finally, I found a one-page memo Simpson sent to Sgt. Steenerson in an email on
3/10/17, (attachment 2[x]i); Steenerson was identified as a witness in a citizen's
complaint.  In that memo, Simpson ordered Steenerson "not to discuss (the) matter with
anyone other than supervisors or (his) representative" until the investigation was
complete.

### Statement of Sr. Administrative Assistant Luz Barrett, (4/24/17)

I interviewed Barrett in the chief's conference room at the Upland Police Department.
The interview was recorded and later transcribed, and can be found in attachments 5[h]
and 6[a], respectively.[10]

Ms. Barrett has been employed by the City of Upland for 14 years and began as a
records clerk in the police department.  For the last 12 years, Barrett has been senior
administrative assistant to the chief.  In that capacity, Barrett interacts with employees
throughout the police department, typically doing so more often with captains,
lieutenants, sergeants and the training officer.

I asked Ms. Barrett how long she has known Captain Yoakum, Sgt. Simpson and
Detective Teague.  Barrett said she and Yoakum worked together in the detective
bureau, (Barrett as the secretary and Yoakum as a detective), and has known him for
about 13 years.  Simpson, in turn, was working at the San Bernardino Sheriff's
Department when Barrett began with Upland PD, but he returned to Upland in 2005 or
2006, and they have worked together since.  Finally, although Barrett and Teague have
both worked at Upland PD for many years, it was only after Teague became a detective
about two years prior that they actually began working together.

---

[9] The *"Facebook Post"* and *"MMD Debacle"* statements found in the 3/9/17 email were essentially the same,
though not identical to, the statements in the document attached to the 3/17/17 email.
[10] The words OFF CAMERA appear throughout the transcript.  However, the only breaks that occurred during this
four-part interview are clearly identified.

Barrett said she has historically enjoyed a good relationship with Yoakum, Simpson and Teague, but while they still get along well with one another, that status has changed somewhat in the recent past.  Barrett believes this happened, in part, because of tension after Chief Johnson was appointed, and also opined that Simpson began to "start trouble" after realizing he was not going to be promoted.  When asked to elaborate, Barrett said Simpson would start rumors, and solicit others to say "bad things" about the chief.

I asked Barrett to give me an example of a rumor she personally has heard Simpson say.  Barrett said from her proximity to Chief Johnson's office she can hear everything being said in that office.  People talking to Johnson apparently forget Barrett is indirectly present, she explained, so Barrett has heard conversations between Simpson and the chief that were later the subject of inaccurate organizational rumors.  For example, Barrett recalled a conversation between Johnson and Simpson in which Simpson's attire was discussed.  The conversation occurred on a Thursday, on which casual attire is allowed; Simpson was wearing a polo shirt and jeans.  During that conversation, Johnson told Simpson if he (Simpson) was contacting citizens, he preferred that Simpson wear a shirt and tie because it looked more professional.  Soon thereafter, Barrett heard rumors that Johnson said detectives were no longer allowed to wear polo shirts.

*(During a subsequent interview on 5/4/17, Barrett said she told Code Enforcement Officer Desiree Shiflett about the interaction between Simpson and Johnson, and the inaccurate rumor that followed.  Barrett also told me she did not recall from whom she heard the rumor.)*

Barrett said she also felt like Simpson was trying to "pull" information from her.  For example, when Chief Johnson's doors were closed Simpson would ask Barrett who was in his (Johnson's) office.  Similarly, when Johnson was gone, Simpson would ask where he went, or what he was doing.  Barrett estimated Simpson has tried to get information from her about seven times in the previous four months.

Referring to her previous statement, I asked Barrett to elaborate on how Simpson tried to solicit others for negative comments about Chief Johnson.  Barrett recalled one incident where another individual, later identified as Officer Alaina Clark, was "venting" with other employees, saying she was upset and stressed about the volume of work given her by Chief Johnson.  Later that day Simpson approached Clark and asked her to give him specifics about what Johnson was doing and why Johnson was "stressing her out."  Barrett believes Clark told Simpson she was simply venting, and left it at that.  Barrett was not present when Simpson approached Clark, but knew about their interaction because of a conversation she and Clark had after it occurred.

Barrett continued, saying something similar happened in the code enforcement office.  Soon after a medical marijuana dispensary (MMD) enforcement action, Simpson

COU-00000452

reportedly went to that office and asked a code enforcement officer (CEO) if what Chief Johnson did was "normal" and proper procedure.

*(Although Barrett did not initially know specifically who in code enforcement Simpson asked, during a subsequent phone interview on 7/12/17, which was not recorded, Barrett said she believes the statement was made to two of three code enforcement officers, Marsie Grady and Desiree Shiflett, with whom she often speaks.)*

Next, I asked Barrett if she had any examples of Captain Yoakum soliciting from other employees, information about Chief Johnson.  Barrett spoke about another incident in the code enforcement office, this time saying Yoakum went to that office and asked the CEOs to keep a log of anything Johnson asked them to do, and then give that log to him (Yoakum).  Barrett noted that because of his position Yoakum can make such a request, but she thought it was "suspicious" he would do so and felt he was going behind Johnson's back.  *(When asked for clarification of this statement during the phone interview on 7/12/17, Barrett recalled it was CEO Marsie Grady who told her about Yoakum's request.  Grady went to Barrett's office after Yoakum made this request and asked Barrett why he would do so.)*

I asked Barrett what prompted the code enforcement officer to share this information with her.  Barrett recalled having a conversation with Grady and Shiflett in which they spoke about Yoakum's request, asked Barrett if there was something going on, and then also asked if they were going to get in trouble for giving the log to Yoakum.  Barrett believes Yoakum's request came about three or four months prior (to the date of our interview), possibly soon after the MMD incident.[11]  She does not believe the CEOs started a log, saying to her knowledge Yoakum never asked for it again.

Ms. Barrett and I then discussed three memos she had reportedly written that detailed her interactions with Captain Yoakum, Sgt. Simpson, and Detective Teague on three different dates – 3/14/17, 4/3/17, and 4/12/17, (attachments 2[q]i, 2[q]ii, and 2[q]iii, respectively).

First, I asked Barrett to review the memo titled "Statement – March 14, 2017," in which she wrote about an interaction with Captain Yoakum on that date.  Per Barrett's memo, Yoakum came to her office the day after receiving a work performance plan by Chief Johnson and said he needed to know whose side she was going to be on.  Yoakum also told Barrett he was, "Drawing a line in the sand" and needed to know where she stood, and remarked that he couldn't believe Barrett didn't warn him Johnson was going to give him the performance plan.  Barrett believed Yoakum came to her in an attempt to gather information so he could get Johnson fired.  Barrett reviewed the memo and confirmed the signature thereon was hers.

Noting the handwritten date next to her signature on the document was 4/13/17, while the memo was titled "Statement – March 14, 2017," I asked Barrett if 4/13/17 was the

---

[11] Although not specified, based on questions, answers, and other conversations, the medical marijuana dispensary enforcement action to which Ms. Barrett referred was likely the incident on 1/21/17.

COU-00000453

date she actually typed the information.  Barrett said it was and explained she keeps notes of requests from the chief in a notebook.  Immediately after her interaction with Yoakum on 3/14/17, Barrett wrote notes in that notebook, doing so because she was "very uncomfortable" and "disappointed" with what Yoakum said.  The more thought she gave to their interaction, Barrett said, the more upset she was that Yoakum put her in such a position.  When Yoakum, Simpson and Teague came to her office, one right after the other, on 4/12/17, Barrett said it "came to a head," so she put her notes into memo form.  Describing the conduct of Yoakum, Simpson and Teague as an "escalation," Barrett said she also felt they were trying to scare her, or make her think she was doing something that she shouldn't be doing.  Although she spoke with Chief Johnson to ensure she was not over-reacting, Barrett said she was not directed to write the memo.

After she reviewed the memo about her interaction with Captain Yoakum on 3/14/17, I asked Barrett if the memo was accurate, and she said it was.

I asked Barrett if Captain Yoakum came to her office specifically to talk to her, or for some other reason.  Barrett said Yoakum has a mail slot in her office but she does not recall if he took anything from that slot when they spoke.  She did say Yoakum was upset when he came to her office.

I also asked Barrett if she knew what Yoakum was talking about when he said, "I need to know whose side you're going to be on."  Barrett said she did, and explained she knew that Chief Johnson was going to talk to Yoakum about Yoakum's work performance.  When Yoakum came in and said he was "drawing a line in the sand" and wanted to know "whose side" Barrett was on, because Yoakum was upset about his recent conversation with the chief, Barrett knew he was referring to Johnson or him, (Yoakum).  As their conversation progressed, she became even more convinced.

During their conversation, which lasted between five and ten minutes, Yoakum told Barrett he could not believe she didn't warn him that Chief Johnson was going to give him a work performance plan.  Referring to a disciplinary package in which Yoakum proposed discipline that was returned by Johnson for re-consideration, Barrett told Yoakum she essentially tried to warn him by suggesting he (Yoakum) look at what he was recommending.  In response, Yoakum told Barrett she should have come right out and warned him.  Barrett told Yoakum she could not do so, as it would be a betrayal of the chief's confidence.  Yoakum then told Barrett he needed her help, saying anything she gave him was "good enough."

*(During our 4/24/17 interview Barrett said she was angry about her conversation with Captain Yoakum on 3/14/17, and spoke with two co-workers, individually, about that interaction.  When I re-interviewed Barrett on 5/4/17 she identified the co-workers as Desiree Shiflett and Sylvia Kiel.)*

I asked Barrett if at the time of her conversation with Yoakum on 3/14/17 she knew that an investigation (involving Chief Johnson) was being conducted, and she told me, "No."

Referring to her statement in the 3/14/17 interaction memo that she believed Yoakum
was seeking her help to get Chief Johnson fired, I asked Barrett on what she based her
opinion.  Barrett said she has known Yoakum for years and explained when he doesn't
get his way, "He throws a fit."  It was clear to Barrett that Yoakum did not want Johnson
as the chief any longer.

Although Yoakum did not specifically say he was going to get Johnson fired, Barrett
recalled that he said, "It's a fight to the end; it's either him or me," and one of them had
to go.  Barrett knew Yoakum was referring to the chief, and told Yoakum, "You need to
be careful."  Barrett also recalled Yoakum once said he had an attorney and was
"getting everything together."  Before their interaction on 3/14/17, Barrett did not believe
Yoakum was trying to get Chief Johnson fired.

*(During our 7/12/17 conversation I asked Barrett to clarify her statements about Captain
Yoakum telling her he needed her help, and that anything she could give him was good
enough, as well as Yoakum's comment, "It's a fight to the end."  Barrett said after her
interaction with Yoakum on 3/14/17, in which Yoakum said he was "Drawing a line in the
sand," Yoakum would stop by her office periodically in an attempt to get information
about things Chief Johnson had done that, she believed, he could then use to get
Johnson fired.  Both statements were made during conversations in which Yoakum tried
to get information about Johnson – conversations that occurred after their 3/14/17
interaction, but before the 4/12 interaction.*

*At my request Barrett checked her notes to determine if she documented Captain
Yoakum's statement, "It's a fight to the end."  Barrett later told me she did document
Yoakum's comment, and on 7/19/17 sent me a copy of her notes.  The notes showed
Yoakum made this statement on 4/11/17.  The notes also indicate Yoakum made the
statement, "No backing down now; too late."  I did not ask Barrett about the additional
comments.  A copy of the notes can be found in attachment 2[v].)*

COU-00000455



Apr 11 - Yoakum asked for time off slip back. I said why if you left early. ~~He insisted~~ I told him this minor - pick your battles. He insisted so I gave him slip back. He said this was a fight to the end. I warned not to go against Chief "no disrespect but you are just a captain" Repeated this is "Fight to end" and no backing down now. Too late.

*Attachment 2[v]*

During the same conversation Yoakum told Barrett he was not going to ask her to do anything illegal, but she could not recall the specific point at which it was said.

Per Barrett's memo, during their 3/14/17 interaction she told Yoakum her loyalties lied with the chief.  I asked Barrett what Yoakum said in response to that comment. Yoakum was "a little upset," and told Barrett she had known him much longer than she had known Johnson.  Yoakum also said he could not believe she was siding with the chief.

I asked Barrett to explain why she was offended by what Yoakum did on 3/14/17, (per her memo).  Barrett felt it was wrong for someone she considers a friend to put her in the position that Yoakum did, adding that, as a captain, he should know better.  I also asked why she though Yoakum was trying to solicit her help in what she believed was his attempt to get Chief Johnson fired.  Barrett explained in her position she has access to information that other people do not, and would be able to see first-hand if the chief did anything inappropriate

Barrett described Yoakum's behavior during their 3/14/17 interaction as one of the "fits" to which she previously referred.  She said Yoakum engaged in other behaviors as well that led her to believe he was upset with Chief Johnson.  For example, Barrett's

21

EXHIBIT 25
Page 24 of 144

COU-00000456

perception was that Yoakum would avoid the hallway near Johnson's and her office when he knew Johnson was in the building, and there were times he would not respond to her emails or text messages when she tried to contact him at Johnson's request.

Barrett also recalled a conversation she had with Captain Yoakum about leave chits. Although captains at Upland PD have historically worked from 7:00 am to 6:00 pm, with an hour of unpaid lunch, Yoakum leaves at 5:00 pm. Chief Johnson told Yoakum if he was going to leave early, he would need to submit a leave chit for the time off. Yoakum told Barrett he was not going to do so, and during the brief conversation that followed, Barrett suggested that Yoakum pick his battles. In response, Yoakum made a statement similar to, "I already told you, it's going to be me or him."

I asked Barrett if she believed Captain Yoakum had done anything else to undermine Chief Johnson. Barrett spoke about an incident involving the selection of a detective to attend "sergeant school," (basic supervision course). (The detective was identified as Lon Teague.) Barrett explained vacancies exist for the position of sergeant, and there is a list from which those vacancies are filled. Yoakum chose Detective Teague to attend the school instead of sending the next person on the eligibility list for sergeant, who happens to be at the rank of officer. When Barrett asked Johnson if he was aware of Yoakum's decision, she learned he knew nothing about it. Barrett told Yoakum that Detective Teague could not attend the course; Yoakum got "pissed off" and sent Teague to a different school.

After Teague's participation in the course was cancelled, Barrett said Teague essentially quit talking to her and would take a different path to avoid her in the halls, or look down if they did pass one another.

*(When asked for additional information during the phone interview on 7/12/17 Barrett said Chief Johnson is typically the person who would decide which officer will attend certain schools, such as the basic supervision course, and does so based on an officer's placement on the promotional list.)*

Following a brief break, the interview resumed, *(Barrett Interview 2).*

During the break Barrett told me Captain Yoakum was well-liked in the organization, and she was concerned detectives would treat her differently because she provided information for the investigation. Barrett also said since their interaction on 3/14/17, when she and Yoakum passed each other in the halls, Yoakum would sometimes mumble things under his breath, loud enough for her, but not for other people to hear. I asked Barrett, now on record, to provide additional information.

Barrett said although she usually could not understand what Yoakum said when he mumbled as they passed, two or three weeks after their 3/14/17 interaction, during one such "mumble" she heard him say, "At least I'm not doing anything illegal." Barrett believed Yoakum was referring to Chief Johnson's actions at the MMD enforcement action because detectives alleged Johnson had done something illegal during that

COU-00000457

incident.  Barrett did not respond to Yoakum's comment, and the "mumblings" made in passing stopped after five or six times.

*(During a follow-up interview on 5/4/17 Barrett and I again discussed her statement that Yoakum "mumbled" comments as they passed each other in the hall.  Barrett told me that in addition to Yoakum's comment, "At least I didn't do anything illegal," she understood what he said "a couple" of other times as well.  Although she could no longer recall what those comments were, Barrett knew they were, "putting down the chief.")*

Barrett and I took another break, and then the interview resumed, *(Barrett Interview 3).*

Next, I asked Barrett about the memo titled "Statement – April 3, 2017."  Once again Barrett reviewed the memo, confirmed the signature was hers, and said she wrote this memo on 4/13/17 based on notes she took following her interaction with Sgt. Simpson on 4/3/17.  Barrett also confirmed the memo was accurate.

Per Barrett's memo, Simpson approached Barrett and said he needed to speak with her.  During the conversation that followed Simpson told Barrett he just left an interview with a private investigator hired by the city, and also said she should be expecting a call because he had given her name to the investigator.  When asked why, Simpson told Barrett it was because of "the copies (she) made and gave to the officer's attorney."[12]  Simpson also told Barrett he knew she was just doing what she had been told to do.  As their conversation continued Simpson also spoke about recordings from the medical marijuana dispensary, saying "they" knew Barrett was directed by Chief Johnson to put the recordings in another office so he could alter the video.  Although she was not sure of Simpson's exact words, Barrett believed the message was that she enabled Johnson to tamper with the DVR by placing the equipment in an office where nobody would see him.  She also believed Simpson was referring to the detectives when he used the word "they" because he works with them in the detective bureau.

Barrett said she was in her office when Simpson approached her, but their conversation occurred in the upstairs breakroom.  The conversation lasted about two minutes, and they were alone at the time.

Barrett said that during their conversation, Simpson did not tell her what he and the investigator discussed or the questions he was asked during his interview, instead saying only that he had given the investigator Barrett's name.  Barrett did not know for certain what investigation Simpson was referring to, but heard rumors that the UPMA and UPOA had filed a complaint with the city manager about things Chief Johnson had done, including his actions on an MMD enforcement action, violating officer's rights, and engaging in illegal activity.

---

[12] When interviewed by P.I. Hackworth for the Johnson investigation, Simpson spoke about an officer who did not receive a complete copy of an internal affairs report to which that officer was entitled.

COU-00000458

I asked Barrett if she knew what Simpson was referring to when he told her he had given her name to the investigator because of copies she made and gave to an officer's attorney.  Barrett said she did and explained Simpson was apparently referring to documents she copies in preparation for Skelly hearings.  Although Barrett did not know to which officer or Skelly hearing Simpson specifically referred, she did say Simpson was apparently misinformed about the process, as the copies are actually made by watch commanders and not her.  Simpson's comment that he knew Barrett was "just doing what (she) was told to do," Barrett explained, implied there were pages she intentionally didn't send because Johnson told her not to, which did not occur.  Barrett did not ask Simpson to elaborate on his comments because she felt it was inappropriate for him to even approach her.

I also asked Barrett if she recalled what Simpson said about the medical marijuana dispensary recordings.  Again Barrett could not recall his exact words, but she believed Simpson was implying the detectives thought Chief Johnson directed her to place the DVR where Johnson could alter it without anyone knowing.  And, once again, Barrett said Simpson's assumptions were inaccurate.  Barrett explained Johnson was involved in an MMD enforcement action and the city attorney asked him for a supplemental report.  Apparently Johnson asked that a DVR from that incident be brought upstairs so he could refresh his memory by viewing the content.[13]  Someone from the IT department, (later identified as Rami Asad), brought the DVR to Barrett and asked where she wanted it placed.  At the time Barrett knew nothing about the DVR, but directed Asad to put the DVR in an adjacent office.  Barrett explained the sergeant assigned to that office, (identified as Sgt. Tseng), was on vacation, and she had the only other key.  When the chief returned that day, Barrett told him where the DVR was placed.

Just as she did not ask for additional information from Simpson after he made his comments about copies of documents given to attorneys, Barrett did not discuss his other remarks either and returned to her office.

I asked Barrett about the comment in her memo that she believed "they" were trying to scare her or influence what she would say to the investigator if interviewed.  Barrett explained that, although nobody said it directly, she felt people assumed she would cover for Chief Johnson if he did something wrong.  Consequently, she thought Simpson was telling her to be careful with what she said, tell the truth, and don't lie for the chief.  She also said this was not necessarily an attempt to scare her, but instead to influence what she was saying.

Barrett recalled another conversation with Simpson that occurred in the downstairs sergeants office, possibly after a staff meeting.  Although she did not recall how the topic came up, during that conversation Simpson told Barrett if the city manager didn't do anything with the investigation being conducted at the time, "they" were going to the

---

[13] During the audit of Captain Yoakum's City email account I found an email dated 2/7/17 at 11:14 AM from Yoakum to IT Technician Rami Asad.  In his email, Yoakum told Asad he had a DVR and needed help playing the video.  A copy of the email can be found in attachment 2[w]i.

COU-00000459

media.  Barrett questioned Simpson's comment, saying as far as she knew Chief Johnson had done nothing wrong.  Barrett could not recall the exact date this conversation occurred, but said it was before their 4/3/17 interaction.

Following another brief break the interview resumed, *(Barrett Interview 4).*

Next, Barrett and I discussed the memo titled, "Statement – April 12, 2017."  Once again Barrett reviewed the memo, confirmed the signature was hers, and said she wrote this memo on 4/13/17 based on notes she took following her interaction with Detective Teague, Captain Yoakum, and Sgt. Simpson.

Per Barrett's memo, on 4/12/17 at about 11:33 am Detective Teague came to her office, asked how she was doing, and then asked when she was going to be interviewed. Following a brief conversation, Teague left.

Almost immediately after Teague left, Captain Yoakum came to Barrett's office and asked how she was doing.  When Barrett told him she was fine and questioned why he asked, Yoakum said he wanted to make sure she was okay, and then told her she *would* be okay.  Yoakum also asked Barrett when she was being interviewed.  When Barrett told Yoakum nobody had called her to schedule an interview, he said that was "weird," (or something similar), because he knew the chief was being interviewed that day.  Following their brief conversation, Yoakum left Barrett's office.

Almost immediately after Yoakum left, Simpson came to Barrett's office and asked Barrett how her interview went.  Barrett told Simpson more than just he must have given the investigator her name because other people had asked about her interview as well. I asked Barrett if she had spoken with Yoakum, Simpson or Teague *after* they left her office on 4/12/17, but before she typed her memos the following day, and she told me, "No."

Barrett and I first discussed her interaction with Detective Teague.  I asked Barrett if Teague comes to her office often for casual conversation and she replied, "No, not at all."  Barrett also said Teague comes to her office only when he needs something, which typically happens about once every three weeks.  She also said before the 4/12/17 interaction he last came to her office the end of March to find out if the Upland Police Foundation had agreed to fund a training course.

I asked Barrett if she and Teague interact elsewhere in the department.  Barrett said they would say "Hi" to one another when passing in the halls, but since his attendance at the basic supervision course was cancelled he doesn't acknowledge her, and has even taken a different path in an apparent attempt to avoid her.

Barrett said when Detective Teague asked her when she was going to be interviewed, based on her 4/3/17 interaction with Sgt. Simpson she believed he was referring to the same investigation.  I asked Barrett if she had previously discussed with Teague any investigations being conducted in the police department and she told me, "No," (also

COU-00000460

pointing out that they no longer talk). Similarly, other than the conversation she and Sgt. Simpson had in the sergeants office, Barrett said she has not previously discussed with *anyone* at the police department, any investigations that were being conducted.

I asked Barrett if she recalled anything else Detective Teague said to her during their brief conversation on 4/12/17. Barrett told me when Teague came to her office and said, "Good morning," she replied in kind, and then "gave him a weird look" when he asked how she was doing because he had not recently been talking to her at all. Following a brief pause, Teague asked Barrett if she had been interviewed yet. Barrett replied, "No," and asked Teague if she was supposed to be interviewed. Teague said, "No," told her he was just wondering, and left the office.

Barrett and I then discussed her interaction with Captain Yoakum after Teague left her office. Barrett said Yoakum typically comes to her office three or four times a day to check his mail; sometimes they would talk, and sometimes they would not. On 4/12/17, Yoakum came to her office two or three minutes after Teague left.

When Yoakum asked Barrett how she was doing, told her he wanted to make sure she was okay, and then asked when she was going to be interviewed, because of her brief conversation with Detective Teague only minutes earlier she knew what Yoakum was referring to. She also thought it was "weird" that Yoakum came into her office asking essentially the same thing that Teague had asked.

I asked Barrett if Yoakum said why the chief was being interviewed that day. Barrett said he did not, but she already knew. Other than telling her she would be okay, Barrett could not recall anything else Yoakum said during their conversation. The conversation between Barrett and Yoakum was also brief.

*(During a subsequent interview on 5/4/17 Barrett said she knew Chief Johnson was being interviewed on 4/12/17 because she worked with HR Manager Gonzales to schedule other interviews for that investigation. Barrett asked Gonzales if she wanted her [Barrett] to schedule Johnson's interview as well. Gonzales said, "No," telling Barrett that Johnson would be the last one interviewed. Although Barrett schedules most appointments for Johnson, she did not schedule his 4/12/17 interview. However, on 4/11/17, when she checked his calendar for scheduled appointments, [as she typically does], Barrett saw he was scheduled for the interview. Because Gonzales told her that Johnson would be the last person interviewed, Barrett knew the investigation was "complete." During the 5/4/17 follow-up interview I also asked Barrett if she told anyone that Johnson was being interviewed, and she replied, "No." Barrett also said in a second follow-up interview, this time on 5/9/19, [Luz Barret (2), attachment 5[hh] and 6[e]], from what she could recall, nobody asked her if Johnson was being interviewed either.)*

Within a minute or two of Captain Yoakum leaving Barrett's office, Sgt. Simpson came in as well and asked Barrett how her interview went. Like Yoakum, Simpson has a mail slot in Barrett's office and checks it periodically, (though not as regularly).

When Simpson came to Barrett's office and asked how her interview went, she assumed he was referring to the same interview mentioned during their 4/3/17 interaction.  Because Teague and Yoakum were in her office only minutes earlier asking the same thing, Barrett said she "caught on" to what was happening and paid closer attention during her conversation with Simpson.

When Barrett told Simpson she had not been interviewed, and that she did not have an interview scheduled, he looked surprised and asked, "Oh, you haven't?"  (Barrett noted both Yoakum and Teague were also surprised when she said this during her interactions with them.)  I also asked Barrett what Simpson said when she told him more than he must have given the investigator her name because other people asked about the interview as well.  Although she was not certain, Barrett believes Simpson replied, "You're probably right," and might have said he was surprised they *hadn't* interviewed her, but he said nothing that would lead her to believe he knew Yoakum and Teague were in her office moments earlier.  She also said none of these three individuals – Yoakum, Simpson, or Teague – gave her any indication someone else would come to her office after they left.  However, she believed it was "Way too much of a coincidence" that all three came to her office (independently) within an eight minute period, all wanting to know if she had been interviewed.

In her memo, Barrett said she and Simpson discussed the turmoil the situation was causing the department.  I asked Barrett what turmoil she was referring to.  Barrett said during their conversation she asked Simpson what he was trying to accomplish.  In response, Simpson asked Barrett what she was talking about, and a discussion followed.  Barrett told Simpson that if the investigation did not turn out the way he wanted, more investigations involving Chief Johnson were only going to further divide the police department.  If Simpson got what he wanted and Johnson left the department, Barrett continued, the city manager was going to select the next chief from the outside as well.  Simpson replied, "The next chief can't be as bad as this one," or, "It can't possibly get worse."

Barrett then asked Simpson how he thought Chief Johnson was going to react if Johnson *did* stay, saying the chief would trust him even less.  At the end of their conversation Simpson told Barrett she was right, and that it could get worse.  Barrett said her conversation with Simpson lasted eight to ten minutes.

During the interview Barrett told me people in the organization "nitpick" everything Chief Johnson does and are apparently unhappy because Johnson has made several changes, expects more from the employees, and holds them accountable for their work.  She said some people are also unhappy that promotions are no longer based on longevity.

Barrett believes that if she told Yoakum, Simpson and Teague that she *had* been interviewed, their next question would be, "What did you say," or, "What did the

COU-00000462

investigator ask.  Because all three came to her office in such a short period of time, one telling her she would be okay, she also felt this was an effort to intimidate her.

I asked Barrett if anyone other than her had access to Chief Johnson's calendar. Barrett said Yoakum has viewing rights, and to her knowledge is the only person in the department who can do so other than her and Johnson, (who both can also add and delete appointments).

As the interview concluded Barrett told me she came forward with the information because she believes Chief Johnson has done nothing wrong and nothing illegal.  She also believed he would be cleared of any wrongdoing in his investigation, and was concerned that employees would then come up with other allegations.  Based on what occurred in her office on 4/12/17, Barrett felt those making new allegations would be even more vocal with her, and push her harder about whatever it is they think the chief has done.

Throughout the interview Barrett was uncomfortable providing information, concerned about "backlash" from her statements, (not just toward her, but toward other officers who gave statements as well), and at times became emotional.

For additional details refer to the complete interview audio and transcript.

After the interview I asked Barrett to provide me with copies of the notes she took after her interactions with Yoakum, Simpson and Teague.  I also asked her to give me other documents to which she referred, including text messages she sent to Yoakum on behalf of Chief Johnson that went unanswered, and the disciplinary package Johnson returned to Yoakum asking him to re-consider his recommendation for discipline.

Barrett gave me the following documents:

- Four pages of handwritten notes, including one page dated "Mar 14" with the name "Yoakum"; one page dated "Apr 3" with the name "Simpson"; and two pages dated "Apr 12" with the times "11:33 am Teague," "11:36 am Yoakum," and "11:40 am Simpson":

EXHIBIT 25
Page 31 of 144

COU-00000463

UPD IA 06-17
Simpson

Mar 14
Yoakum - drawing line in sand
    why I didn't warn
    told him outright (been direct)

*Attachment 2[r]i*



Apr 3
Simpson - went to breakroom
    - inform me he gave my name
      to investigator
    - for making copies
    - said "I know you were
      only doing what you were
      told to do" (by Chief)
    - for MMD video put in
      Tseng office (recordings edited)

*Attachment 2[r]ii*



Apr 12

11:33 am Teague - asked if I had
                  been interviewed
            - I responded "was I
              suppose to be"
            - he was just wondering

11:36 am Yoakum - am I okay
            - I respond "why"
            + reassure me I will
              be okay
            - when & am I being
              interviewed
            - not scheduled or
              informed

11:40 am Simpson - asked how interview was
            - respond - I wasn't
            - more people must
              have given investigator
              my name
            - asked what he was
              hoping for with all
              this                    1

*Attachment 2[r]iii, page 1*

Simpson (cont) - Chief leaves today - no Chief Yoa
                 CM goes outside again
            - couldn't be worse than Jere
            - Chief gets cleared, will like
              you even less
            - causing turmoil, PD will
              implode
            - really think about what
              trying to accomplish
            - employees unhappy - bad
              working environment

*Attachment 2[r]iii, page 2*

EXHIBIT 25
Page 32 of 144

COU-00000464

- Screenshots of two text messages sent to Yoakum from Barrett, including one dated "Thu, Feb 2, 3:39 PM," and the other dated "Wed, Feb 15, 4:33 PM":





Attachment 2[k]                    Attachment 2[o]

*(Barrett's reported lack of response by Captain Yoakum to her text messages sent on behalf of Chief Johnson was not investigated further.)*

Barrett also gave me copies of two emails she sent Captain Yoakum that were possibly unanswered, and several pages from a disciplinary package Yoakum submitted to Chief Johnson, on which appeared various handwritten notes. The emails were discussed in a follow-up interview with Barrett on 5/4/17, but based on the information she provided they were not investigated further or used to support any conclusions. I did not include copies of those emails in my report. The disciplinary package was also discussed during the same interview, but when I spoke with Chief Johnson he said it was not an issue of concern, and therefore I did not include a copy of that document in my report either.

Following Barrett's interview I asked HR Manager Kelly Gonzales if it was possible to determine who had viewing rights to Chief Johnson's calendar, and specifically who accessed his calendar on 4/12/17 and a few days before. Gonzales spoke with IT

COU-00000465

Technician Rami Asad, who told her only Johnson, Barrett and Yoakum could view the actual appointments, (and not just availability), on Johnson's calendar, but it was not possible to determine if (or when) they did.

I also asked Ms. Gonzales to check payroll records to confirm Yoakum, Simpson and Teague were working on 4/12/17; she said they were.

### Statement of Sr. Administrative Assistant Luz Barrett, (5/4/17)

Because I had questions about the documents Barrett gave me, I re-interviewed her, again in the chief's conference room.  The interview was recorded and later transcribed, and can be found in attachments 5[gg] and 6[c], respectively, (*Luz Barrett (1) May 4, 2017*). Barrett confirmed she received the interview notice from HR Manager Gonzales, and that signature on that form was hers.

Barrett and I first discussed the handwritten notes she provided, which were consistent with her typewritten memos.  I asked Barrett if having read her handwritten notes she believed the memos were accurate, and she said they were.

Referring to her 4/12/17 interaction, I asked Barrett if Captain Yoakum, Simpson, or Detective Teague had ever come to her office, one right after the other, and she said, "No."  Barrett also said she did not remember them picking anything up from her office when they were there.

Recalling that Barrett told me during our previous interview Simpson "fished" for information several times, I asked her if she had since remembered any other examples.  Barrett said she did, and spoke about a day when Chief Johnson was in his office alone with the doors closed; Johnson was yelling, and she could hear that he was clearly upset, (Barrett did not recall the date).  Barrett also said anybody walking by Johnson's office would have been able to hear the chief as well.

Barrett walked to the reception area (at the top of the stairs and adjacent to the chief's conference room), and began speaking with Administrative Assistant Jackie Crandall. (Barrett said the chief could not be heard from Crandall's desk.)  While there, Simpson walked by and made a statement similar to, "Oh my God, are you okay?"  Simpson also told Barrett he could hear the chief, and asked her what it was about.  Barrett was surprised, but said nothing.

Barrett recalled another, more recent example, ("within the last month"), when she returned from lunch and the doors to Chief Johnson's office were closed.  Barrett heard raised voices between Johnson and someone else, and could tell Johnson was upset.  Simpson walked by Barrett's office, commented that Johnson sounded upset, and asked Barrett who was with the chief and what it was about.  Despite Barrett's response that she didn't know, Simpson remained as if he was trying to hear what was being said.  When Barrett asked Simpson if he needed something else, he left her office.

EXHIBIT 25
Page 34 of 144

COU-00000466

Barrett also provided additional information about her conversation with Captain
Yoakum on 3/14/17. Referring to a comment she made during our 4/24/17 interview
that her "file was getting pretty big," I asked Barrett to explain what she meant. Barrett
said whenever Chief Johnson returned something for correction, regardless of the
document, she maintained a copy for several months to ensure corrections were made.

Because it was not clear to me in the 4/24/17 interview, I asked Barrett when she told
Chief Johnson about the various interactions with Yoakum, Simpson and Teague.
Although she told Johnson about her 4/12/17 interactions when he returned from his
interview on that same day, Barrett did not tell him about her interactions with Yoakum,
(on 3/14/17), or with Simpson, (on 4/3/17), until the following day.

Barrett and I also discussed the text messages she sent Captain Yoakum that went
unanswered. Referring to the February 2nd message sent at 3:39 PM in which she told
Yoakum the chief wanted him in his office for a meeting, (attachment 2[k]), Barrett said
Yoakum did not get back to her, and she next saw him the following day. Noting that
the next message to Yoakum on her phone was dated February 9th, I asked Barrett if
she deleted any texts between the two dates, and she told me, "No." Barrett also said
she did not delete any messages after her February 15th text asking Yoakum if he had
gone home, and telling Yoakum the chief wanted to see him, (attachment 2[o]), which
also went unanswered.

During this follow-up interview Barrett and I again discussed why she was upset about
her interactions with Yoakum, Simpson and Teague. Barrett said she felt "a little
intimidated" by her interaction with Yoakum on 3/14/17 because he wanted her to "pick
a side." Continuing, Barrett said Yoakum knows he is well-liked while the chief is not,
and she was angered by her belief that Yoakum was trying to gather a group of
supporters. After doing so, Barrett opined, Yoakum could then tell others she was not
willing to help him, making her, "the enemy." Barrett said she had been with Upland PD
for a long time and that she "knows how people are." She also said, "It happened to me
before when a captain did something wrong."

At this point in our discussion Barrett began to cry and asked if we could go off-tape.
We did, and during the break she spoke about an incident that occurred several years
prior where she was essentially harassed and mocked. Because of the relationships
among those involved, Barrett opined, including senior ranking members of the
department, the misconduct was dismissed, and *she* was forced to apologize. We
remained off-tape for about ten minutes, and then the interview resumed, (*Luz Barrett
(2), 5/4/17*).

After discussing the emails and disciplinary package Barrett gave me, (that were not
factored into my conclusion or used as the basis of any findings), in the final segment of
my interview I asked Barrett if she was emotional and upset during the 4/24/17 interview
because of what was happening in the department, or because of her interactions with
Yoakum, Simpson and Teague. Barrett said it was a combination of both, and
explained she was upset because she has been through this before and knows how it
"plays out." Because she's been through this before, Barrett continued, she took it

COU-00000467

harder when Yoakum, Simpson and Teague came to her office.  Doing so was "the same pattern as before," Barrett explained, where people "stick together" and "make (things) a little difficult."

For additional details refer to the complete interview audio.

*Statement of Sr. Administrative Assistant Luz Barrett, (5/9/17)*

I spoke with Ms. Barrett in the chief's conference room, and the interview was recorded and later transcribed, (attachments 5[hh] and 6[e], respectively).  Before we began, Barrett acknowledged the interview was a continuation of my previous interviews, and knew she was not to discuss the investigation with anyone.

I asked Ms. Barrett about her role in placing a DVR from the MMD incident into Sgt. Tseng's office for viewing by Chief Johnson.  Barrett said she opened Tseng's door for IT Technician Asad, who placed the DVR in Tseng's office.  When Asad left, Barrett locked Tseng's office door.

Barrett explained she made the decision to have the DVR placed in Sgt. Tseng's office because she knew he was on vacation that week, and she had the only other key to his door.

Sometime after the DVR was placed in Sgt. Tseng's office Barrett opened the door for Chief Johnson.  When Johnson finished he told Barrett, who immediately locked the door behind him.  Barrett said she opened the door a second time for Johnson, after lunch on a Wednesday, (though she wasn't certain if it was the same day the DVR was placed in Tseng's office or the following day).  Barrett recalled the second viewing occurred on Wednesday afternoon because the city prosecutor, who is at Upland only during that time, was with Johnson.  When Barrett went to the restroom later she noticed Tseng's door was propped open but the chief was not inside so she locked the office.  Barrett guessed the door was propped open for an hour or two before she closed it.  After Barrett locked the door the second time she opened it for IT, who removed the DVR.  Barrett said the DVR was in Tseng's office most likely for one full day, but no longer than a day-and-a-half.

For additional details refer to the complete interview audio.

*Statement of Sr. Administrative Assistant Luz Barrett, (7/6/17)*

I spoke with Barrett by phone on 7/12/17 to clarify statements made during previous interviews, (as noted elsewhere); the conversation was not recorded.  I also asked Barrett to tell me where Captain Yoakum's office was located, and whether she believed he could hear conversations among the detectives, (I had previously established his office was in the detective bureau).  Barrett described the detective bureau as an office with about 15 cubicles.  Yoakum's office, in turn, is adjacent to the detective briefing room and work stations used by detectives Wyman and Bonhus, as well as two health

COU-00000468

workers from the county.[14]   Barrett believes it is possible for Yoakum to hear
conversations in the detective bureau from his office, depending on how loud people are
talking and the existence of other noise.

*Statement of Chief Brian Johnson, (5/4/17)*

I interviewed Chief Johnson in his conference room.  The interview was recorded and
later transcribed, and can be found in attachments 5[l] and 6[b], respectively.

Chief Johnson and I initially discussed a meeting he had with Captain Yoakum and Sgt.
Simpson on 1/31/17.  Johnson had previously given me a copy of his calendar entry for
that meeting, on which appeared handwritten notes:



*Attachment 2[g]*

---

[14] I did not interview the health workers for my investigation.

34

EXHIBIT 25
Page 37 of 144

COU-00000469

Chief Johnson told me he scheduled this meeting after Sgt. Simpson inadvertently sent him an email apparently intended for Simpson's own documentation:

Johnson confirmed he wrote the notes on the calendar entry and did so "weeks" after the meeting occurred.  The purpose of that meeting, Johnson explained, was to discuss the email, but several other topics were covered as well.

Referring to the first item on his bulleted list, *"Marc admitted I never said I wouldn't hire from outside 'Not interested in hiring an LAPD,'"* I asked Chief Johnson what he meant by those comments.  Johnson explained there has long been a rumor that he said he would never hire from the outside, and spoke about the history of his actual comment.

During the selection process for chief, Johnson and the other two finalists were with department heads and police union representatives, including Simpson and Sgt. Duran.  Johnson recalled Simpson asking him if he would hire someone from LAPD if he was appointed.  In response, Johnson told Simpson he had no interest in bringing somebody (to Upland PD) from LAPD, also saying he believed there were plenty of talented people within UPD.  Knowing he was hired as a change agent, (citing the department's history of not selecting a chief from the outside in nearly 50 years), Johnson did not say unequivocally he wouldn't hire from the outside; rather, only that he had *no interest* in bringing someone from LAPD.  Johnson said he has made this same statement several times to other people, including Captain Yoakum and the lieutenants.

Believing Simpson was responsible, (at least in part), for spreading the rumor, during their 1/31/17 meeting Johnson challenged Simpson, reminding Simpson he pressed Johnson on this issue at the selection process for chief.  Simpson finally admitted to Johnson that he (Johnson) never said he wouldn't hire from the outside.

Johnson said the rumor had existed for about 18 months and began when the decision was made by Johnson, the human resources manager, and the city manager to open the promotional process for lieutenant to outside applicants.  While he could not attribute the rumor's origin to Simpson, Johnson continued, Simpson knew what Johnson said during the selection process for chief yet did nothing to correct the rumor being spread when he heard it.

During a joint UPOA/UPMA meeting shortly after the 1/31/17 meeting,[15] Johnson said the topic of promotions was raised.  Johnson was hoping someone would talk about the rumor so he could ask Simpson to correct the misinformation in the presence of other board members, but the issue did not come up.

As the interview continued Johnson spoke about other topics of discussion during their meeting on 1/31/17, including a conversation he had with Simpson six months after being appointed chief.  Johnson heard Simpson was undermining him so he called Simpson into his office.  Simpson denied that he would ever undermine Johnson, told the chief he was supportive, and assured him he was loyal.  During a recent

---

[15] Most likely on 2/8/17.

promotional process, however, Johnson considered Simpson's response to a conversation they had essentially a "dig."

Johnson explained he promoted someone who he believed had stronger administrative skills than Simpson, but who also finished lower on the eligibility list.  With Captain Yoakum present, Johnson spoke with Simpson about why he selected the other candidate, praising Simpson's strengths, and specifically telling him that despite what he (Simpson) may feel, he was not being "passed over" for promotion.  About one hour after their meeting, Simpson sent Johnson a text message saying he was going to continue working for the chief, even though he was "passed over."  Johnson later sent me a screen shot of the text message:



*Attachment 2[e]*

Johnson spoke about something else Simpson said during the promotional process that they likely discussed during the 1/31/17 meeting as well.  Simpson told Johnson he knew the two of them had not always gotten along, and that Johnson felt he (Simpson) wasn't supportive.  Simpson then told Johnson about a conversation he had with his wife.  During *that* conversation, Simpson's wife told Simpson that before Johnson was appointed, Simpson would come home from work, "bitching and moaning" the chief

EXHIBIT 25
Page 39 of 144

COU-00000471

wasn't doing anything and that the organization was stagnant.  She then told Simpson
he continues to "bitch and moan" now because the new chief is making changes.

Johnson did not respond to Simpson's story about the conversations with his wife at the
time, but wondered if he was doing the same "bitching and moaning" to people in the
organization.  During the 1/31/17 meeting, Johnson reminded Simpson of conversations
they've had about Simpson undermining him.  Johnson also reminded Simpson of the
story he shared during the promotional process about conversations he had with his
wife and asked him if it was unreasonable to assume he would engage in the same
conduct at work.  Simpson continued to deny that he would ever undermine Johnson.

Next, Chief Johnson and I discussed the second comment on his bulleted list, *"Admitted
that email he sent had false statements about me serving a warrant by myself."*  I
showed Johnson the email Simpson inadvertently sent him on 1/27/17, noting the upper
half of that email appeared to be an exchange with Captain Yoakum documenting
Simpson's response on a call for service.  The bottom half, in turn, appeared to be
notes Simpson wrote to himself.  Included among those notes was the statement, *"He
served a search warrant solo without telling anyone."*  The email was addressed to
Chief Johnson, with the subject, *"Don't erase #6."*  Johnson confirmed this was the
same email that initially prompted the 1/31/17 meeting, and to which he referred in his
handwritten notes.

EXHIBIT 25
Page 40 of 144

COU-00000472

**Johnson, Brian**

| | |
|---|---|
| From: | msimpson1971@gmail.com |
| Sent: | Friday, January 27, 2017 3:58 PM |
| To: | Johnson, Brian |
| Subject: | Don't erase #6 |

On January 27, 2017 at 2:45 pm Marc and I discussed the tactics used at the Vons supermarket when a man with a gun call was received (UPD16362018).
We discussed going in alone was not the best or correct choice in this instance.
Marc took responsibility for his actions.
We discussed better options for when this happens again.

Marc, please respond with a return email acknowledging this.

Thank you

*Captain Anthony Yoakum*
*Support Services Division Commander*
*Upland Police Department*
*1499 W. 13th Street*
*Upland, CA 91786*
*(909) 946-7624 ext. 3220*
*ayoakum@uplandpd.org*


I received the above written reprimand, which admittedly has some merit.  Although I question the process.  Normally an incident briefing would be completed for this type of call.

The chief requires Ops Plan on the most mundane events.   Will he be disciplined for going solo on a non planned event.  He served a search warrant solo without telling anyone.  Put himself and others in harm way.

1

*Attachment 2[f]*

When they discussed the email Simpson told Johnson it was not intended for him. Simpson also said he sent the email to himself to "refresh (his) recollection about stuff." Johnson told Simpson his statement about serving a search warrant was false, and Simpson admitted it was, saying, "You're right, chief, that's not what happened." Simpson did not say why he wrote an inaccurate statement or if he shared the comment with anyone else.

Johnson confirmed the statement about serving a search warrant referred to the MMD enforcement action on 1/21/17.

EXHIBIT 25
Page 41 of 144

COU-00000473

Chief Johnson and I took a break, and about 40 minutes later the interview resumed, *(Chief Johnson [2], 5/4/17).*

Next, Chief Johnson and I discussed the third bullet point in his handwritten notes, *"Said the Mgt/Labor meeting (summer) was illegally tape-recorded w/out my knowledge."* Johnson said the meeting to which he referred was a joint UPOA/UPMA meeting at Upland High School he was asked to attend, and at which he spoke about several issues.

During the 1/31/17 meeting, Johnson made a comment about the joint UPOA/UPMA meeting.  He also told Simpson, "That's not what I said," or, "This is what I said."  In response, Simpson said something similar to, "Chief, that's not what you said; we have you on tape," or, "We can listen to the tape."  When Johnson asked what he was talking about, Simpson told him the meeting was recorded.  Johnson questioned Simpson's statement, asking, "You guys surreptitiously recorded me?"  Johnson also told Simpson that doing so was a crime.  Johnson believes Simpson realized what he (Simpson) had said, and when Johnson began asking other questions, Simpson corrected his statement, saying instead there was a rumor the meeting was recorded.  Neither Yoakum nor Simpson said they were personally aware of such a recording being made.

Johnson said after the 1/31/17 meeting ended, he received a text message from Simpson.  In that message, Simpson told Johnson he had just spoken with Teague, and Teague had "no knowledge of the meeting at the high school..."  (The screenshot I received did not include the last line of Simpson's text, *"...being recorded, FYI."* However, during the interview Johnson read the entire text, including the missing words, which confirmed Simpson's message referred to the recording.)

COU-00000474



*Attachment 2[h]*

I asked Johnson if he directed either Yoakum or Simpson to follow-up on the recording
rumor during their 1/31/17 meeting and he told me, "No." However, Johnson believes a
recording of the joint UPOA/UPMA meeting at Upland High School does, in fact, exist.

Johnson said he was upset at the possibility he was recorded at a closed meeting
without his knowledge, and commented that doing so was a serious violation of trust.
Sometime after the 1/31/17 meeting with Yoakum and Simpson, Johnson spoke with
the city manager about what occurred and then decided to meet with the UPOA and
UPMA presidents, (Detective Teague and Sgt. Simpson, respectively).  During their
meeting, which occurred within a day or two of the 1/31/17 meeting, Johnson offered to
"put this behind us," but told Simpson and Teague he wanted a letter from the UPOA
and UPMA saying they would not release the recording without his written consent.  In
response, Simpson and Teague agreed to do so.

Earlier in my investigation Johnson gave me a series of emails about the recording, one
email was sent to Johnson by Simpson on 2/2/17, (attachment 2[i]).  In that email,
Simpson told Johnson he had spoken with their attorney, and they agreed to Johnson's
request.  In a subsequent email dated 3/6/17 from Simpson to Johnson, (attachment

COU-00000475

2[j]), Simpson wrote that he had been in contact with their attorney, and they hoped to have a letter the following day, (which in turn would be given to Johnson two days later). Despite the emails from Simpson, an email exchange between Johnson and the UPOA attorney John Bakhit, (included with attachment 2[j]), and a personal conversation about the letter with Bakhit on 5/3/17, the letter has not been received.[16]

Johnson said 30 to 40 people were at the joint meeting, and with one exception, retired Upland police lieutenant John Moore, all were UPOA or UPMA members.

I asked Chief Johnson if he ever authorized anyone to record the meeting, or if there was any reason why someone would believe they were allowed to do so without his consent, and he told me "No."

*(During a follow-up interview on 5/9/17 Johnson said several topics were discussed at the meeting, including recruitment, deployment, staffing, promotional exams, and the long-rumored issue about hiring from the outside.  Johnson said it was a closed meeting between labor and management where matters he considered confidential were discussed.)*

Finally, I asked Johnson if he personally conducted any follow-up on the outside hiring rumor or the false statement that he served a search warrant by himself, or directed anyone else to do so after the 1/31/17 meeting, and he told me, "No."

For additional details refer to the complete interview audio.

## Statement of Chief Brian Johnson, (5/9/17)

I again interviewed Chief Johnson in his conference room.  The interview was recorded and later transcribed, and can be found in attachments 5[m] and 6[d], respectively.

Because I reviewed the administrative investigation involving Chief Johnson, (conducted by P.I. Hackworth), I had a basic understanding of the MMD incident that occurred on 1/21/17, (where Johnson reportedly initiated an enforcement action alone), and the incident that followed, (in which it was alleged he unlawfully viewed a DVR seized from the scene).  Reportedly, during the enforcement action Johnson directed officers to arrest the dispensary operators for violation of the Upland Municipal Code, which was against department policy.[17]  Based on my review of the final administrative report I knew Captain Yoakum, Sgt. Simpson, and Detective Stanley were present during discussions about the charges most appropriate to use.

I asked Johnson if he recalled a conversation with Captain Yoakum and Sgt. Simpson at the scene, (and during the enforcement action), about whether it was appropriate to make arrests for violations of the municipal code.  Johnson did recall the conversation

---

[16] One email from Bakhit to Chief Johnson, dated 3/3/17, shows an attachment titled, *"Letter to Chief Brian Johnson."*  Johnson said the document in that email was unrelated to the letter he requested.

[17] Upland Police Department policy 13.04(I), effective 3/1/88 and revised 2/23/11 states, "Persons will not be physically arrested for violations of Upland Municipal Code ordinances."

COU-00000476

and said Detective Stanley was also present.  After giving me some history about the enforcement of MMD violations, and the research conducted when considering various options to do so, Johnson spoke about that conversation.

While discussing their options at the scene, Johnson suggested arresting the dispensary operators for violating a court order, but Yoakum, Simpson and Stanley did not believe there was sufficient cause.  Johnson followed their advice, instead choosing to arrest the operators for violation of the municipal code, (an option he had previously discussed with former city prosecutor Boyd-Weatherby, who concurred doing so was appropriate).  I asked Johnson if Yoakum, Simpson or Stanley told him about the department policy which states physical arrests will not be made for municipal code violations, or if they expressed any concern about doing so, and he told me, "No." Several weeks later, Johnson received the complaint alleging he directed officers to make arrests against department policy.

I also asked Johnson about viewing the DVR.  Despite giving his statement to the reporting officer from that incident, Johnson was asked by Yoakum to write a supplemental report.  Johnson, Yoakum, and Code Enforcement Officer Marsie Grady met with Boyd-Weatherby, who initially said a supplemental report wasn't necessary. Boyd-Weatherby ultimately read the report, and told Johnson writing a supplemental was not a bad idea.  Johnson spoke about a DVR seized during the incident pursuant to the abatement warrant and an officer's body-worn camera, and asked Yoakum to have the DVR taken out of evidence so he could view the recording before preparing his statement.  Johnson said his comments made it clear he was going to view the DVR, and Yoakum did not raise any concerns about doing so.

Johnson said when he reviewed the report of his administrative investigation, (prepared by P.I. Hackworth), he saw that Yoakum asked Cadet Geneva Holzer to remove the DVR from evidence.  Per that same report, Holzer was apparently unclear on the proper process and asked Detectives Stanley and Wyman how she should do so. Johnson opined it was "odd" that Stanley and Wyman did not ask Holzer why she was retrieving the DVR from evidence, suggesting they knew the DVR was for him to view.

*(In P.I. Hackworth's report, Detective Wyman's statement about his interaction with Cadet Holzer was brief and said nothing about Holzer retrieving the DVR so Chief Johnson could view it.  In Holzer's statement, Holzer said she was asked by Captain Yoakum to retrieve the DVR because Johnson wanted to "look at it," but there was no indication she shared this information with Stanley or Wyman during their conversation. Detective Stanley's statement, in turn, made no reference at all to the interaction he and Wyman had with Holzer.  I did not review the actual interview audio to determine if Stanley, Wyman or Holzer included this information in their complete statements to Hackworth.)*

Johnson said he viewed the DVR one or two days after meeting with Yoakum, Grady, and Boyd-Weatherby.  A day or two after doing so, Yoakum came to Johnson's office with the Legal Sourcebook saying a warrant was needed to review contents of the DVR. Although Johnson said the administrative report prepared by P.I. Hackworth indicates

EXHIBIT 25
Page 45 of 144

detectives saw Yoakum in the office with Johnson when he was viewing the DVR, Johnson does not recall Yoakum being present at the time. Johnson also said that same report indicates several detectives, including some "experts," reportedly saw him viewing the DVR yet said or did nothing to stop him.

Finally, I asked Johnson if Sgt. Simpson told him that a warrant was required to view contents of the DVR and he told me, "No." Johnson also said Simpson never talked to him about viewing the DVR, but the day after a February 8th meeting between Johnson and the UPOA/UPMA, Simpson and Detective Teague went to the city manager alleging misconduct. *(Based on statements in Hackworth's report, Johnson viewed the DVR on February 7th or 8th.)*

For additional details refer to the complete interview audio.

### *Statement of Former City Prosecutor Jamaar Boyd-Weatherby, (4/26/17)*

I interviewed Boyd-Weatherby in an office at Upland City Hall. Boyd-Weatherby, who is with the law firm *Jones & Mayer,* was the contract city prosecutor for Upland from early 2015 until that contract ended in February or March 2017. The interview was recorded and can be found in attachment 5[bb].

Mr. Boyd-Weatherby told me that in his capacity as a contract attorney for the city of Upland he prosecuted municipal code violations and worked with code enforcement, animal control, and the police department to address issues with medical marijuana dispensaries, homelessness, prostitution, gambling, massage parlors, and other community concerns. Although he did assist with one administrative matter, (unrelated to my investigation), Boyd-Weatherby said he is not typically involved in personnel issues.

Because of the tasks for which he was responsible, Mr. Boyd-Weatherby spoke often with code enforcement officers, (his office was next to theirs), and to a lesser extent, Chief Johnson and Captain Yoakum. Boyd-Weatherby does not know Sgt. Simpson, and recalled having one conversation with Detective Teague, (discussed below).

I asked Mr. Boyd-Weatherby if he was aware of an administrative investigation being conducted in which Chief Johnson was involved. Boyd-Weatherby said he was, and explained that he was contacted by City Manager Thouvenell and asked if he (Boyd-Weatherby) had a conversation with Lt. Ansara and Detective Teague. When Boyd-Weatherby told Thouvenell such a conversation occurred, Thouvenell commented that Ansara and Teague should not have done so, and asked him to prepare a memo about what they discussed. Boyd-Weatherby said he was also interviewed (for the investigation) by a private investigator on 4/4/17.

Mr. Boyd-Weatherby explained that he actually had two independent conversations – one with Lt. Ansara, and the other with Detective Teague – both about concerns they had with Chief Johnson viewing a video recording from the MMD incident. Boyd-Weatherby initially received a call from Captain Yoakum, who told Boyd-Weatherby that

COU-00000478

Ansara wanted to speak with him.[18] Two days later, Ansara came to Boyd-Weatherby's office and expressed his concerns, saying he also shared these concerns with the city manager because his complaint was about Yoakum and the chief.  Following their conversation, Ansara left the office.  A short time later Detective Teague came to Boyd-Weatherby's office and expressed *his* concerns as well.  Neither Yoakum, Ansara, nor Teague said anything to, or asked Boyd-Weatherby about any other complaints against the chief.

Mr. Boyd-Weatherby said he also had a conversation with Chief Johnson and Captain Yoakum a few weeks after the MMD incident occurred.[19]  Yoakum told Boyd-Weatherby the detectives did not believe there was sufficient probable cause (to make the arrests) and also expressed concerns about the incident report.  Boyd-Weatherby reviewed the report, (specifically, Chief Johnson's statement), and asked Johnson to prepare a supplemental.

Mr. Boyd-Weatherby said he did not have conversations about the MMD enforcement action with any other officers, but did hear "rumblings" that people were unhappy with Chief Johnson's actions during that incident.

I asked Mr. Boyd-Weatherby if he knew what other issues were included in the investigation for which he was interviewed.  Boyd-Weatherby heard there were also concerns about the removal of political signs during election season, but nothing else.  Although Boyd-Weatherby did not say he believed it was part of the investigation, he heard Code Enforcement Officer Marsie Grady say that the detectives were unhappy with Chief Johnson because Johnson was "opening promotions to outsiders" and wasn't "promoting through the ranks."  I did not ask Boyd-Weatherby for additional information about these comments, or his understanding of what each one meant.

Finally, Mr. Boyd-Weatherby told me he had no role in the investigation involving Chief Johnson, nor did he speak with Captain Yoakum, Lt. Ansara, Detective Teague, or Sgt. Simpson *about* the investigation.  He did recall Yoakum saying at one point something similar to, "It's a really sad environment right now; things are toxic,"

For additional details refer to the complete interview audio.

Following my conversation with Mr. Boyd-Weatherby I contacted P.I. Hackworth, and with consent of the City obtained a copy of the memorandum Boyd-Weatherby prepared for City Manager Thouvenell.  The memo was dated 2/20/17 and details the conversations Boyd-Weatherby with Captain Yoakum, Lt. Ansara, and Detective Teague on 2/13/17.  A copy of the memo is included with my report as attachment 2[p].

---

[18] Per Boyd-Weatherby's memo, Captain Yoakum called Boyd-Weatherby on 2/13/17 and the conversations with Lt. Ansara and Detective Teague occurred on 2/15/17.
[19] Boyd-Weatherby did not know if his conversation with Chief Johnson and Captain Yoakum occurred before or after he was contacted by City Manager Thouvenell.

44

EXHIBIT 25
Page 47 of 144

COU-00000479

*Statement of Dr. John Bunkers, (5/1/17)*

During my conversations with Chief Johnson he identified Dr. John Bunkers as a community member who might have information about statements made by Sgt. Simpson that were critical of the department.  I interviewed Dr. Bunkers at his office in Glendora.  The interview was recorded, and can be found in attachment 5[z].

Dr. Bunkers said he is active in the Upland community and spoke about his involvement with the Upland Coalition of Concerned Citizens, (UC3, among other acronyms). Bunkers described UC3 as a predominantly north Upland constituency group active in community issues.  The membership of UC3 includes several retired senior ranking law enforcement officers, he explained, and tends to be focused on the recent Upland Fire Department annexation, discussions about the San Bernardino Sheriff's Department taking over police services in Upland, homeless issues, and illegal marijuana dispensaries.  Although he is not a member, nor involved with UC3, Bunkers said he has been to their meetings, but has distanced himself from the group because he is uncomfortable with some of the issues they have taken up.

When I first spoke with Dr. Bunkers, before the interview was recorded, I explained the reason for my visit.  Specifically, I told Bunkers I was conducting an investigation on behalf of the City of Upland into allegations that inappropriate comments were made by members of the police department.  Bunkers said he supports Chief Johnson, but knew Johnson did not have full support of the "rank and file."  Bunkers also mentioned Sgt. Simpson by name and spoke about how they met, sharing this information again after I began recording the interview.

Dr. Bunkers said he first met Sgt. Simpson while attending the citizens academy in 2016, and then saw Simpson every Tuesday throughout the ten-week program. Bunkers said he was impressed by Simpson's demeanor, and described him as "professional."  Bunkers also recalled that when they met, Simpson joked about Chief Johnson, saying he needed to "hone his skills" interacting with citizens.

During early formation of UC3, (January or February of this year), Dr. Bunkers heard that Sgt. Simpson was making negative comments to members of UC3 about Chief Johnson and the direction of the police department.  Bunkers said hearing the name "Simpson" might not have meant anything, but because he met Simpson during the citizens academy he knew who they were talking about.  Bunkers said he was not entirely surprised about the comments because he knew there was disaffection for the chief among "rank and file" personnel.  As if to offer an explanation why, Bunkers said when Chief Johnson was appointed the city had budget problems, and also employed several more police officers than they now have.

Although Dr. Bunkers said Sgt. Simpson was named as the source of comments made to the retired law enforcement members of UC3 about dissention in the police department, he could not cite a specific example.  Explaining the information he had was second-hand, Bunkers said some of the complaints were about the police department's CRO team, (Community Resource Officers), and its mission – essentially,

that officers were engaged in social work – but he could not attribute this comment to
Simpson.

Dr. Bunkers said the conversations he had with the retired officers who had spoken with
Simpson (when the negative comments were made) occurred about the time he
organized meetings between UC3 and Chief Johnson.  Bunkers recalled one such
meeting that occurred included four or five retired law enforcement officers, (including a
senior ranking deputy from the Los Angeles County Sheriff's Department), Chief
Johnson, and Lt. Blanco.  During that meeting, they discussed homeless issues and
marijuana dispensaries.  The retired law enforcement officers in attendance felt that
Chief Johnson was not doing enough to deal with the problems, but after that meeting
had a more favorable opinion of the chief.

Dr. Bunkers told me that although he occasionally sees Sgt. Simpson, the only direct
interaction the two have had was at the citizens academy.  Again, Bunkers said he has
never directly heard Simpson make a derogatory statement about Chief Johnson or the
police department.

I asked Dr. Bunkers for the names of individuals who have had direct interaction with
Sgt. Simpson.  Although reluctant to provide this information, Bunkers identified one
such person as Steve Bierbaum, a retired firefighter, (who was also once a police
officer), now active and vocal in the community.  Bunkers said he has a good
relationship with Bierbaum and the two of them speak on a regular basis.  Bunkers also
said it was "somewhere between possible and probable" Simpson complained about the
police department to Bierbaum, but noted that three or four other retired law
enforcement officers, (who he did not identify), talk to Simpson as well.[20]

For additional information refer to the complete interview audio.

*Statement of Steve Bierbaum, (6/5/17)*

I interviewed Mr. Bierbaum in a Denny's Restaurant on Foothill Boulevard.  Bierbaum is
a retired firefighter who began his public safety career as a police officer.  The interview
was recorded, and can be found in attachment 5[oo].

Mr. Bierbaum is a retired firefighter who began his public safety career as a police
officer, was also identified by Dr. Bunkers as one of the individuals in UC3 who was
"vocal," (though not necessarily the person who told him Sgt. Simpson made statements
Bunkers believed were critical of Chief Johnson and the police department).

On 5/7/17 an article about the Yoakum/Simpson/Teague investigation appeared in *The
San Bernardino County Sentinel* news publication; Mr. Bierbaum was quoted in that
article, (attachment 2[s]).  I told Bierbaum that based on *The Sentinel* article it was

---

[20] Dr. Bunkers believes Sgt. Simpson lives in north Upland, where several other active and retired law enforcement
officers, including those involved with UC3, also reside.

EXHIBIT 25
Page 49 of 144

COU-00000481

apparent he knew about issues within the police department.  I asked Bierbaum if my statement was accurate and he replied, "Yes."

Mr. Bierbaum and I spoke about his statement in the *Sentinel* article that 80 percent of the department was prepared to vote they had "no confidence" in Chief Johnson. Bierbaum said this statement was not based on information from one individual, but rather different members of the police department who have reached out to him with concerns about working conditions.  Bierbaum also said that having worked in public safety, he knows police officers and firefighters can't publicly voice their opinion about such matters.

Mr. Bierbaum spoke about some of the concerns regarding Upland PD that have been brought to his attention.  For example, he said several members of the department are concerned about Chief Johnson's participation in enforcement activities, and specifically, putting people in harm's way.  He then spoke about an incident that occurred at a medical marijuana dispensary at 9th and Benson where Chief Johnson entered the building and called for backup after essentially being locked inside, resulting in a response from a nearby agency.[21]  Although Bierbaum initially questioned what he heard about the incident, three or four days after it occurred he saw a video that showed Chief Johnson entering the building.  Bierbaum would not tell me where the video came from, but believed it was captured by a stationary camera, (he did say it was not from an officer).

Mr. Bierbaum spoke about a second incident at a different medical marijuana dispensary that occurred a few days before our interview, which he reportedly witnessed.  Bierbaum said Chief Johnson entered the dispensary without telling anyone and called for backup.[22]  (I did not ask Bierbaum why he thought Chief Johnson entered the dispensary without telling anyone.)  Bierbaum said he obtained a copy of the dispatch printout for this incident and also had pictures and video from the scene.

During our conversation Mr. Bierbaum also said that Chief Johnson yells at, or is otherwise disrespectful to employees in the police department.  Although he has not witnessed this personally, Bierbaum did say Chief Johnson raised his voice and was disrespectful to members of Bierbaum's group the first and second time he met with them.[23]  Bierbaum also said he personally witnessed an interaction between Chief Johnson and kids at the skate park where he felt Johnson's demeanor was inappropriate.

Finally, Mr. Bierbaum said he knew three Upland police officers left the department and believes they did so because of their concerns about police administration.

---

[21] Presumably the incident on 1/21/17.

[22] I did not independently confirm that enforcement action was taken at a medical marijuana dispensary during this time frame, or determine the extent of Chief Johnson's participation, if any.

[23] Though not clarified during the interview, Bierbaum was presumably referring to UC3.

COU-00000482

Mr. Bierbaum would not identify the individuals who were sharing with him their concerns about the police department, nor would he tell me with whom at the department he is friends.

I asked Mr. Bierbaum how often he had contact with employees of the police department.  Bierbaum said the contact varies, but after the 9th and Benson MMD incident he spoke frequently with officers about what occurred.  His last contact with an Upland police officer was about two weeks before our interview when he saw the officer on a call for service.

Mr. Bierbaum told me people in the department were afraid to talk because two employees were under administrative investigation, which Bierbaum said public safety personnel consider a prelude to termination.   He also said employees were particularly concerned because the administrative investigation happened to union representatives who spoke out on behalf of others.

For additional information refer to the complete interview audio.

*Statement of Richard Nutt, (6/19/17)*

During my investigation Chief Johnson identified Richard Nutt as a retired law enforcement officer who was associated with UC3.  I spoke with Nutt at his home in Upland; the interview was not recorded.

Mr. Nutt told me he retired from the Los Angeles County Sheriff's Department in 2013 at the rank of lieutenant, and in late 2016 began working with other (also retired) law enforcement officers to address community concerns.  Nutt recalled this group of about 30-40 retired officers met with Chief Johnson at Cable Airport in Upland.  Sgt. Marc Simpson was also present representing Upland PD with Chief Johnson.

Mr. Nutt said the group of retired law enforcement officers established themselves as the Upland Coalition of Concerned Citizens, or UC3.  Although he supported UC3's efforts to address issues such as homelessness, medical marijuana dispensaries and prostitution, Nutt distanced himself from the group because some of their social media postings included personal attacks on different people.

Since the meeting with Chief Johnson and Sgt. Simpson in 2016, Mr. Nutt said he has had limited interaction with Simpson.  Nutt saw Simpson the Tuesday before a summit on homelessness in October 2016 and in early 2017 spoke with Simpson on the phone. During their phone conversation, Nutt told Simpson people at a meeting had the perception that Johnson and City Manager Thouvenell wanted medical marijuana dispensaries to exist.  Simpson denied that the perceptions were accurate, telling Nutt that Johnson and Thouvenell were opposed to the dispensaries.

Mr. Nutt also saw Sgt. Simpson in March 2017.  While having lunch at Rancho Los Magueyes restaurant with Steve Bierbaum, (a member of UC3 whom Nutt refers to as his, "Go-to guy," and who interacts with Simpson "All the time"), and two other friends,

EXHIBIT 25
Page 51 of 144

COU-00000483

Simpson entered the room.  Nutt asked Simpson how he was doing, but he does not recall if Simpson said anything about an investigation or what was happening with him (Simpson) personally.

Finally, Mr. Nutt said he recently sent Sgt. Simpson a text message after hearing that Simpson was the subject of an investigation, essentially saying, "I'm thinking about you."  In response, Simpson replied, "Thanks."

Mr. Nutt recalled hearing someone say that Chief Johnson believed Sgt. Simpson was trying to undermine him, (Johnson), though he did not remember if this came from Simpson himself, or Steve Bierbaum.  Nutt also heard Johnson was the subject of an investigation but was certain this information did not come from Simpson, saying instead it was possibly Bierbaum who told him.  Sometime before Simpson was placed on administrative leave, Nutt also heard about an incident involving Chief Johnson at a medical marijuana dispensary.[24]  Again, that information did not come from Simpson.

I asked Mr. Nutt if he knew Captain Yoakum or Detective Teague.  Nutt said his interaction with Yoakum was even more limited than that with Simpson, and spoke about a conversation he and Yoakum had before a UC3 meeting in December 2016.  Essentially, Chief Johnson was scheduled to attend that meeting, but called Nutt saying he was unavailable so Yoakum would attend in his stead.  Nutt knew the meeting would be contentious so he called Yoakum to warn him.  Nutt had one interaction with Teague, in turn, providing Teague with information about a house from which drugs were possibly being sold.

During our conversation I asked Mr. Nutt if he personally heard Captain Yoakum, Sgt. Simpson, or Detective Teague criticize Chief Johnson, Johnson's policies, or the department, or say anything that would indicate they were trying to get Johnson fired.  Nutt said he had not personally heard any such statements from these officers.

Finally, I asked Mr. Nutt if Captain Yoakum, Sgt. Simpson or Detective Teague ever said anything to him about an administrative investigation in which they or Chief Johnson were involved and he told me, "No."

### *Statement of Christy McKinzie, (5/26/17)*

On 5/18/17 Chief Johnson received an email from community member Christy McKinzie.  Chief Johnson explained that McKinzie is involved with an organization known as *Ladies of the Inland Empire for Strong Communities,* and in that capacity works on various issues, including homelessness.  In her email, McKinzie wrote that she "heard about Simpson, Yokum *(sic),* and Teague."  McKinzie also said she believed there is a small group within the department who did not care for Johnson's approach on certain issues such as homelessness, and opined that they would go against his policies and undermine him "every chance they could."  Finally, McKinzie said while doing outreach on the streets she "see(s) and hear(s) some of the stories… (that) did

---

[24] Sgt. Simpson and Captain Yoakum were both placed on administrative leave on 4/19/17.

EXHIBIT 25
Page 52 of 144

COU-00000484

not make the department look great."  A copy of the email can be found in attachment 2[u].

To determine what "stories" Ms. McKinzie heard while engaged in outreach, and how she heard about Simpson, Yoakum and Teague, I interviewed McKinzie at Klatch Coffee in Rancho Cucamonga.  The interview was recorded and can be found in attachment 5[n].

Ms. McKinzie began by telling me she is the founder and director of *Ladies of the Inland Empire*, a group of individuals engaged in homeless issues, anti-bullying campaigns, and community outreach.[25]  As such, McKinzie has worked with Upland police officers to address homelessness.

I asked Ms. McKinzie about the email she sent to Chief Johnson.  McKinzie shared some background about her relationship with Johnson and the department, saying when he was first appointed she had concerns because he came from LAPD, (McKinzie described herself as previously anti-police).  McKinzie did research but could not find anything bad about the chief, and sometime thereafter had occasion to call him during non-business hours.  Even though it was 8:00 PM and Chief Johnson was out of town, he took her call.  McKinzie said she was impressed by his responsiveness, and the more they worked together, the more she was impressed by his approach to homeless issues.

Ms. McKinzie also spoke about the CRO team Chief Johnson established after he was appointed.  McKinzie said although the officers assigned to CRO were trying to help, she heard from homeless individuals they were being harassed and arrested by some officers, and advocates (to assist and find services for the homeless) were not being called.  Consequently, McKinzie believes there were officers who did not want to use the chief's approach.  McKinzie said she first noticed this happening in November 2016.

Referring to the statement in her email about Yoakum, Simpson and Teague, McKinzie said during a conversation she had with an associate, Dr. John Bunkers, Bunkers asked her if she saw a letter posted on the website *Nextdoor*.[26]  Although McKinzie does not believe the officers were named in this particular letter, she said it did indicate officers were on administrative leave.  The *Sentinel* article naming the officers came out the following day or two.

In addition to Chief Johnson, Ms. McKinzie identified other members of Upland PD with whom she interacts or has interacted as Lt. Blanco, Sgt. Kabayan, and Officers Kirk, McCullough and Landovar.  McKinzie also interacted with Sgt. Simpson during the citizen academy, and has met with Detective Teague "more than once."  McKinzie said her interaction with Blanco was frequent, almost daily, when he was assigned to the CRO team.  However, after Blanco was promoted and Simpson became the supervisor

---

[25] www.ladiesoftheie.org
[26] I could not find on *Nextdoor* the document to which McKinzie referred, but I did locate on *Facebook* a PDF attachment on a May 5, 2017 post by Steve Bierbaum.  The document can be found in attachment 2[t].

COU-00000485

for CRO, that communication stopped.  Consequently, McKinzie believed CRO was no longer responsible for homeless issues.

I asked Ms. McKinzie if during these interactions (with officers) she heard complaints about programs or policies within the department, or anything the chief was doing. McKinzie said the only complaint she heard was that officers on the CRO team were given "shit" from "both ends," – the public and the officers – for what they were doing. She does not recall any of those individuals "bad mouthing," or making complaints about the police department.

I also asked Ms. McKinzie if she heard Mr. Bierbaum or Dr. Bunkers make complaints about the police department and she immediately replied, "Absolutely."  McKinzie said there are many "posts" (on social media) about the manner in which Chief Johnson is addressing the homeless issue and opining that three Upland police officers left the department and went to Ontario PD because of Johnson's mismanagement.  McKinzie clarified that these posts were from members of UC3 in general and not Dr. Bunkers, who she said respects the chief.

There have also been complaints about how Chief Johnson has handled medical marijuana dispensaries, as if to suggest Johnson wants to keep them open.  McKinzie thought the implication was "unrealistic," as she has seen posts "all over Facebook" that Johnson personally shut down such a dispensary.

During my interview Ms. McKinzie said she saw on a posted agenda that Captain Yoakum and Sgt. Simpson were attending a UC3 meeting during its early formation. McKinzie found this odd because she knows members of UC3 are very outspoken, and Yoakum always seemed like he was "on board" with department programs.

Referring to a comment in *The Sentinel* article (about the investigation), I asked Ms. McKinzie if she personally had conversations with any officer at Upland PD about the comment that close to 80 percent of the police department was prepared to vote no confidence in the chief.  McKinzie said she only read this in the article, and believes the numbers are actually reversed, (i.e., 80 percent *support* the chief).

Finally, I asked Ms. McKinzie when she last spoke with Captain Yoakum, Sgt. Simpson, or Detective Teague.  McKinzie said she has not done so recently, last seeing Simpson at the citizen academy, and Yoakum "way before" then.  Her only recent communication with Teague, in turn, was an online debate about nine months prior.

For additional information, refer to the complete interview audio.

<u>Statement of Administrative Assistant Jackie Crandall, (5/18/17)</u>

Because Sr. Administrative Assistant Barrett said that Sgt. Simpson came to Administrative Assistant Jackie Crandall's work station while Barrett and Crandall were talking, and asked for information about what was occurring in Chief Johnson's office, I interviewed Crandall in a conference room at Upland City Hall.  Crandall confirmed she

COU-00000486

received the interview notice and signed it in my presence. The interview was recorded, and can be found in attachment 5[aa].

Ms. Crandall has worked for the City of Upland since 2004. Until 2009 she worked in police records, and as an administrative assistant has since been responsible for a variety of tasks at the police department including back-up for Barrett, administrative assistant for the detectives, and payroll clerk.[27] Captain Yoakum was her supervisor (and had been for about two years) before he was placed on administrative leave, but acting Captain Matthews is now the person to whom she reports.

Because her desk is adjacent to Chief Johnson's conference room, (and in turn, his office), I asked Crandall if she is able to hear interactions occurring in either area. Unless the interaction occurs outside those rooms or the voices are very loud, Crandall explained, she cannot hear what's being said, even if the doors are open.

I asked Ms. Crandall if she recalled Sgt. Simpson coming to her work station and asking what was happening in the chief's office or conference room, and she replied, "No." Even after I mentioned that Luz Barrett might have been present when this occurred, Crandall said she does not recall such an interaction. She did say that people will sometimes ask her, "Where are they?"

I also asked Ms. Crandall if she recalled when Sgt. Simpson last came to her desk. Although it is not unusual for him to do so, Crandall could not recall when this last occurred, adding that when she returned from a two-week absence, both Simpson and Captain Yoakum were gone.

Ms. Crandall told me she is not a person involved in gossip, and believes that other employees know this as well. However, she has heard detectives "gripe" about Chief Johnson, essentially "venting," most recently because of promotions being made from officer to sergeant. Crandall does not recall these gripes coming from Captain Yoakum or Sgt. Simpson. Similarly, while Crandall does not have a lot of interaction with Simpson, she has never heard Yoakum say anything negative about the chief.

Finally, I asked Ms. Crandall if she heard a rumor about Chief Johnson hiring from the outside or serving a warrant, and she replied, "No."

For additional information refer to the complete interview audio.

_Statement of Code Enforcement Officer Marsie Grady, (5/18/17)_

Based on the statement provided by Sr. Administrative Assistant Barrett, I interviewed Code Enforcement Officer (CEO) Marsie Grady in a conference room at Upland City Hall. Grady confirmed the signature on the interview notice she received was hers. The interview was recorded, and can be found in attachment 5[q].

---

[27] From 2012-2015 Crandall worked in city hall and the police department, splitting her time between both.

COU-00000487

CEO Grady told me she has worked for the City of Upland since 2003, previously as a business inspector and police services technician, but since July 2014 she has been a code enforcement officer.  Grady said she is one of three CEOs, and identified the others as Vera Heilman and Desiree Shiflett.  Currently, Grady (and the other CEOs) report to Acting Captain Matthews, although Captain Yoakum was their supervisor before Yoakum was placed on leave.  Per Grady, Sgt. Simpson is not in her chain of command.

I asked CEO Grady if she recalled an MMD enforcement action in which Chief Johnson was involved in January 2017.  Grady was initially uncertain about the specific enforcement action to which I referred, saying Johnson has been at many, but based on other questions asked during the interview recalled the incident.  Grady said code enforcement officers do most of the work for MMD enforcement, and for the January 2017 incident she was called in to assist.  (Grady explained the abatement warrant for this particular dispensary was based on her declaration.)

I asked CEO Grady how much interaction she had with Sgt. Simpson.  Grady said the interaction was more frequent when Simpson supervised CRO, but now it is limited.  I also asked if she recalled Simpson questioning her about Chief Johnson's involvement in the MMD incident, (she replied, "No"), or if what the chief did was proper.  In response to the latter question Grady answered, "I don't think him," but said Detective Stanley might have done so, (she was not certain).  Finally, I asked Grady if she had conversations with anybody, (other than Stanley), where the topic of Johnson's involvement in MMD enforcement actions was discussed.  Grady replied, "No," but did say there was "lots of chatter" about this issue.  Grady explained she heard that Johnson went to a dispensary at 1600 W. 9th by himself,[28] (though she could not recall who said this), and detectives questioned if it was proper for him to do so.

CEO Grady said she was at the MMD enforcement action (1600 W. 9th on 1/21/17) for about two hours and assisted with evidence collection; CEO Shiflett was also at the scene, but CEO Heilman was not.  Grady did not recall any conversations with Captain Yoakum or Sgt. Simpson at the scene, nor did she recall Yoakum or Simpson questioning Chief Johnson's tactics during the incident.

I asked CEO Grady if Captain Yoakum ever asked her, or to her knowledge, CEOs Shiflett or Heilman, to keep a log of tasks Chief Johnson wanted them to do.  Responding, "I've never heard that," Grady said she does maintain a log of medical marijuana dispensaries, but it was not something Chief Johnson asked her to do.  Likewise, Grady said she and the other CEOs also keep logs for daily inspections and massage parlors, but they have always done so.

I asked CEO Grady if she heard a rumor that Chief Johnson was going to hire ranking officers from the outside.  Grady said the rumor sounded vaguely familiar.  Hoping to refresh her memory I told Grady that former contract attorney Jamaar Boyd-Weatherby heard her say essentially the same thing, (i.e., that the chief was going to promote from

---

[28] This is the location of the medical marijuana enforcement action on 1/21/17.

COU-00000488

the outside).  Again Grady said this particular rumor sounded familiar.  Grady also said she heard the rumor about the same time people were unhappy with Johnson's decision to promote officers to sergeant without requiring they first become a detective.  Grady does not know from whom she heard people were upset, but did say it was neither Yoakum nor Simpson.  Grady also said she has never heard Yoakum or Simpson repeat these rumors.

As the interview concluded I asked CEO Grady if she heard Captain Yoakum or Sgt. Simpson make statements that were critical of Chief Johnson or his decisions.  Responding, "Not personally, no," Grady said she has heard "chatter."  Further, while she has not personally heard Simpson or Yoakum make such statements, Grady did recall an interaction with Yoakum in the code enforcement office two or three months prior (to our interview) where Yoakum mumbled under his breath that he thought he was in trouble.

For additional information, refer to the complete interview audio.

Following my interview of Grady, I spoke with Barrett to determine if she had any information that would refresh Grady's memory about Yoakum's request to keep a log of what Johnson asked her to do.  Barrett said the conversation she had with Grady happened about the same time there was an issue involving political signs.

### Statement of Code Enforcement Officer Marsie Grady, (5/25/17)

On 5/25/17 I again spoke with CEO Grady; the interview was recorded and can be found in attachment 5[r].  Before questioning I reminded Grady the previous interview notice she received and signed was still in effect.

I again asked Grady if Sgt. Simpson came to her work area asking about Chief Johnson's involvement in the MMD enforcement action on 1/21/17.  Once again Grady said there was "lots of chatter" among detectives, adding that the chatter occurred Monday or Tuesday after the incident occurred.  Grady felt the detectives were "fishing" for information from her, asking if what happened at the dispensary was normal.  Although she does not recall having this conversation with Simpson, it was possible he was present when the chatter occurred.

I also asked CEO Grady about the log Captain Yoakum reportedly asked her to keep.  I asked Grady if she recalled a conversation with Luz Barrett about the log, saying it would have likely occurred soon after there was some issue with political signs.  Grady said she and Barrett talk often, but she did not recall that particular conversation.  Grady also said there would be no reason for her to lie to Barrett, adding that if she made such a statement to Barrett it would be accurate, nor was there a reason for Barrett to lie.

Next, I asked CEO Grady for additional information about the comment Captain Yoakum mumbled under his breath thinking he was in trouble.  Grady now said Yoakum looked stressed and made a statement similar to, "I might not be here tomorrow," so she assumed he was in trouble.  Grady was also surprised Yoakum said this because

COU-00000489

he does not talk to her about personal matters.  Grady said she does not recall if anyone else was present when this occurred.

Finally, I asked CEO Grady if she ever heard Captain Yoakum or Sgt. Simpson say they wanted to get the chief fired, or something similar; Grady said she had not.

CEO Grady and I went off tape briefly so I could locate a statement she made during our first conversation.  After we resumed the statement was clarified and the interview ended.

For additional information refer to the complete interview audio.

### Statement of Code Enforcement Officer Vera Heilman, (5/25/17)

I interviewed Heilman in a conference room at Upland City Hall.  Heilman confirmed she received the interview notice and signed it in my presence.  The interview was recorded and can be found in attachment 5[s].

CEO Heilman has been employed by the City of Upland for 14 years, including the last eight years as a code enforcement officer.  Prior to that Heilman worked as a building inspector and police services technician.  Because of her experience with other law enforcement agencies as a police dispatcher before being hired by Upland, she also covers vacant dispatch shifts.  Heilman said acting Captain Matthews is her current supervisor, but Sgt. Simpson is not in her chain of command, (unless Simpson works patrol while she's assigned to dispatch).

I asked CEO Heilman if she recalled an MMD enforcement action in which Chief Johnson was involved in January 2017.  Although she was not present at that incident Heilman knew about the enforcement action, saying she received a text message from CEO Marsie Grady asking if Heilman could come in to assist.  In that same text message, Grady also told Heilman that Johnson went to the dispensary and wanted to close it down.

I asked CEO Heilman if she recalled Sgt. Simpson later coming to her work area and asking questions about the incident or Chief Johnson's actions during that incident, and she replied, "No."

Heilman told me she heard complaints about the enforcement action from other dispatchers, who said Chief Johnson asked for a unit in the 1600 block of W. 9th.  After dispatch sent units, the chief then asked for code 3 (emergency) "backs," (assistance).

CEO Heilman and I also discussed the log Captain Yoakum reportedly asked code enforcement officers to maintain, (documenting tasks assigned to them by Chief Johnson).  Explaining that she only works two days per week in code enforcement, (the other two in dispatch), Heilman said Yoakum did not ask her to keep such a log, and to her knowledge did not ask the other CEOs either.

COU-00000490

Finally, I asked CEO Heilman if she ever heard Captain Yoakum or Sgt. Simpson say anything that was critical of Chief Johnson, his policies, or his actions and she replied, "No, never."

For additional details refer to the complete interview audio.

*Statement of Code Enforcement Officer Desiree Shiflett, (5/18/17)*

I interviewed Shiflett in a conference room at Upland City Hall.  Shiflett confirmed she received the interview notice and that the signature thereon was hers.  The interview was recorded, and can be found in attachment 5[p].

Code Enforcement Officer (CEO) Shiflett told me she has been with the Upland police department for 15 years, initially as a records clerk and then as a police services technician.  In April 2016 Shiflett was promoted to code enforcement officer, and has worked in that capacity ever since.  Prior to her time with the City of Upland, Shiflett was employed by the San Bernardino County Sheriff's Department.  Currently, Shiflett (and the other CEOs) report to Acting Captain Matthews, although Captain Yoakum was their supervisor before Yoakum was placed on leave.  Per Shiflett, Sgt. Simpson is not in her chain of command.

CEO Shiflett told me she and the other CEOs are involved in MMD enforcement actions in general, and said she personally was involved in the incident that occurred on 1/21/17.  Shiflett explained she was called in on her day off to assist at the scene and while there collected evidence.  Shiflett knew Chief Johnson was at the scene but did not recall Captain Yoakum or Sgt. Simpson also being present.

I asked CEO Shiflett if she had any conversations with Captain Yoakum or Sgt. Simpson about Chief Johnson's involvement in the 1/21/17 incident and she told me, "No."  I also asked her if Simpson came to her work area sometime thereafter questioning the chief's actions during that incident and she again said, "No."  When asked the same question about Yoakum, Shiflett said she was "pretty sure" he did not.

Shiflett acknowledged that in her position she hears "chatter, complaints" around the police department.  I asked Shiflett if she heard these complaints from Sgt. Simpson and she replied, "I don't believe so; (we) don't really have any interaction."

I asked Shiflett about the log (of tasks assigned by Chief Johnson) that Captain Yoakum reportedly asked her and/or the other CEOs to maintain.  Shiflett said although they have logs for incident inspections (to comply with community development block grant, or CDBG requirements) and marijuana enforcement, neither she, nor to her knowledge, the other CEOs, were ever asked by Yoakum or Sgt. Simpson to maintain a log of Johnson's requests.

I asked CEO Shiflett if she ever had discussions with Captain Yoakum or Sgt. Simpson about Chief Johnson's performance and she replied, "No."  I then asked her if she had ever heard Yoakum or Simpson comment about the chief's performance or what he was

doing. Shiflett recalled a brief conversation with Yoakum they had in passing about two months prior, (perhaps in early March 2017), near the upstairs copy room. Shiflett saw Yoakum, told Yoakum she hadn't seen him recently, and asked him if he had been hiding. Yoakum replied, "No, I'm going to get someone fired." Shiflett did not want to know more information so she said, "I hope it's (INAUDIBLE) or something." In response, Yoakum answered, "No, but once I fire this person, everything will be better." Shiflett assumed Yoakum was referring to Johnson because Luz Barrett told her Yoakum did not get along with the chief, (though Shiflett also knew the department had several new officers, presumably to whom Yoakum could have been referring). Not wanting to get "in between" Yoakum and the chief, or "whoever he was out to get," Shiflett simply said, "Okay," and walked away.

Shiflett said nobody else was present when this brief conversation occurred. She also said this was the only time she heard Yoakum make such a statement.

During the interview I asked CEO Shiflett if she heard a rumor that Chief Johnson served a warrant by himself at the medical marijuana dispensary. Shiflett said she had not, explaining that the only thing she heard was Chief Johnson went to dispensary with other officers.

I also asked if she heard a rumor that Chief Johnson was going to hire a ranking officer from outside the department. Shiflett said in or about November 2016 she heard the detectives complaining that Johnson was going to open the lieutenant position to outside applicants.

Shiflett said she has never heard either rumor from Captain Yoakum or Sgt. Simpson.

Finally, I asked CEO Shiflett if she recalled any comments by people who were unhappy with matters involving Chief Johnson. Shiflett replied, "Probably just about every decision the chief has made…is met with complaints." Shiflett could not attribute any of these complaints to Captain Yoakum or Sgt. Simpson and instead recalled a time when officers "grumbled" about the change in uniforms. Yoakum told the officers the decision to change uniforms was his (Yoakum's).

For additional details refer to the complete interview audio.

### Statement of Sgt. Bill Chani (5/25/17)[29]

I interviewed Sgt. Chani in a vacant office at the Upland police department. Chani acknowledged receipt of the interview notice and signed it in my presence. The interview was recorded and can be found in attachment 5[kk].

---

[29] Sgt. Chani's statement includes information relevant to a separate administrative investigation, (UPD IA 05-17). Although the complete interview audio, (attachment 5[kk]), is included with my report, only the statements relevant to this investigation, (UPD IA 06-17), are included in the narrative.

EXHIBIT 25
Page 60 of 144

COU-00000492

Sgt. Chani has been a police officer for the city of Upland for 21 years, and is currently a patrol supervisor assigned to the weekend midnight shift.  Chani has been a sergeant for about two and one-half years.

After speaking with Sgt. Chani about a separate administrative investigation, (UPD IA 05-17), we discussed comments made by Sgt. Simpson or Captain Yoakum that disparaged Chief Johnson.  Chani acknowledged there were complaints about Johnson throughout the organization, saying those complaints began soon after Johnson was appointed, and offered as examples the changing of uniforms, uncertainty about what Johnson wanted to do (with the organization), Johnson's enforcement of skate park rules, and Johnson's removal of medical marijuana signs.

I asked Chani if he recalled a rumor about Chief Johnson hiring (ranking officers) from outside the organization.  Chani said he did recall such a rumor, and explained Johnson wanted to open the testing process for lieutenant and captain to outside applicants.  When asked if he recalled either Sgt. Simpson or Captain Yoakum talking about this rumor, Chani said he did not, but added that several people expressed their concern when Johnson spoke about the possibility (of opening the process to outside applicants) at an association meeting.

I also asked Sgt. Chani if he heard either Captain Yoakum or Sgt. Simpson say the chief served a warrant by himself.  Chani said he was working when he heard "something" about an MMD enforcement action that occurred earlier in the day at 9th and Benson.  Specifically, Chani heard that Chief Johnson entered an MMD at that location and then "took down" the dispensary.  Chani said Sgt. Simpson was working that evening and "may have been" the person he heard this from, (at least in part), but added he (Chani) has also heard "15 different renditions" of the story.

I asked Sgt. Chani if he recalls Sgt. Simpson being critical of Chief Johnson's actions during the MMD incident.  Chani heard Simpson say that Johnson told him (Simpson), "You need to protect me; tell me if I'm doing something wrong."  Simpson then said he didn't "like the idea of serving a search warrant (that evening) when paperwork was ready to be served in a couple of days."  Chani did not recall if anyone else was present when Simpson made this statement, but added that the statement would not have been made in the presence of subordinates.  Chani also said he would be uncomfortable discussing sensitive issues with subordinates in the room.  He did not recall Captain Yoakum making statements that were critical of Johnson's actions at the MMD incident.

I asked Sgt. Chani if he heard Sgt. Simpson or Captain Yoakum say they were trying to get the chief fired, or make any other statement that would lead him to believe they were attempting to do so, and he told me, "No."

I then asked Sgt. Chani what comments Sgt. Simpson made that were critical of Chief Johnson.  Simpson told Chani that the chief "pushed him (Simpson) hard to do a lot of things."  Simpson also told Chani that he and Chief Johnson "butted heads" and "had disagreements," about time frames (on assignments), and Simpson opined that to the chief, "everything is an emergency," but Chani could not provide additional information.

58

EXHIBIT 25
Page 61 of 144

Again, Chani said any conversation between him and Simpson in which Simpson expressed dissatisfaction with the chief did not occur in the presence of subordinates.

Sgt. Chani did not recall Captain Yoakum making any comments critical of the chief, adding that, because of his schedule, he saw Yoakum less than he saw Simpson. Likewise, Chani could not recall any discussion about a work slowdown.

Recalling that earlier in the interview Sgt. Chani said Chief Johnson spoke (about opening the lieutenant and captain positions to outside applicants) at an association meeting, I asked Chani if this was the same meeting held at Upland High School. Chani told me it was, and said he was in attendance, but denied hearing anything about the meeting being recorded.

Sgt. Chani and I then spoke about the administrative investigation involving Chief Johnson. Chani initially said he was interviewed for the investigation by a private investigator, but otherwise did not know that such an investigation was being conducted. As he continued, however, Chani said he heard rumors that "a lot of people" were being interviewed, (though he could not recall from whom he heard this), and based on these rumors knew an investigation was being conducted.

I asked Sgt. Chani if either Captain Yoakum or Sgt. Simpson told him an investigation was being conducted and he replied, "I don't think they specifically came up and told me, no." Continuing, Chani said he might have asked Simpson if he (Simpson) had been interviewed, but could not recall if Simpson asked him if *he* had been interviewed. Neither Yoakum nor Simpson spoke with him about the nature of the investigation.

I asked Sgt. Chani what he knew about the investigation before he was interviewed. Chani said he assumed the investigation was about the MMD incident and Chief Johnson's actions thereat. Chani also said he believed the investigation was about video evidence the chief came across during that incident – specifically, that a hard drive taken from the dispensary went through Upland's "I.T." department to "decipher" rather than going through evidence. Chani told me it was "possible" he heard this from Sgt. Simpson, but he didn't know. Captain Yoakum, in turn, did not talk to him about the investigation.

I also asked Sgt. Chani if he knew Sgt. Simpson, Captain Yoakum, or Detective Teague had been interviewed. Chani said he and Simpson "could have talked about it," (i.e., just that Simpson had, or was going to be interviewed, but not the actual investigation), but he did not know about Yoakum or Teague. Chani did not believe anyone else was present during his conversation with Simpson.

Sgt. Chani said there was no discussion about the investigation beyond whether Simpson had been, or was going to be interviewed, and acknowledged that doing so would be a violation of policy. Chani also said making comments that were critical of the chief or his actions would be a violation as well, ("I'm sure it's in the policy"), regardless of to whom those statements were made, (subordinates or otherwise). I asked Chani if he believed the comments Simpson made about the chief's actions were

COU-00000494

disparaging, and he replied, "I don't think so."  Chani explained Simpson had complaints about working conditions and working relationships, but not "in a derogatory manner."  I then narrowed my question, asking Chani specifically about the comments Simpson made as they relate to Chief Johnson's actions during the MMD incident.  When asked if he believed *those* comments were disparaging, Chani replied, "They were facts," adding, "To me he sounded stressed out about it, like it had brought liability to him as well."

For additional details refer to the complete interview audio.

### Statement of Lt. Marcelo Blanco, (5/25/17)

I interviewed Lt. Blanco in a conference room at Upland City Hall.  The interview was recorded, and can be found in attachment 5[ee].

Lt. Blanco said he has been with the Upland Police Department for about 26 years, initially as a volunteer and then police cadet.  He has been a sworn officer for 21 years, and was promoted to lieutenant in September 2016.  Before his promotion, Blanco supervised CRO team; Sgt. Simpson assumed responsibility for the team thereafter.[30]

Lt. Blanco and I initially discussed rumors circulating throughout the police department. First, I asked Blanco to tell me what he knew about a rumor that Chief Johnson might open ranking positions to outside applicants, and how LAPD factored into that rumor. Blanco said he was familiar with the rumor and explained the department decided to fill the vacant captain position; people believed Johnson would open the position to outside applicants, and because of his background, (LAPD), speculated he would select someone from that agency.

Blanco did not know the rumor's origin but recalled Sgt. Simpson talking about it during general discussions; Blanco did not hear the rumor from Captain Yoakum.  Blanco said he heard the rumor "several times," adding, "Marc is a good guy, but tends to go over some things over and over again."  He also said Simpson was critical of the possibility Johnson would select someone from outside Upland PD, and unhappy because it impacted his (Simpson's) promotional opportunities.

When asked what led him to believe Simpson was being critical of Chief Johnson's "decision," Blanco said it was the tone of Simpson's comments.  (Blanco explained that while the UPMA gave their approval for Johnson to select a captain from outside applicants, at no time was it announced Johnson would do so.)  Simpson was also critical of being "bypassed" by Johnson for promotion to lieutenant.  Apparently Simpson believed he was next in line for the promotion, (despite, as Blanco said, the existence of the "rule of three"[31]), and the rumor that Johnson was going to select an outside applicant for captain "added more fuel to the fire."

---

[30] Lt. Blanco was interviewed on 5/18/17 for a separate administrative investigation and provided this information at that time.
[31] A personnel rule that allows the hiring authority to select any one of the top three individuals on a certified promotional list, regardless of their ranking in that group.

COU-00000495

I asked Blanco if other people were present when Simpson made these comments. Blanco was "pretty certain" other people *were* present, and said Simpson was also "very vocal" about things happening in the department while the administrative investigation involving Chief Johnson was evolving.  For example, Simpson was vocal about the investigation process, saying Johnson had violated the law and done things that could lead to his removal.

I also asked Blanco if Simpson said specifically how he thought Chief Johnson violated the law.  Blanco replied, "Yes," saying that Johnson had viewed a DVR without a warrant.  Blanco explained he was not "100 percent" certain Simpson said this, (as opposed to Blanco hearing it from someone else), but believed he did, explaining that Simpson researched laws he believed Johnson violated by viewing the DVR.

During this part of the interview Blanco commented that Simpson met with the "other investigator" three or four times.  When asked how he knew this, Blanco said Simpson told him.[32]

Referring to Simpson's comments about Chief Johnson opening the captain position to outside applicants, I asked Blanco if subordinates were present when those comments were made.  Blanco believes discussions in which the comments were made occurred in the watch commander's office among supervisors.  Blanco said people would come into the office, but he and the other supervisors were cognizant of their role and did not share with those individuals something of this nature.  I asked Blanco if he would consider Simpson's comments inappropriate if made in the presence of subordinates, and he replied, "Yes."

I asked Blanco if he ever heard Captain Yoakum or Sgt. Simpson say that Chief Johnson served a warrant by himself.  Blanco said he did not, but was aware Johnson entered a medical marijuana dispensary by himself.  When asked if he recalled Yoakum or Simpson being critical of Johnson's actions during that incident, (which I confirmed to be the 1/21/17 enforcement action), Blanco said Simpson was the on-scene supervisor, and was critical of the officer safety issues.  Blanco also said he spoke with Yoakum, who was "frustrated," but not critical of Johnson's actions.  Once again, the discussions in which Simpson was critical of Johnson's actions likely occurred among sergeants and lieutenants in the watch commander's office, (but could have occurred elsewhere as well, he acknowledged), and not in the presence of subordinates.

As the interview continued I asked Blanco if he ever heard Captain Yoakum or Sgt. Simpson say they wanted to get Chief Johnson fired, or anything similar.  Blanco said he has never Yoakum make such a statement, but added, "Marc definitely said those words."  Blanco explained he and Simpson met with the city manager,[33] (a meeting he

---

[32] Sgt. Simpson was interviewed by P.I. Hackworth three times for the administrative investigation involving Chief Johnson: 2/28/17, 3/13/17, and 4/3/17.

[33] Lt. Blanco did not specifically identify the city manager by name during this interview, but based on statements made by others also interviewed for my investigation, and a subsequent interview of Blanco, he was referring to Mr. Thouvenell.

EXHIBIT 25
Page 64 of 144

COU-00000496

later said occurred "toward the end of the investigation"). During that meeting the city manager asked, "What do you want me to do," (referring to the investigation involving Chief Johnson), to which Simpson replied, "He needs to get fired." Blanco was not certain Simpson made that exact statement, but with "99.9 percent" certainty said the word "fired" was used. I asked Blanco if he heard Simpson make a similar statement outside of that meeting and he said it was, "possible," and based his answer on "all the discussions while the interview[34] was going on, and what the outcome was going to be."

*(During a subsequent interview on 7/6/17, I asked Blanco about the statement Detective Stanley attributed to Captain Yoakum on the day of the MMD enforcement action, as discussed later in my report. When Yoakum and Stanley were talking outside the watch commander's office, referring to Chief Johnson's actions at the MMD enforcement action Yoakum reportedly made the statement, "If you did that I'd fire you." Blanco said he spoke with Yoakum on the phone that day but did not recall seeing Stanley and Yoakum at the station, nor did he remember hearing Yoakum make such a statement.)*

Blanco said a discussion about getting Chief Johnson fired might have also occurred during a joint UPOA/UPMA meeting when the general membership was surveyed.

Lt. Blanco spoke about another time he heard Simpson make comments that were critical of Chief Johnson. Blanco explained he became aware that Johnson was going to give Yoakum a performance improvement plan, which surprised Blanco, as everyone thought Yoakum was an ally of the chief. Blanco is the vice president of the UPMA and believes he might have heard this during a meeting with the UPMA attorney. Although Blanco does not remember hearing anything else about the issue, he did say Simpson also told him outside of the meeting that Johnson was "looking at" disciplining Yoakum.

I asked Blanco if he heard either Yoakum or Simpson talk about engaging in a work slowdown and he replied, "No."

Next, Blanco and I discussed the joint UPOA/UPMA meeting at Upland High School that occurred the previous summer. Blanco said this was the same meeting to which he previously referred, (when the survey was taken), but he was not present for that meeting. I asked Blanco if, to his knowledge, the meeting was recorded. Blanco replied, "Rumor had it that it was," but he had no first-hand knowledge of such a recording being made. Blanco heard (as part of that rumor) that Lt. Moore recorded the meeting, but Blanco did not ask Moore if the rumor was true. Blanco was unsure if he heard Simpson say the meeting was recorded, and does not know if a recording of the joint UPOA/UPMA meeting exists.

I asked Blanco about the administrative investigation involving Chief Johnson, and specifically, if he was aware that such an investigation was being conducted. Blanco said he was, and explained that he heard detectives had witnessed an event with a DVR and wrote memos (about their observations). Blanco also said he was given an

---

[34] Although I did not clarify his response at the time, based on the context of Lt. Blanco's answer I believe he meant to say, "...while the *investigation* was going on."

EXHIBIT 25
Page 65 of 144

COU-00000497

interview notice, (which was when he knew for certain that an investigation *had* been initiated), and heard rumors that other people were being interviewed as well.

When asked if he knew the nature of the investigation, Blanco said he heard rumors it was about the DVR and Chief Johnson's actions at the medical marijuana dispensary. Additionally, Simpson told him he received memos (about the incident) from detectives. Sometime after the investigation began, in his capacity as vice-president of the UPMA Blanco read the memos, (which gave him more background about the investigation), and then sent them to their attorney. Blanco believes he read the memos after he was interviewed by P.I. Hackworth.

I asked Blanco if Simpson told him *when* he was interviewed. Blanco said he did, and explained that Simpson told him he called the investigator to schedule another interview because he had additional information to provide. Blanco did not recall the conversation in which this particular comment was made, and was "pretty confident" Simpson never shared with him the nature of the questions that were asked during the interview. Blanco did not know if Yoakum or Teague were interviewed for the investigation.

Finally, I asked Blanco if he was aware, (and not just assumed), Chief Johnson was interviewed for the investigation. Although neither Yoakum, Simpson, nor Teague told Blanco that Johnson was *going* to be interviewed, Blanco said he might have heard someone say the chief would be interviewed soon.

For additional details, refer to the complete interview audio.

## Statement of Cadet Geneva Holzer, (5/25/17)

I interviewed Cadet Holzer in a conference room at Upland City Hall. Holzer acknowledged receipt of the interview notice and identified the signature on the document as hers. The interview was recorded and can be found in attachment 5[j].

Cadet Holzer has been with the Upland police department for four and one-half years and is currently assigned exclusively to the evidence room.

I asked Cadet Holzer if she recalled an MMD enforcement action on 1/21/17 in the 1600 block of W. 9th. Holzer said she did, recalling the incident was on her day off and she was called in to assist with evidence collection. I also asked if she had discussed with anyone the reason the chief was at the scene, or if she heard comments that led her to believe people were unhappy with what occurred. Holzer said people in the department were not happy with the chief in general or the choices he has made, but denied hearing complaints about his actions at the scene, saying only that they "didn't want to be there on a Saturday."

Cadet Holzer and I also discussed her role in retrieving for Captain Yoakum a DVR seized during that incident. Holzer said she received an email from Forensic Specialist Colleen Sellers, who was also replying to an email from Yoakum requesting that Sellers

COU-00000498

retrieve the DVR.  (Sellers was not working so she sent the request to Holzer.)  The day after Holzer received the email, Yoakum came to her office and said, "we still want to look at the DVR," or something similar, (though he did not specifically identify the chief).

Following their conversation Holzer retrieved a box of evidence in which the DVR was stored and gave the box to Yoakum in his office.  Fifteen to twenty minutes later Holzer saw Detectives Stanley and Wyman coming down the stairs and told them she retrieved the DVR for Captain Yoakum, also asking if they wanted to document the retrieval on their (evidence-tracking) spreadsheet.  Stanley and Wyman seemed surprised and questioned aloud why Yoakum wanted the DVR, saying "they" need a warrant to look at it."  Holzer was confident Stanley and Wyman knew the DVR was the same DVR seized during the medical marijuana dispensary enforcement action.

A few days after Cadet Holzer gave the box of evidence to Captain Yoakum, it was returned.  Holzer inventoried the contents, confirmed all items were accounted for, and returned the box to evidence storage.

Referring to complaints about the chief, Holzer said she is personally saddened that people in the department are upset, and believes that the negative comments bring down morale.

I asked Cadet Holzer if she has heard Captain Yoakum or Sgt. Simpson say anything critical of Chief Johnson.  Holzer paused and then replied, "Never once have I heard Yoakum speak ill about the chief." However, she then spoke about conversations that have occurred among detectives and officers when they get together for lunch.  Specifically, Holzer said "people chat," making statements similar to, "This sucks," and, "I don't' want to go to work."  One example she offered was that people were not happy that they had to carry two cell phones, and discussed ways to prevent their personal phones from being subpoenaed.  The discussion then evolved into other complaints about what the chief was doing.  Simpson was a participant in these discussions.

I asked Cadet Holzer if she ever heard Captain Yoakum or Sgt. Simpson say the chief was going to hire from LAPD, or something similar, or that he had served a warrant by himself at the medical marijuana dispensary.  Holzer answered, "No."

I also asked Cadet Holzer if she ever heard Captain Yoakum or Sgt. Simpson say they wanted to get the chief fired, or get rid of the chief.  Responding, "Not those exact words," Holzer spoke about "chatter" during one lunch in particular, (at which Simpson and several detectives were present, but Yoakum was not), recalling that people said they don't want the chief around, and hoped he was gone soon.  When asked what conversation prompted these comments, Holzer said there was discussion about a lengthy document Chief Johnson gave to Captain Yoakum on leadership or how to be a better captain.  Simpson and the detectives were saying "how stupid that was."

*(On 6/20/17 I asked Chief Johnson about the document to which Holzer referred. Johnson said the only lengthy document about "leadership" or "how to be a better*

COU-00000499

*captain" was the performance improvement plan discussed elsewhere in this report. I
did not record this conversation with Chief Johnson.)*

Referring to the matter for which she was interviewed by P.I. Hackworth, I asked Cadet
Holzer if she ever heard Captain Yoakum, Sgt. Simpson, or Detective Teague talking
about that particular investigation. Holzer said Simpson asked her if she was
interviewed, ("You were interviewed, right?"), to which she replied, "Yes"; he did not ask
her specifically what she was asked. Simpson asked this question during the same
lunch at which other detectives were present.

Pointing out to Cadet Holzer that a question about being interviewed was random
without other comments about an underlying investigation, or reference to the
investigation conducted by P.I. Hackworth in particular, I asked Holzer if such a
discussion did in fact occur. Holzer said people were talking about "past stuff," but
recalled only that they were "griping" about things the chief was doing and their
unhappiness with him in general. She did not recall if the MMD incident or the DVR
issue were topics discussed during lunch, nor does she remember hearing the word,
"investigation."

Cadet Holzer told me that although Sgt. Simpson was not her immediate supervisor,
she felt obligated to answer his question "out of respect" nonetheless. The question did
not make her feel uncomfortable, Holzer explained, but she was hoping Simpson would
not ask anything else.

During our conversation Cadet Holzer said that although Sgt. Simpson knew she was
being interviewed, she personally did not tell him, adding, "When told I need to do an
interview, I keep it quiet."

Cadet Holzer could not recall any discussion during lunch about Chief Johnson being
interviewed.

At the time of our conversation Holzer could not recall the specific date on which this
lunch occurred or the name of the restaurant, but said she would check her email for
additional information and let me know.

For additional details refer to the complete interview audio.

Later that day I received from Cadet Holzer the email exchange between Holzer,
Captain Yoakum, and Forensic Specialist Sellers that Holzer spoke about during her
interview, (attachment 2[l]). The initial email was sent to Colleen Sellers by Captain
Yoakum on 2/3/17, (a Friday), at 11:36 AM, with the subject, *UPD17021018,*
(presumably a case number). In his email, Yoakum wrote:

> *"Colleen,*
>
> *The chief would like the DVR from this dispensary so he can view the video. Can
> you pull it out for him.*

COU-00000500

*I need to get with Rami so we can figure out how to view it.*

*Thank you"*

On Monday, 2/6/17 at 3:39 PM, Sellers replied to Yoakum and copied Cadet Holzer on the email.  In her response Sellers told Yoakum she was off, but also said that Holzer would be (at work) half day "tomorrow."[35]

Also included in the email exchange Holzer sent me was information about the lunch to which she referred during her interview.  Holzer identified the restaurant as "Pubelita," (later determined to be *Pueblita*), and said the date of that lunch was 4/10/17.

## Statement of Sgt. Maurice Duran, (5/25/17)[36]

I interviewed Sgt. Duran in a vacant office at the Upland Police Department.  Duran confirmed he received the interview notice and signed it in my presence.  The interview was recorded, and can be found in attachment 5[nn].

Sgt. Duran has been a police officer with Upland PD for about 13 years and was promoted to sergeant in January 2016.

After discussing a separate administrative investigation, (UPD IA 05-17), I then asked Duran about the rumor that Chief Johnson was going to open the captain position to outside applicants.  Duran said people were unhappy with the possibility Johnson would do so, and provided some background about the issue.  When Upland was selecting a police chief, the executive boards of the UPOA and UPMA interviewed the candidates. At the time, Duran was president of the UPOA, and Simpson was vice-president of the UPMA.

Duran said there was some concern about Upland selecting a chief from the outside, so the boards asked the candidates their opinion about bringing in other outside staff. Johnson said doing so would be demoralizing and he had no intention of doing so. However, at a joint UPOA/UPMA meeting held after Johnson was appointed, Johnson addressed the membership and made a comment about opening the process (for senior ranking positions) to outside applicants.  Duran said there was also a recent attempt to open the position of captain to outside applicants, and "a lot of people were very vocal" about such a possibility.

I asked Duran if Sgt. Simpson was among those he heard express his dissatisfaction. Duran said he didn't think Simpson was happy with the possibility, but added, "I don't think anybody was happy with it" because doing so would disrupt promotional

---

[35] Based on the date of this email and Holzer's statement, this indicates the DVR was given to Yoakum on 2/7/17.
[36] Sgt. Duran's statement includes information relevant to a separate administrative investigation, (UPD IA 05-17). Although the complete interview audio, (attachment 5[nn]), is included with my report, only the statements relevant to this investigation, (UPD IA 06-17), are included in the narrative.

EXHIBIT 25
Page 69 of 144

COU-00000501

opportunities. Because Simpson was the UPMA president at the time, Duran explained, Simpson was the "mouthpiece" for others.

I also asked Sgt. Duran how LAPD factored into discussions about Chief Johnson "going to the outside." Because Johnson was appointed chief following a 26 year career in LAPD, people were concerned anyone he selected for a ranking position would come from LAPD as well, which would change Upland PD completely.

I asked Duran if he ever heard Sgt. Simpson discuss with line officers the issue of opening positions to outside applicants and the possibility that the individual selected would come from LAPD. Duran replied, "I'm not aware of him doing that," and said he had never seen Simpson talking to line officers "trying to grow dissent." Duran also said those conversations have occurred among the management group.

Next, Sgt. Duran and I discussed the MMD enforcement action that occurred on 1/21/17. Duran said when he came to work that evening officers told him about the incident and essentially asked for his opinion about what occurred. Duran told the officers he did not have all the facts and suggested they talk to the supervisor who was involved, Sgt. Simpson. When asked if he heard Simpson complain about the incident or the actions of Chief Johnson, Duran said only that he knew it was discussed among the management group. Several supervisors were not in favor of what happened during that incident, he added, referring specifically to what they believed was an unsafe enforcement action, but Duran did not know if it was Simpson who initiated the discussion or made this statement.

Duran said he has never heard Simpson share complaints about the MMD enforcement action, or other complaints about Chief Johnson in the presence of line officers, saying that to do so would be inappropriate. Similarly, Duran has never heard Yoakum complain about Johnson, and described Yoakum as "completely an organization man."

I also asked Duran if he ever heard Simpson say that Chief Johnson served a warrant by himself. Duran said he heard rumors that Johnson went into the medical marijuana dispensary, and that a warrant was going to be served, but he did not hear that Johnson served the warrant.

I asked Sgt. Duran if he ever heard Simpson say he wanted to get Chief Johnson fired. Duran did not think Simpson made such a statement, but believes he (Simpson) said that any (presumably adverse) information about Johnson needed to go to whomever was responsible for the investigation.

I also asked Sgt. Duran if he ever heard Captain Yoakum or Sgt. Simpson talk about engaging in a work slowdown, and he replied, "Never."

Sgt. Duran and I also discussed the joint UPOA/UPMA meeting that was rumored to have been recorded. Duran said he was at that meeting but had not heard the rumor and had no knowledge such a recording was made.

COU-00000502

Finally, Sgt. Duran and I discussed the administrative investigation involving Chief Johnson. Duran was not personally aware an investigation was being conducted, (he was not interviewed for that investigation), but heard rumors to that effect. Duran also heard the investigation was about the removal of political signs. Duran denied that either Yoakum or Simpson told him there was an investigation being conducted involving Johnson.

While discussing the administrative investigation involving Chief Johnson, Duran said that when he was the POA president he often had interaction with the public, including many people who work in law enforcement. Some of those individuals are active in the community and share with Duran rumors *they've* heard about the police department. We did not discuss this further.

For additional details, refer to the complete interview audio.

### Summarized Statement of Lt. John Poole to P.I. Steve Fobes, (5/27/17)[37]

P.I. Fobes interviewed Lt. Poole at the Upland Police Department and later prepared a supplemental report, (attachment 1[b]. The interview was recorded, and can be found in attachment 5[ff].

Essentially, Lt. Poole shared no information with P.I. Fobes indicating he heard Captain Yoakum or Sgt. Simpson spread rumors about Chief Johnson promoting from outside the agency or serving a warrant by himself, nor has he heard Yoakum or Simpson make statements that were critical of Johnson. Simpson did tell Poole about the MMD enforcement action and that Johnson was involved in the incident, but he did not say anything that could be perceived as critical of Johnson's actions. Poole also heard a rumor about getting Chief Johnson fired, but based on that rumor believed it was the UPOA who was trying to do so. Finally, Poole did not hear any rumor about Yoakum or Simpson encouraging a work slowdown, nor did he have any knowledge of a UPOA/UPMA meeting at Upland High School the previous summer being recorded.

For additional details refer to the supplemental report prepared by P.I. Fobes and the complete interview audio.

### Statement of Officer Alaina Clark, (6/1/17)

During my interview of Sr. Administrative Assistant Barrett she spoke about a conversation she had with Officer Alaina Clark. Specifically, Barrett said Clark told her Sgt. Simpson asked if Chief Johnson was being unfair to her, (Clark), or was giving her too much work.

---

[37] The interview includes questions asked as part of a separate administrative investigation, (UPD IA 05-17). I have included the interview audio and Lt. Poole's statement to P.I. Fobes in their entirety.

COU-00000503

I interviewed Clark in a conference room at Upland City Hall.  Clark said she received
the interview notice and signed it in my presence.  The interview was recorded, and can
be found in attachment 5[ii].

Officer Clark said she has been a police officer with the City of Upland for three years.
Prior to that, Clark was a deputy for the Los Angeles County Sheriff's Department, and
a police officer for the City of Torrance.  Clark is currently assigned to Training and
Backgrounds, (across from Administrative Assistant Crandall's desk and down the hall
from the detective bureau), where she is responsible for a variety of personnel-related
tasks.  Until approximately one month before I interviewed her Sgt. Tseng was Clark's
immediate supervisor, but she now reports to Lt. Blanco.  Captain Yoakum is also in her
chain of command.

During the interview Officer Clark said complaints around the police department were
common, ("Daily"), and opined that because of this, the work environment was toxic.
Clark also spoke about the adverse impact these complaints have had on applicants,
("They don't want to stay").

Officer Clark and I discussed various rumors that were circulating throughout the
department.  For example, I asked Clark if she heard a rumor that Chief Johnson was
going to select a captain from outside their department.  Clark said she has, adding that
there was also speculation the captain would be from LAPD, but she did not believe
there was any truth to the rumor.  Clark did not personally hear either Yoakum or
Simpson talking about this rumor, ("It was more from officers").

I asked Officer Clark how often she interacted with Captain Yoakum and Sgt. Simpson.
Clark spoke highly of Simpson and said although he was not her direct supervisor, she
would say "Hi" to him when he was assigned to the detective bureau.  Clark interacted
with Yoakum almost daily until he was placed on administrative leave.

Officer Clark and I also discussed the MMD enforcement action on 1/21/17.  Clark said
she was not working that day or otherwise involved in the incident, but she has heard
people say the actions of Chief Johnson were unsafe, and they were upset because
Johnson did things by himself.  Clark has never heard Captain Yoakum or Sgt. Simpson
talking about the incident, nor has she heard anyone say that the chief served a warrant
by himself.

I asked Officer Clark if she heard anyone say they wanted to get Chief Johnson fired.
Clark replied, "No," but said she has heard people say they hoped the chief "wasn't here
anymore."  Clark could not recall Captain Yoakum or Sgt. Simpson making such a
statement, but she knew they were "up to something."  When asked to elaborate Clark
said she heard there was an investigation into what occurred at the 1/21/17 MMD
incident; she was not interviewed.  Clark also said neither Yoakum nor Simpson told her
an investigation was being conducted.  I asked Clark if she knew that Yoakum,
Simpson, or Detective Teague had been interviewed for that investigation and she
replied, "No."

EXHIBIT 25

COU-00000504

Officer Clark also spoke about an interaction she had with Sgt. Simpson sometime in March 2017.  During a conversation with Simpson in the hallway near her office, Clark said she was "stressed" because of her workload.  (Clark does not believe anyone else was present during this particular interaction.)  The following week Simpson took Clark into an office, closed the door, and asked her about her interactions with Chief Johnson, specifically asking why she was stressed.  Simpson also asked Clark if he could use her name, (for what she assumed was the investigation), but she told him, "No," saying she did not want to get involved.  During their conversation Simpson did not say he wanted to get the chief fired, nor does she think he used the word, "Investigation."

Officer Clark did not know whether Simpson was disappointed or upset by her refusal to participate, but believes his demeanor toward her changed after their conversation, (although she said he remained cordial).

I asked Officer Clark if she ever heard Captain Yoakum or Sgt. Simpson say anything that was critical of Chief Johnson.  Clark said the comments that stand out in her mind were made by line officers, adding that if Yoakum or Simpson did say things, they were not so bad that she would remember.

I also asked Officer Clark if she was at the joint UPOA/UPMA meeting the previous summer; she was not, (nor has she been to any such meeting).

Finally, I asked Officer Clark if she had lunch with the detectives at Pueblita restaurant on April 10.  Clark does not believe she did, saying she does not often go to lunch with other employees.

### Statement of Acting Captain Cliff Matthews, (6/5/17)

I interviewed Acting Captain Matthews in a conference room at Upland City Hall. Matthews was appointed to this position after Captain Yoakum was placed on administrative leave.  Matthews confirmed he received the interview notice, and signed it in my presence.  The interview was recorded, and can be found in attachment 5[g].

Matthews has been a police officer with Upland PD for about 26 years and was promoted to lieutenant in 2010.  Before being appointed acting captain, he was a patrol watch commander.

Matthews and I first discussed the rumors circulating throughout Upland PD.  Referring to the rumor that Chief Johnson was going to open the captain position to outside applicants, I asked Matthews if he recalled any talk about the person hired for that position coming from LAPD.  Matthews said there was "speculation" among the employees that Johnson would do so, and explained the issue of opening positions to outside applicants was discussed in contract negotiations.  Specifically, there was initially talk about opening to outside applicants the positions of captain *and* lieutenant, but agreement was reached that the City would do so only for the rank of captain. Matthews was certain he discussed with both Yoakum and Sgt. Simpson the possibility that if the captain position *was* opened to outside applicants, Johnson might select that

COU-00000505

person from LAPD.  Matthews also said he has heard Johnson say several times he (Johnson) does not have anyone from LAPD in mind for the position, and Matthews has no reason to doubt him.  Finally, Matthews said he does not remember either Yoakum or Simpson discussing this in the presence of officers or detectives, but he was not certain.

I also asked Matthews if he ever heard Yoakum or Simpson say Chief Johnson served a warrant by himself.  Matthews said he heard people talking about Johnson initiating contact at a medical marijuana dispensary by himself that resulted in a warrant being served, but he (Matthews) personally was not involved in the incident.  Because there was concern about tactics during that enforcement action, Matthews and the officers on his shift used the incident as an opportunity in their daily briefing to discuss good tactics in general, being careful to note while doing so that they did not know what happened at the scene.  Matthews also said the entire department was talking about the incident so it's likely he heard about it from Yoakum and Simpson as well, but again said any such discussion did not occur in the presence of subordinates.[38]

Next, I asked Matthews if he ever heard Yoakum or Simpson say they wanted to get Chief Johnson fired, or that they were going to get Johnson fired, or anything similar.  Although he had not heard Yoakum or Simpson make such a statement, like several other people throughout the organization, they have said there are a lot of problems in the department, but they weren't sure there was a solution to those problems with Johnson as chief, (or something similar).  Matthews was certain he heard Simpson make this statement, and "thinks" he heard Yoakum say it as well.  Matthews does not remember who else was present when Yoakum and Simpson made this statement, but explained that they did not do so in the presence of anyone below the rank of sergeant.

During this part of our discussion Matthews offered that he, too, has been asked if he thought problems in the department could be fixed.  Although when asked at the time he replied, "No," Matthews now feels otherwise.

I also asked Matthews if he had ever heard Yoakum or Simpson make statements that disparaged Chief Johnson or were critical of Johnson or his actions.  Matthews replied, "Not disparage his character, but critical of his actions?  Certainly, as I've heard people do throughout my career."  Matthews opined that people "grumble" about decisions they don't agree with, and offered that he did this himself as an officer.  That being said, Matthews has heard criticisms about Johnson from both Simpson, and to a lesser extent, Yoakum.  When asked for specific examples, Matthews said he has heard Yoakum and Simpson question Johnson's tactics at the MMD enforcement action on 1/21/17, and also at a skate park on Christmas Eve or Christmas day.  When Yoakum was talking to Matthews about Johnson's actions at the medical marijuana dispensary incident, Matthews said Yoakum was clearly frustrated, but also apparently cognizant of his position in the organization, appearing to withhold what Matthews believed was

---

[38] Acting Captain Matthews correctly noted that because he is subordinate to Captain Yoakum, any discussion about the incident between Yoakum and Matthews technically occurred in the presence of a subordinate. However, Matthews clarified that his reference to comments made in the presence of subordinates referred to those below the rank of sergeant.

COU-00000506

more to say.  Finally, Matthews said he does not recall anything else because nothing
Yoakum or Simpson have said stood out as being "over the top."  Matthews also
believes that Simpson's intent when making statements discussed herein was to "get
things back on track" and not undermine the chief.

Matthews told me that while Yoakum was typically tempered in his comments, (my
words), Simpson was "probably" more outspoken and "not nearly" as tempered, and
with one known exception, was also always open and honest with Matthews about
matters in which he (Simpson) was involved.  Matthews explained there was some
allegation of misconduct made against the chief regarding evidence from the MMD
incident on 1/21/17.  Matthews walked into a room and heard Lt. Ansara talking with
other people, possibly including Simpson.  Ansara told Matthews, "You probably don't
want to be a part of this," so Matthews left.  Matthews did not believe the comment was
made as if something devious was being done, but rather, to gather information from
witnesses and protect the integrity of a personnel matter.  Simpson did not discuss with
Matthews the conversation they were having, and Matthews did not ask.

I asked Matthews if, to his knowledge, either Yoakum or Simpson ever talked about
engaging in a work slowdown.  Matthews said they have not, but explained there have
been discussions about work slowdowns among the management team during contract
negotiations, all before Chief Johnson was appointed.  However, everyone agreed such
an action was "absolutely unacceptable," and something they never wanted to see
happen.

Matthews and I also discussed the joint UPOA/UPMA meeting held at Upland High
School the previous summer.  Matthews wasn't sure if he was at that particular meeting,
but to his knowledge the meeting was not recorded, nor had he heard anyone say it
was.

I asked Matthews if he was aware there was an administrative investigation being
conducted involving Chief Johnson.  Matthews said he was, and thought there were two
such investigations involving Johnson as the subject.  Matthews did not recall how (or
from whom) he first heard about the investigation, but did say he had a private meeting
with the city manager, who mentioned there was an investigation, (without providing
details), and also heard Johnson himself say he was under investigation.  Matthews
also recalled people telling him they were going to be interviewed by a private
investigator, (though he did not recall who said this), but he has not heard anyone make
any statements about any investigation.

I also asked Matthews if he knew Yoakum, Simpson, or Detective Teague were
interviewed for the investigation involving Chief Johnson and he replied, "No…but I'm
not surprised."  Matthews also said he "didn't think" any of these individuals had asked
him if *he* had been interviewed.

As the interview concluded, I asked Matthews if he recalled Yoakum coming into his
(Matthews') office and saying he had received something from Chief Johnson that he
(Yoakum) wasn't happy about.  Matthews said he did, explaining that Yoakum told him

COU-00000507

Johnson put him on a performance improvement plan.  Their conversation was brief and Matthews does not recall Yoakum's exact words or when Yoakum had been given the plan, (though he assumes it was recent), but he did say Yoakum was upset and did not think it was justified.  Yoakum and Matthews were alone and the office door was closed when this interaction occurred.

I asked Matthews if he believed Yoakum's comments were inappropriate for a supervisor to share with a subordinate, (which Matthews was at the time).  Matthews answered, "Technically, it was not appropriate; it's clear we cannot share (dissatisfaction with the chief) with our subordinates," but offered what he believed to be a mitigating factor.  Matthews explained he and Yoakum have worked side-by-side for 26 years, and in many respects considers the two of them "equals."

For additional information refer to the complete interview audio.

*Statement of Detective John Bonhus, (6/5/17)*

I interviewed Detective Bonhus in a conference room at Upland City Hall.  Bonhus, who was represented by his attorney, Kevin Flautt, (Mastagni Holstedt), said he received the interview notice and signed it in my presence.  The interview was recorded and can be found it attachment 5[w].

Bonhus began his law enforcement career with Upland PD as a police cadet in 2001.  He has been a sworn officer for 13 years, and a detective for about the last two years.

I began by confirming with Bonhus that he was interviewed once before by Private Investigator Hackworth for a different matter.  I then asked Bonhus if he knew when Chief Johnson was interviewed for that investigation.  Bonhus said he did not, but heard in passing that there was a Thursday when Johnson was "blocked out" all day at city hall, in a suit and tie, and seen early in the morning.  (Bonhus explained this was unusual, as Johnson usually wears his class "A" uniform, and does not typically work early in the day.)  Additionally, Bonhus heard this from "Lots of people" on the same day Johnson was reportedly at city hall.

I asked Bonhus if, before he received notice for his interview (with Hackworth), he was aware there was an administrative investigation being conducted, and he said, "No."  Until he received that notice, Bonhus explained, he did not know that an investigation was *actually* being conducted, but presumed such an investigation would be done because he was told by a lieutenant in February to submit a memo about possible misconduct – specifically, a DVR taken from an MMD enforcement action.

Bonhus told me he was not at the MMD enforcement action involving Chief Johnson on 1/21/17 but had concerns about the incident.  Bonhus said people who *were* at the incident told him about basic tactics and decision making, (based on the context of this particular discussion, by Johnson), that they felt were problematic.  Bonhus said the incident was being discussed by "pretty much everyone" the following week, and heard about it from patrol officers and sergeants who were working the day it occurred.

EXHIBIT 25
Page 76 of 144

COU-00000508

I asked Bonhus how he knew that a DVR seized during the MMD incident had been removed from evidence.  Bonhus said Detective Stanley told him that he (Stanley) and one other detective were asked by an evidence clerk what to do with the DVR taken from the dispensary.  Bonhus said his conversation with Stanley occurred at lunch, but he could not recall who else was present at the time.

I also asked Bonhus if someone told him that the DVR (taken from the dispensary) was in Sgt. Tseng's office.  Answering, "No," Bonhus said Tseng's office is near the stairwell and restroom he (Bonhus) uses.  At one point during the day Bonhus walked past the office and saw the DVR and Chief Johnson, Sgt. Kabayan, and possibly Captain Yoakum inside.[39]  Bonhus brought his concerns to Sgt. Simpson's attention, who took him to Lt. Ansara.

I asked Bonhus if he was aware Yoakum, Simpson, or Detective Teague were also interviewed for the administrative investigation.  Bonhus said he was not, but assumed everybody who was involved in the matter would be interviewed.  Bonhus also said none of these individuals told him they had been, or were going to be interviewed, nor did they ask him (Bonhus) if he had been, or was going to be interviewed.  Likewise, Bonhus did not hear Yoakum, Simpson or Teague ask anyone else if they had been, or were going to be interviewed, nor did he hear them tell anyone that they had been interviewed for the investigation.

Recalling Bonhus made a statement to P.I. Hackworth similar to, "If I had done that, I'd be at home on admin leave waiting for a termination letter,"[40] I asked Bonhus if he heard someone else make a similar statement.  Bonhus spoke about a detective briefing that was held on Tuesday or Wednesday of the week after the 1/21/17 MMD incident occurred.  During that briefing, at which possibly all six detectives and Captain Yoakum were present, either Detective Stanley or Captain Yoakum, (he could not recall which one), said something similar. Bonhus did not believe Sgt. Simpson was at that briefing.

I asked Bonhus about the nature of the discussions during their briefing.  Bonhus said the discussion was about a variety of topics, including tactics at the incident, the MMD enforcement process in general, and how detectives are told about overtime concerns, yet enforcement was taken on a Saturday when it was already planned for during the week.  Bonhus said during that discussion there were criticisms of Chief Johnson's actions at the MMD incident, but believed their intent was to be critical of the situation and how it was handled, and not Johnson specifically.

I also asked Bonhus if he heard Yoakum or Simpson make comments that were critical of Chief Johnson at any other time.  Bonhus said he had, explaining the comments were made during a board meeting while discussing working conditions.  Bonhus said he is a member of the UPOA board of directors, along with Teague, Detective Sellers, and

---

[39] Detective Bonhus wrote a memo about his observations for the Hackworth investigation, but I did not obtain a copy for my investigation.

[40] From P.I. Hackworth's interview of Detective Bonhus on 2/28/17 for the administrative investigation involving Chief Johnson.

COU-00000509

officers Peelman, Gutierrez, Lane and Widen. When asked what comments were made, Bonhus recalled a discussion with other board members about staffing levels in patrol. During that discussion Simpson spoke about a conversation he had with Johnson. Simpson reportedly told Johnson to just "rip off the Band-Aid" and lower the patrol staffing level to five, as was management's right to do. Simpson's perception was that Johnson "chewed him out" for that statement.

I did not ask Bonhus what other statements Simpson made during their meetings that were critical of Chief Johnson. Bonhus did say he could not recall Simpson making any such statements outside of the confines of those meetings, nor has he ever heard Yoakum make statements that were critical of Johnson.

Bonhus and I also discussed the lunch that reportedly occurred at Pueblita Restaurant on 4/10/17. Although he and other police department employees eat at Pueblita from time to time, Bonhus said, he did not recall specifically doing so on that particular date. Bonhus did say he has been to lunch with department employees when tactics at the MMD incident on 1/21/17 were discussed, but those discussions did not include anything about the investigation involving Chief Johnson.

I asked Bonhus if he ever heard either Yoakum or Simpson say they were trying to get Chief Johnson fired, or anything similar, and he said, "No."

Bonhus and I then discussed rumors circulating throughout the department. First, I asked Bonhus about the rumor that Chief Johnson was going to open the captain position to outside applicants. Bonhus said people had talked about this possibility for nearly two years. I also asked if it was rumored Johnson was going to select that person from LAPD, and Bonhus said it was his personal belief Johnson would do so. When asked if he heard Simpson say Johnson was going to select the next captain from LAPD, Bonhus replied, "I don't know that I've heard him say this independently." Bonhus also recalled that during a board meeting at the end of Johnson's first year as chief, Johnson made a commitment that he was not going to hire the captain from LAPD.

Next, I asked Bonhus if he ever heard Simpson say that official documents copied for attorneys were intentionally given to the attorneys incomplete. Bonhus said he has not heard Simpson make such a statement, but did hear Stanley say he had not received several documents that should have been included in a packet he received.

Finally, I asked Bonhus if he was at a joint UPOA/UPMA meeting at Upland High School the previous summer. Bonhus said he was, but to his knowledge that meeting was not recorded. Similarly, Bonhus had not heard anyone say the meeting was recorded, and to his knowledge no such recording exists.

For additional information refer to the complete interview audio.

*Statement of Detective Aaron Wyman, (6/5/17)*

COU-00000510

I interviewed Detective Wyman in a conference room at Upland City Hall; Wyman was represented by attorney Kevin Flautt.  Wyman confirmed he received the interview notice and signed the notice in my presence.  The interview was recorded, and can be found in attachment 5[t].

Detective Wyman told me he began his law enforcement career as a police cadet with the City of Upland in 2001.  He was hired as a police officer two years later, and in 2014 was promoted to the rank of detective.

Detective Wyman and I initially discussed the interaction that occurred between Detective Stanley and Cadet Holzer, (for which Wyman was present), when Holzer asked the proper way to document removal of a DVR from evidence.  Wyman wrote a memo based on that interaction and his subsequent observation of the DVR, which he said was left unsecured in Sgt. Tseng's office.  Wyman gave his memo to Lt. Ansara.

Because Detective Stanley reportedly told Detective Wyman that Captain Yoakum said to him, (Stanley), "You'd be fired for doing the same," I asked Wyman if Stanley made such a statement.[41]  Wyman said he did, adding that Stanley told him Yoakum made this statement while at the scene of the MMD incident on 1/21/17.  Wyman does not know if anyone else was present when Stanley told him about Yoakum's statement, but was sure Stanley told other detectives about Yoakum's statement as well.  Wyman also said Stanley told him about Yoakum's statement when Wyman and Stanley were discussing the MMD incident so he knew the statement was referring to Chief Johnson's actions during that incident.  Wyman has not otherwise heard Yoakum, or Sgt. Simpson, make any similar statements.

I asked Detective Wyman if he knew there was an administrative investigation involving Chief Johnson being conducted before he (Wyman) received the interview notice (for the Hackworth interview).  Wyman said he did, explaining he received a phone call from Lt. Ansara on the evening of 2/7/17 directing him to not discuss what occurred with the DVR because an administrative investigation might be conducted.  Wyman also said that while nobody told him there *was* an administrative investigation being conducted, he and other people assumed "something was going on."

I asked Detective Wyman if he heard any details about the investigation before he was interviewed and he replied, "No, just my involvement."

I also asked Detective Wyman if he was aware that Chief Johnson had been interviewed for the administrative investigation and he told me, "No."  Wyman also said he did not hear anyone say that Johnson was in a suit and tie, and blocked out (on his calendar) for the day at city hall, but explained he was out of the state from mid-March, 2017 through April 25, 2017.

---

[41] From P.I. Hackworth's interview of Detective Wyman on 2/22/17 for the administrative investigation involving Chief Johnson.

EXHIBIT 25
Page 79 of 144

COU-00000511

Detective Wyman told me he was not personally aware that Captain Yoakum, Sgt. Simpson, or Detective Teague had been interviewed for the investigation; they did not tell him, nor did they ask Wyman if he had been, or was going to be interviewed for that investigation.

I asked Detective Wyman if he had been to lunch with other police department employees where the investigation involving Chief Johnson was discussed and he told me, "No."

I asked Detective Wyman if he heard Captain Yoakum or Sgt. Simpson sharing with other employees, criticisms of Johnson's actions at the 1/21/17 MMD incident. Answering, "Not that I can recall," Wyman said the conversations he had (in which Johnson's actions were discussed) were with other detectives a few days after the incident occurred.  I also asked Detective Wyman if he heard Captain Yoakum or Sgt. Simpson make comments that were critical of Chief Johnson, his policies, or his actions in general, and he told me, "No."  Wyman also said he never worked with Simpson, explaining that Simpson came to the detective bureau when he (Wyman) was gone.

Detective Wyman and I also discussed some of the rumors circulating throughout the department, including the possibility that Chief Johnson would open the captain position to outside applicants.  Wyman was familiar with the rumor, (though he did not hear it from Captain Yoakum or Sgt. Simpson), and said there was also talk that Johnson would select the captain from LAPD.  Wyman denied hearing Yoakum or Simpson say that the chief served a warrant by himself, or that copies of official documents prepared for attorneys were incomplete.

Finally, I asked Detective Wyman if he was at the joint UPOA/UPMA meeting at Upland High School during the summer of 2016; Wyman said he was not.  Wyman also said he has not heard anyone say the meeting was recorded, and to his knowledge it was not.

For additional information refer to the complete interview audio.

### Statement of Detective Chris Hilliard, (6/5/17)

I interviewed Detective Hilliard in a conference room at Upland City Hall.  Hilliard, who was represented by his attorney, Kevin Flautt, said he received the interview notice and signed it in my presence.  The interview was recorded and can be found it attachment 5[u].

Detective Hilliard said he has been employed as a police officer with the City of Upland for 16 years, and was promoted to detective in 2015.

Because Detective Hilliard reportedly took pictures of the DVR seized from the medical marijuana dispensary on 1/21/17 and subsequently placed on Sgt. Tseng's desk for

COU-00000512

viewing,[42] I asked about his knowledge of that enforcement action.  Hilliard said there was a department-wide discussion about the incident.  He also knew about the incident because Detective Stanley asked Hilliard how to best inventory the evidence.

Detective Hilliard told me that on or about 2/7/17 he walked past Sgt. Tseng's office on his way to the restroom and saw that Tseng's office door was open and a DVR was on Tseng's desk.  Hilliard knew a DVR was seized during the medical marijuana dispensary enforcement action, and believed the DVR he saw was from that incident.  Hilliard did not remember anyone telling him the DVR was in Tseng's office before he saw it.  Knowing Tseng was on vacation Hilliard returned to the detective bureau and asked about the open office and DVR.  Hilliard also took pictures of the DVR on Tseng's desk.

Detective Hilliard said he did not remember who told him about Chief Johnson's actions at the MMD incident, but again said "multiple people" had officer safety concerns with what occurred.  I asked Hilliard if he had conversations with Captain Yoakum or Sgt. Simpson about Johnson's actions during that incident and he replied, "We may have; I don't remember anything specific."

I asked Detective Hilliard if Detective Stanley told him that Yoakum made a statement similar to, "If any of you did this you'd be fired."  Hilliard remembered "Something of that nature" being said but did not know if it came from Stanley.  Hilliard also did not remember hearing this from Yoakum himself, where he was when this statement was made, or if anyone else was present at the time.

Detective Hilliard and I also discussed his knowledge of the administrative investigation involving Chief Johnson.  Hilliard did not remember anyone telling him that such an investigation was being conducted, and also said when he received notice of his interview with P.I. Hackworth he did not know why he was being interviewed.  When asked if he recalled any conversation about Johnson being investigated or the reasons therefore Hilliard replied, "Not anything in particular."

I asked Detective Hilliard if he knew Chief Johnson was interviewed for the investigation.  Hilliard "assumed" he would (be), but does not remember anyone telling him this.  Hilliard also said he did not know *when* Johnson was interviewed, nor did he remember hearing comments about the chief wearing a suit and going to city hall on any particular day.

I also asked Detective Hilliard if he was aware that Captain Yoakum, Sgt. Simpson and Detective Teague were interviewed for the investigation (involving Chief Johnson) and he replied, "I don't know if they were or not."  Hilliard also did not remember Yoakum, Simpson or Teague telling him that they had been, or were going to be interviewed, nor did he recall any of them asking him, or anyone else, if *they* had been, or were going to be interviewed.

---

[42] From P.I. Hackworth's interview of Detective Hilliard on 3/16/17 for the administrative investigation involving Chief Johnson.

EXHIBIT 25
Page 81 of 144

COU-00000513

I asked Detective Hilliard if he was present with other police department employees during lunch at Pueblita Restaurant when the investigation involving Chief Johnson was discussed.  Hilliard said they eat at Pueblita often, but he did not recall such a conversation during *any* lunch with other employees.

When asked if he recalled Captain Yoakum or Sgt. Simpson saying anything critical about Chief Johnson or Johnson's actions, policies or decisions, Detective Hilliard replied, "No."  Hilliard elaborated, saying, "To the contrary," and opining that Yoakum and Simpson were both "solution-based," and did everything the chief asked them to do. "Even if they didn't agree," Hilliard added, "I didn't know."

Referring to rumors circulating throughout the police department I asked Detective Hilliard if he heard that Chief Johnson was going to open the captain position to outside applicants.  Hilliard believed the department had historically done so, but said he has not recently heard anything about this.  Hilliard also did not hear that Johnson was going to select that individual from LAPD.

I asked Detective Hilliard if he heard Captain Yoakum or Sgt. Simpson say Chief Johnson served a warrant by himself; he replied, "I don't recall them telling me that."  I also asked Hilliard if he heard Yoakum or Simpson talk about copies of official documents being provided to attorneys with information intentionally omitted, and he told me, "No."

Finally, I asked Detective Hilliard if he was at a joint UPOA/UPMA meeting in which Chief Johnson spoke the previous summer.  Hilliard said he was, but had no knowledge of that meeting being recorded.

For additional information refer to the complete interview audio.

### Statement of Detective Jeff Stanley, (6/5/17)

I interviewed Detective Stanley in a conference room at Upland City Hall.  Stanley, who has been a police officer for the City of Upland since 1999 and a detective since 2014, was represented by his attorney, Kevin Flautt.  Stanley said he received the interview notice and signed it in my presence.  The interview was recorded, and can be found in attachment 5[v].[43]

Detective Stanley and I discussed his involvement in the MMD enforcement action on 1/21/17.  Stanley recalled the incident, explaining he was the on-call detective brought in to handle the case.  Stanley initially went to the police station, where he met with Captain Yoakum near the watch commander's office before then going to the scene. During Stanley's brief interaction with Yoakum, Lt. Blanco, who was the watch

---

[43] During the interview Detective Stanley referred to a memo he wrote detailing his involvement in the medical marijuana dispensary enforcement action on 1/21/17.  Although my intent was simply to ask specific questions about that incident and not re-visit every detail previously discussed with P.I. Hackworth, nonetheless, I later obtained from Hackworth a copy of that memo and have included it herein for reference, (attachment 2[m]).

commander, came out of his office and commented that he had several people in his jail but did not know why. Yoakum, who apparently had more information about the incident than Stanley, looked at Stanley and made a statement similar to, "I'd fire you if you did something like that." Stanley said nobody else was present when Yoakum made this statement.

Although Detective Stanley did not know what conduct Captain Yoakum was referring to when he made his statement, about thirty minutes later he believed Yoakum's comment was about Chief Johnson's actions throughout the incident.[44] Stanley identified those actions as "Walking in by yourself and taking down the place without backup or dispatch knowing," but did not know if Lt. Blanco gave him this information or if he heard it from other officers at the scene.

I asked Detective Stanley if he recalled a discussion at the scene about the charges on which they should book the suspects. Stanley said he did, and explained that he, Chief Johnson, Sgt. Simpson, and possibly Captain Yoakum went into a side office at the dispensary to have this discussion. Johnson talked about charging the suspects with a restraining order violation but Stanley advised him they could not do so because the suspects had not been served; Simpson agreed. Johnson then spoke about using the municipal code. Stanley told the others he wasn't familiar with use of the municipal code and left the discussion.

I also asked Detective Stanley if he recalled any discussion at the scene about department policy regarding the arrest of individuals for municipal code violations. Stanley said such a discussion did not occur with him present, and also told me he personally was not aware it was against department policy to arrest for municipal code violations, adding, "I found out later during a meeting; I didn't know for twenty years."

Because Cadet Holzer said she asked Detective Stanley how she should document the removal of a DVR from evidence, I asked Stanley if he had such a conversation on or about 2/7/17. Stanley said he did, (Detective Wyman was with him at the time), recalling that Holzer told him she gave to Captain Yoakum a DVR and a laptop computer taken from the medical marijuana dispensary. Although before he was approached by Holzer, Stanley had not spoken with Yoakum about Yoakum and Chief Johnson viewing the DVR, Stanley said he assumed the DVR was for both, (Yoakum and Johnson), because Johnson was the "driving force" behind the enforcement action, and reviewing evidence is something the detectives typically do.

I asked Detective Stanley if at some point he walked past Sgt. Tseng's office and saw on Tseng's desk what he believed to be a DVR seized from the 1/21/17 MMD enforcement action; Stanley said he did. I also asked Stanley if he just happened to walk past Tseng's office or if someone told him the DVR was there. Stanley said he "might have been" told, but added that the bathroom he uses is located across from Tseng's office.

---

[44] Detective Stanley did not identify Chief Johnson by name, but the content of his response made it clear he was referring to Johnson.

COU-00000515

During the interview Detective Stanley and I also discussed his knowledge of the administrative investigation involving Chief Johnson; I asked Stanley if he knew when Johnson was interviewed for that investigation, (Stanley himself was also interviewed).[45] Stanley recalled someone telling him one day that Johnson was at city hall getting interviewed but he did not remember who said this or the specific date on which he was told.  When asked if he knew Johnson was being interviewed as part of the same administrative investigation for which *he* (Stanley) had been interviewed, Stanley said he "could only assume," but did not know for sure.  Stanley also said when he received notice of his interview (with P.I. Hackworth) he assumed it was for an investigation involving Johnson, but did not recall anyone telling him before that interview that such an investigation was being conducted.

I asked Detective Stanley if he was aware Captain Yoakum, Sgt. Simpson and Detective Teague were interviewed for the administrative investigation involving Chief Johnson.  Stanley said he "thought" he became aware because "everyone in the bureau" and "half the department had interviews," (based on their comments about having an appointment at City Hall), but "didn't think" Yoakum, Simpson or Teague told him they had been, or were going to be interviewed.  When asked if he was present when Yoakum, Simpson or Teague told anyone they had been, or were going to be interviewed, Stanley replied, "Not that I recall."  Stanley also said he was not present when Yoakum, Simpson or Teague asked anybody else if they had been, or were going to be interviewed, answering, "(It) doesn't stand out, no."

I also asked Detective Stanley about the lunch at Pueblita Restaurant with other police department employees.  Stanley said he and the others – typically "detectives, the detective supervisor, and sometimes evidence people or officers" – eat at Pueblita often, perhaps even once every week or so, but could not specifically recall being there on 4/10/17.  I asked Stanley if he recalled being at lunch with other employees when the administrative investigation involving Chief Johnson was discussed and he replied, "Not specifically."  Stanley explained "half" the detective bureau are union representatives, so they'll often talk about working conditions and problems in the department.  Adding that there have been many discussions with union representatives about problems with Johnson and the department, recruitment, and retention, ("That's a daily thing"), Stanley said he did not remember discussing the administrative investigation at lunch.

I asked Detective Stanley if he ever heard Captain Yoakum or Sgt. Simpson say they wanted to get Chief Johnson fired, or anything similar.  Stanley said he has heard such a statement "hundreds of times" and from "so many people" during the previous year, but could not specifically say he heard this from Yoakum or Simpson.

As the interview continued I asked Detective Stanley if any criticisms of Chief Johnson's actions at the MMD enforcement action on 1/21/17 came from Captain Yoakum or Sgt. Simpson.  Stanley replied, "No," (other than Yoakum's remark about firing Stanley if he

---

[45] Detective Stanley was interviewed by P.I. Hackworth on 2/22/17 and Chief Johnson was interviewed, also by Hackworth, on 4/12/17.

EXHIBIT 25
Page 84 of 144

COU-00000516

did the same), adding that the comments came from people who were at the scene. Stanley also said there were "ten to twenty" people at the scene so he could not specifically say from whom he heard those criticisms.

I also asked Detective Stanley if he heard Sgt. Simpson talking about copies of official documents that were given to attorneys being deliberately provided incomplete and he said, "No."

Detective Stanley and I also discussed rumors reportedly circulating throughout the police department.  First, I asked Stanley if there was a rumor about Chief Johnson opening the lieutenant and/or captain positions to outside applicants.  Stanley said he has heard such a rumor, though not from Captain Yoakum or Sgt. Simpson, and when asked if there was also talk about Johnson selecting that person(s) from LAPD he replied, "The majority of us believe that."

Next, I asked Detective Stanley if he ever heard Captain Yoakum or Sgt. Simpson say that Chief Johnson served a warrant by himself.  Stanley replied, "No; we already knew that's what happened but it didn't come from them."

Finally, I asked Detective Stanley if he was at a joint UPOA/UPMA meeting at Upland High School the previous summer when Chief Johnson spoke; Stanley said he had been to two such meetings.  I asked Stanley if, to his knowledge, *any* joint UPOA/UPMA meeting where Johnson spoke had been recorded, and he replied, "Not by me." Stanley also denied hearing anyone else say the meeting was recorded.

Following a brief conversation with Detective Stanley's attorney off-tape, the interview resumed.

I told Stanley his reaction to my question about knowledge of the UPOA/UPMA meeting being recorded led me to believe he had more information, also pointing out that in a "tight" unit, as detectives typically are, it was unlikely he (Stanley) would not have heard this rumor.  Again Stanley denied knowledge that a meeting was recorded, saying, "This is the first time I've ever heard that."

For additional information, refer to the complete interview audio.

<u>Statement of Detective Scott Sellers, (6/5/17)</u>

I interviewed Detective Sellers in a conference room at Upland City Hall.  Sellers, who was represented by his attorney, Kevin Flautt, said he received the interview notice and signed it in my presence.  The interview was recorded and can be found it attachment 5[x].

Sellers told me he has been employed by the City of Upland since 1992, initially as a police cadet and then as a sworn officer.  He has been a detective for the last seven years.

COU-00000517

I asked Sellers if he was aware of an MMD enforcement action involving Chief Johnson that occurred on 1/21/17.  Sellers said he was, and explained that he and his wife, who works as an evidence technician for Upland PD, were called on their day off and asked to assist with the scene.  Although they were not able to do so, the following week when Sellers came to work he heard several people, including some who were at the scene, sharing concerns about what occurred.  Specifically, Sellers heard that Chief Johnson went to a medical marijuana dispensary without telling dispatch and "took down" the dispensary by himself.

I asked Sellers if he was present when Captain Yoakum or Sgt. Simpson talked about the MMD incident.  Although Simpson was not assigned to the detective bureau at that time, Sellers did recall a discussion that occurred, possibly during a detective bureau briefing on the first Tuesday after the incident occurred, when Yoakum might have been present.  Sellers also recalled that other detectives, including Detective Stanley, were present as well.

I asked Sellers if he heard Captain Yoakum make a statement similar to, "If any of you had done this you'd be fired."  Sellers said the comment sounded familiar but he did not know who said it.  Sellers also said the statement could have been made during the same Tuesday morning detective bureau briefing.  Sellers denied that anyone else told him Yoakum made this statement.

Sellers said at some point he became aware, by "word of mouth" between detectives and Cadet Geneva Holzer, that a DVR was seized during the MMD enforcement action.  When asked if he was made aware of concerns about the DVR, Sellers said he heard from Detective Hilliard that others were concerned because Chief Johnson took the DVR out of evidence and was searching the DVR without a warrant.  Sellers also heard that the DVR was put into Sgt. Tseng's office.  Detectives Stanley and Hilliard were joking that Tseng's office was broken into, and questioned what was being done with the DVR.

I asked Sellers if either Yoakum or Simpson said anything about *their* concerns (as they relate to the DVR), and he replied, "Not that I can remember."

Sellers and I also discussed the administrative investigation involving Chief Johnson.  When asked if he was aware that such an investigation was being conducted, Sellers said he heard Johnson was the "target" of an investigation, and that it was related to the MMD incident on 1/21/17, but could not recall who told him.  Sellers also said the fact that an investigation was being conducted might have been discussed in a UPOA board meeting, (Sellers is a member of the board of directors), but he did not recall Yoakum or Simpson telling him.

I asked Sellers if he was aware that Chief Johnson was interviewed for the aforementioned investigation.  Sellers told me one day he and "a bunch" of people were talking when someone said, (referring to Johnson), "His interview is today because his whole calendar is booked," or "blacked out."  Sellers did not know the specific date on which this was said, nor did he recall who said it.

*(During a subsequent interview on 7/10/17 Sellers said he did not recall if the conversation occurred in the morning or afternoon, nor did he recall if Sgt. Simpson or Detective Teague were among the group.)*

I also asked Sellers if he was aware Yoakum, Simpson or Detective Teague were also interviewed for the investigation.  Sellers said he assumed Teague was, "Just because every detective was interviewed," but he did not know whether Yoakum or Simpson were.[46]  Sellers did not recall Yoakum, Simpson or Teague telling him that they had been, or were going to be, interviewed, nor did these individuals ask him (Sellers) if *he* had been interviewed.

Based on his response to my question about Yoakum, Simpson or Teague being interviewed, I asked Sellers if Teague ever told him an investigation was being conducted.  Sellers initially replied, "I'm sure he did," saying the conversation was "ongoing for a couple weeks," but then said he wasn't sure if Teague told him.  Sellers also said he didn't know *who* told him the first time he heard about the investigation, *when* he was told, (though it could have been in early March 2017), or if anyone else was present at the time.

I asked Sellers if he recalled being at lunch with other detectives at Pueblita Restaurant. Sellers said he had only been to the restaurant once, but not with detectives or other employees.

I asked Detective Sellers if he had ever heard Yoakum or Simpson say they were going to get Chief Johnson fired, or anything similar, and he told me, "No."

When asked if, other than in the confines of a UPOA board meeting, he heard Simpson make any comments that were critical of Chief Johnson, Sellers spoke about a meeting he and other board members had with Chief Johnson; Simpson was president of the UPMA at that time.  Although he did not attribute to Simpson a specific criticism of Johnson, Sellers said the UPOA had previously met to discuss low morale, working conditions, and why people were leaving the agency.  The board of directors polled management and POA membership about their concerns; Sgt. Simpson tallied those polls, and was the person who spoke most about the results at a joint UPOA/UPMA meeting.  The polling results were later shared with Chief Johnson.

I asked Sellers if, other than Simpson's comments about the polling results, and outside of POA meetings, he heard Simpson make comments that were critical of Chief Johnson.  Answering, "Yeah, I'm sure I've heard him express concerns over what the chief has been doing," Sellers said they discussed the MMD incident, but could not recall what else Simpson has said about Johnson that was negative.  Sellers also said comments Simpson made that were critical of Chief Johnson were most likely made in the detective bureau or detective briefings in the presence of other detectives; he did

---

[46] Detective Sellers was not interviewed by P.I. Hackworth for the administrative investigation.

COU-00000519

not recall any civilian employees being present.  Finally, Sellers said he did not recall Simpson making statements critical of Chief Johnson other than in those areas.

I also asked Sellers if he ever heard Captain Yoakum make statements that were critical of Chief Johnson.  Sellers replied, "No," saying that he thought Yoakum was the person most loyal to Johnson.

Sellers and I then discussed rumors circulating throughout the department.  First, I asked Sellers if he ever heard Simpson say that Chief Johnson was going to hire a ranking officer from LAPD.  Sellers said he has heard the statement but did not remember hearing it from Simpson.

Next, I asked Sellers if he ever heard Simpson talk about copies of official documents provided to attorneys being intentionally incomplete.  Sellers recalled that Detective Stanley had such an issue but he has not heard Simpson or Yoakum say anything about the allegation.

Finally, I asked Sellers about the joint UPOA/UPMA meeting at Upland High School the previous summer being recorded.  Sellers said he was at the meeting but to his knowledge it was not recorded.  Sellers also said he has only heard "speculation" it was recorded, and that came from Chief Johnson.

For additional information refer to the complete interview audio.

_Statement of Sgt. Jim Tseng, (6/5/17)_

I interviewed Sgt. Tseng in a conference room at Upland City Hall.  Also present was Tseng's attorney, Michael McCoy, (Castillo Harper).  The interview was recorded and can be found in attachment 5[II].

Sgt. Tseng told me he has been a sergeant for two years, and has been in the office next to Luz Barrett's office since September 2016.  To Tseng's knowledge, only he and Barrett have a key to his office.

I asked Sgt. Tseng to confirm the dates he was on vacation in early February of this year.  Referring to his calendar, Tseng said he was out of the office from February 6th – 9th.  Tseng did not believe he came to the office during this time, but said if he did so it would have been on the 9th or 10th.

I asked Sgt. Tseng if he was aware of an MMD enforcement action in which Chief Johnson was involved that occurred in January of this year; Tseng said he was.  I also asked Tseng if he was aware that a DVR seized during that enforcement action had been put in his office.  Tseng was aware, saying while on vacation he received text messages asking why his office door was open, and telling him people were in his office and "stuff" was on his desk.  Tseng identified Detective Bonhus as one of the people who gave him this information, saying he did so via text.

COU-00000520

For additional details refer to the complete interview audio.

*Statement of Retired Lt. Alan Ansara, (6/7/17)*[47]

I interviewed Ansara in a conference room at Upland City Hall.  The interview was recorded, and can be found in attachment 5[cc].

Lt. Ansara told me he retired from Upland PD at the end of March 2017 after 33 years of service, (31 full-time, two as a reserve police officer).  At the time he retired Ansara was the swing shift/graveyard watch commander, which was then Monday through Thursday 3:00 PM – 1:00 AM.

I asked Lt. Ansara when he last had contact with Captain Yoakum, Sgt. Simpson, and Detective Teague.  Ansara said he hasn't spoken with Yoakum since he retired, but did send him a text message about two or three weeks before Ansara's interview with me inviting him to Ansara's retirement party.  Ansara said there was nothing about the investigation in that text.  (Ansara knew Yoakum and Simpson were on administrative leave because he received several text messages informing him, but none of those messages explained why.)  Ansara last had contact with Simpson, in turn, also about two weeks prior.  Ansara spoke with Simpson and asked if he was still on administrative leave and if the investigation was still on-going, but they did not otherwise discuss the investigation itself.  Finally, Ansara met with Teague, also one or two weeks prior.  During that conversation, Ansara asked Teague to help him spread the word about Ansara's retirement party.

I asked Lt. Ansara if he recalled a rumor in the police department about Chief Johnson opening the captain position to outside applicants.  Ansara said he did, but as part of that rumor heard nothing about LAPD.

I also asked Lt. Ansara if he ever heard Sgt. Simpson say that Chief Johnson served a warrant by himself; Ansara said he did.  Although he could not recall the date, Ansara knew Simpson was referring to the MMD enforcement action on 1/21/17.  Simpson did not complain about Johnson's actions during that particular incident, but expressed "frustrations" over the tactics Johnson used.

Lt. Ansara also spoke about being contacted by Sgt. Simpson, who was making a complaint about Chief Johnson that was brought to Simpson by the detectives.  Although the detectives were also unhappy with Johnson's tactics during the MMD incident, Ansara said the tactical concerns had nothing to do with their complaint.  Rather, the detectives complained to Simpson that Johnson had unlawfully accessed a DVR seized from the dispensary.  Because the allegation involved both Captain Yoakum and the chief, Ansara went to the city manager with the complaint.[48]

---

[47] Lt. Ansara's statement includes information relevant to a separate administrative investigation, (UPD IA 05-17).  Although the complete interview audio, (attachment 5[cc]), is included with my report, only the statements relevant to this investigation, (UPD IA 06-17), are included in the narrative.

[48] Although not specifically identified by name, based on other interviews the city manager to whom Ansara referred was Martin Thouvenell.

COU-00000521

When Sgt. Simpson brought the DVR complaint to Lt. Ansara, he (verbally) ordered
Simpson and detectives Teague, Stanley, Wyman and Bonhus not to discuss the matter
with anyone.

With the exception of comments Sgt. Simpson made about the MMD incident, Ansara
has not heard Simpson make statements that were critical of Chief Johnson, his
policies, or his actions.  When I asked Ansara if he ever heard Captain Yoakum criticize
the chief he laughed and said, "No," explaining that during conversations with Yoakum,
*he* (Ansara) criticized the chief.  When he did, Yoakum would not respond to Ansara's
comments.

I asked Lt. Ansara if he ever heard Captain Yoakum or Sgt. Simpson say they wanted to
get Chief Johnson fired, (or anything similar), and he said, "No."  When asked if he ever
heard Yoakum or Simpson talk about engaging in a work slowdown, Ansara again said,
"No."

I also asked Lt. Ansara if he attended a joint UPOA/UPMA meeting at which Chief
Johnson spoke the previous summer; Ansara said he did, (Ansara was the UPMA
president at the time).  Ansara also said to his knowledge the meeting was not
recorded, but he did hear such a rumor when meeting with Chief Johnson sometime
thereafter.

Lt. Ansara and I also spoke about how he became aware that an administrative
investigation involving Chief Johnson was being conducted.  Ansara said he, Sgt.
Simpson, and Detective Teague brought the DVR complaint to the city manager, who
told them he was going to order an investigation.  Likewise, Ansara said he was
interviewed for that investigation.

I asked Lt. Ansara if, during their meeting with the city manager, they were ever asked
to solicit input from other employees about complaints they had against Chief Johnson.
Ansara said when he, Simpson and Teague went to the city manager they had a
number of complaints about the chief, but made the decision to only address what
occurred with the DVR.  However, the city manager told them he had the impression
that "things aren't good up there, "(referring to the police department), and "this is just
the tip of the iceberg." The city manager also mentioned specific concerns about
Johnson not being at the police department enough and "flying off the handle when
frustrated," and asked them if what he said was true.  When they said it was, the city
manager told Ansara, Simpson and Teague he was going to have someone investigate
everything.  He also told them to "go back and find out about these things" from the
other employees.  Lt. Ansara said this was the only meeting he had with the city
manager (about complaints against the chief).

I asked Lt. Ansara if he knew when Chief Johnson was interviewed for the investigation
and he told me, "No."  Ansara also assumed Sgt. Simpson and Detective Teague were
being interviewed, but he did not know that Captain Yoakum was.  Finally, Ansara does
not believe Yoakum, Simpson or Teague told him they were interviewed, but was "sure"

COU-00000522

they asked him (Ansara) if *he* had been interviewed, (though he did not have a specific recollection of them doing do).

For additional information refer to the complete interview audio.

*Statement of Detective Lon Teague, (6/7/17)*

I interviewed Detective Teague in a conference room at Upland City Hall. Teague was represented by his attorney, Kevin Flautt, and in my presence signed the interview notice from City Manager Martin Thouvenell directing him to not discuss the investigation with anyone.[49] The interview was recorded, and can be found in attachment 5[a].[50]

Detective Teague told me he began his law enforcement career as a police explorer for the City of Upland in 1993. He was hired as a cadet one year later, and then became a sworn officer in 1996. Teague has been a detective since September 2014.

I began the interview by confirming with Teague that he had also been interviewed for an administrative investigation by Private Investigator Hackworth on or about 3/1/17. I also confirmed with Teague he told Hackworth during his interview that on or about 2/7/17 he took pictures of an unattended DVR in Sgt. Tseng's office, and that the DVR was seized during an MMD enforcement action on 1/21/17. After taking the pictures, Teague explained, he contacted Lt. Ansara, who told him verbally to not discuss the matter because it would most likely become an investigation.

*(During a subsequent interview on 7/10/17 I asked Detective Teague what he understood Lt. Ansara's order to encompass. Teague thought Ansara's order was specific to the DVR incident, but could not recall if they discussed Chief Johnson's actions at the medical marijuana dispensary incident during that same conversation.)*

I asked Detective Teague if he told anyone about seeing the DVR in Sgt. Tseng's office after receiving the directive from Lt. Ansara. Teague said the only people he would have talked to about the incident were City Manager Thouvenell, P.I. Hackworth, and his representative, attorney John Bakhit, (Mastagni Holstedt).

Referring to the MMD enforcement action on 1/21/17, I asked Detective Teague if it was accurate to say several people in the police department were talking about that incident. Teague said it was an accurate statement, adding that he also knew people were concerned about Chief Johnson's actions thereat. I asked Teague if he spoke with anyone about Johnson's actions at the MMD incident after receiving the order from Lt. Ansara. Teague said *before* receiving the order from Lt. Ansara he had discussions

---

[49] During my interview I mistakenly said the memo came from HR Manager Kelly Gonzales, when in fact it came from City Manager Thouvenell.

[50] Citing Government Code 3506, Mr. Flautt raised objections throughout the interview when questions were asked about statements that might have been made while discussing association business with other UPOA or UPMA board members. I have not specifically identified the questions for which those objections were raised.

COU-00000523

about what was seen during the *DVR* incident,[51] primarily with the person who brought it to his attention, (identified as Detective Wyman during a subsequent interview on 7/10/17). *After* Ansara gave him the directive, Teague said the matter was discussed in his capacity as UPOA president with Lt. Ansara and Sgt. Simpson, who are both UPMA executive board members. However, the discussions they had, Teague explained, were nothing more than trying to decide what action they were going to take after witnessing a potential violation of the law. Ultimately, Teague and Ansara decided to bring their concerns to the city manager.

Next, I confirmed with Detective Teague that on the date of his interview with P.I. Hackworth he signed a notice from (then) HR Manager Tanya Bragg directing him to not discuss the matter or share a copy of the notice he received with anyone other than his representative. I provided Teague with a copy of that memo, which he reviewed and confirmed as the same document he signed.

I asked Detective Teague why he believed people are ordered to not discuss an investigation with anyone. Teague replied, "To preserve the integrity of the investigation," explaining such a directive is necessary "to prevent people from hearing hearsay, and then formulating their statements off of (that) hearsay or rumor."

I then asked Detective Teague if he told anyone that he received the memo from HR Manager Bragg, if he told anyone he had been interviewed for the investigation, or if he asked anyone if *they* had been interviewed for the investigation; Teague answered, "I don't remember," to each question. When asked if he discussed the investigation itself with anyone other than his representative, Teague replied, "No," saying he understood the question to mean discussing details of the case, questions that were asked of him during his interview, or any first-hand knowledge he had about the matter. Teague further clarified his response, saying in his capacity as UPOA president he met with City Manager Thouvenell "a handful of times," but Thouvenell already knew the facts.

During this particular series of questions Detective Teague used the movie *Fight Club* as a metaphor when discussing the expected confidentiality of an administrative investigation. Quoting from that movie the line, *"The first rule of fight club is that nobody talks about fight club"*, Teague said everybody already knew what was going on. *How* they knew, Teague questioned, he didn't know.

Continuing, Detective Teague said members of the association were concerned about what happened, and asked him what was going on with the investigation involving Chief Johnson, (though he could not recall who they were or when they asked). In response, Teague gave an approximation of when the investigation would be complete. Teague did not recall anybody asking what the investigation was about, nor did he share any details with them.

---

[51] Based on Detective Teague's response to my question I believe he misunderstood what I was asking. I did not clarify my question at that time, but the matter was discussed during a subsequent interview on 7/10/17.

EXHIBIT 25
Page 92 of 144

COU-00000524

*(During the follow-up interview on 7/10/17, Detective Teague said he knew
approximately when the investigation would be complete based on conversations with
his attorney and City Manager Thouvenell.)*

Reading aloud the section from Ms. Bragg's memo directing Teague to not share with
anyone a copy of the interview notice he received, I asked Teague if he believed telling
someone he had been interviewed, or asking if *they* had been interviewed, would be a
violation of that directive, and he told me, "No." Teague explained his response, saying
he did not disclose any details of the investigation or what he was asked, nor did he say
anything that would otherwise compromise the investigation. Teague also said
everybody knew about, and had discussed the medical marijuana dispensary
enforcement action and the DVR incident before any investigation began.

Now referring to a similar notice he received from City Manager Thouvenell[52] for the
investigation *I* was conducting, I asked Detective Teague if he told anyone other than
his representative that he had received the memo. Teague replied, "No," saying, if
anything, he would let his supervisor know that he had an appointment at city hall. I
also asked Teague if he told anyone he was going to be interviewed for the
investigation I was conducting; Teague did not recall if he did so. When asked if he
discussed the investigation itself with anyone, Teague said until he received the
interview notice the previous week he had "no idea" what the investigation was about.
Teague also said on the day Yoakum and Simpson were placed on administrative
leave, (4/19/17) he was told by Chief Johnson and Lt. Matthews only that he was being
investigated for "conduct unbecoming," and "trying to undermine the department," (or
something similar). I asked Teague if he told anyone it was alleged he engaged in
conduct unbecoming, and he replied, "I don't know; not that I recall."

I asked Detective Teague if he asked anyone whether they were being interviewed for
the investigation *I* was conducting and he replied, "I don't remember." Teague also did
not remember if he told Detective Sellers, who is a UPOA board member, about the
investigation. I then asked Teague if he told Sellers an investigation involving Chief
Johnson was being conducted. Teague was uncertain, saying only that he knew Sellers
was aware of what happened before the order not to discuss was given by Lt. Ansara,
and that the UPOA board knew there was going to be an investigation.

In an attempt to confirm his previous answer, I again asked Teague if he specifically
recalled telling Sellers about the investigation I was conducting, or the investigation
involving Chief Johnson. In response to Mr. Flautt's request for clarification of the
period of time to which I was referring, I reminded Teague he had received four
directives not to discuss the investigations: 2/8/17, from Lt. Ansara; 3/1/17 from HR
Manager Bragg; 4/19/17, from Chief Johnson, and most recently, from City Manager
Thouvenell for the investigation I was conducting.[53]  I also clarified with Teague my

---

[52] Mistakenly identified during this question as HR Manager Gonzales.
[53] Not identified by date when I asked this question, but the memo Teague received for my interview was dated
6/1/17, and signed in my presence on 6/7/17.

COU-00000525

question applied to telling Sellers about either investigation after any of these directives were given.

Detective Teague explained that while there were "lots" of discussions among the UPOA and UPMA board members about what occurred, (information that was already known by the general membership), they were trying to decide what course of action should be taken. After notices were received from HR Manager Bragg, (which Teague believed referred to the DVR incident), there was only reference to "the investigation"; any details weren't "hashed out" repeatedly. Teague said there was a "laundry list" of complaints about what Chief Johnson had done, and therefore Teague could not tell me the dates on which specific issues were discussed, if at all. However, Teague did not recall having discussions with anyone regarding what he personally knew about the DVR incident.

*(During the follow-up interview on 7/10/17 I told Detective Teague his statement 'any details weren't hashed out repeatedly' implied there was some discussion about the investigation after his interview notice was received. I also asked Teague to clarify what he meant. Teague said his answer meant that he never shared details of the investigation with anybody other than people who knew about the incident before the investigation was initiated.)*

I asked Detective Teague if he knew, (not assumed), that Captain Yoakum and Sgt. Simpson were interviewed by P.I. Hackworth for the investigation involving Chief Johnson, and he replied, "I don't remember."

I also asked Detective Teague about non-police department employees with whom he might have possibly discussed the investigation involving Chief Johnson. Teague said he recognized the names *Steve Bierbaum* and *Rick Nutt*, but did not know either individual personally. Teague knows Dr. John Bunkers, in turn, and last saw him at the State of the City address in March 2017 at Cable Airport. Teague explained he knows Dr. Bunkers from community events, but has not spoken with him about the DVR incident, the investigation involving Chief Johnson, or the investigation I was conducting.

Next, I asked Detective Teague about former Upland Police Chief Steve Adams. Teague said he last spoke with Adams, whom he considers a personal friend, during the last week of April 2017.

Teague said he told Adams about Chief Johnson's actions at the MMD enforcement action, but did so "a couple of days" after it happened. When asked if he also told Adams about the DVR after he was ordered by Lt. Ansara not to do so, he replied, "I don't remember." Similarly, Teague did not remember whether he talked to Adams about anything related to the investigation involving Johnson, saying he has often sought Adams' advice. Teague also did not remember whether he told Adams he was going to be interviewed, or had been interviewed for that investigation.

EXHIBIT 25
Page 94 of 144

COU-00000526

I asked Teague if he had spoken with Adams after Captain Yoakum and Sgt. Simpson were placed on administrative leave.  Teague said he had, recalling that he "might" have asked Adams in that conversation if Adams heard what happened.  Teague also asked Adams if he had talked to Captain Yoakum, and if Yoakum was doing okay.  Teague said he did not recall Adams asking him what was going on, nor does he remember if he and Adams discussed anything else in this brief, ("about five minutes"), conversation.

I then asked Detective Teague if he had recently spoken with (now retired) Lt. Ansara.  Teague said he and Ansara spoke about one and a half weeks earlier, (the only conversation they have had since Ansara retired in March), primarily to talk about Ansara's upcoming retirement party, and that conversation lasted about one hour.  Teague denied there was any discussion about the investigation involving Chief Johnson or the investigation I was conducting.

Finally, I asked Detective Teague if he had spoken with any reporters after receiving the interview notice from HR Manager Bragg.  Teague said he was contacted by one reporter, but told that individual he could not discuss the matter.  *(Teague clarified during the 7/10/17 interview that the matter to which the reporter referred was the investigation in which Teague, Yoakum and Simpson are the subjects.)*  Teague has not spoken with any reporter since he received the interview notice from City Manager Thouvenell.

I asked Detective Teague if he knew, (not assumed), that Chief Johnson was interviewed for the investigation in which Johnson was the subject.  Teague said he did not have first-hand knowledge that the chief *was* being interviewed, but heard "things" around the department one Monday that Johnson's office was blacked out, or his office door was closed.  When asked why this alone would lead him to believe the chief was being interviewed that day, Teague explained that someone said, "The chief is at city hall being interviewed."  (Teague later said it "sounded familiar" when I asked if he recalled someone also saying Chief Johnson was in a suit that day.)  Teague could not recall who made this statement, nor did he remember if either Captain Yoakum or Sgt. Simpson told him as well.

Next, I asked Detective Teague about going into Luz Barrett's office on the day Chief Johnson was interviewed.  Teague said he and Barrett have worked together many years and described their relationship as "professional."  Teague also said they only interact for business-related matters, and that "pretty much all" of his conversations with Barrett take place in her office.  Although he does not have a mail slot in Barrett's office, Teague said he goes to her office "once a week, if that," and does so if he's requested or to pick something up.

I asked Teague if he recalled going into Barrett's office the day Johnson was interviewed.  Teague said he did not remember doing so, but when asked if he recalled asking Barrett whether she had been interviewed, following a deep sigh, Teague replied, "That sounds vaguely familiar, yeah."  When asked why he did so, Teague answered, "I can't tell you why; out of curiosity, I guess," but denied his intent was to get

EXHIBIT 25
Page 95 of 144

information about the investigation.  Teague said he did not specifically remember asking Barrett this question on the day Johnson was not in his office, (and reportedly at the interview).

Teague said he could not remember if he went to Barrett's office because he knew Johnson was being interviewed, nor did Teague know if he went there specifically to ask Barrett if she had been interviewed.  Teague also said he did not remember any other reason why he would have gone to Barrett's office, nor did he recall Barrett's response when he asked her if she had been interviewed.

I asked Detective Teague if at the time he went to Barrett's office (asking if she had been interviewed) he thought it was a violation of the written directive he had been given, and he replied, "No."

I also asked Detective Teague about Captain Yoakum and Sgt. Simpson going into Barrett's office immediately after he left.  Teague essentially denied knowing that either person went to her office, (though he said Yoakum does so throughout the day), seeing Yoakum before he (Teague) went to Barrett's office or after he left, or having any conversation with Yoakum *about* going to Barrett's office.  When asked if Simpson knew he (Teague) was going to Barrett's office, Teague replied, "I don't know."  Teague also answered, "I don't recall," when asked if he had any conversation with Simpson before he (Teague) went to Barrett's office, or after he left.  Finally, Teague said he did not remember Yoakum, Simpson and him talking about going to Barrett's office before he did so.

Detective Teague and I then discussed the lunch at Pueblita Restaurant where other police department employees were reportedly present when the investigation involving Chief Johnson might have been discussed.  Teague said he had been to Pueblita three or four times, including when Sgt. Simpson was also present, (Teague had never been to Pueblita with Captain Yoakum).  When asked if he was at a lunch with other employees when the investigation was discussed, Teague replied, "I don't recall the investigation ever being discussed."  Teague did not remember asking anyone at a lunch gathering if they had been interviewed, or telling anyone that *he* had been interviewed.  Similarly, Teague did not hear Simpson tell anyone, including Teague, that he (Simpson) had been interviewed, nor did he remember Simpson asking anyone if they had been interviewed.

Finally, Detective Teague and I discussed the basic supervisor course he was initially scheduled to attend, but then told he could not.  Teague was in Captain Yoakum's office when Officer Clark came in and said there was an opening in an upcoming supervision course.  Yoakum knew Teague was on the (promotional) list and asked Teague if he wanted to attend.

Teague explained he was sixth on the list, and that the first four on that list has already attended the course.  Teague told Yoakum there was one person ahead of him, but Yoakum assigned him to attend nonetheless.

COU-00000528

The following week, while away at training, Teague was told by either Yoakum or Clark he would not be attending the supervision course because of staffing issues, (or something similar).  Teague did not believe the reason "fit," (i.e., that it was valid).

I asked Teague if he was aware Luz Barrett told Chief Johnson that Yoakum was sending him to the supervision course.  Teague said he had no idea Barrett was involved in the process, nor did he think she had anything to do with his participation being cancelled.

As the interview concluded I asked Teague if he had a department-issued cell-phone.  Teague said he did, but receives work-related text messages on his personal cell-phone as well.  Teague denied answering work-related emails on his personal phone or personal computer.  I directed Teague to not delete any work-related text messages or emails from his personal cell-phone and computer, or his business cell-phone and computer, until the investigation was complete.

For additional details, refer to the complete interview audio.

_Statement of Captain Anthony Yoakum, (6/7/17)_

I interviewed Captain Yoakum in a conference room at Upland City Hall.  Yoakum was represented by his attorney, Brandi Harper, (Castillo Harper).  The interview was recorded and later transcribed, and can be found in attachments 5[c] and 6[f], respectively.

Captain Yoakum has been a police officer with the City of Upland for about 29 years.  He has held his current rank for about three years, and for the last two years has been the only captain at Upland PD.  As such, he is second in command of the organization and essentially responsible for its day-to-day operations.  Because of his rank and the positions he has held, Yoakum has attended various Peace Officer Standards and Training (POST) certified courses, including _Internal Affairs Investigations, Basic Supervision, Management, Executive Development, Role of the Police Chief,_ and _Command College._

I asked Captain Yoakum if he was interviewed on 3/28/17 by Private Investigator Hackworth for an administrative investigation involving allegations against Chief Johnson.  Yoakum said he has been interviewed by P.I. Hackworth "a couple of times" for different investigations but could not recall the specific interview to which I referred.  However, when I showed Yoakum the interview notice from HR Manager Kelly Gonzales dated 3/28/17 he acknowledged that the signature was his.  Yoakum also said he reviewed the memo before he signed it.

Captain Yoakum told me he has conducted "more than ten" internal affairs investigations during his career, during which witnesses or subject officers were directed to not discuss the investigation with anyone.  Yoakum also said he personally has given such a directive.

94

EXHIBIT 25
Page 97 of 144

COU-00000529

Following a short break, the interview resumed, (*Captain Anthony Yoakum (2) June 7, 2017*).

I asked Captain Yoakum why witnesses and subject officers are directed to not discuss a pending investigation.  Yoakum said doing so "…protects the integrity of the investigation and helps to get to the truth and the facts of the matter."

Captain Yoakum said he could not recall telling anyone that he received the interview notice from Ms. Bragg or that he was interviewed for the Johnson investigation.  Yoakum also did not recall personally discussing the investigation with anyone, but said "a lot of people" in the organization were doing so.  When they did, Yoakum would direct them not to talk about the investigation.

*(During a subsequent interview on 7/6/17, Yoakum said he could not remember to whom these directives were given, or if they were even specific directives rather than simply re-directing the conversation.  He also estimated the number of people with whom he did so at "around ten.")*

Referring to the interview notice he received on 3/28/17 I read Captain Yoakum the paragraph that states, *"As investigations of this nature are confidential, you are not to discuss this matter or to provide or share a copy of this notice with any other person."*  I then asked Yoakum if telling someone he had been interviewed would be a violation of that directive.  Yoakum did not believe *telling* someone *he* had been interviewed would be in conflict with that particular directive in the notice, but said *asking* someone if *they* had been interviewed would be a violation because the latter was "discussing" the investigation.  Actually *discussing* the investigation, he continued, would also be a violation of the directive.

Now referring to the interview notice he signed in my presence, (i.e., for the investigation *I* was conducting), I asked Captain Yoakum if he told anyone he had received the notice or that he was being interviewed for the investigation.  I also asked Yoakum if he asked anyone whether *they* had been interviewed, or if he had otherwise discussed the investigation at all.  Yoakum essentially replied to all questions, "Not that I can recall."  Again Yoakum opined that asking someone if they had been interviewed or discussing the investigation would be in conflict with the directive.

I asked Captain Yoakum if he knew that Sgt. Simpson and Detective Teague were also interviewed by P.I. Hackworth for the Johnson investigation.  Yoakum said he did know, and explained that, because he is their supervisor, both Simpson and Teague told him they were being interviewed so he'd know where they would be and what they were doing.  Yoakum could not recall the extent of their discussions when he was told.

Captain Yoakum and I then discussed his relationship with various community members, including Steve Bierbaum.  Yoakum said he knows Bierbaum through various work-related community events, but the relationship has evolved somewhat with Bierbaum and other members of the Upland Coalition of Concerned Citizens, (UC3).  Yoakum said he and Bierbaum had spoken since he was placed on administrative

leave, doing so at an afternoon barbecue or gathering of several people, (per Yoakum, nobody else from the police department was at the event). Yoakum did not recall discussing with Bierbaum anything about the Johnson investigation, but he did say Bierbaum asked him about medical marijuana dispensaries in general, including the dispensary at which action was taken on 1/21/17, and the roles of law enforcement and code enforcement. Yoakum said he and Bierbaum also spoke about homelessness and Memorial Park – essentially issues on which UC3 was focusing – but he did not recall any discussion about the actions of Chief Johnson at the MMD incident on 1/21/17.

I also asked Captain Yoakum if he told Mr. Bierbaum he was being interviewed for the investigation *I* was conducting, and he replied, "No, sir, I don't believe I have."[54]

I asked Captain Yoakum if he also knew Rick Nutt. Yoakum said the name sounded familiar, but he did not know whether he and Nutt had actually met.

Next, I asked Captain Yoakum if he knew Dr. John Bunkers. Yoakum said he did, having met Dr. Bunkers at community events. Yoakum said he saw Dr. Bunkers "many times in many places," but they last spoke before he was placed on administrative leave. Yoakum did not recall having any conversation with Dr. Bunkers about the Johnson investigation after Yoakum received the interview notice from HR Manager Gonzales on 3/28/17, or about concerns with Chief Johnson that other employees had. (I did not ask Yoakum if he and Bunkers had such a conversation *before* 3/28/17.) Yoakum did not believe he had spoken with Dr. Bunkers since being placed on administrative leave.

At this point in the interview Ms. Harper raised concern that the notice Captain Yoakum received from Ms. Gonzales did not identify the medical marijuana dispensary or that Chief Johnson was the subject of the investigation being conducted. Also, at Harper's prompting, Yoakum said he never received any further notice that specified what the investigation encompassed. In response to Ms. Harper's comments, I asked Yoakum if he knew to what investigation the notice referred before he was interviewed. Yoakum said he did not know specifically, but had an idea the investigation was regarding, "Everything…I think (it) covered so many different topics," including the actions of Chief Johnson.

Captain Yoakum and I then discussed his relationship with former chief Steve Adams. Yoakum considers Adams a friend, and last spoke with him one day earlier, (on 6/6/17). Yoakum did not recall speaking with Adams about the Johnson investigation, nor did he believe that he told Adams he was going to be interviewed, or that he *had* been interviewed for that investigation. Yoakum also said although Adams knows he is on administrative leave, they did not discuss the investigation *I* was conducting, adding that even he (Yoakum) does not know what it's about.

---

[54] The transcript indicates Yoakum answered *"So, sir, I believe I have,"* to this particular question, (00:16:58 on page 27 of the *Yoakum (2)* transcript). However, after reviewing the audio, I determined Yoakum actually said, *"No sir, I don't believe I have."*

COU-00000531

Finally, I asked Captain Yoakum if he had spoken with Lt. Ansara since Ansara retired.
Yoakum said he received one text message from Ansara inviting him to a party, but that
was the only communication they have had.  Yoakum did not recall talking to Ansara
about the Johnson investigation.

I asked Captain Yoakum if he had spoken with any reporters after receiving the
interview notice from Ms. Gonzales on 3/28/17, or the notice he received for the
investigation I was conducting, and he told me, "No."

Recalling the lunch gathering at Pueblita Restaurant that reportedly occurred on
4/10/17, I asked Captain Yoakum if he had been to lunch with other police department
employees since the 1/21/17 MMD incident occurred.  Saying he infrequently has lunch
with other employees, Yoakum did not recall doing so when anything about the Johnson
investigation was discussed.

I asked Captain Yoakum if he knew when Chief Johnson was going to be interviewed
for the allegations against him.  Yoakum initially replied, "I don't remember," and then
added, "I could have known, but I don't remember if I specifically was told."  Yoakum
also said he did not remember Sgt. Simpson or Detective Teague telling him that
Johnson was being interviewed.

Next, I asked Captain Yoakum if he recalled going into Luz Barrett's office at about
11:35 on the morning of April 12th and asking if she was okay.  Yoakum said he has a
mailbox in Barrett's office and is typically there "a couple of times" each day, but did not
specifically recall doing so on April 12th.  However, Yoakum also said such a question
"sounds like" something he would ask because he cares about all of their employees.  I
then gave Yoakum more information about the reported interaction with Barrett, asking
if he recalled assuring her she *would* be okay.  Again Yoakum did not remember doing
so, nor did he recall asking Barrett if she had been, or was going to be interviewed,
whether on April 12th or at any other time since the 1/21/17 MMD enforcement action.

I also asked Yoakum if he recalled going into Barrett's office on the same day he knew
Johnson was being interviewed and he replied, "No, I don't recall that."  Yoakum also
said it did not "ring a bell" when asked if he recalled anyone saying the chief's calendar
was blocked out for the day, and that the chief was at City Hall being interviewed for the
investigation.  Yoakum denied knowing Detective Teague went into Barrett's office just
before he (Yoakum) did, and could not recall Sgt. Simpson going into Barrett's office
after Yoakum left. When asked if he saw Detective Teague that morning, Yoakum said
his office is located in the detective bureau so he would have seen "all of them,"
(referring to Teague and the other detectives), if they were at work on that particular
day.

I told Captain Yoakum that several people said "everybody knew" Chief Johnson was
being interviewed, not only because Johnson's calendar was blocked out and he was
reportedly at City Hall, but also because Johnson was in a suit and tie on that particular
day when he usually wears a uniform.  Yoakum said he has seen Johnson in a suit

EXHIBIT 25
Page 100 of 144

COU-00000532

"maybe twice in two years," but did not recall when he last did so.  *(The latter part of Yoakum's statement was made during a subsequent interview on 7/10/17.)*

Recalling that Information Technology Technician Rami Asad said Yoakum was one of only three people who had viewing rights to the appointments on Chief Johnson's calendar, (Johnson and Barrett being the other two), I asked Yoakum if he knew how to access the information in (Microsoft) Outlook. Yoakum said he did know how to view Johnson's calendar and the appointments therein, but did not recall looking at the calendar "specifically for (the) purpose" of knowing when Johnson was being interviewed.  I then asked Yoakum if he recalled looking at Johnson's calendar for *any* purpose and seeing Johnson was being interviewed. Yoakum said he "probably" looks at Johnson's calendar "daily" to see if they have meetings scheduled together, or where Johnson is so he can help him with anything he needs. Regardless, Yoakum continued, he had no specific recollection of the day Johnson was interviewed.

I then asked Captain Yoakum about his reported interaction with Barrett on 3/14/17.  I asked Yoakum if he recalled going into Barrett's office the day after receiving a Performance Improvement Plan (PIP) from Chief Johnson, and he replied, "No." Yoakum also did not remember having a conversation with Barrett in which he asked why she didn't warn him he was going to receive the PIP, nor did he recall saying to her, "I need to know whose side you're on."  (I asked Yoakum if he was sure he didn't tell Barrett he needed to know whose side she was on, or if he just didn't recall doing so, and he answered, "I don't recall saying that to her.")

Finally, I asked Yoakum if he recalled saying, "I'm drawing a line in the sand," or something similar.  Again Yoakum did not recall making such a statement, and said the remark about drawing a line in the sand was something Chief Johnson said to *him*. Yoakum recalled Johnson was talking about his (Johnson's) investigation, during which Johnson said if "they wanted a war," he was "drawing a line in the sand."  Yoakum could not recall the specific date on which this conversation with Johnson occurred, but believes it was after he received the PIP.  Yoakum explained he and his attorney met with Johnson to discuss the PIP, and Johnson agreed to set the PIP aside in favor of weekly meetings with Yoakum.  Yoakum believes it was during one of those meetings when Johnson used the phrase, *"Drawing a line in the sand."*

*(During a subsequent conversation with Chief Johnson on 7/10/17 I asked if it was possible that he, [Johnson], used the phrase, "Drawing a line in the sand." Johnson said he has used that phrase many times, and possibly did so when having a conversation with Yoakum in which the investigation against him, [Johnson], was mentioned, but not discussed.)*

Throughout the interview Yoakum either denied, or said he did not recall, making other statements to Barrett as well.  For example, Yoakum did not recall telling Barrett, (or anyone else), "either he goes or I go," (referring to Chief Johnson), nor did he recall telling Barrett he was not going to ask her to do anything illegal.  Yoakum also did not recall going into Barrett's office and asking for information that would lead her to believe

COU-00000533

he wanted to get Chief Johnson in trouble, nor did he recall Barrett telling him she was not going to help in response to his request.

Recalling another one of Barrett's statements, I asked Yoakum if he ever asked the code enforcement officers to keep a log of tasks Chief Johnson asked them to do. Yoakum did not believe he asked the code enforcement officers to keep such a log, but did say there had been many times where Johnson asked employees under Yoakum's supervision to do something without Yoakum knowing. Yoakum also said it was possible he asked the code enforcement officers to let him know if Johnson assigned a task so he could help them "keep on top" of whatever they had to do.

Recalling the statement made by Code Enforcement Officer Desiree Shiflett, I asked Yoakum if he ever said to any employee, "I'm trying to get someone fired; after I get that person fired, everything will be okay," or something similar. Again Yoakum did not recall doing so, and remarked that such a statement did not sound like something he would say. Yoakum also did not recall making any statement to any employee that could lead that person to believe he (Yoakum) was trying to get Chief Johnson fired, but agreed that doing so would be inappropriate.

I also asked Captain Yoakum if he ever said to another employee, "At least I didn't do anything illegal," or something similar. Once again, Yoakum said, "No, I don't believe I've ever said that."

Next, I asked Captain Yoakum if he ever made a statement similar to, "There are lots of problems, but I don't know if there are solutions with him as chief"; Yoakum did not remember doing so.

Finally, I asked Captain Yoakum if he had ever made statements that were critical of Chief Johnson, Johnson's policies, or the organization in the presence of subordinates, (essentially, everyone else in the organization). Yoakum did not recall making any such statements and explained people came to his office on a regular basis, ("Weekly, if not daily"), to complain. When they do, Yoakum said, he tries to "steer them back" in a positive direction, adding that he has been nothing but supportive of Chief Johnson and has pushed Johnson's mission and vision to the troops every day. Yoakum also said he did not recall making any statements critical of Chief Johnson or Johnson's policies to Steve Bierbaum, Dr. Bunkers, or the media.

Referring to the joint UPOA/UPMA meeting that was rumored to have been recorded, I asked Captain Yoakum if he was at that meeting. Yoakum said he was, but had no idea if the meeting *was* recorded. Yoakum recalled a meeting with Chief Johnson and Sgt. Simpson, (though not the date), at which this was one of many topics discussed, but he could not recall who said what. Yoakum also said he did not have any conversation with Simpson about the recording subsequent to their meeting with Johnson.

Captain Yoakum and I then discussed the MMD enforcement action on 1/21/17. I asked Yoakum if he went to the police station before going to the scene but he did not recall doing so. Yoakum also did not remember having a conversation with Detective

COU-00000534

Stanley, either before going to the scene or sometime thereafter, in which he made the statement, "I'd fire you if you did this."

Referring to a discussion about what the dispensary operators should be charged with that reportedly occurred at the scene, I asked Yoakum if Chief Johnson suggested arresting them for 166.4 PC, (violation of a court order). Yoakum said Johnson did make such a suggestion, but he could not recall the discussion that followed, or who was present during that discussion. Yoakum also said the suspects were eventually arrested for violation of the municipal code, but he could not remember how that decision was made. I asked Yoakum if at the time of their discussion he (Yoakum) was aware department policy essentially prohibited custodial arrests for municipal code violations. Yoakum said he was not aware of the policy at that time, but was later directed by Chief Johnson to change the policy. Yoakum did not know if anybody told Johnson about the policy while at the scene.

I then asked Captain Yoakum if he recalled a meeting in the detective bureau the week after the 1/21/17 MMD enforcement action. Yoakum did not recall the meeting, nor did he recall making a statement similar to, "If I did that, I would be fired" in the presence of anyone else.

*(During a subsequent interview on 7/10/17, I broadened the question somewhat, also asking Yoakum if he made a statement similar to, "If I did that, I'd be sitting at home waiting for a termination letter." Again Yoakum said he did not recall making such a statement.)*

Following a brief break, the interview resumed, *(Captain Anthony Yoakum (3) June 7, 2017).*

Referring to the DVR seized during the MMD enforcement action, I asked Captain Yoakum if he knew that Chief Johnson intended to view contents of the DVR when Johnson asked him to retrieve it. Yoakum said he did know Johnson wanted to view the contents, but at that time Yoakum did not think about the need for a warrant to do so, saying, "It didn't even cross my mind." At some point after contents of the DVR were viewed Yoakum was made aware that a warrant *was* required. Had Yoakum known a warrant was necessary at the time Johnson requested the DVR, Yoakum explained, he would have told him.

Captain Yoakum and I also discussed the basic supervision course Detective Teague was scheduled to attend. Yoakum said he told Officer (Alaina) Clark to register Teague for the course, and at some point thereafter, Teague's participation was cancelled. Yoakum did not know who told Teague he could not attend, (Clark or him).

I asked Yoakum if Teague was upset that he could not attend the course. Although he and Teague discussed the issue when Yoakum returned to work, Yoakum did not remember if Teague was upset about the cancellation. When asked if he told Teague that Luz Barret informed Chief Johnson Teague was scheduled to attend the course,

Yoakum essentially said no, explaining that he (Yoakum) had no idea how information about Teague's enrollment got back to Johnson.

*(During my audit of Yoakum's City email account I found an email he received from Luz Barrett on 3/30/17 asking him to inform Teague that Teague will not be attending the supervision course.  A copy of the email can be found in attachment 2[w]vii.)*

As the interview continued I asked Captain Yoakum about several emails I found during an audit of his City email account.  I showed Yoakum and his attorney each email we discussed.

First, we discussed the two-page email dated March 17 from Chief Johnson to Yoakum, subject, *"Leadership Development,"* (attachment 2[w]iii), and a subsequent email sent from what appeared to be Yoakum's personal email address to Yoakum's City account dated March 19 with the subject, *"More Paperwork,"* (attachment 2[w]v).  Yoakum explained Chief Johnson sent him a captain daily "To-Do" list, and the six-page document attached to the subsequent email was a list Yoakum began to create in response.  Yoakum said he and Johnson did not get the opportunity to discuss the list.

Next, I asked Yoakum about the email also apparently sent from his personal email address to his City account dated 3/19/17, and with the subject, *"Paperwork,"* (attachment 2[w]iv).  Attached to that email was a two-page document titled, *"Confidential 3."*

At Captain Yoakum's request we took another break, and resumed the interview about five minutes later, *(Captain Anthony Yoakum (4) June 7, 2017).*

Before our discussion about the two-page attachment began, Ms. Harper said the document to which I referred, and specifically the page titled, *"Possible ideas to deal with Chief,"* contained some attorney/client communication copied from one document and pasted into the document found in Yoakum's email.[55]

Referring to that document, I told Captain Yoakum the comment, *"Document everything"* was self-explanatory, but then asked what he meant by, *"Overburden him."*  When I did, Ms. Harper interjected, asking Yoakum if he authored the document on his own.  Yoakum said he did not, and instead got the information, in part, from his attorney.  Yoakum could not recall specifically what he wrote, which ideas were his, (as opposed to those given to him by his attorney), or what his intent was behind the comment, *"Overburden him."*  I asked Yoakum if he did anything in furtherance of "overburdening" Chief Johnson and he replied, "No, not that I'm aware of."  I also asked Yoakum if he ever did anything in furtherance of a work slow-down, (another idea on the list), and he replied, "No."

---

[55] The document lacked any indication it was an attorney/client privileged communication.

EXHIBIT 25
Page 104 of 144

*(Later in the interview, when talking about how he felt "under the microscope" for
everything, Yoakum said "overburden him" likely meant he was going to document
every comment made by every person with whom he came in contact.)*

I asked Yoakum to what his entry *"Gucklick and the Sentinel"* referred.  Yoakum
explained Gucklick is a writer for *The Sentinel* publication, and although contacting him
was one of the ideas suggested, he did not do so.

Finally, I asked Captain Yoakum about his reference to *"PIU."*  Yoakum said PIU is the
Public Integrity Unit at the District Attorney's office.

Next, I asked Captain Yoakum about two pictures of interview questions for the Police
Lieutenant promotional exam I found in his email.  Yoakum could not recall why he had
the questions, perhaps other than to facilitate future promotional examinations, and
answered emphatically, "Oh, God, no," when asked if he shared the questions with
anyone not authorized to have them.  (The pictures were not investigated further nor
used as the basis for any findings, so I did not include them in my report.)

I asked Captain Yoakum if he was trying to get Chief Johnson fired.  Responding, "No, I
was not," Yoakum went on to share how his relationship with Johnson evolved.  Initially,
Yoakum explained, and despite some opinions to the contrary, he was excited that
Upland had selected a chief from LAPD.  Yoakum dismissed negative comments from
others and welcomed Johnson "with open arms."

Yoakum said he has done nothing but support Johnson since he was appointed chief,
again, despite the frequent complaints from others.  In February or March, when he was
served with the PIP, Yoakum said Johnson suddenly changed, and apparently felt
Yoakum was his "enemy."  "Does something need to change," Yoakum asked
rhetorically; "Yes, (but) firing him is not the solution."

I told Captain Yoakum it was apparent from my conversations with people in his
organization that he was generally well-liked and respected.  However, I explained, the
statements made by those same individuals – statements about which I asked him
during the interview – were said with certainty.  Yoakum again said he did not recall
making those statements, but agreed it was inappropriate for the second in command of
an organization to do so in the presence of subordinates.  It wasn't until the end of
February or early March, when in his opinion he started to be attacked, Yoakum said,
that he became very defensive and worried about his own future.

Finally, I asked Captain Yoakum if he spoke with Lt. Mathews about receiving the PIP
and being unhappy with it, and he replied, "I might have."

As the interview concluded I asked Captain Yoakum to change the password on his
department-issued cellphone so I could access text messages, which he did.  Yoakum
has had a department-issued phone for a couple of months, and before that

**EXHIBIT 25**

COU-00000537

occasionally used his personal phone for work-related emails and texts.[56]  I asked Yoakum to refrain from deleting any work-related emails or text messages from his personal cell phone and computer until the investigation was complete.

_Statement of Sgt. Marcus Simpson, (6/7/17)_

I interviewed Sgt. Simpson in a conference room at Upland City Hall.  Simpson was represented by his attorney, Michael McCoy, and the interview was recorded and later transcribed, (attachments 5[b] and 6[g], respectively)[57].

Sgt. Simpson was first hired as a police officer by the City of Upland in 1994.  In 2000 Simpson left Upland and was hired by the San Bernardino County Sheriff's Department, where he remained until returning to Upland in 2008.  After returning to Upland PD Simpson was promoted to detective and then sergeant, and has held that position for about three years.  Before being placed on administrative leave (on 4/19/17) Simpson supervised the detective bureau, but had done so for about four to six weeks only.  Prior to that assignment, Simpson was a patrol supervisor and also responsible for the CRO team.

Sgt. Simpson said he has attended both the Peace Officer Standards and Training (POST) basic supervision course and the POST internal affairs (IA) investigations course.

I showed Sgt. Simpson the interview notice he received from (then) HR Manager Tanya Bragg.  The notice was dated 2/24/17 and directed Simpson to appear for an interview with Private Investigator John Hackworth on 2/28/17.[58]  Simpson identified the signature as his and said he signed the notice on the date he was interviewed.

I asked Sgt. Simpson if he had ever personally conducted an internal affairs investigation as a supervisor.  Simpson said he had, estimating he had conducted fewer than ten such investigations in less than three years.  As part of those investigations, Simpson said, he personally has ordered witnesses and subject officers to not discuss the investigation with anyone, doing so both verbally and in writing.[59]  When asked why witness or subject employees are ordered to not discuss an investigation, Simpson replied, "Before the interview, that's the important part, so you don't get polluted statements from the involved parties."[60]

---

[56] During my audit of Captain Yoakum's City email account I found an email from Yoakum to IT Technician Asad dated 3/13/17 asking Asad for a work cell phone.  I did not include a copy of that email in my report.

[57] The interview also included questions relevant to a separate administrative investigation, (UPD IA 05-17). However, I have included both the interview audio and the transcript in their entirety.

[58] When I first referred to the interview notice I erroneously identified the date as 3/1/17.

[59] During an audit of Simpson's City email account I found an email and memo dated 3/10/17 in which Simpson advised Sgt. Robert Steenerson he (Simpson) was investigating a citizen complaint to which Steenerson was a witness.  In that memo, Simpson directed Steenerson to not discuss the matter with anyone "other than supervisors or (his) representative."  A copy of the email and memo can be found in attachment 2[x]i.

[60] The transcript indicates Simpson answered, _"Before [UNINTELLIGIBLE] part...,"_ (Sgt. Marc Simpson (1-2) June 7, 2017, page 58, 00:49:13).  When I reviewed the audio I determined Simpson answered, _"Before the interview, that's the important part..."_

COU-00000538

I asked Sgt. Simpson if he told anyone he received the interview notice from HR Manager Bragg dated 2/28/17, and he replied, "No." However, when I asked Simpson if he told anyone he had been interviewed for the investigation, he hesitated, and then deferring to Mr. McCoy, asked, "I think this is union business?" McCoy said it was, and then argued that as president of the Police Management Association, (UPMA), Simpson may have had such a discussion while conducting union business. McCoy also argued that the interview notice from Ms. Bragg was an unlawful order because Bragg was not in Simpson's chain of command.

In an attempt to determine if Simpson told anyone he was interviewed for the investigation, and now that Mr. McCoy had raised the issue, whether such a conversation occurred for purposes other than conducting union business, I asked the question once again. In response, Simpson said, "Yeah, I told people." When asked who he told, Simpson said he did not remember because he had spoken with so many people about the chief, and received so many complaints. Simpson also said he was "ordered – or asked" by the city manager to speak to people about the investigation. I then asked Simpson if everyone he told that he had been interviewed was on the UPMA board, and again Simpson said he did not remember.

Next, I asked Sgt. Simpson if telling someone he had been interviewed would be in conflict with the directive in the memo he received from Ms. Bragg. I read Simpson the paragraph to which I referred, which states:

> *"As investigations of this nature are confidential, you are not to discuss this matter or to provide or share a copy of this notice with any other person including employees of the city except for your representative."*

When I read the paragraph Simpson said he never received a copy of the notice, and therefore he could not have given anyone a copy. Pointing out that he knew when to show up for the interview, I asked Simpson if he read the notice before signing it; Simpson said he did. I again asked Simpson if he thought that telling someone he had been interviewed would be in conflict with the directive, and once again he did not answer the question. Instead, Simpson remarked there is established case law that indicates the order was illegal.

I asked Simpson the question a third time. Simpson replied, "It's not a yes or no answer," and spoke about three separate meetings he and other board members had with the city manager, (Thouvenell), in which they were directed to "seek out complaints" and have people write memos about issues with Chief Johnson.[61] Simpson also said these meetings occurred before he signed the interview notice. When I asked what would be the purpose of telling someone he had been interviewed if he was soliciting input, Simpson said Thouvenell also told them he wanted to "make sure people were comfortable."

---

[61] Although he did not identify the city manager by name, based on other statements Simpson was referring to City Manager Martin Thouvenell.

COU-00000539

Sgt. Simpson could not recall the meeting dates but said he was told (by City Manager Thouvenell) to solicit input from other employees before he was interviewed (by P.I. Hackworth).[62]  Simpson also said he was part of the complaint (against Chief Johnson), explaining that Detective Wyman gave him (Simpson) a memo.  Simpson, in turn, wrote a memo as well, and gave it to Lt. Ansara.  "Eventually," (though again he could not recall the date), Simpson, Ansara, and Detective Teague met with Thouvenell.

*(During a subsequent interview on 7/6/17, Simpson said Thouvenell's directive to solicit input was given verbally.)*

During their meeting with City Manager Thouvenell, Simpson said Thouvenell told them he was prepared to "get rid of" Chief Johnson, but needed them to "gather information and give it to the investigator and him."  When Lt. Ansara[63] asked Thouvenell about the chain-of-command, Thouvenell told them he "didn't care about that stuff," and again said he wanted them to get information.[64]

Recalling that he was interviewed three times for the investigation, Simpson told me not all meetings with City Manager Thouvenell were held before his interviews occurred.  Simpson also said Thouvenell knew he was interviewed and wanted him to continue soliciting input, which Simpson did.

I asked Sgt. Simpson if he asked anyone if they had been interviewed for the investigation.  Simpson initially replied, "Yeah, it came up," but when asked for additional information, he said people often talk to him about their complaints against Chief Johnson, and therefore he could not remember if he had asked others if they were interviewed.

I also asked Simpson if he discussed the investigation with anyone.  Simpson replied, "Union-wise," but did not directly answer my follow-up question asking if everybody with whom he discussed the investigation was on the association board.  Instead, Simpson replied, "We talked, the POA board talked about it, yes."  When pressed further, and asked specifically if he discussed the investigation with anybody other than association board members, Simpson replied, "Yes, we had discussions if people had been interviewed because we were trying to get them through the process."  I clarified with Simpson that my question was whether he had *discussed* the investigation with anyone, and he replied, "Not that I recall."

Sgt. Simpson and I then discussed the input he was reportedly asked to solicit.  I asked Simpson if he actively sought input, contacting employees who he knew had complaints

---

[62] Sgt. Simpson was interviewed by P.I. Hackworth on 2/28/17, 3/13/17, and 4/3/17.

[63] The transcript indicates Sgt. Simpson said *he* asked City Manager Thouvenell about the chain-of-command. Upon reviewing the interview audio, I determined Simpson said, *"Lt. Ansara asked him about the chain-of-command,"* (page 67, Sgt. Marc Simpson (1-2) June 7, 2017, 00:57:29, line 5).

[64] Line (7) at 00:57:29 in the transcript indicates Simpson said, *"He explained that we're gonna type memos."* After reviewing the audio, it sounds like Simpson actually said, *"We explained to him we'd get him typed memos,"* (page 67, Sgt. Marc Simpson (1-2) June 7, 2017).

EXHIBIT 25
Page 108 of 144

COU-00000540

about Chief Johnson, or if he waited until they brought their complaints to the attention of an association board member.  Simpson said he knew certain officers had complaints so he contacted those individuals.  Simpson did not know how many people he contacted but said he had about sixty pages of complaints.  During those conversations, Simpson explained, it came up that he had been interviewed, but details about the investigation were not discussed.

I asked Sgt. Simpson if he believed that sharing with others, questions he was asked, answers he gave, or complaints he raised during his interview would be a violation of the written directive he received.  In response, Simpson answered, "Not based on what the city manager told us."

In an attempt to illustrate for Sgt. Simpson the difference between simply gathering input for complaints against the chief versus discussing the investigation, I offered a hypothetical scenario.  Specifically, I told Simpson that approaching someone who he knew had a complaint against the chief, telling that individual he (Simpson) had been interviewed for an investigation, and then sharing the complaints that were discussed during the interview was much different than simply asking someone to share their own complaints, (though the actual scenario was even more detailed when presented).  Simpson said he believed sharing this information was "part of the solicitation" so people would feel comfortable:

> *"I think that's part of the solicitation…so you can get people to feel comfortable, to know what to say, to feel that they're not going to put themselves out on a cliff by themselves.  So giving them non-specific, 'Hey, there's been issues about a marijuana dispensary, and that was brought up.  You can feel free to talk about it. It's just not gonna be you.'"*

Referring to the conversations in which he solicited input (about complaints against Chief Johnson) from officers, I asked Sgt. Simpson if he shared information that was discussed during his interview with P.I. Hackworth.  Answering, "I can't give absolutes," Simpson said he did not do so in every conversation, but added, "There (were) times that, yeah, I'm sure that something was brought up."

Following a ten-minute break the interview resumed, *(Sgt. Marc Simpson (2) June 7, 2017).*

As the interviewed continued, Simpson clarified his previous statement about the extent of information shared with other officers when soliciting input, now saying it was essentially limited, (e.g., "If you have a complaint, it's part of the investigation; feel free to talk about it.")  When I told Simpson this was somewhat different than his previous answer, in which he said he had shared with those officers details of his Hackworth interview, Simpson replied, "Within the confines of POA and PMA people."  I explained to Simpson he was clearly referring to officers from whom he was soliciting input, and reminded him he said he shared with those individuals details of his own interview.  In response, Simpson replied, "I don't remember saying that, but – I'm saying that I wanted to set them at ease about some of the issues, that we had similar complaints."

Next, I asked Sgt. Simpson if he knew that Captain Yoakum and Detective Teague were also interviewed for the investigation. Simpson said he knew a lot of people were interviewed, but he did not know Yoakum and Teague were even involved in the investigation. However, when I then asked Simpson if either Yoakum or Teague told him they had been interviewed, Simpson answered, "It may have come up in POA and PMA business," (Teague is president of the UPOA). Following a brief exchange about the discrepancy in his answers, during which Simpson rationalized his response that knowing about the interview was "confidential information," Simpson said he did know they were interviewed.

Sgt. Simpson and I then discussed conversations he might have had with various members of the community. First, I asked Simpson if he knew Steve Bierbaum. Simpson said he did, and explained they met in September 2016 when Bierbaum was upset about homeless issues. Simpson said he last spoke with Bierbaum about two weeks before our interview, but he did not recall who initiated the conversation. Bierbaum wanted to know how Simpson was doing.

I asked Sgt. Simpson if he talked to Mr. Bierbaum about the investigation in any way after receiving the interview notice from HR Manager Bragg, and he replied, "No."[65]

I also asked Simpson if he told Bierbaum he was being interviewed for the investigation in which he (Simpson) was the subject, and he told me, "No." Referring to an article about the investigation that appeared in *"The Sentinel,"* (in which Bierbaum was quoted), I asked Simpson if he had any conversation with Bierbaum about being placed on administrative leave or the underlying investigation. Simpson said Bierbaum knew he was the subject of an administrative investigation, (though Simpson denied telling him), but Simpson had nothing to share because he did not know what the investigation was about.

I asked Simpson if he has ever made statements to Bierbaum that were critical of Chief Johnson, his policies, his actions, or the department. Simpson replied, "No…as a police officer, in that capacity, I have never ever been critical about the chief. I'm not gonna say something bad while I'm in uniform acting as a department representative." I then re-phrased my question to include comments he made as a private citizen during conversations with Bierbaum. Simpson replied, "No, we don't talk; he just wants to see how I'm doing." Simpson did say Bierbaum has been upset with Johnson's actions, but denied telling Bierbaum that "80 percent of the department was prepared to vote 'no confidence' in the chief, (a statement attributed to Bierbaum in *"The Sentinel"* article).

Next, I asked Sgt. Simpson if he knows Rick Nutt. Simpson said he does, but has spoken with him only twice, including once when he saw Nutt in a restaurant "months ago." Simpson said he has not spoken with Nutt about the investigation.

---

[65] The transcript indicates Sgt. Simpson answered, *"Might have talked to him about it,"* (page 89, 00:08:11, Sgt. Marc Simpson (1-2) June 7, 2017). However, when I reviewed the audio, I determined Simpson actually said, *"I didn't talk to him about it."*

COU-00000542

I also asked Sgt. Simpson if he knows Dr. John Bunkers.  Simpson said he met Dr. Bunkers during a citizens academy, and they last spoke in December 2016 or January 2017, (before the Johnson investigation was initiated).

Assuming that Sgt. Simpson knows former chief Steve Adams, I asked Simpson if he and Adams talk to one another on a regular basis.  Simpson said Adams contacted him about two weeks earlier to see how he was doing, but before that they had not spoken in years.  They have spoken several times since, during which Adams essentially reassured Simpson what he was going through would "work its way through," but they did not discuss the investigation.  Simpson also said they never talked about Chief Johnson during their conversations.

Finally, I asked Sgt. Simpson if he had spoken with Lt. Ansara since Ansara retired. Simpson said they spoke one day earlier, (6/6/17), but he did not tell Ansara he was being interviewed.  Simpson did tell Ansara he had been interviewed for the Johnson investigation, (and vice-versa), but they did not discuss what was asked or said during their interviews.  Ansara was aware of the complaints against Chief Johnson because he was the UPMA president at the time, and because he was present during the first meeting with City Manager Thouvenell.  Again Simpson could not recall the date on which that meeting occurred, but said it was before the Johnson investigation was initiated.  (Simpson also said the second and third meetings with Thouvenell were attended by Simpson, Lt. Blanco, and Detective Teague, and occurred *after* Simpson was interviewed.  In each meeting, Thouvenell told them to gather information.)

I asked Sgt. Simpson if he had spoken with any reporters after he received the notice for either his 2/28/17 interview with P.I. Hackworth or for his interview with me, and he told me, "No."

As the interview continued I asked Sgt. Simpson if he ever made comments that were critical of Chief Johnson or Johnson's policies in the presence of subordinates. Simpson said if given a roster of the police department, everyone has been critical of Johnson.  I then re-phrased my question, asking Simpson if he was critical of Johnson while soliciting input from the officers.  Simpson replied:

> *"I would say I didn't have to criticize him because what he had done criticized…if we said the chief had done – the chief broke the law on this, or the chief, the tactics at the marijuana dispensary, are you familiar with that?  That's being critical, but – not that – I'm not saying I was critical, but by just – by, by mere talking about it's critical of the chief because you're implicating, insinuating that he's done something wrong."*

*(During a subsequent interview on 7/6/17 I asked Simpson about his comment, "The chief broke the law."  Specifically, I asked Simpson if during any of his conversations with employees from whom he solicited input, he told them that the chief broke the law, and he replied, "Not that I remember.")*

COU-00000543

I asked Sgt. Simpson if he ever made a statement similar to, "There are lots of problems but I don't know if there are solutions with him as the chief." Simpson told me he has made a lot of statements, so he could not answer "Yes" or "No."

Next, Sgt. Simpson and I discussed the lunch that reportedly took place at Pueblita Restaurant on 4/10/17. Simpson said he often has lunch with other police department employees, including detectives, and has been to Pueblita Restaurant. I asked Simpson if he recalled having lunch with co-workers when the Johnson investigation was discussed, initially referring to the specific date, but then asking if such a discussion occurred during *any* such lunch; Simpson replied, "No." I then narrowed my question, asking Simpson if during lunch with co-workers he asked any employee if they had been interviewed for the investigation involving Chief Johnson. In response, Simpson answered, "I'm not gonna deny it, I don't recall specifically." Simpson then denied asking Cadet Holzer if *she* had been interviewed, saying, "I've never really talked to her," and again remarked that he has had *many* conversations. Simpson said that, "Except for civilian employees – I really don't talk to them," at some point he has spoken with most employees on the department about complaints again Chief Johnson.

I asked Sgt. Simpson if he knew when Chief Johnson was interviewed for the investigation and he told me, "No." I then re-phrased my question and asked Simpson if he knew Johnson was going to be interviewed on a certain day. Simpson was not certain, but thought "Luz" (Barrett) told him Johnson was going to be "out of the office being interviewed." Simpson also said neither Captain Yoakum nor Detective Teague told him Johnson was being interviewed.

I also asked Simpson if he remembered anyone saying that the chief was in a suit, his calendar was blocked out for the day, and he was going to be at city hall, and therefore they assumed he was being interviewed. Simpson said he did not know who has access to Johnson's calendar, and had "no idea" about the statements that were reportedly made. When Simpson also said he personally does not have access to Johnson's calendar, I pointed out it was possible for anyone to see that *any* employee is blocked out for a given time. Simpson essentially said he was unfamiliar with that feature in Outlook.

Next, Sgt. Simpson and I discussed the reported interactions with Sr. Administrative Assistant Barrett.

Simpson told me has worked with Barrett for a couple of years, and though they do not socialize with one another off-duty, they do occasionally engage in casual conversation. Simpson has a mail slot in Barrett's office and checks it once a day.

I asked Simpson if he went into Barrett's office on the day Chief Johnson was interviewed and asked her how *her* interview went. Simpson replied, "No," saying he never talked to Barrett about her interview. I then asked if he recalled talking to Barrett about the turmoil the situation in the department has caused. Simpson said he did recall such a conversation, saying Barrett actually brought it up.

COU-00000544

When asked what he thought Barrett meant by, "this situation," Simpson spoke about previous conversations he and Barrett had.  Simpson said Barrett told him she dreads coming to work, goes home crying, and could not envision herself working for Chief Johnson any longer.  Barrett also told him that her loyalty was to the office of the chief, and not to the chief himself.

Simpson said he and Barrett also had a conversation about two months prior in which Barrett said either the chief had to go, or "a bunch of us" had to go.  I asked Simpson if he ever made a similar statement to Barrett, saying, "Either the chief goes or I go," and he said, "No, I never said anything like that, not once."

Simpson also told me that during his conversation with Barrett he told her he could let "bygones be bygones" and work with the chief.  In response, Barrett reiterated, "I don't think that's gonna happen; it's not going good."

Pointing out that he went to Barrett's office once a day, (per his earlier statement), I asked Simpson if he did so on a day when he knew Chief Johnson was being interviewed.  Simpson said he had no idea when Johnson was being interviewed, and also denied telling Barrett he knew Johnson was being interviewed.

I asked Sgt. Simpson if he knew Captain Yoakum and Detective Teague went into Barrett's office before him on that same day and he replied, "No."  Simpson also did not recall having a conversation with Yoakum and Teague about Chief Johnson being interviewed, and denied that he, Yoakum and Teague talked about going to Barrett's office to get information about the interview or find out if she had been interviewed.  So, too, did Simpson deny talking to Yoakum or Teague about any conversations *they* had with Barrett.

Next, I asked Simpson about the reported interaction that occurred on 4/3/17.  I asked Simpson if, during the first part of April he recalled telling Barrett he needed to speak with her, and then having a conversation with her an the break room.  Simpson did recall such a conversation, and answered "Yes" when asked if he spoke with Barrett to solicit input on behalf of the city manager.  Simpson also said they were alone during the conversation, which lasted about fifteen to thirty seconds.

During their conversation Simpson told Barrett he knew she had some issues with Chief Johnson.  Simpson also told Barrett he mentioned her during his interview, and that she should feel comfortable talking to the investigator about what was going on.  Simpson did not recall Barrett asking him why she should be expecting a call for an interview.

Simpson also did not remember telling Barrett something similar to, "It was because of copies you made and gave to an officer's attorney" during their conversation.  I asked Simpson if he had some concern that documents provided to an attorney were incomplete.  Simpson did have such a concern, but said he and Barrett had that discussion months earlier.  Barrett gave Simpson documents she had prepared for a Skelly hearing.  Simpson asked Barrett where the rest of the documents were, to which she replied, "I'm just doing what I'm told."  I asked Simpson if *he* told Barrett in any

COU-00000545

conversation, whether on 4/3/17 or months prior, that he knew she was just doing what she was told. Simpson replied it was Barrett who made such a statement.

I also asked Simpson if he recalled telling Barrett something about recordings from the MMD enforcement action (on 1/21/17); Simpson said he had no idea what the statement was about. Knowing that "everyone in the department" was talking about the 1/21/17 MMD enforcement action, (based on other witness statements), I then asked Simpson if it was a safe assumption that any conversation with Barrett about an MMD incident would have referred to that particular event. In response, Simpson said, "I don't even remember having a conversation with Luz."

Next, I asked Simpson if he remembered having *any* conversation with Barrett about the MMD enforcement action. I also asked Simpson if he told Barrett that he or "they," (referring to the detectives), knew she was directed by Chief Johnson to put the DVR in another office so he could do something with the video. Again Simpson answered, "No," saying:

> *"I had no idea about that. I just – wasn't even involved in the DVR or having information about the DVR and how it all unfolded and how it ended up in the office, and everything that went down with it."*

It was my understanding Simpson was aware of concerns about the DVR so I was surprised by his response. I asked Simpson if he was told the DVR was in Sgt. Tseng's office, and he answered, "Yes." Simpson also told me he was familiar with concerns about the DVR, but denied having any conversation with Barrett about the DVR, recordings, or anything similar.

Sgt. Simpson and I also discussed his role at the MMD enforcement action on 1/21/17. Simpson said he was at the scene, and acknowledged he had concerns about the way it was handled. I asked Simpson if there was discussion at the scene about what the suspects should be charged with. Simpson said such a discussion did occur, during which Chief Johnson said he wanted to arrest for 166.4 PC, (violation of a court order). When they told Johnson an arrest for 166.4 PC could not be made, he essentially said the suspects would be taken to the station. After questioning, if it could be proven the suspects had knowledge they weren't supposed to be in the dispensary, they would arrest them for 166.4. Simpson said he was not present when the discussion about arresting for municipal code violations occurred, but did not know department policy essentially prohibited custodial arrests (for violations of the municipal code), until sometime after the incident.

Next, Sgt. Simpson and I briefly discussed his concerns about the DVR. Simpson said there were several concerns, including chain-of-custody issues and that Chief Johnson was violating the law by viewing the contents without a warrant, (which Simpson knew was required). Simpson said Detective Wyman brought the concerns to his attention and wrote a memo about his observations. Simpson wrote a memo as well, which went to Lt. Ansara. I asked Simpson if Ansara directed him to not discuss the matter with anyone, and he replied, "I don't really think so."

COU-00000546

I asked Simpson if he recalled having a conversation about the DVR with Ansara and others when Lt. Mathews entered the room, and Ansara told Mathews, "You probably don't want to be a part of this." Simpson said he did not recall such a conversation.

I also asked Sgt. Simpson if he recalled having a conversation with one or more of the code enforcement officers about whether Chief Johnson's actions at the medical marijuana dispensary enforcement action were appropriate. Simpson said he called CEO Marsie Grady on the day of the incident and asked her about the municipal code, also telling Grady he wasn't sure if it was the right thing to do. Grady agreed with Simpson and told him the city attorney said the same thing, (i.e., not to arrest), to Chief Johnson. Simpson did not remember if he specifically asked Grady if she thought what Johnson did was appropriate, but denied discussing with her Johnson's tactics during the incident.

I asked Simpson if he recalled a meeting in the detective bureau the week after the medical marijuana dispensary enforcement action occurred, or any meeting in which he was critical of Chief Johnson's actions during that incident. Although he did not recall such a meeting in the detective bureau, when asked if the issue came up in *any* meeting, Simpson replied, "Yeah, we've all been critical – everyone has been critical."[66] Simpson could not remember specifically what he said, nor did he recall if the comments were made during a UPOA/UPMA meeting, adding, "Yes, I have been critical of the chief's actions in the POA and PMA meetings."

Next, I asked Sgt. Simpson if he recalled asking Officer Clark what Chief Johnson was doing to "stress her out," or something similar. Simpson said he did recall the conversation and explained it was more information gathering after meeting with the city manager. Nobody else was present when the conversation occurred.

I also asked Sgt. Simpson if he recalled approaching Administrative Assistant Jackie Crandall at her desk, asking if she was okay, and then asking her what was happening in the chief's office. Simpson did not recall doing so.[67] I then asked if he recalled approaching Luz Barrett in her office after lunch, telling her Chief Johnson sounded upset, and asking who he had in his office. Simpson said the conversation with Barrett did happen but he could not recall when, nor did he remember why he asked.

Sgt. Simpson and I then discussed the meeting he had with Chief Johnson and Captain Yoakum on 1/31/17 after Simpson accidentally sent Johnson an email apparently intended for himself, (*"Subject: Don't erase #6,"* attachment 2[f]). Simpson explained that he typed notes to himself in response to a conversation with Captain Yoakum about a call for service. Simpson was in a hurry, and inadvertently put Johnson's name in the *"To"* field.

---

[66] The transcript indicates Sgt. Simpson answered, *"Yeah, we've all been critical of – yes, everyone super critical."* Upon reviewing the audio I determined Simpson actually said, *"We've all been critical; everyone has been critical,"* or very similar, (page 142, 00:49:41, Sgt. Marc Simpson (1-2) June 7, 2017).

[67] During a subsequent interview on 7/6/17 I asked Simpson the same question, this time naming Luz Barrett instead of Jackie Crandall. His answer was essentially the same.

EXHIBIT 25
Page 115 of 144

COU-00000547

Simpson said they discussed contents of the email in their meeting, but denied acknowledging to Johnson that the statement about Johnson going "solo" on a search warrant was not accurate, saying, "It *was* accurate; he went and did everything by himself."  When I asked if the incident was, in fact a warrant, Simpson replied, "I don't know what it was that he was doing."

Next, I asked Simpson if he heard the rumor that that the captain's position was going to be opened to outside applicants and that the chief was going to hire from LAPD. Simpson has heard the rumor, and said it was the general consensus that whomever Johnson selected for the position would come from LAPD.  I also asked Simpson if he remembered Johnson telling the general membership at a joint UPOA/UPMA meeting the previous summer that he wasn't interested in hiring from LAPD.  Simpson recalled that Johnson said he didn't want to hire from the outside.  However, Johnson also shared with the membership he was told when he was hired that they, (presumably the ranking officers at Upland PD), were all going to be disloyal, and he needed to establish his inner circle with people he could trust.

I asked Sgt. Simpson if he and Chief Johnson discussed the issue about not hiring from LAPD during the 1/31/17 meeting.  Simpson told me they did, but he could not remember acknowledging to Johnson that Johnson said at the joint UPOA/UPMA membership meeting he was *not interested* in hiring from LAPD.

Finally, I asked Sgt. Simpson if he remembered telling Chief Johnson during the 1/31/17 meeting that the joint UPOA/UPMA meeting at Upland High School the previous summer was recorded.  Simpson said he told Johnson he heard a rumor that the meeting was recorded, but did not personally know if it was.  Simpson also said he never told Johnson definitively that the meeting *was* recorded.

I asked Simpson who told him the meeting was recorded.  Simpson replied, "I don't remember; it was a rumor, anonymous, it was an anonymous rumor going around the PD."[68]  When I told Simpson if he heard a rumor it couldn't be anonymous, Simpson explained he receives notes in his box, "all the time."  I then asked Simpson if that was how he heard the rumor and he replied, "That's one of the ways I heard the rumor; that's the way I heard the rumor."  *(Simpson later said using the phrase, "Heard a rumor" was a bad choice of words and clarified that he never actually heard someone say the meeting was recorded.)*

I asked Simpson what the note he received said about the recording.  Simpson told me he throws away a lot of what he receives and therefore could not say exactly what was in the note, but believed it said only that the person was in possession of a recording of the chief.

---

[68] The latter part of Simpson's answer, specifically, "...going around the PD," was said by Mr. McCoy.  Simpson merely acknowledged what McCoy said was accurate, responding, "Right" to McCoy's comment, (page 156 at 01:01:16, Sgt. Marc Simpson (1-2) June 7, 2017).

COU-00000548

I also asked Simpson if he met with an attorney and agreed to provide a letter to Chief Johnson about the recording.  Simpson said they did agree to do so after Johnson threatened to initiate an internal investigation, but later decided against giving him the letter.

*(During a subsequent interview on 7/6/17 I asked Simpson when he found the note in his mailbox.  Simpson essentially said it was soon after the joint general membership meeting at Upland High School occurred.)*

Recalling the document I found during an audit of Captain Yoakum's city email account, I asked Sgt. Simpson if he ever discussed with anyone, engaging in a work slowdown or overwhelming Chief Johnson as a way to deal with Johnson, and he replied, "No."

Next, Sgt. Simpson and I discussed various emails found in his city email account, (attachments 2[x]i – 2[x]vi).  First, we discussed an email dated 1/12/17, (*"Subject: Don't erase 3,"* attachment 2[x]ii).  The email was sent to Marc Simpson from Marc Simpson at 4:46 PM.  Simpson sent another email to himself eight minutes later on the same date, (*"Subject: Don't erase 4,"* attachment 2[x]iii).  Simpson said both emails, (and others we discussed thereafter), were notes taken for documentation because he believes Chief Johnson is "targeting" him.

I then asked Sgt. Simpson about an email dated 3/17/17 sent from Simpson to *"msimpson1971@gmail.com,"* (attachment 2[x]v), to which was attached a nine-page document titled, *"Facebook Post."*  Simpson identified the recipient address as his personal email account, and said the document was intended for the city manager.  Simpson also said the attachment was a compilation of various complaints they had received, as well as more documentation of his own.   The attached document included information found in an email Simpson sent to himself on 3/9/17, (attachment 2[x]iv).  Specifically, the 3/9/17 email discussed a Facebook post and what Simpson referred to as the *"MMD Debacle."*

*(Although I did not discuss with Sgt. Simpson the entries in the attachment, the document referred to at least eleven different incidents, including a Facebook post and a lengthy re-cap and critique of the MMD enforcement action and Chief Johnson's actions thereat.  Most, if not all of the incidents in that document appeared to involve Simpson.  During a subsequent interview on 7/6/17, Simpson essentially said the Facebook post and "MMD Debacle" were his own first-person accounts of both events.)*

Finally, I asked Sgt. Simpson about an undated draft email, (attachment 2[x]vi).  Simpson said the body of the email was the complaint memo he prepared for Lt. Ansara.

Based on the emails I found during the audit, (specifically, *"Don't erase 3," "Don't erase 4," and "Don't erase 6"),* I presumed numbers *1, 2,* and *5* had also been written.  When asked if he knew where those particular emails were, Simpson said he was not sure.

COU-00000549

As the interview concluded Sgt. Simpson told me he did not have a department-issued cell phone, but uses his personal phone for business-related purposes, including email. I asked Simpson to not delete any work-related text messages or emails until the investigation was complete.  I also asked Simpson to look for the missing *"Don't erase"* emails and send them to me via his attorney.

For additional details refer to the complete interview audio.

### Statement of Cache Wilson, (6/19/17)

During one of my conversations with Luz Barrett she spoke about recently having lunch with former Upland PD employee Cache Wilson.[69]  During that lunch, Wilson told Barrett she had recently spoken with former Upland Police Chief Steve Adams.  Based on her conversation with Wilson, Barrett believed that Adams shared information suggesting he had information about the investigation for which Captain Yoakum and Sgt. Simpson were placed on administrative leave.  I interviewed Wilson by phone; the interview was recorded and can be found in attachment 5[i].[70]

Ms. Wilson told me she was previously a background investigator for Upland PD and left in 2013 after ten years of service.  She has since remained friends with members of the department, including Luz Barrett, with whom she had lunch about four or five weeks prior.

Ms. Wilson said she did not recall a discussion about what was happening in the police department when she and Barrett were together at lunch.  Wilson did tell Barrett she had recently spoken with former Chief Adams.

Ms. Wilson explained she speaks with Adams from time to time, and received a call from him wanting to "catch up" about six to eight weeks prior.  When he called, Adams asked Wilson if she heard what was happening at the police department.  Wilson told Adams she read an article in the *Daily Bulletin*, and Adams replied that he read a similar article in *The Sentinel*.[71]  Although Wilson did not recall what she and Adams talked about when they spoke, based on that conversation she did not believe he had more information than what was in the articles, speculating that the people with whom Adams speaks were not allowed to discuss the investigation.  Stating emphatically that Barrett was "loyal to her job and loyal to her chief," Wilson also said her friends at the police department do not tell her (Wilson) what's happening (with the investigation).

I asked Ms. Wilson if former Chief Adams told her the investigation was in retaliation for complaints the UPOA and UPMA made against Chief Johnson, or if he identified those who were subjects of that investigation.  Wilson said Adams did not, adding that the information was in the article she read.

---

[69] Barrett identified her former co-worker as Cache *Thouvenell*, whose last name has been changed to Wilson.

[70] Wilson said she does not like to talk about Upland PD, saying she has "horrible memories," and gets PTSD when doing so.

[71] *The Daily Bulletin* and *The Sentinel* are both news publications.

EXHIBIT 25
Page 118 of 144

COU-00000550

I also asked Ms. Wilson if she remembered Adams saying he had spoken with Captain Yoakum, Sgt. Simpson, or Detective Teague about the investigation. Wilson said Yoakum and Adams are friends, (Yoakum and Yoakum's wife were at Adams' house for dinner the weekend before Adams and Wilson spoke), but Adams said nothing that led Wilson to believe he had more information about the investigation than what was in the article.

For additional information refer to the complete interview audio.

In an attempt to determine if the conversation(s) between former chief Adams and Captain Yoakum included any discussion about the Johnson investigation, on 7/13/17 I tried to interview Adams. Although the person who answered my phone call did not identify himself, when I asked for Steve Adams he replied, "Who's calling?" I then identified myself as a private investigator, and after responding curtly, "I have nothing to say," Adams hung up.

### Statement of City Manager Martin Thouvenell, (6/17/17)

Because Sgt. Simpson said during his interview that City Manager Thouvenell told him to solicit from other employees, input about complaints against Chief Johnson, and to "Make them feel comfortable" while doing so, I interviewed Thouvenell in his office at City Hall. Also present was attorney Ed Zappia. The meeting was recorded, and can be found in attachment 5[o].

I asked Mr. Thouvenell if he recalled having met with representatives of the UPOA and/or UPMA – specifically, Sgt. Simpson and Lt. Ansara – earlier this year regarding complaints about Chief Johnson. Thouvenell said he did, explaining that one or two such meetings occurred, but he could not recall when those meetings were held. Detective Teague was also present for at least one meeting. Thouvenell also believed the meetings were essentially impromptu, (in response to a phone call from those individuals asking if they could come to his office and talk), and therefore did not think the dates were in his calendar. Although he could not recall the meeting date(s), Thouvenell said they occurred before any investigation into allegations against Chief Johnson was initiated. Thouvenell did not take notes or otherwise document the meeting(s).

Mr. Thouvenell explained representatives of the UPOA and UPMA came to his office with complaints against Chief Johnson. Thouvenell told those individuals their allegations were generic and could not be investigated, saying that if they wanted an investigation to be conducted they had to bring him specific, written complaints. Sometime thereafter Lt. Ansara brought to Thouvenell a letter detailing five or six complaints against the chief, and in response Thouvenell initiated an investigation. That letter was eventually given to Private Investigator John Hackworth, who conducted the investigation.

I asked Mr. Thouvenell if he ever told Sgt. Simpson, Lt. Ansara, Detective Teague, or any other meeting participants to solicit from other employees, input about complaints

COU-00000551

against Chief Johnson and he told me, "No." I also asked Thouvenell if he said anything that could reasonably be interpreted by the meeting participants as such a request and he replied, "Absolutely not." Thouvenell also denied telling Simpson, Ansara or Teague to, "Make the employees feel comfortable when you're talking to them," (or anything similar), and said he did not recall any of these individuals ask, or talk about following the chain of command during their meeting(s).

I also asked Mr. Thouvenell if he told Sgt. Simpson, Lt. Ansara or Detective Teague that it was okay to discuss any investigation (into allegations against Chief Johnson) that might be initiated as a result of their meeting, or specifically direct them to *not* discuss the investigation, and he told me, "No." Likewise, Thouvenell said neither Simpson, Ansara, or Teague asked him if they could discuss or share with other employees, information about the complaints or any investigation that would follow. During his meeting(s) with Simpson, Ansara and Teague, Thouvenell did not say he was going to initiate an investigation, but could have told them after making the decision to do so. Mr. Thouvenell said he had no other conversations with Sgt. Simpson after their meeting. The only time he spoke with Ansara after the meeting, in turn, was when Ansara brought the memo to Thouvenell.[72]

Mr. Thouvenell and I also briefly discussed the memo prepared for him by former contract city prosecutor Jamaar Boyd-Weatherby. Thouvenell said Boyd-Weatherby prepared this memo in response to a conversation Boyd-Weatherby had with Sgt. Simpson, Lt. Ansara, or Detective Teague. Thouvenell was told about the conversation by Chief Johnson.

Attorney Zappia asked Mr. Thouvenell to provide more information about the nature of complaints against Chief Johnson that were brought to Thouvenell's attention during his meeting(s) with Sgt. Simpson, Lt. Ansara and Detective Teague. Thouvenell said these officers complained that communication was at an all-time low; Johnson used profanity on one or more occasions; and Johnson's actions on a marijuana arrest and subsequent viewing of a DVR were inappropriate. There might have been one or two other complaints, but Thouvenell could not recall.

In response to Mr. Zappia's questions, Mr. Thouvenell confirmed he did not specifically tell or give any indication to the employees with whom he met that he agreed with their complaints, and/or was going to take action against Chief Johnson. Thouvenell also again confirmed he did not ask these same employees to investigate, or make inquiries in support of their allegations.

Finally, I asked Mr. Thouvenell if, before meeting with Sgt. Simpson, he and Lt. Ansara met about concerns with Chief Johnson viewing the DVR and he told me, "No." Thouvenell also believes he first heard about the allegation that Johnson improperly viewed the DVR during his meeting(s) with Simpson.

---

[72] I did not specifically mention Detective Teague by name when asking this particular question, but I have included him in my summary of Thouvenell's response based on Thouvenell's previous statement that Teague might also have been present during the meeting.

COU-00000552

After the interview concluded Mr. Thouvenell said he also met with the UPMA attorney, Brandi Harper about the complaints against Chief Johnson.  We resumed the interview on record and discussed this further.

Thouvenell explained that, during his meeting(s) with Sgt. Simpson, Lt. Ansara, and Detective Teague, they suggested he (Thouvenell) contact their attorney.  The following day Thouvenell called Ms. Harper, and they met about one week later.

During their meeting, Harper spoke about the complaints against Chief Johnson already brought to Thouvenell's attention.  Thouvenell told Harper he could not investigate general complaints, but said if there were specific allegations they would be glad to initiate an investigation.  When Harper told him he would have to order the officers to make the complaints Thouvenell said he was not going to do so, and instead told Harper that, as their attorney, *she* should order the officers to make the complaints.  I asked Thouvenell if he said anything to Harper that would lead her to believe he wanted the officers to solicit input (about complaints against Johnson) from other employees and he told me, "No."  Mr. Zappia further clarified this question, asking Thouvenell if he said or *did* anything, either in his meeting with Simpson or in the subsequent meeting with Harper, that encouraged Simpson to solicit or *gather* information, and again he said, "No."

For additional information refer to the complete interview audio.

To determine the content of the memo Lt. Ansara gave Mr. Thouvenell, I requested and received from P.I. Hackworth a copy of that memo, (included as attachment 2[n]).

In his memo, dated February 8, 2017, with the subject, "Allegation of Misconduct," Lt. Ansara advised Mr. Thouvenell that he believed Chief Johnson improperly viewed a DVR seized during the service of an abatement warrant.  There were no other unrelated allegations of misconduct in this particular memo.

Because Mr. Thouvenell said the memo he received included five or six allegations of misconduct against Chief Johnson, I asked P.I. Hackworth if he had any other memos from Lt. Ansara to Thouvenell; he did not.  I also sent an email to Thouvenell with a copy of the Ansara memo dated 2/8/17, asking if it was the document to which he referred during my interview.  Thouvenell replied, indicating he recalled the memo from Ansara included several complaints.

In an attempt to locate the memo to which Mr. Thouvenell referred, I sent an email to P.I. Hackworth asking for *any* memos that included complaints against Chief Johnson. Hackworth replied, saying he had no other memos with complaints against Johnson.

On 7/3/17 I again spoke with City Manager Thouvenell; the conversation was not recorded.  Mr. Thouvenell told me he found a letter from attorney Brandi Harper, to which complaints against Johnson were attached.  Thouvenell also recalled he received

COU-00000553

the letter about one or two weeks after he met with representatives from the UPOA and
UPMA.

I asked Mr. Thouvenell if, during the meeting he had with representatives from the
UPOA and UPMA, anyone said they wanted Chief Johnson fired.  Thouvenell said he
asked the group if the relationship between Johnson and them was salvageable, and
they replied, "No, he needs to be fired."  Thouvenell did not say who made this
statement.

### Statement of Police Records Specialist Sylvia Kiel, (7/6/17)

Because Barrett said she spoke with two co-workers, Sylvia Kiel and Desiree Shiflett,
about her interaction with Captain Yoakum, Sgt. Simpson and Detective Teague on
4/12/17, I interviewed Kiel in a conference room at Upland City Hall.  Kiel said she
received the interview notice and signed it in my presence.  The interview was recorded,
and can be found in attachment 5[jj].

PRS Kiel told me she has been employed as a Police Records Specialist with the City
of Upland for about 16 years.  Kiel considers Luz Barrett a "very close friend," and talks
to her on a regular basis.

I asked Kiel if Barrett told her about an interaction she (Barrett) had with Yoakum,
Simpson and Teague.  Kiel said she did, adding that Barrett was upset and "not happy"
about what occurred.  Barrett also told Kiel the interaction made her feel uncomfortable.
(The conversation between Kiel and Barrett took place upstairs during a break on the
same day Barrett's interaction with Yoakum, Simpson and Teague occurred.)

I also asked Kiel why the conversation with Barrett stood out in her mind.  Kiel said she
remembered the conversation because Barrett was upset, and also because Yoakum
and Simpson were not currently at work.

Finally, Kiel could not recall any other conversations with Barrett where Barrett was
upset about interactions with Yoakum, Simpson or Teague.

For additional details refer to the complete interview audio.

### Statement of Code Enforcement Officer Desiree Shiflett, (7/6/17)

I also interviewed CEO Shiflett about her reported conversation with Barrett after
Yoakum, Simpson and Teague went to Barrett's office on 4/12/17.  Shiflett said she
received the interview notice and signed it in my presence.  The interview was recorded,
and can be found in attachment 5[k].

I asked Shiflett if she recalled a conversation with Barrett where Barrett spoke about
Yoakum, Simpson and Teague coming into her office, one right after the other, during
the course of a few minutes.  Shiflett vaguely recalled such a conversation but did not
know the details.  She also was not sure if her conversation with Barrett happened the

COU-00000554

same day the interaction occurred, or the following day.  Shiflett believes Barrett told her about the interaction because Yoakum, Simpson and Teague were, "rude."

I also asked Shiflett if Barrett had shared with her any other interaction with Yoakum, Simpson or Teague where Barrett was upset by something any of the three had done. Although she could not recall a specific incident to which Barrett referred, Shiflett said that Barret has complained Simpson and Teague are "rude" and "demanding," as if she worked directly for them.

For additional details refer to the complete interview audio.

### Statement of Lt. Marcelo Blanco, (7/6/17)

Because he was present during at least one meeting with City Manager Thouvenell, I again interviewed Blanco in an attempt to determine what direction was given to gather additional information about complaints against Chief Johnson.  Blanco said he received the interview notice and signed it in my presence.  The interview was conducted in a conference room at Upland City Hall and recorded, (attachment 5[dd]).

Lt. Blanco told me he has met with City Manager Thouvenell at different times on various matters, but was present at one meeting with Thouvenell where complaints against Chief Johnson were discussed.  Although he could not recall the date, once again Blanco said that meeting occurred as the Johnson investigation was nearing completion; Sgt. Simpson and Detective Teague were also present.  Blanco, Simpson and Teague met with Thouvenell to discuss complaints that were part of that investigation, and the meeting lasted about 30-45 minutes.

Because the Johnson investigation was already being conducted when Blanco, Simpson and Teague met with Thouvenell, I asked Blanco to explain the gist of their conversation.  Blanco said they wanted to ensure Thouvenell was aware of all issues involving Chief Johnson, and also verbally shared the results of a survey about concerns with Johnson that had recently been conducted among the UPOA and UPMA membership.

I asked Lt. Blanco if he recalled City Manager Thouvenell asking them to get more information about the complaints against Chief Johnson.  Blanco "vaguely remembers" such a request, saying the information they shared with Thouvenell was third-hand. Because Thouvenell told them he could not do anything with third-hand information, Blanco believes Thouvenell was seeking information "from the horse's mouth," and wanted them to get information directly from the person involved in the various complaints.  I asked Blanco what he thought Thouvenell was asking them to do, and he replied, "Conduct additional follow-up," on allegations they were making, "other than what was being investigated."  Blanco also believed Thouvenell was seeking follow-up to concerns raised in the survey and not the investigation already being conducted.

EXHIBIT 25
Page 123 of 144

COU-00000555

Lt. Blanco told me he understood the comments by City Manager Thouvenell to mean they should get people (who made allegations against Chief Johnson) to write a memo about what occurred and not conduct an interview or their own investigation.

Recalling a statement by Sgt. Simpson during his 6/7/17 interview, I asked Blanco if Thouvenell told them to make the employees feel comfortable about information they, (the employees), were sharing. Blanco did not recall Thouvenell making such a statement. I also asked Blanco if there was any discussion with Thouvenell about gathering information from employees while the Johnson investigation was being conducted. Blanco doesn't think they discussed this with Thouvenell during their meeting, but believes their labor attorney said that whatever information they were gathering needed to be separate from the allegations in the Johnson investigation. Blanco said it was their understanding the Johnson investigation was about the medical marijuana dispensary enforcement action (on 1/21/17) and the DVR issue that followed.

I asked Blanco if he remembered any discussion in the meeting with Thouvenell that would lead him to believe it was okay to share details of the Johnson investigation during their information gathering. Blanco did not recall such a discussion, saying, "I can't imagine, because it's like this, (referring to the investigation I was conducting); the letter says don't discuss." Blanco said he understands confidentiality, and took away from their conversation with Thouvenell that they were not to break that confidentiality. Blanco answered with a similar response when asked if Thouvenell told them it was okay to share details of their own interviews, saying, "It doesn't ring any bells; I can't imagine that was said."

In an attempt to determine when the different meetings with City Manager Thouvenell occurred I asked Lt. Blanco when the UPOA/UPMA survey was conducted and if he personally gave Thouvenell a list of complaints about Chief Johnson. Blanco was unsure of the date, but believes the survey was taken after the DVR incident on 2/8/17. Blanco also said the survey was complete when they met with Thouvenell, but they did not bring the results to that meeting. Additionally, Blanco believes Simpson gave Thouvenell a copy of the comments from that survey, but did so sometime after their meeting with Thouvenell occurred.

Finally, I asked Lt. Blanco what Sgt. Simpson's role was in the UPOA/UPMA survey. Blanco said Simpson went to every member of the UPMA to ensure they had completed the survey, and either Simpson or Detective Teague compiled the results.

For additional details refer to the complete interview audio.

### Statement of Captain Anthony Yoakum, (7/6/17)

After reviewing the audio and transcripts of various interviews, I again spoke with Captain Yoakum to clarify or otherwise follow-up on certain statements. Once again Yoakum was interviewed in a conference room at Upland City Hall, and his attorney, Brandi Harper was present. The interview was recorded and later transcribed, and can be found in attachments 5[d] and 6[h], respectively.

COU-00000556

Because Captain Yoakum reportedly told CEO Shiflett that he was "Going to get someone fired," I asked Yoakum if he was involved in any personnel matters in 2017 where he was going to recommend termination.  Although we did not discuss details, Yoakum said he has been involved in two administrative investigations during the previous year in which termination had been discussed; one matter might have occurred in 2017, but it was resolved before Yoakum was placed on administrative leave.

I also asked Captain Yoakum about his department-issued cell phone.  After the 6/7/17 interview I checked Yoakum's cell phone but found no text messages at all.  Even though Yoakum had the phone for about one month only, (based on his statement, and the email he sent to IT Technician Asad on 3/13/17 asking for a department-issued phone), it was unusual to see no messages whatsoever.  Yoakum told me he has received text messages on his department-issued phone, but routinely deletes those messages after they're received.  Yoakum also denied deleting text messages at the time he gave his phone to Chief Johnson when placed on administrative leave, or when he changed his password during the 6/7/17 interview.

Recalling Cadet Holzer's statement that Sgt. Simpson and other detectives referred to a document Chief Johnson gave Captain Yoakum as "stupid," (reportedly said during lunch at Pueblita Restaurant), I asked Yoakum if he received from Johnson any documents other than the PIP intended to develop him as a captain.  Pointing out the PIP was ultimately set aside, Yoakum said the document that came to mind when I asked this question was the *"Captain's Daily To-Do List"* discussed in our previous interview.

I also asked Captain Yoakum for additional information about the 1/31/17 meeting he and Sgt. Simpson had with Chief Johnson, (prompted by the email Simpson inadvertently sent Johnson, re: attachment 2[f]).  Yoakum now "vaguely" recalled the meeting, but did not remember if the rumor about opening certain positions to outside applicants, and LAPD, was discussed.  Yoakum also did not remember Simpson acknowledging to Chief Johnson in that meeting that what Johnson was saying (about the rumor) was correct.

I asked Captain Yoakum if he recalled a discussion during the 1/31/17 meeting about Chief Johnson "going solo" on a search warrant, and he answered, "No."

Following a brief break, the interview resumed, *(Captain Yoakum 2-B, July 6 2017).*

As the interview concluded I asked Captain Yoakum for additional information about his reference to *"PIU"* in the document, *"Possible ideas to deal with Chief."*  Referring to the document as a privileged attorney/client communication , Ms. Harper was apparently uncomfortable with my questions, but did ask Yoakum if he had an independent understanding of conduct in which Chief Johnson engaged that would lead to a PIU referral.  In response, Yoakum replied, "Not that I can think about right now."

For additional details, refer to the complete interview audio and transcript.

COU-00000557

*Statement of Sgt. Marcus Simpson, (7/6/17)*

On 7/6/17 I conducted a follow-up interview of Sgt. Simpson, and once again the interview was held in a conference room at Upland City Hall.  The interview was recorded and later transcribed, and can be found in attachments 5[e] and 6[i], respectively.[73]  Simpson was again represented by his attorney, Michael McCoy.

I asked Sgt. Simpson if he found the missing *"Don't erase"* emails and he told me, "No."

When Sgt. Simpson was sent a notice directing him to appear for his follow-up interview with me, (attachment 3[l]), he was also directed to bring to that interview the following items:

- A list of names of police department employees with whom (he) spoke about complaints against Chief Johnson;

- Any and all written notes of (his) conversations with police department employees about their complaints against Chief Johnson, including the dates of those conversations, if known;

- Any and all written notes of (his) conversation(s) with City Manager Thouvenell regarding complaints against Chief Johnson, including the dates of those conversations, if known;

- Any and all text messages, emails and calendar entries from (his) personal cell phone(s) and personal email account(s) regarding complaints against Chief Johnson or the administrative investigation for which (he was) interviewed by Private Investigator Hackworth on or about 2/28/17, 3/13/17, and 4/3/17.

Simpson did, in fact, bring several documents, (attachments 2[y]i – 2[y]vi), but only the first two items from the list were among them, (i.e., names of employees with whom he spoke about complaints against Chief Johnson, and written notes of those conversations).  Even then, the "written notes" appeared to be a compilation of complaints rather than notes and dates of the actual conversations.

In an attempt to determine the dates of various events that might be relevant to my investigation and the extent of Sgt. Simpson's conversations with others about the Johnson investigation, I asked Simpson about the membership survey (regarding complaints against Chief Johnson) to which witnesses had referred in previous interviews.

Simpson could not recall if the survey was conducted before or after the MMD enforcement action (on 1/21/17), but believed it was before the 2/7/17 DVR incident.

---

[73] The interview also included questions relevant to a separate administrative investigation, (UPD IA 05-17). However, I have included both the interview audio and the transcript in their entirety.

Simpson said the survey was conducted at a general membership meeting of the UPOA and UPMA, and included all sworn officers except Chief Johnson, but he could not recall the date of that meeting.

Simpson recalled that there were 40 – 45 people at the meeting when the survey was conducted. After the meeting, Simpson and other association board members gave the survey to officers who did not attend. "Almost everyone" (sworn) in the department ultimately participated, (though Simpson said they did not give the survey to new officers).

Sgt. Simpson told me results of the survey were presented to City Manager Thouvenell during one of the three meetings previously discussed but could not recall the date. Simpson said Thouvenell also had a meeting with (UPMA attorney) Brandi Harper, and believes the survey results were first given to Thouvenell three or four weeks before that meeting occurred.

During his 6/7/17 interview Sgt. Simpson said he had about 60 pages of complaints against Chief Johnson. I asked Simpson if those notes were from the membership survey or from soliciting input about Johnson from the employees. Simpson said the information was from both, but could not remember if the survey was initiated in response to City Manager Thouvenell's request for more information, or if it had already been conducted before the meeting with Thouvenell in which that request was made.

Sgt. Simpson told me he was present when results of the membership survey were presented to City Manager Thouvenell but could not recall if they discussed the Johnson investigation at that time.

Next, Sgt. Simpson and I discussed the interview notice he received from Human Resources directing him to not discuss the Johnson investigation. Referring to his statement during the 6/7/17 interview that City Manager Thouvenell told him to solicit input about complaints against Chief Johnson, I asked Sgt. Simpson if he told Thouvenell he had received the directive, and inquired if it was still okay to gather information. Simpson did not remember if he received the directive before or after the meetings but said there was no such discussion.

Sgt. Simpson and I also briefly discussed the list of names he brought to the interview, (re: people with whom he spoke about complaints against Chief Johnson, attachment 2[y]i). Simpson said the names on that list were officers he spoke with in response to the city manager's request for additional information and not as part of the membership survey. Twenty officers were named on the list.

*(Although some officers named on the list were previously interviewed for my investigation, the questions generally were not about the extent of any Johnson investigation-related conversations they might have had with Simpson. Specifically, the following officers on that list were interviewed by P.I. Steve Fobes or me: Acting Captain Mathews; (retired) Lt. Ansara; Lt. Poole; Sgt. Tseng; Sgt. Duran; Detective Stanley; Detective Bonhus; Detective Hilliard; Detective Wyman; and Officer Clark.)*

124

EXHIBIT 25
Page 127 of 144

COU-00000559

I asked Sgt. Simpson if he told any of the officers on the list he provided what the Johnson investigation was about. Simpson did not remember the details of what he said, but recalled telling the officers that the city manager had asked them to solicit complaints about the chief. Simpson did not recall if any of the officers he spoke with asked him what the investigation was about. He also did not recall telling the officers that he had been interviewed for the investigation, nor did he recall if he told them about his own interview. So, too, was Simpson unable to remember when the conversations occurred, or if he spoke with these officers after he received his interview notice for the Johnson investigation.

Again referring to his meetings with City Manager Thouvenell, I asked Sgt. Simpson if he recalled Thouvenell asking, "What do you want me to do about the complaints?" Simpson did recall the question being asked, and said in response to Thouvenell's question that he and the others at that meeting all wanted Johnson fired. Simpson did not recall at which of the three meetings with Thouvenell this question was asked, or who else was present at the time.

Next, I asked Sgt. Simpson about the DVR seized during the MMD enforcement action on 1/21/17 and subsequently retrieved from evidence for viewing. I asked Simpson if he had any concerns about the DVR before Detective Wyman first contacted him with *his* (Wyman's) concerns; Simpson said he did not.

I also asked Sgt. Simpson a follow-up question related to the reported lunch conversation at Pueblita Restaurant in April 2017. Based on Cadet Holzer's statement about that lunch I believed Sgt. Simpson knew Captain Yoakum had received a Performance Improvement Plan, (PIP). To confirm that he did as a preface to my follow-up question, I asked Simpson if he knew Yoakum had received a PIP. When Simpson began to answer, "I – I don't remember if I - ," I told him I had information that he *was* aware. Simpson then remarked, "I don't remember who told me, but I know that I talked to some attorneys about it."

Referring to the lunch gathering at Pueblita we discussed during the 6/7/17 interview I asked Simpson if he remembered talking about the PIP during that lunch, or at any lunch. I also asked if he recalled telling another employee it was "stupid" that Chief Johnson gave Yoakum the PIP. Simpson said he did not recall the conversation or making such a statement.

Sgt. Simpson and I also discussed the extent of his conversations with other employees about the Johnson investigation. I told Simpson he said the extent of his discussions with officers who were not association board members was limited to saying only that there was an investigation and people were being interviewed. However, I told Simpson he also said previously that he shared information about the investigation to make people feel comfortable. I asked him to clarify his answers.

Simpson said when he read the transcript of the 6/7/17 interview he thought he was confused by my questions. Although Simpson said he did discuss with the officers that

COU-00000560

there was an investigation, he did not remember what he said to make them feel comfortable. Simpson also said he has spoken with so many people – not only about the investigation, but about complaints against Johnson as well – that it has become a "blur."

Next, Sgt. Simpson and I discussed the perceived directive from City Manager Thouvenell to solicit complaints about Chief Johnson from other employees. Recognizing that Simpson has experience conducting administrative investigations, I told him it was difficult for me to understand how he could receive a directive to not discuss an investigation but then essentially do so when given a conflicting directive from the city manager without some discussion about that conflict. Simpson replied, "The private tells you not to do something, the general tells you to do it, who do you listen to? You listen to the general." I then again tried to make the distinction between simply asking someone to put their complaint in a memo and actually sharing information about an underlying investigation, (an investigation that Simpson said was, "far-reaching," per Thouvenell). Simpson acknowledged it was possible to request information about a complaint without discussing the investigation, but when asked why he then did not do so, Simpson again said he did not remember details about the conversations he had.

As the interview concluded I asked Sgt. Simpson about the documents he brought to the interview, (attachments 2[y]i – 2[y]vi). Except for the list of employees with whom Simpson spoke, most documents were essentially complaints about Chief Johnson. Simpson said the compilation of complaints about Johnson were the notes to which he referred during the interview, while the emails were actually copies of emails he had previously been given by other people.

For additional details, refer to the complete interview audio and transcript, as well as the various documents discussed therein.

### Statement of Detective Scott Sellers, (7/10/17)

On 7/10/17 I conducted a follow-up interview of Detective Sellers at Upland City Hall. Sellers was represented by his attorney, Kevin Flautt, and signed the interview notice in my presence. The interview was recorded and can be found in attachment 5[y].

Knowing that Detective Sellers is married to Forensic Specialist Colleen Sellers, who received an email from Captain Yoakum on 2/3/17 asking to retrieve the DVR (from the medical marijuana dispensary enforcement action on 1/21/17) so Chief Johnson could view it, I asked Sellers if Colleen checks her work emails from home. Sellers said Colleen has a department-issued iPad and sometimes checks her work emails.

I asked Detective Sellers if Colleen told him that Captain Yoakum asked her to retrieve the DVR. Sellers said it sounded "vaguely familiar," but also said he did not believe he was working on the day Colleen received the email. When asked if he and Colleen had a conversation about Yoakum's request, Sellers said they talked about the DVR being retrieved from evidence, and he thought it was being done for Chief Johnson.

COU-00000561

Detective Sellers thought the conversation with Colleen occurred during the weekend, (he is off Saturday, Sunday and Monday), because by the time they returned on Tuesday or Wednesday, the DVR was already in Sgt. Tseng's office.

Detective Sellers denied telling anyone about the DVR being retrieved from evidence while he was on his days off, or that Chief Johnson wanted to view contents of the DVR. He did not know if Colleen had such a conversation with anyone.

Because Detective Sellers said during his 6/5/17 interview that Sgt. Simpson was critical of Chief Johnson when presenting to the general membership results of a "poll" that were taken, and in an attempt to establish the dates on which that particular meeting, and other meetings were held, I asked Detective Sellers for additional information.

Sellers said on 2/8/17 the association board met with Chief Johnson, (Sellers is the UPOA treasurer); per Mr. Flautt, attorney John Bakhit was also present.  During that meeting board members shared with Johnson their concerns *about* Johnson.  On or about 2/24/17, during a joint general membership meeting, a survey was conducted. Sometime thereafter, Sgt. Simpson and Detective Teague presented results of that survey to the city manager.

Sellers said his statements during the 6/5/17 interview about Simpson being critical of Johnson during a meeting referred to the 2/24/17 general membership meeting at which the survey was conducted.  Simpson was the person who spoke most at that meeting, and made comments about Johnson's actions at the medical marijuana dispensary enforcement action.  However, Sellers now said he did not think Simpson was being critical of the chief, but rather, was simply talking about what happened at the scene.

Finally, Detective Sellers said the only place he has heard Simpson making comments that were critical of Chief Johnson outside the confines of an association meeting was in the detective bureau or during detective briefings.  Sellers said Simpson was critical of Johnson's actions at the MMD enforcement action, and also said something about Johnson "yelling at people."  Simpson made these comments while he was "shooting the breeze," and not necessarily in an actual meeting.

For additional details refer to the complete interview audio.

<u>Statement of Detective Lon Teague, (7/10/17)</u>

On 7/10/17 I again spoke with Detective Teague.  The interview was conducted in a conference room at Upland City Hall.  Teague was represented by his attorney, Kevin Flautt, and the interview was recorded, (attachment 5[f]).

I asked Detective Teague follow-up questions to our 6/7/17 conversation about the DVR, including the date on which Lt. Ansara ordered him to not discuss the matter with anyone.  Teague could not recall whether he received this order on 2/7/17 or 2/8/17,

COU-00000562

and also said it could have been on 2/9/17, saying there was a period of time during which no order had been given.  In an attempt to establish the date, I asked Teague if the order was given on the same date he took pictures of the DVR, (which, per his statement to P.I. Hackworth, was on 2/7/17), but he could not recall.  Finally, I asked Teague if he still had the digital file of the picture he took of the DVR, including the metadata.  At my request Teague said he would check, and send me the file (via his attorney) if he had it.

*(On 7/24/17 I received an email from Teague's attorney, (Kevin Flautt), saying he sent me pictures with date-stamps and other information.  As of 7/26/17 I have not received the photographs.)*

Next, Detective Teague and I spoke about his conversation with former city prosecutor Jamaar Boyd-Weatherby.  Teague said he met with Boyd-Weatherby on 2/13/17 to inform him of SB 178, (the Electronic Communications Privacy Act).  Teague knew Boyd-Weatherby was the city prosecutor, but believed Boyd-Weatherby was also responsible for protecting the City's risk of civil liability.  It was Teague's understanding he was supposed to give Boyd-Weatherby the text of SB178 so Boyd-Weatherby could do the necessary research.

Detective Teague said he felt an obligation to talk to Boyd-Weatherby for several reasons.  Not only was Boyd-Weatherby the attorney responsible for protecting the City's interests, but Teague also thought he was reporting what he believed to be misconduct to the city prosecutor.  Teague also believes he was *told* to speak with Boyd-Weatherby – not about details of the DVR incident itself, but about relevant statutes.

Although initially Detective Teague did not know who told him to speak with Boyd-Weatherby, as the interview continued he believed it was Lt. Ansara who did so, (though he did not recall if it was an order or a request).  Teague said his conversation with Boyd-Weatherby was brief, and did not recall discussing details of his own observations during the DVR incident.

Later in the interview Mr. Flautt asked Detective Teague if, based on his experience working for the City of Upland, he believed the city attorney could question him or solicit information freely because of his position and authority; Teague replied, "Yes."  Flautt then asked Teague if he felt the city attorney also had the authority to order him to do things.  Teague again answered, "Yes," saying he believed the city attorney could do so because of his position with the City, and agreed with Flautt's statement that the city attorney was an "agent of the city manager or the City itself of the highest authority."

I asked Detective Teague if he had personally worked on lawsuits with Boyd-Weatherby.  Teague answered, "No," but said Boyd-Weatherby has been present during at least one MMD abatement warrant.  I then asked Teague if he was aware that a different attorney was responsible for lawsuits and administrative issues, and that Boyd-Weatherby's role was specifically as a prosecutor; again, Teague said, "No."

COU-00000563

During the interview Detective Teague and I discussed the meetings with City Manager Thouvenell at which Teague was present. Teague recalled being present at four such meetings but did not know the dates on which they occurred. During the first meeting with Thouvenell, at which Sgt. Simpson and Lt. Ansara were also present, they reported Chief Johnson's misconduct with the DVR, as well as a general overview of the state of the police department. Ansara, Simpson and Teague discussed the same issues with Thouvenell during the second meeting, which occurred two or three weeks later.

About two or three weeks after the second meeting, Detective Teague met with City Manager Thouvenell again, this time with Lt. Blanco and Sgt. Simpson. Teague met with Thouvenell a fourth time, alone, after the investigation (in which Teague, Yoakum and Simpson were the subjects) was initiated.

I asked Detective Teague if during the meetings City Manager Thouvenell directed them to solicit input from other employees about complaints against Chief Johnson, and he replied, "Yes." Teague said during the second or third meeting, (he could not recall), when they shared with Thouvenell complaints they heard about Johnson from their members, Thouvenell said he needed details. Thouvenell also told them if they could get that information, including names, dates, and times, and bring it to him, he would take it from there.

I told Teague that when he and the others had this conversation with Thouvenell they knew an investigation had already been initiated, and asked him if there was any discussion with Thouvenell about how they should collect the information; he replied, "No." Teague understood the Johnson investigation to be exclusively about the DVR, and believed Thouvenell's request was for information about issues other than the DVR.

Recalling Sgt. Simpson's statement during *his* interview, I asked Detective Teague if he recalled City Manager Thouvenell saying they should "make people feel comfortable" while gathering information. Teague said such a remark did not sound familiar. I also asked Teague if Thouvenell ever said it was okay to share details about the investigation or their own interviews. Once again, Teague said the comment did not sound familiar.

I then asked Detective Teague if he understood City Manager Thouvenell's comments during their conversation to mean it *was* okay to share details about the investigation or their own interview. In response, Teague said what he took from the meeting was that Thouvenell wanted information about complaints other than the DVR.

I also asked Detective Teague if he took any notes during his meetings with City Manager Thouvenell, and he told me, "No."

Finally, I asked Detective Teague if City Manager Thouvenell asked them during their meeting what they wanted him to do about the complaints against Chief Johnson. Teague said he did, and in response, everyone answered, "He needs to be fired."

For additional details, refer to complete interview audio.

COU-00000564

*Additional investigation*

In an attempt to confirm Detective Teague's statement that Lt. Ansara directed him, or asked him to bring information about the statutes to Boyd-Weatherby, I called Ansara. I left a voice messages on two different dates, but Ansara did not return my call.

I obtained a copy of the letter from Ms. Harper to which Mr. Thouvenell referred during our interview and saw it was dated 3/22/17, with the notation, *"Via Personal Service."* The letter did not include reference to any directives by Thouvenell or Harper to solicit input about complaints against Chief Johnson. Attached to the letter was a 13-page summary of the UPOA/UPMA survey conducted on 2/24/17. The letter was sought to establish dates, and can be found in attachment 2[z], (I did not include a copy of the survey results).

| Analysis and Conclusions |
| --- |

On 2/9/17 an administrative investigation into alleged misconduct by Chief Johnson was initiated; Captain Yoakum, Sgt. Simpson, and Detective Teague were identified as witnesses. Captain Yoakum signed a written directive on 3/28/17 to not discuss the investigation, Simpson received and signed a similar notice on 2/28/17, and Detective Teague did the same on 3/1/17. Simpson and Teague had also previously been verbally ordered by Lt. Ansara on or about 2/7/17 to not discuss an incident that later became part of that investigation. The written notices were specific:

> *"As investigations of this nature are confidential, you are not to disclose this matter, or to provide or share a copy of this Notice, with any other person (including employees of the City), except for your representative. Your discretion will allow the investigation to proceed without rumors and speculation about this matter."*

The evidence indicates Yoakum, Simpson and Teague knew an investigation had been initiated, even before signing the written directive, and at least had some idea about the nature of that investigation. To wit:

- Per witness statements, "everybody (in the organization) was talking about" the MMD enforcement action on 1/21/17, and specifically, what they believed to be inappropriate conduct by Chief Johnson during that incident;

- Yoakum and Simpson were both personally involved in the MMD enforcement action on 1/21/17, and reportedly were participants in the discussions that followed;

- On or about 2/7/17 Teague witnessed possible misconduct by Chief Johnson involving a DVR seized during the MMD incident on 1/21/17, and reported his observations to Simpson; both were ordered by Lt. Ansara to not discuss the

matter.  Yoakum was also involved in the DVR incident and a few days later learned that Johnson's actions were not proper;

- Simpson and Teague reported what they believed to be misconduct by Johnson to City Manager Thouvenell on or about 2/9/17.  As a result of that meeting, as well as subsequent meetings with Thouvenell, Simpson and Teague knew that an investigation would be conducted, and the nature of that investigation;

- Acting in their capacity as UPMA and UPOA presidents, both Simpson and Teague participated in discussions with other board members about Johnson's conduct and the fact that an investigation was being conducted.

Despite the directives they were given, on 4/12/17 Captain Yoakum, Sgt. Simpson, and Detective Teague went into the office of Chief Johnson's secretary, Sr. Administrative Assistant Luz Barrett, one immediately after the other left, within a seven-minute period, and asked her either *when* she was going to be interviewed, (Teague and Yoakum), or *how* her interview went, (Simpson).  During Yoakum's interaction with Barrett, he also told her he knew Johnson was being interviewed the same day.  (Barrett was not interviewed for the Johnson investigation.)

Detective Teague recalled asking Barrett if she had been interviewed, but said he did so out of "curiosity," and not to get information about the investigation.  Conversely, Yoakum could not recall asking Barrett about her interview, while Simpson denied doing so.

Although Yoakum, Simpson and Teague either denied or said they did not recall discussing in advance going to Barrett's office on the same day, or knowing that each other did so, their statements don't comport with the facts.

First, the interaction occurred on the same day Chief Johnson was interviewed for the investigation.  Based on their own statements, Yoakum, Simpson and Teague likely knew Johnson *was* being interviewed that day.  Yoakum, who said he *"could have known"* when Johnson was interviewed, is one of only three people with viewing rights to Johnson's calendar, and looks at Johnson's calendar daily, (though Yoakum said he had no personal recollection of the day Johnson was interviewed).  Simpson, in turn, said he thought Barrett told him Johnson was out of the office all day being interviewed, (which she denied), while Teague recalled someone saying Johnson was at City Hall being interviewed.

Statements made by detectives Bonhus, Stanley, and Sellers indicate *several* people believed Johnson was at City Hall being interviewed.  (As previously discussed, anyone on the City's email server can check another employee's availability, though not the details of an appointment, for a given time.)  Because Captain Yoakum, Sgt. Simpson and Detective Teague essentially share an office, it is unlikely they, too, would not have known.  Yoakum himself said during his interview that because his office is in the detective bureau, he would have seen all detectives if they were working on that

particular day.  (I later confirmed with HR Manager Gonzales that all detectives were working on 4/12/17.)

Second, the interactions with Barrett on 4/12/17 all occurred within seven-minutes. Even if Yoakum and Simpson went to Barrett's office to check their mail slots, (something they do on a daily basis), Teague does not have a mail slot in that office, and interacts with Barrett infrequently.  As such, it is unlikely they would all go to Barrett's office, one immediately after the other left, in such a short period of time, and ask essentially the same question without *some* discussion about doing so in advance.

The interaction on 4/12/17 was so unusual that Barrett kept notes to document what occurred, and also spoke with two co-workers, (Kiel and Shiflett), who corroborated her statement.  By saying he did ask Barrett if she was interviewed, Detective Teague essentially corroborated the statements in Barrett's notes as well.

Notably, Captain Yoakum said during his interview that asking someone else if they had been interviewed would be a violation of the written directive he was given.

I cannot determine with certainty *why* Yoakum, Simpson and Teague asked Barrett when she was being interviewed or how her interview went.  While based on the limited interaction I do not believe there was an attempt to influence the investigation when they went to her office on 4/12/17, it is certainly reasonable to opine additional questions would have been asked if Barrett answered differently.

I believe the evidence supports that on 4/12/17 Captain Yoakum, Sgt. Simpson, and Detective Teague did ask Barrett about her interview, and that *some* discussion among them about doing so occurred in advance.  While Teague had the professional maturity to acknowledge what he did, at least in part, Yoakum and Simpson did not.

Sgt. Simpson also violated the directive to not discuss the investigation with anyone when he spoke with Barrett on 4/3/17.  Once again, Barrett documented the interaction after it occurred.

Simpson acknowledged that a conversation with Barrett did occur in which he told Barrett he had given her name to an investigator, but denied they spoke about "copies" Barrett made for an attorney.  Rather, Simpson said such a discussion occurred several months prior.  Simpson also denied any discussion about recordings from the MMD enforcement action, or telling Barrett he knew she was just doing what she was told to do.

Given the specificity with which Barrett detailed her interaction with Simpson on 4/3/17, the fact documentation even exists, and the absence of any known motive for Barrett to lie, I believe the conversation occurred as Barrett recalled.

I also believe Simpson's comments were a direct attempt to influence the issues Barrett would discuss if interviewed for the Johnson investigation.  Whether Barrett was ultimately interviewed is irrelevant.  Based on his comments about giving Barrett's name

EXHIBIT 25

COU-00000567

to the investigator during the 4/3/17 interaction, and asking Barrett on 4/12/17 how her interview went, when they spoke on 4/3/17 Simpson clearly believed Barrett *would* be interviewed. Telling Barrett he gave the investigator her name because of "the copies (she) made and gave to the officer's attorney," that "they" (detectives) knew Chief Johnson directed her to put the "recordings" from the MMD incident in another office so Johnson could alter them, (or something similar), and then saying he (Simpson) knew she was just doing what she was told to do, would clearly taint any such interview. Simpson himself said during his 6/7/17 interview that witnesses are ordered to not discuss an investigation, "Before the interview, that's the important part, so you don't get polluted statements from the involved party." Simpson's comments during the 4/3/17 interaction with Barrett did just that.

Finally, Simpson's interaction with Barrett on 4/3/17 occurred on the same day, and likely immediately after Simpson was interviewed by P.I. Hackworth – an interview for which he had previously signed a directive ordering him to not discuss the investigation.

When discussing the 4/3/17 interaction with Barrett, Simpson said the conversation occurred as part of his efforts to solicit input (about complaints against Chief Johnson) on behalf of City Manager Thouvenell. However, Simpson's role as the UPMA president was to look out for the interests of his members; Barrett is a civilian employee and not a member of the UPMA. Notably, during his 6/7/17 interview, when discussing a conversation Simpson reportedly had at a lunch gathering, Simpson said he has had "many" conversations with others, "Except for civilian employees; I really don't talk to them."

Simpson's use of what he perceived to be a directive from City Manager Thouvenell as an excuse for discussing the Johnson investigation is also problematic. Simpson initially said he was "ordered or asked" by Thouvenell "to speak to people about the investigation." Such a statement is misleading for investigative purposes, at best, but also a misinterpretation of what Thouvenell apparently asked Simpson and the others to do.

While Thouvenell apparently asked for some kind of information, based on his statement, and the statements of others who were also with Simpson when the request was made, the extent of that information was simply asking people who had complaints about Chief Johnson to provide additional details, and not, as Lt. Blanco said, to conduct their own investigation. As I explained to Simpson during the interview, it's entirely possible – necessary, in fact, given the circumstances – to ask someone for information about their complaint or to put their complaint in writing without discussing an underlying investigation, details of his own participation in that investigation, or even that an investigation is being conducted. Simpson understood the distinction, but apparently conducted himself in a way that suggests otherwise. Simpson's interaction with Barrett on 4/3/17 is one such example.

Simpson also said Thouvenell told him and the others that they should make people feel comfortable when sharing their complaints. Not only was Simpson the only person who said Thouvenell made such a statement, but so, too, did he then use this as justification

COU-00000568

for sharing details about his own investigation. When interviewed on 6/7/17 Simpson
said that during the conversations in which he solicited input about complaints against
Chief Johnson, there were times he shared information from his own interview with P.I.
Hackworth.

Throughout the investigation it was apparent Simpson discussed the Johnson
investigation with other people, likely many times, (though the extent to which he did
could not be determined).  However, given his position as the UPMA president, many of
those discussions probably *did* occur during association meetings.  It's also likely, (if not
a certainty), Simpson was critical of Johnson during those same meetings.  However, it
is Simpson's conduct beyond the association meetings or while engaged in union
business that is problematic.

For example, Simpson asked Cadet Holzer if she was interviewed for the (Johnson)
investigation, and also reportedly participated in a discussion with detectives and other
subordinates in which they described as "stupid" a document Johnson gave to Captain
Yoakum.  Based on Holzer's statement, it's also likely Simpson shared with others the
*type* of document Yoakum was given, a Performance Improvement Plan, despite the
intended confidentiality of such a document.

Simpson also reportedly made statements that were critical of Chief Johnson while
"shooting the breeze" with detectives.  For example, Detective Sellers recalled Simpson
was critical of Johnson's actions at the 1/21/17 MMD incident during a conversation that
occurred the following week. Despite the apparent general reluctance when interviewed
to be completely forthcoming about other statements Simpson made that were critical of
Johnson, several people either said or implied Simpson did, in fact, make such
statements.  The content of those statements, the extent to which they were made, and
the environment in which they were said, could not be established.

I believe the line between opinions shared in furtherance of union objectives and
conduct unbecoming an officer, (let alone a supervisor), has been crossed.  However,
that same line is also blurred because of the reporting relationships that exist, (i.e.,
many of those whom Simpson supervises are also on the association board of
directors).

Simpson also reportedly made statements that were critical of Johnson to members of
the community, but once again the extent to which he did so could not be determined.
For example, although Dr. Bunkers has never personally heard Simpson make a
derogatory statement about Chief Johnson, he has heard members of UC3 say
Simpson made negative comments about Johnson and the direction of the police
department.  Bunkers identified Steve Bierbaum as one person with whom Simpson has
had direction interaction.  Although Bierbaum was cordial and spent considerable time
speaking with me, he would not identify the source of what is arguably information
known only to members of the department.

Understandably, as the UPMA president Simpson is in the difficult and often unenviable
position of protecting the interests of the association.  However difficult that role may be,

COU-00000569

there is an expectation nonetheless that the conduct in which Simpson engages in
furtherance of that objective is reasonable.  While I do not believe there is a concerted
effort between Simpson and Yoakum to undermine Chief Johnson, individually I believe
such an objective exists.  For example, in addition to the statements Simpson has made
that were critical of Johnson, or his attempt to influence Barrett's statements (about
Johnson) in a pending administrative investigation, Simpson has also reportedly tried to
get information about Johnson from Barrett, doing so at least twice, (once in her office,
which he admitted, and again at Crandall's desk, which he denied).  Simpson has also
said (to Thouvenell) he wanted Johnson fired, and made a statement (to Mathews) that
there are a lot of problems in the department, but he wasn't sure there was a solution to
those problems with Johnson as chief.

Perhaps most indicative of the disdain Simpson has for Johnson is the extensive
documentation obtained during my investigation.  Although I did not determine the
veracity of every allegation or complaint listed in the lengthy documents Simpson gave
me during the 7/6/17 interview, most, if not all of the eleven incidents he wrote about in
a separate document intended for City Manager Thouvenell, (attachment 2[x]v),
involved Simpson.

I also do not believe Simpson was forthcoming when interviewed for my investigation.
During the interviews Simpson sometimes answered, "I don't recall," (or similar), in
response to questions that would indicate wrongdoing or otherwise support the
allegations of misconduct.  Although I believe it is entirely reasonable Simpson would
not remember everything he was asked, questions about conduct in which he was
alleged to have engaged only two months before our interview were also answered, "I
don't recall."  Simpson also answered my questions with questions of his own, beyond
what I would consider a reasonable attempt to clarify what I was asking.

For example, when Simpson and I discussed his participation in a conversation about
the Johnson investigation while Simpson was having lunch with other police department
employees, the following exchange occurred:

*Wedge:*  Okay, and I—the, the lunch I'm referring to was on April 10th, so—and I
don't expect you to remember off the top of your head that date but do you recall
a conversation—excuse me—do you recall a discussion at a lunch you were
having with other PD employees at a restaurant? Do you recall a conversation
about the investigation involving the chief?

*SIMPSON:*  I have no idea. April 10th—

*WEDGE:*  Okay, forget the date. Do you recall a discussion at any lunch with
other PD employees where there was a discussion about the investigation?

*SIMPSON:*  Specifically the IA?

*WEDGE:*   The investigation being conducted involving the chief.  I'm not—I'm not talking about people saying "Oh yeah, you know this is what he did on the MMD." I'm talking about the investigation.

*SIMPSON:*   As far—you have to be—more specific as far as the investigation. That's a real broad—

*WEDGE:*   The investigation for which you were noticed on February 28th and subsequently interviewed, this was on April 10th. You were interviewed on February 28th so you knew at that point—well you knew what the investigation was about in general because you were collecting information from the employees but when you were interviewed there should have been no doubt in your mind what the investigation was about.

*SIMPSON:*   Right, I got that.

*WEDGE:*   Okay. So when you had this lunch, supposedly when you were at lunch, you would have known what the investigation involving the chief was about.

*SIMPSON:*   Right.

*WEDGE:*   Okay, and so that's what I'm asking you, do you recall being at a lunch with other PD employees when the investigation was discussed?

*SIMPSON:*   No, I don't remember talking specifically about the investigation.

*WEDGE:*   Not, okay, not even specifically, just discussing that there was an investigation. I mean, I think it's safe it say that people knew there was an investigation.

*SIMPSON:*   Yeah, I just don't—I just can't remember. I didn't go out to lunch with—in April 10th or at so many times or I don't remember exactly what was said in every—

Conversely, when discussing a separate administrative investigation during his 6/7/17 interview, (UPD IA 05-17), Simpson was able to recall with apparent certainty specifically which agencies both officers on his CRO team contacted in November 2016, more than six months prior.  During that interview Simpson said he was able to recall this information because he kept notes, but in a subsequent interview on 7/6/17 clarified his previous statement and said his notes were not specific to the issue we were discussing.  Instead, Simpson explained, he was able to recall which officer contacted

UPD IA 06-17
Simpson

which agency because, "Two officers I have to keep track of...it's not hard to remember."[74]

During my investigation I also tried to determine the extent to which Sgt. Simpson and Captain Yoakum allowed Chief Johnson to violate department policy at the MMD incident, if at all, when discussing the charges for which to arrest the dispensary operators. Reportedly at Johnson's direction, the suspects were ultimately taken into custody and charged with violations of the municipal code, against department policy. Simpson denied he was present when the discussion about arresting for municipal code violations occurred, and both he and Yoakum said they were unaware at that time the policy essentially prohibited custodial arrests for such a violation. As an aside, while those who *were* present when the discussion occurred can argue they did not want to oppose a directive given by the chief of police, statements indicate Johnson followed their advice earlier in the discussion when he suggested arresting the suspects for violation of a restraining order but they recommended against doing so.

I also could not determine if Simpson and/or Yoakum allowed Johnson to violate policy by viewing contents of the DVR without a warrant. On 2/3/17 Yoakum sent an email to Forensic Specialist Sellers asking her to remove the DVR from evidence so Johnson could "view the video." Sellers apparently told her husband, Detective Scott Sellers, about the request, and the DVR was ultimately pulled from evidence on 2/7/17. Although Detective Sellers denied telling anyone about Yoakum's (and Johnson's) request, at least four days passed in which this information could have been shared with others, (either by Sellers or his wife). Detectives Stanley and Wyman were also told about the DVR shortly after it was taken from evidence, likely before it was viewed by Johnson. Several detectives either saw Johnson viewing the contents or saw the DVR unattended in an open office, yet said nothing to Johnson. Simpson denied he was aware of concerns about the DVR until those concerns were brought to his attention by detectives, (after several people saw the apparent violation occurring), and Yoakum said he was unaware of the law prohibiting the viewing of DVR contents without a warrant until after the incident occurred.

None of this is to suggest there are not problems that need to be addressed in the organization. Indeed, documents obtained during my investigation include complaints that may well be valid. However, it is the manner in which Simpson and Yoakum chose to address those complaints that I believe is inappropriate.

While the conduct in which Yoakum and Simpson engaged is inappropriate and unacceptable, the impact of their conduct on Barrett is significant as well. As discussed in my narrative, Barrett was uncomfortable bringing the allegations forward, in part because of her friendship with Yoakum, but also because of the treatment she endured when reporting misconduct several years prior; Barrett now fears more of the same. Despite that experience, Barrett felt it was necessary to report the inappropriate conduct

---

[74] The discussion on 6/7/17 in which Simpson identified the agencies each officer contacted began at 00:19:19, (Sgt. Marc Simpson (1-2) June 7, 2017). The subsequent discussion on 7/6/17 began at 00:13:29, (Sgt. Simpson, July 6, 2017).

EXHIBIT 25
Page 140 of 144

COU-00000572

because she believed their actions were unethical and disrespectful to Chief Johnson and her.

I could not determine from my investigation the extent to which Simpson initiated, perpetuated, or failed to correct various rumors.  For example, most people I interviewed were familiar with the rumor about potentially opening the lieutenant and/or captain positions to outside applicants, and the possibility, (or, according to some, the likelihood), that Chief Johnson would fill that position with someone from LAPD.  Johnson was clear his message has been only that he wasn't interested in hiring a ranking officer from LAPD, and that he never said he *would not* hire someone from the outside.  While I don't doubt the rumor was discussed at the 1/31/17 meeting between Johnson, Yoakum and Simpson, or even that Simpson agreed with Johnson during that discussion, given the variations of the message that exist, and the different perceptions of what Johnson has historically said, I cannot sustain an allegation of misconduct without additional information.

Finally, I was also unable to sustain an allegation of misconduct based on the statement in an email Simpson intended to send to himself but instead sent to Johnson, either as an independent violation, or in support of my position that Simpson is trying to undermine Chief Johnson.  In that email, Simpson wrote that Johnson "served a search warrant solo without telling anyone."  Technically, Johnson did not serve a search warrant, alone or otherwise, nor did he serve the abatement warrant by himself, and in that respect Simpson's comment is inaccurate.  However, given the context of this statement and Johnson's actions at the MMD incident, such an interpretation alone is not indicative of deliberate dishonesty.  Regardless, in a profession where attention to detail is important and reports are written to refresh one's memory, the accuracy of those reports can be critical.  Clearly Simpson intended to document this information for future reference, and doing so when the content is inaccurate becomes more problematic with time.

## Disposition

The following violations have been alleged and are disposed of herein:

**Upland Police Department Policy Manual:**

**7.01(I) – Professional Standards and Evaluations *(Code of Conduct/Code of Ethics – Policy):*** All department employees shall conduct their professional and private lives in a manner that presents a favorable image of the community, the Police Department, and the individual.  Courteous and businesslike demeanor shall be observed at all times.

**Sustained.** Sgt. Simpson engaged in conduct that reflected unfavorably on his professional image when he failed to follow a written directive ordering him to not discuss an administrative investigation, and when he was not forthcoming during the subsequent internal affairs interview; when he undermined the authority of the Chief of

COU-00000573

Police; and when he made comments about the Chief of Police in the presence of other employees that were disrespectful or otherwise inappropriate.

---

**7.01(IV)A – Professional Standards and Evaluations** *(Code of Conduct/Code of Ethics [Duty] – Performance of Duties):* Members of the Department shall be held strictly accountable for the proper performance of duties assigned to them, and for adherence to the rules and regulations adopted for the good order of the Department.

**Sustained.** Sgt. Simpson did not adhere to the rules and regulations of the Upland Police Department policy manual when he failed to follow a written directive ordering him to not discuss an administrative investigation, and when he was not forthcoming during the subsequent internal affairs interview; and when he engaged in conduct that was unbecoming an officer.

---

**7.01(IV)Q(1) – Professional Standards and Evaluations** *(Code of Conduct/Code of Ethics [Duty] – Conduct Unbecoming an Officer):* Sworn employees shall not conduct themselves in a manner or participate in any activity which, if it were known to the public, would tend to bring discredit upon or reflect poorly on, the professional image of the police department.

**Sustained.** Sgt. Simpson engaged in conduct that was unbecoming an officer when he at least twice failed to follow a written directive ordering him to not discuss an administrative investigation, when he tried to influence that investigation, and when he was not forthcoming during the subsequent internal affairs interview; when he undermined the authority of the Chief of Police; when he made comments about the Chief of Police in the presence of other employees that were disrespectful or otherwise inappropriate; and when he was disrespectful to the chief's secretary.

---

**7.01(IV)R – Professional Standards and Evaluations** *(Code of Conduct/Code of Ethics [Duty] – Truthfulness):* All employees of the Department are required to be truthful. No employee shall give a false or misleading statement; write a false or misleading police report; or give a false or misleading statement during an internal affairs investigation.

**Sustained.** Sgt. Simpson was not forthcoming when interviewed during an internal affairs investigation.

---

**7.01(V)A(2)a – Professional Standards and Evaluations** *(Code of Conduct/Code of Ethics [Orders] – Insubordination):* The deliberate refusal or failure of an employee to accept and obey a lawful order given by a superior is insubordination, and shall subject the employee to disciplinary action.

EXHIBIT 25
Page 142 of 144

COU-00000574

**Sustained.** Sgt. Simpson failed to follow a written directive ordering him to not discuss an administrative investigation.

_____

**7.01(V)A(2)b – Professional Standards and Evaluations *(Code of Conduct/Code of Ethics [Orders] – Respect for Superiors):*** Each employee shall accord respect to their commanding officer, superior, or supervisor at all times, and shall refrain from being unreasonably critical or making derogatory comments on orders received from or issued by him.

**Sustained.** Sgt. Simpson made comments about the Chief of Police in the presence of other employees that were disrespectful or otherwise inappropriate.

_____

**7.01(VII)A – Professional Standards and Evaluations *(Code of Conduct/Code of Ethics [Relationship to Associates] – Respect):*** Employees shall treat other department employees and all other professional associates with respect. In their demeanor, they shall be courteous and considerate. They shall guard against unfriendly feeling, and refrain from all communications to the discredit of their associations, except to superior officers when it is their duty to place before them, facts regarding neglect of duty, disobedience to orders, violation of law, or other improper conduct.

**Sustained.** Sgt. Simpson was disrespectful to Sr. Administrative Assistant Barrett when he tried to influence statements Barrett would make during an administrative interview.

_____

Sgt. Simpson's conduct was also contrary to the *Law Enforcement Code of Ethics,* (included in section 7.01(VIII)A of the Upland Police Department policy manual), which reads, in part:

> *"Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department."*

_____

Sgt. Simpson's conduct was also contrary to the *City of Upland Code of Ethics,* (included in section 7.01(VIII)C of the Upland Police Department policy manual), which reads, in part:

> *"(The conduct of public officials and employees) in both their official and private affairs should be above reproach."*

_____

Finally, Sgt. Simpson's conduct was contrary to the *Code of Professional Conduct and Responsibility for Police Officers,* (included in section 7.01 (IX) of the Upland Police Department policy manual):

COU-00000575

Canon Four, section 4.9:

> *"Peace Officers shall, at all times, conduct themselves in a manner which does not discredit the Peace Officer profession or their employing agency."*

Canon Four, section 4.10:

> *"Peace Officers shall not be disrespectful, insolent, mutinous, or insubordinate in attitude or conduct."*

Canon Four, section 4.11:

> *"Peace Officers shall be courteous and respectful in their official dealings with the public, fellow officers, superiors, and subordinates."*

Canon Six, section 6.3:

> *"Peace Officers shall conduct themselves so as to set exemplary standards of performance for all law enforcement personnel."*

COU-00000576

# EXHIBIT 26



**CONFIDENTIAL**
**PERSONNEL MEMORANDUM**

# MEMORANDUM

| | |
|---|---|
| Date: | August 30, 2017 |
| To: | Marcus Simpson, Sergeant |
| From: | Jeannette Vagnozzi, Deputy City Manager |
| Subject: | NOTICE OF PROPOSED TERMINATION |

## I.  Purpose of Memorandum

This confidential personnel memorandum is to notify you of my intent to terminate your employment for sustained violations of the Upland Police Department Policy Manual and the Law Enforcement Code of Ethics.  It is also to notify you of your right to respond to this Notice of Proposed Termination.

## II.  Factual Findings and Basis For Discipline

The reasons for this Proposed Termination are based upon the findings of two independent investigations (UPD IA 05-17 and 06-17) conducted by retired Police Captain/Investigator Gary Wedge, which I have independently reviewed and which are attached hereto.  It must also be noted that neither Chief Brian Johnson nor City Manager Marty Thouvenell participated or provided any input into my decision given that they may be witnesses in this matter.  I was delegated the authority to independently review the investigation and to independently make the determination as to whether there is cause for discipline and if so, what level of discipline is appropriate.  To summarize, the investigations revealed the following:

### Investigation UPD IA 05-17

In early November 2016, you were directed by Chief Brian Johnson to coordinate a probation and parole compliance sweep.  On or about December 6, 2016 at a Department staff meeting, you were untruthful to Chief Johnson when asked about the status of the sweep scheduled for the following week.  You told Chief Johnson that no agencies were available to participate.  You also specifically stated that neither the San Bernardino County Sheriff's Department ("the Sheriff's Department") nor the Chino Police Department could participate.

However, two days after the staff meeting, Chief Johnson spoke with Chief Karen Comstock from the Chino Police Department, Chief Brad Kaylor from the Ontario Police Department and Chief Robert Avels from the Montclair Police Department at a county police chiefs' meeting.  Chief Avels informed Chief Johnson that Montclair Police Department was able

EXHIBIT 26
Page 1 of 6

COU-00011248

Simpson
Confidential Memo
Page 2

to participate in the sweep and Chief Comstock told Chief Johnson that no one from Chino Police Department had been contacted about participating in the sweep. An email exchange between Chief Comstock and Sgt. Nick Marotta of the Chino PD also revealed that Chino PD had not been contacted to participate in the sweep at the time of the staff meeting on December 6, 2016.

Chief Johnson telephoned you from the chiefs meeting and told you that you made him "look like an idiot" because no one from Chino Police Department had been contacted. During your investigative interview, you denied that you were specifically asked about the Chino Police Department at the staff meeting. However, other accounts and contemporaneous notes taken by Sr. Administrative Assistant Luz Barrett at that meeting reveal that you were specifically asked about participation from Chino PD and the Sheriff's Department and that you stated that there was no participation in the sweep from the Sheriff's Department, the Chino Police Department, Montclair Police Department, Ontario Police Department and Claremont Police Department.

You also informed the investigator that after Chief Johnson called you from the chiefs' meeting, you asked Officers Kirk and McCullough if they knew anything about contacting the Chino Police Department. However, neither officer recalled having such a conversation with you.

Moreover, it was clear that when you told Chief Johnson none of the agencies were available to participate in the sweep at the staff meeting, you knew that Montclair Police Department could participate in the sweep.

### Violations of Upland Department Policy Manual and Law Enforcement Code of Ethics

As a result, I agree with the investigator's findings that your conduct violated the following Upland Police Department Policies:

- 7.01(I) – Professional Standards and Evaluations (Code of Conduct/Code of Ethics – Policy)

Your conduct reflected unfavorably on your professional image when you were untruthful and/or misleading in your response to the questions asked by Chief Johnson at the staff meeting, and when interviewed during the internal affairs investigation.

- 7.01(IV)A - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Performance of Duties)

You failed to adhere to the rules and regulations of the Department policy manual when you were untruthful and/or misleading in your response to the questions asked by Chief Johnson at the staff meeting, and when interviewed during the internal affairs investigation.

- 7.01(IV)Q1 - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Conduct Unbecoming an Officer)

EXHIBIT 26
Page 2 of 6

COU-00011249

Simpson
Confidential Memo
Page 3

You engaged in conduct unbecoming of an officer when you were untruthful and/or misleading in your response to the questions asked by Chief Johnson at the staff meeting, and when interviewed during the internal affairs investigation.

* 7.01(IV)R - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Truthfulness)

You were untruthful and/or misleading in your response to the questions asked by Chief Johnson at the staff meeting, and when interviewed during the internal affairs investigation.

I also agree with the investigator's findings that your conduct was contrary to the Law Enforcement Code of Ethics and Canons 4.9 and 6.3 of the Code of Professional conduct and Responsibility for Police Officers.

### Investigation UPD IA 06-17

On February 9, 2017, an administrative investigation involving allegations of misconduct by Chief Johnson was initiated. You and several others were identified as witnesses and you were provided written notice directing you to appear for an interview and ordering you not to discuss the matter with anyone. You signed that notice on February 28, 2017.

On April 3, 2017, you spoke with Sr. Administrative Assistant Luz Barrett and told her that you had just left an interview with the private investigator the City had hired. You also told her that you gave the investigator her name and that she should be expecting a call. When Barrett asked you why, you told her you gave her name to the investigator because of the "copies [she] made and gave to the officer's attorney," and that "they" [detectives] knew Chief Johnson directed her to put the "recordings" from the Marijuana Medical Dispensary ("MMD") incident in another office so Johnson could alter them, and then telling her you knew she was just doing what she was told to do.

When interviewed during the internal affairs investigation, you denied making those statements to Barrett during the April 3, 2017 interaction, but said you did speak with her because you were directed by City Manager Thouvenell to solicit from employees complaints against Chief Johnson. However, City Manager Thouvenell merely told you that he could not investigate general complaints and would need something more specific before he could initiate an investigation.

On April 12, 2017, Chief Johnson was interviewed for the investigation and on that same day, you went into Barrett's office and asked her when she was going to be interviewed. As a result of your interaction with Barrett, and other reasons, you were placed on administrative leave. When interviewed during the internal affairs investigation by Gary Wedge, however, you denied asking Barrett about the interview. Your conversations with Barrett were an attempt to influence the issues she would discuss if she was interviewed during the investigation.

You also asked Cadet Holzer if she was interviewed for the Johnson investigation and participated in discussions with detectives and other subordinates about the investigation. You

EXHIBIT 26
Page 3 of 6

COU-00011250

Simpson
Confidential Memo
Page 4

also shared with others the type of document Captain Yoakum was given by Chief Johnson, despite the intended confidentiality of the document. You were also critical of Chief Johnson to Detective Sellers a week after the incident for which Chief Johnson was being investigated. Several witnesses corroborated that you made critical statements of Chief Johnson to persons other than the UPMA membership.

Thus, it is clear you discussed the ongoing investigation of Chief Johnson with other people on numerous occasions. It is also clear you discussed the investigation and were critical of Chief Johnson with non-members of the Upland Police Management Association. I also conclude that you were not forthcoming in the internal affairs investigation when asked about your communications with others regarding the investigation of Chief Johnson and critical comments made to others about Chief Johnson.

### Violations of Upland Department Policy Manual and Law Enforcement Code of Ethics

As a result, I agree with the investigator's findings that your conduct violated the following Upland Police Department Policies:

- 7.01(I) – Professional Standards and Evaluations (Code of Conduct/Code of Ethics – Policy)

Your conduct reflected unfavorably on your professional image when you: (1) failed to follow a written directive not to discuss the administrative investigation of Chief Johnson; (2) were not forthcoming during the internal affairs interview; (3) undermined the authority of Chief Johnson; and (4) made comments about Chief Johnson in the presence of others (non-UPMA members) that were disrespectful and inappropriate.

- 7.01(IV)A - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Performance of Duties)

You failed to adhere to the rules and regulations of the Department policy manual when you: (1) failed to follow a written directive not to discuss the administrative investigation of Chief Johnson; (2) were not forthcoming during the internal affairs interview; and (3) engaged in conduct that was unbecoming of an officer.

- 7.01(IV)Q1 - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Conduct Unbecoming an Officer)

You engaged in conduct unbecoming of an officer when you (1) failed to follow a written directive not to discuss the administrative investigation of Chief Johnson; (2) tried to influence the investigation; (3) undermined the authority of Chief Johnson; (4) made comments about Chief Johnson in the presence of others (non-UPMA members) that were disrespectful and inappropriate; and (5) were disrespectful to the Chief's secretary.

EXHIBIT 26
Page 4 of 6

COU-00011251

Simpson
Confidential Memo
Page 5

- 7.01(IV)R - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Truthfulness)

You were not forthcoming when interviewed during the internal affairs investigation.

- 7.01(V)A(2)a - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Orders]– Insubordination)

You failed to follow a written directive not to discuss the administrative investigation of Chief Johnson

- 7.01(V)A(2)b - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Orders]– Respect for Superiors)

You made comments about Chief Johnson in the presence of others (non-UPMA members) that were disrespectful and inappropriate.

- 7.01(VII)A - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Relationship to Associates]– Respect)

You were disrespectful to Sr. Administrative Assistant Barrett when you tried to influence her statements she would make during an administrative interview.

I also agree with the investigator's findings that your conduct was contrary to the Law Enforcement Code of Ethics, the City of Upland Code of Ethics and Canons 4.9, 4.10, 4.11 and 6.3 of the Code of Professional conduct and Responsibility for Police Officers, as set forth in the investigative report.

### III. Proposed Discipline

After independent review and consideration of the investigative findings of both investigations (UPD IA 05-17 and 06-17), I conclude that you engaged in dishonesty, insubordination, and interference with an administrative investigation, among other misconduct. Moreover, your actions demonstrate a pattern of disloyalty and dishonesty with the intent to divide and disrupt the organization and its operations. This is especially troubling because you are a high-ranking Sergeant, and as a result, held to higher expectations and duties of loyalty to Chief Johnson. Your actions were not made in support of concerted protected union activity, but were rather based on individual motivation to undermine the Chief Johnson and to further your goal of having his employment terminated. The City of Upland Police Department cannot tolerate such conduct from its officers. For these reasons, I have determined that termination is warranted.

### IV. Opportunity to Respond

If you believe this action is not appropriate, pursuant to City of Upland Merit System Rules and Regulations, Article XV, Section (2)(A)(4), you have the right to respond verbally or in

EXHIBIT 26
Page 5 of 6

COU-00011252

Simpson
Confidential Memo
Page 6

writing, or both, to me prior to September 11, 2017, the effective date of the Termination.  If you
wish to request a pre-discipline "Skelly" meeting in order to respond, you must request such
meeting within six (6) working days of service of this Notice by no later than 5:00 p.m. on
September 8, 2017.   You have the right to be represented by an attorney or by a representative of
your employee organization during the hearing.  If you wish to respond in writing, you must do so
by no later than 5:00 p.m. on September 8, 2017.  Your response will be considered before final
action is taken.  Failure to respond within six (6) working days of service of this Notice shall be
deemed an admission of charges and a waiver of the right to a pre-discipline hearing.

EXHIBIT 26
Page 6 of 6

COU-00011253

# EXHIBIT 27



**CONFIDENTIAL**
**PERSONNEL MEMORANDUM**

# MEMORANDUM

| | |
|---|---|
| Date: | October 11, 2017 |
| To: | Marcus Simpson, Sergeant |
| From: | Jeannette Vagnozzi, Deputy City Manager |
| Subject: | NOTICE OF TERMINATION |

## I.    Purpose of Memorandum

This is to notify you of my decision to adopt the Notice of Intent to Terminate your employment as my final decision. In reaching my final decision, I also considered your input during our Skelly meeting.

You first asserted numerous conflicts of interest. In response to those alleged conflicts related to my participation, I again assert that this proposed and final decision was mine alone, and based on my independent review of all information/investigations/documents/witness interviews that were provided to you. City Manager Thouvenell, Police Chief Johnson, the City's counsel, nor anyone else ever tried to influence my decision, nor would I have allowed it.

You next asserted that you have a long, unblemished employment history, including numerous commendations, and that termination was too severe. I was aware of this when I proposed your termination, and this does not mitigate the sustained misconduct giving rise to your termination. To the contrary, I would have expected more professionalism from someone with as much experience and a supervisory rank.

You contended that no valid "no talk" order was given, as it was given by HR, and not a superior. I find this response particularly unpersuasive, because in your position and with your experience, you should know not to discuss an ongoing investigation under any circumstances, and certainly not in the manner that you did, or with the individual to whom you addressed. Further, if you were uncertain as to whether there was a valid order given, you should have addressed that alleged uncertainty, not simply violated the order.

You next contended that the allegations against you were supported by only one witness. This is simply not the case considering the entire circumstances. Nor did you present any argument or evidence that any witness was dishonest or mistaken, or that any evidence was inaccurate or misleading. On this point, I do note that you called the Chief a liar in his referring to your wife as having used drugs. In re-reviewing the investigation transcripts and evidence in response to you

EXHIBIT 27
Page 1 of 6

**COU-00011254**

Simpson
Confidential Memo
Page 2

claim here, it is apparent to me that you had informed the Chief that your "daughter" had used marijuana at some point.  In response, the Chief offered any help he could for your family.  The Chief later mistakenly stated your "wife" had used marijuana instead of "daughter," and you were misleading me on this point even during your <u>Skelly</u> meeting.

Accordingly, nothing stated in your Skelly meeting has persuaded me to change my proposed decision, and my final decision is to terminate your employment.

## II.    Factual Findings and Basis for Discipline

The reasons for this Termination are based upon the findings of two independent investigations (UPD IA 05-17 and 06-17) conducted by retired Police Captain/Investigator Gary Wedge, which I have independently reviewed and which are attached hereto.  It must also be noted that neither Chief Brian Johnson nor City Manager Marty Thouvenell participated or provided any input into my decision given that they may be witnesses in this matter.  I was delegated the authority to independently review the investigation and to independently make the determination as to whether there is cause for discipline and if so, what level of discipline is appropriate.  To summarize, the investigations revealed the following:

### <u>Investigation UPD IA 05-17</u>

In early November 2016, you were directed by Chief Brian Johnson to coordinate a probation and parole compliance sweep.  On or about December 6, 2016 at a Department staff meeting, you were untruthful to Chief Johnson when asked about the status of the sweep scheduled for the following week.  You told Chief Johnson that no agencies were available to participate.  You also specifically stated that neither the San Bernardino County Sheriff's Department ("the Sheriff's Department") nor the Chino Police Department could participate.

However, two days after the staff meeting, Chief Johnson spoke with Chief Karen Comstock from the Chino Police Department, Chief Brad Kaylor from the Ontario Police Department and Chief Robert Avels from the Montclair Police Department at a county police chiefs' meeting.  Chief Avels informed Chief Johnson that Montclair Police Department was able to participate in the sweep and Chief Comstock told Chief Johnson that no one from Chino Police Department had been contacted about participating in the sweep.  An email exchange between Chief Comstock and Sgt. Nick Marotta of the Chino PD also revealed that Chino PD had not been contacted to participate in the sweep at the time of the staff meeting on December 6, 2016.

Chief Johnson telephoned you from the chiefs meeting and told you that you made him "look like an idiot" because no one from Chino Police Department had been contacted.   During your investigative interview, you denied that you were specifically asked about the Chino Police Department at the staff meeting.  However, other accounts and contemporaneous notes taken by Sr. Administrative Assistant Luz Barrett at that meeting reveal that you were specifically asked about participation from Chino PD and the Sheriff's Department and that you stated that there was no participation in the sweep from the Sheriff's Department, the Chino Police Department, Montclair Police Department, Ontario Police Department and Claremont Police Department.

EXHIBIT 27
Page 2 of 6

COU-00011255

Simpson
Confidential Memo
Page 3

You also informed the investigator that after Chief Johnson called you from the chiefs' meeting, you asked Officers Kirk and McCullough if they knew anything about contacting the Chino Police Department. However, neither officer recalled having such a conversation with you.

Moreover, it was clear that when you told Chief Johnson none of the agencies were available to participate in the sweep at the staff meeting, you knew that Montclair Police Department could participate in the sweep.

### Violations of Upland Department Policy Manual and Law Enforcement Code of Ethics

As a result, I agree with the investigator's findings that your conduct violated the following Upland Police Department Policies:

- 7.01(I) – Professional Standards and Evaluations (Code of Conduct/Code of Ethics – Policy)

Your conduct reflected unfavorably on your professional image when you were untruthful and/or misleading in your response to the questions asked by Chief Johnson at the staff meeting, and when interviewed during the internal affairs investigation.

- 7.01(IV)A - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Performance of Duties)

You failed to adhere to the rules and regulations of the Department policy manual when you were untruthful and/or misleading in your response to the questions asked by Chief Johnson at the staff meeting, and when interviewed during the internal affairs investigation.

- 7.01(IV)Q1 - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Conduct Unbecoming an Officer)

You engaged in conduct unbecoming of an officer when you were untruthful and/or misleading in your response to the questions asked by Chief Johnson at the staff meeting, and when interviewed during the internal affairs investigation.

- 7.01(IV)R - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Truthfulness)

You were untruthful and/or misleading in your response to the questions asked by Chief Johnson at the staff meeting, and when interviewed during the internal affairs investigation.

I also agree with the investigator's findings that your conduct was contrary to the Law Enforcement Code of Ethics and Canons 4.9 and 6.3 of the Code of Professional conduct and Responsibility for Police Officers.

EXHIBIT 27
Page 3 of 6

COU-00011256

Simpson
Confidential Memo
Page 4

## **Investigation UPD IA 06-17**

On February 9, 2017, an administrative investigation involving allegations of misconduct by Chief Johnson was initiated. You and several others were identified as witnesses and you were provided written notice directing you to appear for an interview and ordering you not to discuss the matter with anyone. You signed that notice on February 28, 2017.

On April 3, 2017, you spoke with Sr. Administrative Assistant Luz Barrett and told her that you had just left an interview with the private investigator the City had hired. You also told her that you gave the investigator her name and that she should be expecting a call. When Barrett asked you why, you told her you gave her name to the investigator because of the "copies [she] made and gave to the officer's attorney," and that "they" [detectives] knew Chief Johnson directed her to put the "recordings" from the Marijuana Medical Dispensary ("MMD") incident in another office so Johnson could alter them, and then telling her you knew she was just doing what she was told to do.

When interviewed during the internal affairs investigation, you denied making those statements to Barrett during the April 3, 2017 interaction, but said you did speak with her because you were directed by City Manager Thouvenell to solicit from employees complaints against Chief Johnson. However, City Manager Thouvenell merely told you that he could not investigate general complaints and would need something more specific before he could initiate an investigation.

On April 12, 2017, Chief Johnson was interviewed for the investigation and on that same day, you went into Barrett's office and asked her when she was going to be interviewed. As a result of your interaction with Barrett, and other reasons, you were placed on administrative leave. When interviewed during the internal affairs investigation by Gary Wedge, however, you denied asking Barrett about the interview. Your conversations with Barrett were an attempt to influence the issues she would discuss if she was interviewed during the investigation.

You also asked Cadet Holzer if she was interviewed for the Johnson investigation and participated in discussions with detectives and other subordinates about the investigation. You also shared with others the type of document Captain Yoakum was given by Chief Johnson, despite the intended confidentiality of the document. You were also critical of Chief Johnson to Detective Sellers a week after the incident for which Chief Johnson was being investigated. Several witnesses corroborated that you made critical statements of Chief Johnson to persons other than the UPMA membership.

Thus, it is clear you discussed the ongoing investigation of Chief Johnson with other people on numerous occasions. It is also clear you discussed the investigation and were critical of Chief Johnson with non-members of the Upland Police Management Association. I also conclude that you were not forthcoming in the internal affairs investigation when asked about your communications with others regarding the investigation of Chief Johnson and critical comments made to others about Chief Johnson.

EXHIBIT 27
Page 4 of 6

COU-00011257

Simpson
Confidential Memo
Page 5

## **Violations of Upland Department Policy Manual and Law Enforcement Code of Ethics**

As a result, I agree with the investigator's findings that your conduct violated the following Upland Police Department Policies:

- 7.01(I) – Professional Standards and Evaluations (Code of Conduct/Code of Ethics – Policy)

Your conduct reflected unfavorably on your professional image when you: (1) failed to follow a written directive not to discuss the administrative investigation of Chief Johnson; (2) were not forthcoming during the internal affairs interview; (3) undermined the authority of Chief Johnson; and (4) made comments about Chief Johnson in the presence of others (non-UPMA members) that were disrespectful and inappropriate.

- 7.01(IV)A - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Performance of Duties)

You failed to adhere to the rules and regulations of the Department policy manual when you: (1) failed to follow a written directive not to discuss the administrative investigation of Chief Johnson; (2) were not forthcoming during the internal affairs interview; and (3) engaged in conduct that was unbecoming of an officer.

- 7.01(IV)Q1 - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Conduct Unbecoming an Officer)

You engaged in conduct unbecoming of an officer when you (1) failed to follow a written directive not to discuss the administrative investigation of Chief Johnson; (2) tried to influence the investigation; (3) undermined the authority of Chief Johnson; (4) made comments about Chief Johnson in the presence of others (non-UPMA members) that were disrespectful and inappropriate; and (5) were disrespectful to the Chief's secretary.

- 7.01(IV)R - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Duty]– Truthfulness)

You were not forthcoming when interviewed during the internal affairs investigation.

- 7.01(V)A(2)a - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Orders]– Insubordination)

You failed to follow a written directive not to discuss the administrative investigation of Chief Johnson

- 7.01(V)A(2)b - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Orders]– Respect for Superiors)

EXHIBIT 27
Page 5 of 6

COU-00011258

Simpson
Confidential Memo
Page 6

You made comments about Chief Johnson in the presence of others (non-UPMA members) that were disrespectful and inappropriate.

- 7.01(VII)A - Professional Standards and Evaluations (Code of Conduct/Code of Ethics[Relationship to Associates]– Respect)

You were disrespectful to Sr. Administrative Assistant Barrett when you tried to influence her statements she would make during an administrative interview.

I also agree with the investigator's findings that your conduct was contrary to the Law Enforcement Code of Ethics, the City of Upland Code of Ethics and Canons 4.9, 4.10, 4.11 and 6.3 of the Code of Professional conduct and Responsibility for Police Officers, as set forth in the investigative report.

## III. Discipline

After independent review and consideration of the investigative findings of both investigations (UPD IA 05-17 and 06-17), I conclude that you engaged in dishonesty, insubordination, and interference with an administrative investigation, among other misconduct. Moreover, your actions demonstrate a pattern of disloyalty and dishonesty with the intent to divide and disrupt the organization and its operations. This is especially troubling because you are a high-ranking Sergeant, and as a result, held to higher expectations and duties of loyalty to Chief Johnson. Your actions were not made in support of concerted protected union activity, but were rather based on individual motivation to undermine the Chief Johnson and to further your goal of having his employment terminated. The City of Upland Police Department cannot tolerate such conduct from its officers. For these reasons, I have determined that termination is warranted.

## IV. Opportunity to Appeal

You have the right to request an appeal of the Notice of Termination action before a mutually selected Arbitrator experienced in police disciplinary cases. The Arbitrator's decision in termination cases is final and finding pursuant to the Upland Police Management Association MOU, Article 28. Your request for an appeal is required to be made to the Human Resources Manager within ten (10) working days of the date of this letter. If you do not timely appeal, the appeal will be deemed waived.

Respectfully,

Jeannette Vagnozzi
Deputy City Manager

EXHIBIT 27
Page 6 of 6

COU-00011259

# EXHIBIT 28

**Kelly Gonzales**

| | |
|---|---|
| **From:** | msimpson1971@gmail.com |
| **Sent:** | Wednesday, October 11, 2017 4:58 PM |
| **To:** | Jeannette Vagnozzi; Kelly Gonzales |
| **Subject:** | Resignation |

Jeanette,

Effective immediately I am resigning my position of police sergeant.

I will arrange with Captain Mathews to return the remainder of my issued equipment and pick up my personal property.

If you have any other questions please contact my attorney, Mike McCoy.

Marc Simpson

EXHIBIT 28
Page 1 of 1

# EXHIBIT 29



ADMINISTRATIVE SERVICES DEPARTMENT
HUMAN RESOURCES
Telephone (909) 931-4177
Facsimile (909) 931-4301

October 11, 2017

Marcus Simpson
1822 N. Balboa Way
Upland, CA 91784

RE:  Resignation

Dear Marcus,

The following is a summary of benefits related to your separation from the City of Upland:

➢ **Accrued Leave and Final Pay Check:**  Any accrued unused vacation, and comp time will be paid out on your final paycheck on **October 11, 2017**.

➢ **City ID Badge & Other Equipment:**   Please return ID badge and any city issued keys/phone/uniforms to your department.

➢ **Medical, Dental, and Vision Coverage:**  Your Kaiser HMO 15 (Employee +2 Plus) and MetLife Dental DHMO (Employee + Family) will cancel on **November 30, 2017.**

   ✓ Under the Consolidated Omnibus Budget Reconciliation Act, COBRA, you may elect to continue your current health coverage for **up to 18 months** at your own expense. But to be eligible, health coverage must remain continuous without a break.

   ✓ If you will have coverage with a new employer and you do not need coverage for September, you can cancel coverage for the month of September.

   ✓ Under the Affordable Care Act you can apply for individual health coverage online through the Health Insurance Marketplace by visiting Covered California at www.coveredca.com, or call 800-300-1506.

➢ **CalPERS:**  We will notify CalPERS of your separation from service.  You have the option of requesting a refund of your CalPERS retirement account, but please be aware that by doing so:

   ▪ Federal and State taxes will be withheld up front and additional penalties will apply when filing your income tax return.
   ▪ You will lose CalPERS membership status.
   ▪ You will lose your current CalPERS service credit.

EXHIBIT   29
Page 1 of 2

**City of Upland**
460 North Euclid Avenue, Upland, CA 91786-4732 • (909) 931-4100 • Fax (909) 931-4123 • TDD (900) 735-2929 • www.uplandca.us

COU-00009850

- For more information or to request a refund, contact CalPERS at **(888) 225-7377**.

➤ **ICMA Deferred Comp**: We will notify ICMA-RC of your separation. Your account summary is available through Account Access at **www.icmarc.org**. You have the following options for this account:

- Leave funds in the current account (funds will stay there until you elect otherwise).
- Transfer to your next employers' deferred comp plan.
- Roll over to an ICMA-RC IRA account.
- Take a lump sum withdrawal. Please note Federal and State taxes will be deducted up front and additional penalties apply when filing your income tax return. For further information, you may contact **ICMA Member Services at (800) 669-7400.**

➤ **Life Insurance:** The City of Upland life insurance coverage may be continued at your own expense. If you are interested in continuing this insurance, you must contact MetLife directly within 31 days of your last day worked. Otherwise the coverage will cancel November 30, 2017.

If you have any questions, please contact me at (909) 931-4376, or kgonzales@ci.upland.ca.us.


Sincerely,

Kelly Gonzales
Human Resources Manager

EXHIBIT 29
Page 2 of 2

COU-00009851

# EXHIBIT 30



# STAFF REPORT

**ITEM NO. 14.A.**

| | |
|---|---|
| **DATE:** | October 23, 2017 |
| **TO:** | MAYOR AND CITY COUNCIL |
| **FROM:** | MARTIN THOUVENELL, INTERIM CITY MANAGER |
| **PREPARED BY:** | JEANNETTE VAGNOZZI, DEPUTY CITY MANAGER |
| | LONDA BOCK-HELMS, FINANCE OFFICER |
| **SUBJECT:** | REVISIONS TO THE FISCAL YEAR 2017-18 BUDGET |



EXHIBIT 30
Page 1 of 5

Page 1 of 3 **COU-00012069**



**Staffing Changes – no impact to the Fiscal Year 2017-18 Budget \*\***

| | |
|---|---|
| Reinstate Police Captain -  (position is currently frozen) | $150,000 |
| Reinstate Police Lieutenant (position is currently frozen) | $130,000 |
| Reclassify Admin. Assistant to Sr. Admin. Assistant | $20,324 |



Staffing Changes with no impact to the current budget - The Captain and Lieutenant positions were frozen in the current fiscal year as cost savings measures; however, greater administrative and mangement structure is needed to support the operations of the department.  Due to current vacancies, there is sufficient funding to staff these positions in

EXHIBIT 30
Page 2 of 5

Page 2 of 3 **COU-00012070**

the last six months of the fiscal year.

EXHIBIT 30
Page 3 of 5

Page 3 of 3 **COU-00012071**

4/15/2019

COU-00012072

8:21 AM

City of Upland
Salary Splits by Position
2017-18 Budget

DRAFT



EXHIBIT 30
Page 5 of 5

**COU-00012073**

8:21 AM

EXHIBIT 31



# MEMORANDUM

TO:        Brian Johnson

FROM:      Martin Thouvenell, City Manager

DATE:      October 27, 2017

RE:        **Notice of At Will Release from Employment**

Dear Chief Johnson,

Pursuant to paragraph 2(c) of your Employment Agreement, this shall serve as notice of release from your at will employment as the Chief of Police for the City of Upland.  The reason for your release is incompatibility of management style best suited for implementing the goals and policies of the City and Police Department.

You have the right to an administrative appeal of this decision.  If you choose to exercise this right, you must notify my office in writing within 5 days.

The City thanks you for your 2 ½ years of service as its Chief of Police and wishes the best of luck in your future endeavors.


Sincerely,

Martin Thouvenell
City Manager


CC: Kelly Gonzales, Human Resources Manager

**City of Upland**
460 North Euclid Avenue, Upland, CA 91786-4732 • (909) 931-4100 • Fax (909) 931-4123 • TDD (900) 735-2929 • www.ci.upland.ca.us

EXHIBIT 31                                    COU-00011560
Page 1 of 1

EXHIBIT 32

Brandi L. Harper, SBN 264672
Brandi@CastilloHarper.com
Joseph N. Bolander, SBN 280857
Joe@CastilloHarper.com
**CASTILLO HARPER, APC**
6848 Magnolia Ave., Ste 100
Riverside, CA 92506
Ph: (909) 466-5600
Fax: (909) 466-5610

*Attorneys for Plaintiff*
MARCUS SIMPSON

CASTILLO HARPER
A PROFESSIONAL CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS SIMPSON,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF UPLAND, a Public Entity; CHIEF OF POLICE BRIAN JOHNSON, individually and in his capacity as Chief of the Upland Police Department; CITY MANAGER MARTIN THOUVENELL, individually and in his capacity as City Manager for the City of Upland; and DOES 1-10, inclusive.<br><br>Defendants. | Case No. 5:18-cv-1024 PSG (SP)<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**1. Labor Code § 1102.5 Retaliation**<br><br>**2. Violation of 42 U.S.C. § 1983 – Due Process**<br><br>**3. Violation of 42 U.S.C. § 1983 – First Amendment Retaliation**<br><br>**4. Discrimination, Interference, Retaliation – Gov. Code §§ 3502, 3502.1, 3506** |

EXHIBIT 32
Page 11 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

This is a second amended complaint for damages and injunctive relief brought by Plaintiff MARCUS SIMPSON ("PLAINTIFF") against The City of Upland, Chief BRIAN JOHNSON, City Manager MARTIN THOUVENELL, and Does 1-10 (collectively referred to as "DEFENDANTS") for retaliation in violation of Labor Code § 1102.5, the MMBA and 42 U.S.C. § 1983 (First and Fourteenth Amendments to the United States Constitution).

## JURISDICTION AND VENUE

1.     On May 11, 2018, DEFENDANTS City of Upland and Thouvenell, removed this case from state court based on 28 U.S.C. section 1331 (federal question), and 28 U.S.C. section 1441(b), because Plaintiff's second (due process) and third (First Amendment retaliation) causes of action, are brought under 42 U.S.C. § 1983. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, and 28 U.S.C. § 1367.  Specifically, this Court has authority to provide declaratory and injunctive relief in this case pursuant to 28 U.S.C. §§2201 and 2202.

2.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because the acts, events, or omissions giving rise to the claim occurred in this District.

///

///

EXHIBIT 32
Page 2 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

## **PARTIES**

3.     PLAINTIFF was, at all times relevant, a resident of San Bernardino County. Prior to his constructive termination on or about October 11, 2017, PLAINTIFF was at all relevant times a member of the Upland Police Department, serving as a Sergeant.

4.     PLAINTIFF'S home address is confidential pursuant to Penal Code §§146e and 832.7, and Vehicle Code §1808.4(a)(11).

5.     DEFENDANT CITY OF UPLAND ("City") is a duly constituted municipal corporation operating under the laws of the State of California.   The Police Department is an operating department of the City and charged with the responsibility of providing public safety for the City of Upland.

6.     DEFENDANT, BRIAN JOHNSON ("JOHNSON"), was at all times relevant the Police Chief for the Upland Police Department. In doing the things alleged herein, Johnson acted under the color of state law, within the course and scope of his employment, and as one to whom official policy-making authority was delegated, and/or one whose decisions were ratified by an official policy maker of the City. As a department head, JOHNSON was delegated policy-making authority over actions such as the ones at issue in this complaint relating to Police Department personnel, like Plaintiff.

EXHIBIT 32
Page 3 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

CASTILLO HARPER
A PROFESSIONAL CORPORATION

7.     DEFENDANT, MARTIN THOUVENELL ("THOUVENELL"), was at all times relevant the City Manager for the City of Upland. In doing the things alleged herein, THOUVENELL acted under the color of state law, within the course and scope of his employment, and as an official policy-maker for the City. As City Manager, THOUVENELL had final policy making authority over the personnel actions taken herein, and either personally participated in those actions, as described below, or delegated to DEFENDANT JOHNSON that authority and/or ratified the unconstitutional decisions and actions of JOHNSON.

8.     The City of Upland has adopted a City Manager form of government. In Upland, the city manager is the "…administrative head of the government…." City of Upland Municipal Code § 2.04.070.  Further, it is the city manager's duty "to, and he or she shall, appoint, remove, promote, demote and discipline any and all officers and employees of the city, except the city clerk, city treasurer and city attorney, unless otherwise prescribed by this code." Further Upland Municipal Code § 2.04.090 provides that "It shall be the duty of the city manager, and he or she shall have the authority to control, order and give directions to all heads of departments and to subordinate officers and employees of the city under his or her jurisdiction through their department heads." PLAINTIFF is informed and believes and thereon alleges that THOUVENELL, in his capacity as city manager, delegated this authority with respect to personnel decisions relating to police

EXHIBIT 32
Page 44 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

CASTILLO HARPER
A PROFESSIONAL CORPORATION

personnel, like PLAINTIFF, to JOHNSON with respect to the actions taken against Plaintiff alleged herein, and/or ratified those actions taken by JOHNSON.

9. DEFENDANT DOES 1 through 10, ("DOES") inclusive, are not known or identified at this time. On information and belief, PLAINTIFF alleges that each DOE is in some manner responsible for the wrongs alleged herein, and that each such defendant advised, encouraged, participated in, ratified, directed or conspired to do, the wrongful acts alleged herein. When the true names and capacities of said defendants become known, PLAINTIFF will seek relief to amend this Complaint to show their true identities in place of their fictitious names as DOES 1 through 10.

10. Each and all of the acts of the DEFENDANTS as alleged herein were done by DEFENDANTS, their agents, servants, and employees, and each of them as individuals and under the color and pretense of the statutes, ordinances, regulations, customs and usages of the State of California, and under the authority of their employment with full knowledge and approval of their superiors as agents. DEFENDANTS are jointly and severally liable for the injuries and damages sustained by PLAINTIFF.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. All necessary prerequisites to suit, to the extent there are any, have been met. On November 20, 2017 PLAINTIFF filed a claim for damages with the

EXHIBIT 32
Page 5 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

City. On or about January 5, 2018, PLAINTIFF filed a second claim for damages with the City. On or about, January 11, 2018, the City notified PLAINTIFF that that it had rejected his claim.

## FACTS COMMON TO ALL COUNTS

12. At all relevant times, PLAINTIFF performed his duties as a police sergeant for the Upland Police Department in a competent, if not exceptional, manner.

13. In or about December of 2014, PLAINTIFF was elected vice president of the Upland Police Management Association ("UPMA"). In or about April of 2015, PLAINTIFF took over the responsibilities of the UPMA president because the then-president was on leave. On or about May 2016, PLAINTIFF was elected to be the UPMA President. The UPMA is the exclusive representative for Police Management employees at the City of Upland. In his capacity as a union board member and president, PLAINTIFF met with DEFENDANT JOHNSON to discuss Union issues and other problems affecting the community and the department.

14. Beginning in 2016, numerous issues arose between the Chief and the Police Management Association. PLAINTIFF upheld his duty to represent the members, and during the course of his union and other protected activity became the target of harassment and retaliation. As part of his responsibilities as Union

EXHIBIT 32
Page 6 of 26

CASTILLO HARPER
A PROFESSIONAL CORPORATION

president and in his private citizen capacity as such, PLAINTIFF raised numerous

concerns with JOHNSON, City Officials, including THOUVENELL, and City

Council, regarding JOHNSON'S illegal actions and misconduct and other issues,

including, but not limited to, the following:

    a.   the failure to meet and confer about changing working conditions;

    b.   implementation of redundant paperwork;

    c.   JOHNSON'S inference that supervisors were sexist and racist;

    d.   Complaints of low morale because of JOHNSON'S policies and attempts to implement failed LAPD standards and practices;

    e.   Complaints of lack of staffing and the safety and other issues that resulted therefrom;

    f.   Complaints of lowering/changing hiring standards;

    g.   Complaints of high employee turnover because of JOHNSON'S policies;

    h.   Complaints of JOHNSON'S lack of communication with supervisors;

    i.   Complaints of JOHNSON undermining sergeants, lieutenants and captain's authority;

EXHIBIT 32
Page 7 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

j.   Creation of hostile work environment (e.g. JOHNSON referred to certain supervisors as "saboteurs", claiming he had informants inside or outside the bargaining unit);

k.   Complaints regarding shifting of staff schedules without abiding by the MOU or seniority;

l.   Complaints regarding JOHNSON'S interference with ongoing criminal investigations;

m.   Complaints regarding JOHNSON'S lack of knowledge of local issues, and as a result, Complaints that JOHNSON violated law and embarrassed the Department by removing political signs around the City;

n.   Complaints that JOHNSON violated the law by mishandling and unlawfully viewing evidence on a computer without a warrant, and arresting suspects without probable cause;

o.   Complaints that Johnson violated the Peace Officers Bill of Rights and Cal. Penal Code § 135.5 during administrative discipline cases;

p.    and Complaints about officer safety issues.

15.   DEFENDANT JOHNSON continuously made comments suggesting he intended to retaliate against PLAINTIFF for his protected speech and union

EXHIBIT 32
Page 8 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

CASTILLO HARPER
A PROFESSIONAL CORPORATION

activity. For example, in or about early 2017, JOHNSON stated that he was aware that PLAINTIFF and the union had spoken to city council about grievances and complaints regarding JOHNSON, which included complaints PLAINTIFF made that JOHNSON had violated the law with respect to his handling of evidence and the  unlawful search of a computer.  JOHNSON challenged the union and PLAINTIFF regarding his protected speech, stating "bring it on, I'm ready for a fucking war with you guys."  JOHNSON challenged the union to do a vote of no confidence as well.

16.    On numerous occasions before and after JOHNSON invited PLAINTIFF and the PMA to go to "war" with him, JOHNSON told PLAINTIFF that he had seen officer's careers ruined by their union activity, and that when he was a member of the Police Protective League while working at LAPD, his goal was to work with the administration and not cause problems.

17.    In or around May of 2016, during contentious contract negotiations between the City and UPMA, JOHNSON called PLAINTIFF into his office and told PLAINTIFF that it should be PLAINTIFF'S goal to support and work with the City. JOHNSON stated that he believed that PLAINTIFF was causing strife between the City, JOHNSON and the UPMA. JOHNSON said that down the road this would be remembered.

EXHIBIT 32
Page 9 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

Case 5:18-cv-01024-PSG-SP Document 57-2 Filed 08/09/19 Page 382 of 532 Page ID
Case 5:18-cv-01024-PSG-SP Document 31 Filed 08/30/19 Page 10 of 26 Page ID #:209
#:1058

18.     PLAINTIFF was the chief UPMA negotiator, in or about September 2016 when DEFENDANTS established a promotional list for Lieutenant. PLAINTIFF passed the test and scored 95 out of 100 and placed second in the testing process. He was placed on the promotional list for Lieutenant. The officer who tested first was initially promoted. Subsequently, in or about January of 2017, JOHNSON skipped PLAINTIFF and selected the employee who tested third for promotion.  PLAINTIFF is informed and believes and thereon alleges that DEFENDANT JOHNSON took this action against PLAINTIFF in retaliation for his protected speech and protected activities, and he did so pursuant to final policy making authority delegated to him by DEFENDANT THOUVENELL.

19.     THOUVENELL was the former Chief of Police at the Department and his influence factored heavily into JOHNSON being named chief. PLAINTIFF is further informed and believes that JOHNSON consulted with THOUVENELL on numerous department and personnel related matters, though THOUVENELL delegated final policy making authority in these areas to JOHNSON. PLAINTIFF is informed and believes and thereon alleges that THOUVENELL was aware of the retaliatory reason that JOHNSON denied PLAINTIFF a promotion, yet he took no action to prevent it.

20.     Also in or about January 2017,  DEFENDANT JOHNSON stated during a joint meeting with the UPMA and Upland Police Officers Association that

EXHIBIT 32
Page 10 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

CASTILLO HARPER
A PROFESSIONAL CORPORATION

Case 5:18-cv-01024-FSG-SP   Document 57-2   Filed 09/09/19   Page 383 of 532   Page ID
Case 5:18-cv-01024-FSG-SP   Document 31   Filed 08/30/19   Page 11 of 26   Page ID #:210
#:1059

he "had dirt" on all of the union board members, and DEFENDANT JOHNSON specifically pointed to PLAINTIFF. Based on his position as Union President, PLAINTIFF went to DEFENDANT CITY MANAGER THOUVENELL with several associational grievances and complaints related to DEFENDANT JOHNSON'S threatening, illegal and retaliatory conduct, which based on information and belief, violated state and federal law, and department policies.

21.     In or about January or February of 2017, PLAINTIFF reported to DEFENDANT THOUVENELL that JOHNSON had engaged in misconduct and illegal activity by encouraging the unlawful arrest of marijuana dispensary operators and by mishandling electronic evidence, and unlawfully reviewing the same without a warrant, thereby violating California's Electronic Communications Privacy Act.  More specifically, on  or about January 21, 2017, JOHNSON was the lead investigator when he served a search warrant at a marijuana dispensary. He collected property to include computers and other electronic files.  Pursuant to California law, due to SB 178, before the computer and its data could be examined, another search warrant was required that specified the type of computer, serial number, specific types of data, files, etc…, that were to be searched.  However, JOHNSON violated the law by removing a seized computer from evidence and searching it without obtaining a warrant. JOHNSON compounded the problem by violating the chain of custody, not properly storing it, and leaving it unattended,

EXHIBIT 32
Page 11 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

something he denied during subsequent investigations, despite photographic evidence proving the contrary.

22.     During this meeting, PLAINTIFF also informed THOUVENELL of JOHNSON'S illegal conduct with respect to political sign removal, the low morale of the union and the department in general, along with unsafe tactics JOHNSON implemented.  In the meeting, THOUVENELL claimed that he knew JOHNSON was performing poorly and that he had witnessed JOHNSON act unprofessionally. THOUVENELL indicated that he had informed JOHNSON that he should alter his conduct but JOHNSON had not been receptive to this criticism, and that if the allegations of illegal conduct against JOHNSON were true, he would fire him.

23.     In or about January or February of 2017, PLAINTIFF also reported JOHNSON'S illegal and improper conduct relating to the unlawful handling and viewing of evidence and the related improper arrests, to at least three members of the City Council, two of whom were councilpersons Gino Filippi and Sid Robinson.  PLAINTIFF also reported the same, during the same timeframe, to Mayor Debbie Stone, who when informed about the facts and details surrounding JOHNSON'S impropriety commented, "We don't need this."

24.     THOUVENELL had taken no action, and with JOHNSON'S retaliatory conduct escalating, PLAINTIFF met again with THOUVENELL to address concerns regarding JOHNSON'S illegal conduct, his impact on the union

EXHIBIT 32
Page 12 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

CASTILLO HARPER
A PROFESSIONAL CORPORATION

Case 5:18-cv-01024-FSC-SP Document 57-2 Filed 00/09/19 Page 385 of 532 Page ID
Case 5:18-cv-01024-FSC-SP Document 51 Filed 08/30/19 Page 13 of 26 Page ID #:212
#:1061

1  membership, and other concerns. THOUVENELL at this time indicated that he

2  "believed" the allegations of illegal conduct against JOHNSON —specifically

3  those related to the illegal search and handling of electronic evidence—were true.

4

5      25.    Thereafter, in or about February or March of 2017, PLAINTIFF met

6  again with THOUVENELL, who asked PLAINTIFF and a representative of the

7  POLICE OFFICERS' ASSOCIATION, what they wanted done regarding

8  JOHNSON. Both PLAINTIFF and the POA representative indicated that they

9  wanted JOHNSON fired. THOUVENELL acted as if he was receptive to the idea

10 of returning as interim-Chief, something suggested by the POA representative, and

11 indicated that he would consider firing JOHNSON when an investigation into his

12 conduct concluded. During at least one of PLAINTIFF'S meetings with

13 THOUVENELL, THOUVENELL told PLAINTIFF and another employee to

14 solicit complaints from officers against JOHNSON. PLAINTIFF is informed and

15 believes that THOUVENELL later denied this during PLAINTIFF'S internal

16 affairs investigation, thereby making a knowingly false statement.

17     26.    PLAINTIFF is informed and believes that in or about February or

18 March of 2017, sometime shortly after his reports of JOHNSON'S illegal conduct,

19 in retaliation for engaging in various forms of protected speech and association,

20 PLAINTIFF was retaliated against when JOHNSON, pursuant to his delegated

21 authority, "froze" a remaining Lieutenant position ensuring that PLAINTIFF

CASTILLO HARPER
A PROFESSIONAL CORPORATION

EXHIBIT 32
Page 13 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

would not be promoted. PLAINTIFF is further informed and believes and thereon alleges that THOUVENELL was aware of JOHNSON'S decision to freeze the position, as well as JOHNSON'S retaliatory motivation for doing so, yet THOUVENELL acquiesced and did nothing to prevent JOHNSON from taking this action.

27. On or about March 22, 2017, counsel for the Police Management Association, for which PLAINTIFF served as president, sent THOUVENELL a letter on behalf of the PMA raising concerns regarding JOHNSON'S conduct relating to the arrests and seizures of evidence at the marijuana dispensary in January of 2017, along with other concerns, including Chief JOHNSON'S violation of the Peace Officer's Bill of Rights and Penal Code Section 135.5 during internal affairs investigations and discipline hearings, in addition to other legal, management and safety issues.

28. Less than a month later, on or about April 19, 2017, PLAINTIFF was placed on administrative leave by JOHNSON and was the subject of an internal affairs investigation ordered by JOHNSON based on false and pretextual allegations of misconduct. PLAINTIFF was continuously asked questions regarding union business and told he was required to disclose confidential union business or be subject to an additional insubordination charge. PLAINTIFF was noticed of DEFENDANT'S intent to terminate him, so faced with an illegitimate

EXHIBIT 32
Page 14 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

1   investigation and having been denied due process,  ultimately PLAINTIFF was

2   forced to resign in order to protect his ability to earn a livelihood in law

3

4   enforcement.

5       29.     DEFENDANT THOUVENELL directly participated in the retaliatory

6

7   and pretextual actions taken against PLAINTIFF.  PLAINTIFF is informed and

8   believes and thereon alleges that during the pendency of the pretextual

9

10  investigation of PLAINTIFF, THOUVENELL told leaders of the POA not to get

11  involved in, or advocate against, the firing of PLAINTIFF.  THOUVENELL

12  indicated that if the POA stayed on the sidelines, they could be rewarded with

13

14  promotions in exchange for their non-opposition. And in fact following

15  PLAINTIFF'S termination, certain members of the POA board promoted.

16

17      30.     Further, PLAINTIFF is informed and believes and thereon alleges that

18  THOUVENELL and JOHNSON made false statements during an investigation

19

20  into JOHNSON'S misconduct for the purpose of shielding JOHNSON; while

21  THOUVENELL and JOHNSON made false statements during the pretextual

22  internal affairs investigation launched against PLAINTIFF for the purpose of

23

24  harming PLAINTIFF and ensuring his forced separation.  THOUVENELL and

25  JOHNSON'S conduct vis-à-vis these investigations, PLAINTIFF is informed and

26  believes, was part of a coordinated and concerted effort between them to retaliate

27

28  against PLAINTIFF for PLAINTIFF'S protected speech.  THOUVENELL' S

EXHIBIT 32
Page 15 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

CASTILLO HARPER
A PROFESSIONAL CORPORATION

Case 5:18-cv-01024-PSG-SP Document 57-2 Filed 08/09/19 Page 388 of 532 Page ID
Case 5:18-cv-01024-PSG-SP Document 51 Filed 08/30/19 Page 16 of 26 Page ID#:215
#:1064

duplicitous conduct in this respect was all the more revealing of his retaliatory

motive, given that he previously claimed to believe the accusations made against

JOHNSON and said he was simply waiting for an investigation demonstrating

JOHNSON'S guilt before taking action against him. When in fact, PLAINTIFF is

informed and believes, THOUVENELL lied in that very investigation to help

exonerate JOHNSON. And then THOUVENELL actively participated in a

conspiracy to force PLAINTIFF out of the Department by, among other things,

attempting to bribe POA members for their silence and knowingly making false

statements during PLAINTIFF'S investigation, because of PLAINTIFF'S

protected speech.

    31.    PLAINTIFF is informed and believes and thereon alleges that

DEFENDANTS and each of them conspired to and did deprive him of his right to

Due Process. PLAINTIFF was given defective notice by JOHNSON related to his

administrative leave. He was then denied his right to a Discipline Review Board

(DRB) hearing even though it is his right under city policy. JOHNSON took these

actions pursuant to his authority delegated by THOUVENELL, and with

THOUVENELL' S knowledge.

    32.    PLAINTIFF'S rights were further violated as he was disciplined twice

for the same claimed violation. PLAINTIFF was further denied a fair investigation

based on a series of conflicts of interest. PLAINTIFF was further denied due

EXHIBIT 32
Page 16 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

CASTILLO HARPER
A PROFESSIONAL CORPORATION

process through the Skelly Process again based on multiple conflicts of interest, including counsel for the City acting as an investigator and refusing to recuse himself as the Skelly officer.

33. PLAINTIFF believes and is informed that the actions of DEFENDANTS THOUVENELL and JOHNSON as described herein were malicious, fraudulent, and/or oppressive and done with a willful and conscious design to injure PLAINTIFF and with a blatant disregard for PLAINTIFF's rights. DEFENDANTS, and each of them and/or their agents/employees, supervised, authorized, condoned and ratified the unlawful conduct of each other.

## FIRST CAUSE OF ACTION
### *Labor Code § 1102.5 Retaliation*
### *Against the City of Upland Only*

34. PLAINTIFF restates and incorporates by this reference each and every allegation contained in the preceding paragraphs of this Complaint as though set forth herein.

35. Labor Code § 1102.5 prohibits an employer from, among other things, retaliating against an employee for disclosing a violation of state or federal statute, or a violation or noncompliance with state, local or federal regulations.

36. As set forth above, PLAINTIFF disclosed, and actively opposed DEFENDANT JOHNSON'S violations of state and federal law, and department policy. PLAINTIFF'S disclosures were based on his reasonably held-belief that

EXHIBIT 32
Page 17 of 26

CASTILLO HARPER
A PROFESSIONAL CORPORATION

Case 5:18-cv-01024-PSG-SP Document 57-2 Filed 09/09/19 Page 390 of 532 Page ID
Case 5:18-cv-01024-PSG-SP Document 31 Filed 08/30/19 Page 18 of 26 Page ID #:217
#:1066

DEFENDANTS' actions constituted violations of state and/or federal law, as well as department policy. PLAINTIFF'S grievances and other reports of misconduct and illegal conduct were also based on his reasonably held belief that DEFENDANTS violated law and policy.

37.    CITY'S actions against PLAINTIFF, including failures to promote him to Lieutenant, his constructive discharge, and other adverse actions as described above, were carried out in retaliation for said disclosing and opposing violations of law and policy.

38.    PLAINTIFFS' disclosure and activities are protected under section 1102.5.  Subsection (e) states that "[a] report made by an employee of a government agency to his employer is a disclosure of information to a government or law enforcement agency."

39.    As a direct and proximate result of CITY'S unlawful conduct, PLAINTIFF has suffered and will continue to suffer severe physical and mental distress, humiliation, embarrassment, anxiety, loss of earnings, loss of other employment benefits, medical expenses, lack of professional opportunities and advancement, and other general and special damages in an amount to be proven at  trial.

///

///

EXHIBIT 32
Page 18 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

CASTILLO HARPER
A PROFESSIONAL CORPORATION

# SECOND CAUSE OF ACTION

### *42 U.S.C. § 1983 Due Process*

### *Against All Defendants*

40.     PLAINTIFF restates and incorporates by this reference each and every allegation contained in the preceding paragraphs of this Complaint as though set forth herein.

41.     PLAINTIFF had a property interest in his position as Sergeant with the Upland Police Department under the Fourteenth Amendment.

42.     PLAINTIFF had and has a fundamental and vested property interest in employment that necessarily includes the right to procedural and fundamental fairness in any administrative process concerning the status of this property interest right as concerns his employment with the DEFENDANT City.

43.     PLAINTIFF is informed and believes and theron alleges that he was deprived of his constitutionally guaranteed due process when, among other things as alleged above, JOHNSON deprived him of a fair and impartial Skelly Hearing, deprived him of a DRB (Discipline Review Board) hearing, and deprived him of documents to which he was entitled.

44.     The aforementioned actions and omissions by JOHNSON were taken with the awareness and acquiescence of THOUVENELL and violated PLAINTIFF'S rights under state and federal law.

EXHIBIT 32
Page 19 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

CASTILLO HARPER
A PROFESSIONAL CORPORATION

Case 5:18-cv-01024-PSG-SP Document 57-2 Filed 08/09/19 Page 392 of 532 Page ID
Case 5:18-cv-01024-PSG-SP Document 51-7 Filed 08/30/19 Page 20 of 26 Page ID #:219
#:1068

45.     In doing the things alleged herein DEFENDANTS violated the rights of PLAINTIFF under the Fifth and Fourteenth Amendments to the United States Constitution to due process.

46.     It was or should have been plainly obvious to any reasonable policy making official of the DEFENDANT City that the acts and omissions of DEFENDANTS as alleged herein directly violated and continued to violate PLAINTIFF'S clearly established constitutional and statutory rights.

47.     In doing the things alleged herein, DEFENDANTS JOHNSON and THOUVENELL acted with malicious intent to violate PLAINTIFF s rights, or at least in conscious, reckless, and callous disregard of PLAINTIFF'S rights and to the injurious consequences likely to result from a violation of said rights.

48.     As a direct and proximate result of defendants' unlawful conduct, PLAINTIFF has suffered and will continue to suffer severe physical and mental distress, humiliation, embarrassment, anxiety, loss of earnings, loss of other employment benefits, medical expenses, lack of professional opportunities and advancement, and other general and special damages in an amount to be proven at trial.

49.     General and special damages are sought according to proof, in addition to attorneys' fees and costs of suit as allowed by law. Punitive damages are sought against the individual defendants, according to proof.

EXHIBIT 32
Page 20 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

CASTILLO HARPER
A PROFESSIONAL CORPORATION

Case 5:18-cv-01024-PSG-SP   Document 57-2   Filed 08/09/19   Page 393 of 532   Page ID
Case 5:18-cv-01024-PSG-SP   Document 31   Filed 03/30/19   Page 21 of 26   Page ID 220
#:1069

# THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 – First Amendment Retaliation
### Against All Defendants

50.     PLAINTIFF hereby incorporates each and every preceding paragraph as though set forth in full here.

51.     PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS JOHNSON, THOUVENELL and City caused him to suffer adverse actions, including denial of promotion to lieutenant and his ultimate constructive discharge, at least in substantial part, for exercising his Constitutional rights to free speech, to petition the government, and to association, with respect to his union speech, affiliation and activities, and otherwise.

52.     In doing the things alleged herein, DEFENDANTS, and each of them, violated the rights of PLAINTIFF under the First and Fourteenth Amendments to the United States Constitution. The acts and omissions of DEFENDANTS, and each of them, were done by DEFENDANTS under color of state law in their capacity as a municipality chartered under state law, and as policy making authorities to which DEFENDANT delegated its governing powers in the subject matter areas in which these policies were promulgated or decisions taken, or customs and practices followed.   The acts and omissions of DEFENDANTS as alleged herein manifested or conformed to official policies, customs, practices, or decisions of Defendant City.  Defendant THOUVENELL was vested with final

EXHIBIT 32
Page 21 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

CASTILLO HARPER
A PROFESSIONAL CORPORATION

policy making authority with respect to the aforementioned adverse actions, and he delegated that authority to Defendant JOHNSON, and/or directly participated in, ratified and adopted said conduct as his own.

53.     It was or should have been plainly obvious to any reasonable policy making official of the City that the acts and omissions of DEFENDANTS as alleged herein, taking singly or in conjunction, directly violated and continued to violate PLAINTIFFS clearly established constitutional and statutory rights. Indoing the things alleged herein, DEFENDANTS JOHNSON and THOUVENELL acted with malicious intent to violate PLAINTIFF'S rights, or at least in conscious, reckless, and callous disregard of PLAINTIFFS rights and to the injurious consequences likely to result from a violation of said rights.

54.     As a direct and proximate result of DEFENDANTS' unlawful conduct, PLAINTIFF has suffered and will continue to suffer severe physical and mental distress, humiliation, embarrassment, anxiety, loss of earnings, loss of other employment benefits, medical expenses, lack of professional opportunities and advancement, and other general and special damages in an amount to be proven at  trial.

55.     General and special damages are sought according to proof.   Punitive damages are sought only against Defendants JOHNSON and THOUVENELL according to proof.

EXHIBIT 32
Page 22 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

# FOURTH CAUSE OF ACTION

***Retaliation, Interference, Discrimination in Violaiton of Government Code §§ 3502, 3502.1 & 3506 – Against Defendant CITY only***

56. PLAINTIFF restates and incorporates by this reference each and every allegation contained in the preceding paragraphs of this Complaint as though set forth herein.

57. Government Code sections 3502 and 3506 prohibit public agencies from, among other things, interfering with, or discriminating against, public employees because of their participation in the activities of employee organizations for the purpose of representation on all matters of employer-employee relations.

58. Government Code § 3502.1 states: "No public employee shall be subject to punitive action or denied promotion, or threatened with any such treatment, for the exercise of lawful action as an elected, appointed, or recognized representative of any employee bargaining unit."

59. Government Code § 3506 states: "Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502."

60. DEFENDANT CITY'S actions against PLAINTIFF, including failures to promote him to Lieutenant, his constructive discharge, and other

EXHIBIT 32
Page 23 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

CASTILLO HARPER
A PROFESSIONAL CORPORATION

adverse actions as described above, were in substantial part carried out in retaliation for PLAINTIFF'S exercise of rights under the MMBA.

61.     PLAINTIFF engaged in activity and excercised rights under Government Code § 3502.

62.     DEFENDANT CITY interfered with and attempted to restrain and otherwise punish and deter PLAINTIFF'S protected activity, and further retaliated against and discriminated against PLAINTIFF based on his protected union activity in violation of Government Code §§ 3502, 3502.1 and 3506.

63.     As a result of DEFENDANTS CITY'S unlawful conduct, PLAINTIFF has suffered and will continue to suffer severe physical and mental distress, humiliation, embarrassment, anxiety, loss of earnings, loss of other employment benefits, medical expenses, lack of professional opportunities and advancement, and other general and special damages in an amount to be proven at  trial.

///

///

///

///

///

EXHIBIT 32
Page 24 of 26

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL**

# PRAYER FOR RELIEF

**WHEREFORE**, PLAINTIFF prays for relief as follows:

1. For general, compensatory, and special damages in amounts according to proof against all DEFENDANTS;

2. For punitive damages in amounts according to proof against JOHNSON and THOUVENELL only;

3. Injunctive relief ordering DEFENDANTS to (a) expunge any false negative personnel documents provided by DEFENDANTS relating to the adverse actions that are the subject of this action; and (b) to take any and all necessary and reasonable steps to remove the stigma and negative perception of SIMPSON;

4. For attorneys' fees as provided by law;

5. For prejudgment, post-judgment and other interest as provided by law;

6. For cost of suit incurred herein; and

7. For such other and further relief as the Court deems fair and just.

Dated:  August 30, 2018                        Respectfully submitted,

                                               CASTILLO HARPER, APC

                                               s/Joseph N. Bolander_____
                                               Brandi L. Harper
                                               Joseph N. Bolander
                                               *Attorneys for Plaintiff*
                                               MARCUS SIMPSON

EXHIBIT 32
Page 25 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF: DEMAND FOR JURY TRIAL

CASTILLO HARPER
A PROFESSIONAL CORPORATION

## DEMAND FOR TRIAL BY JURY

PLAINTIFF hereby demands a trial by jury.

Dated: August 30, 2018                    Respectfully submitted,

                                          CASTILLO HARPER, APC


                                          s/Joseph N. Bolander_____
                                          Brandi L. Harper
                                          Joseph N. Bolander
                                          *Attorneys for PLAINTIFF*
                                          MARCUS SIMPSON

EXHIBIT 32
Page 26 of 26

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL

CASTILLO HARPER
A PROFESSIONAL CORPORATION

# EXHIBIT 33

Brandi L. Harper, SBN 2644672
Brandi@CastilloHarper.com
Joseph N. Bolander, SBN 280857
Joe@CastilloHarper.com
Castillo Harper, APC
6848 Magnolia Ave, Ste 100
Riverside, California 92506
Telephone: (909) 466-5600
Facsimile: (909) 466-5610

Attorneys for Plaintiff, MARCUS SIMPSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| MARCUS SIMPSON, an individual | Case No.: 5:18-CV-1024PSG (SP) |
|---|---|
| Plaintiff, | |
| vs. | **PLAINTIFF MARCUS SIMPSON RESPONSE TO DEFENDANT CITY OF UPLANDS SPECIAL INTEROGATORIES, SET ONE** |
| CITY OF UPLAND, a public entity; CHIEF OF POLICE BRIAN JOHNSON, individually and in his capacity as Chief of Police of the Upland Police Department; CITY MANAGER MARTIN THOUVENELL, individually and in his capacity as Upland City Manager; and DOES 1 through 10, Inclusive | |
| Defendants. | |

PROPOUNDING PARTY:     DEFENDANT CITY OF UPLAND

RESPONDING PARTY:     PLAINTIFF MARCUS SIMPSON

SET NUMBER:     ONE

EXHIBIT 33
PLAINTIFF MARCUS SIMPSON RESPONSE TO DEFENDANT CITY OF
UPLANDS SPECIAL INTEROGATORIES, SET ONE

1   **SPECIAL INTERROGATORY NO. 12:**

2
3       IDENTIFY all DOCUMENTS upon which YOU base YOUR contention

4   that DEFENDANT BRIAN JOHNSON committed an adverse employment action

5   against YOU in retaliation for YOUR protected activity.

6
7   **RESPONSE TO SPECIAL INTERROGATORY NO. 12:**

8       Discovery and investigation are ongoing.  Subject to the foregoing:

9
10      Upland Police Department Internal Affairs Investigations 05-17, 06-17, and

11  Plaintiff's Notice of Intent to Terminate Employment. Internal Affairs

12  investigation into Brian Johnson; Written correspondence sent from Plaintiff to
13
14  DEFENDANTS in his capacity as union president, including a letter from counsel

15  for Upland Police Management Association detailing the unions complaints against

16  Defendant Brian Johnson; complaint filed with the City of Upland against
17
18  Defendant Brian Johnson; City documents indicating Plaintiff's non-selection for

19  promotion and those indicating the freezing of the lieutenant's list.
20
21      Discovery and investigation are ongoing.

22  **SPECIAL INTERROGATORY NO. 13:**
23
24      IDENTIFY YOUR current employment status including your current

25  employer, if any, dates of employment, current salary and current value of all

26  employment benefits you receive.
27

28

EXHIBIT 33
PLAINTIFF MARCUS SIMPSON'S RESPONSE TO DEFENDANT CITY OF
UPLANDS SPECIAL INTEROGATORIES, SET ONE

## RESPONSE TO SPECIAL INTERROGATORY NO. 13:

Plaintiff is employed full-time as a Police Sergeant at California Polytechnic University, Pomona. This chart lists his current benefits and salary.

| Base Pay | 7804 |
|---|---|
| Incentive Pay | 450 |
| Holiday Pay | 0 |
| Longevity | 0 |
| Uniform Allowance | 57 |
| **Total** | 8311 |

## SPECIAL INTERROGATORY NO. 14:

IDENTIFY all economic damages YOU allege YOU sustained as a result of DEFENDANTS' actions as alleged in YOUR COMPLAINT, including the amount of alleged damages and how those amounts were calculated.

## RESPONSE TO SPECIAL INTERROGATORY NO. 14:

Plaintiff objects to this request on the grounds that it seeks premature disclosure of expert witnesses and expert opinion, as Plaintiffs damages will be computed by an expert. Subject to the foregoing, Plaintiff provides the below estimates, while reserving the right to adjust as necessary based on new

## RESPONSE TO SPECIAL INTERROGATORY NO. 15:

Plaintiff has suffered from a loss of reputation and emotional distress.

## SPECIAL INTERROGATORY NO. 16:

IDENTIFY all medical and/or psychiatric/psychologic health care providers with whom YOU have treated as a result of YOUR alleged emotional distress as alleged in YOUR COMPLAINT, and dates of such treatment.

## RESPONSE TO SPECIAL INTERROGATORY NO. 16:

1) Plaintiff was seen by Dr. Adetunji F Adegboyega at Kaiser Permanente Upland Medical Center on July 13, 2017.

Dated: May 13, 2019

Respectfully Submitted,

CASTILLO HARPER, APC

s/Joseph N. Bolander
Brandi L. Harper, Esq.
Joseph Bolander, Esq.
Attorneys for Plaintiff,
MARCUS SIMPSON

1

## PROOF OF SERVICE

2

3     I declare that I am over the age of eighteen (18) and not a party to this action. My business address is 6848 Magnolia Ave. Ste. 100, Riverside, CA 92506.

4     On **May 13, 2019**, I served the following document described as follows:

5     **PLAINTIFF MARCUS SIMPSON RESPONSE TO DEFENDANT CITY OF UPLANDS SPECIAL INTEROGATORIES, SET ONE**

6     on the interested parties in this action by placing a true and correct copy of each document thereof, enclosed in a sealed envelope addressed as follows:

7

| **Walsh & Associates, APC** | **The Zappia Law Firm** |
|---|---|
| *Attn: Alice Chung* | *Attn: Gail Wise* |
| 16633 Ventura Blvd. Ste. 800 | 7777 Center Ave., Ste. 625 |
| Encino, CA 91436 | Huntington Beach, CA 92647 |

8

9

10

11    [X]   I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service. I know that the correspondence was deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date in the United States mail at Ontario, California.

12

13

14

15    []    By Personal Service, I caused such envelope to be delivered by hand to the above addressee(s).

16

17    []    By facsimile machine, I caused the above-referenced document(s) to be transmitted to the above-named persons(s)

18

19    []    By Overnight Courier, I caused the above referenced document(s) to be delivered to an overnight courier (UPS) for delivery to the above addressee(s).

20

21    [X]   BY ELECTRONIC MAIL (E-MAIL) I served the foregoing document by electronic mail (e-mail)

22

23    [X]   (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

24    Executed on May 13, 2019 at Riverside, California.

25

26

27    *Amanda Vickers*

AMANDA VICKERS

28

EXHIBIT 33
Page 5 of 5
PROOF OF SERVICE-1

EXHIBIT 34



## MEMORANDUM OF UNDERSTANDING (MOU)

## BETWEEN

## THE CITY OF UPLAND

## AND

## THE UPLAND POLICE MANAGEMENT ASSOCIATION

*July 1, 2015 to June 30, 2017*

EXHIBIT 34
Page 1 of 17

# TABLE OF CONTENTS

ARTICLE 1 - TERM OF AGREEMENT ..................................................4

ARTICLE 2 – PREAMBLE..................................................................4

ARTICLE 3 – RECOGNITION .............................................................4

ARTICLE 4 - MANAGEMENT RIGHTS ...............................................4

ARTICLE 5 – SALARIES ....................................................................5

ARTICLE 6 – RETIREMENT ...............................................................5

ARTICLE 7 - DEFERRED COMPENSATION .......................................7

ARTICLE 8 – HEALTH INSURANCE – CAFETERIA PLAN ..................7

ARTICLE 9 – RETIREE HEALTH INSURANCE REIMBURSEMENT .......8

ARTICLE 10 – RETIREE HEALTH SAVINGS ACCOUNTS ...................9

ARTICLE 11 – PREVENTATIVE HEALTH BENEFIT ............................9

ARTICLE 12 – LIFE INSURANCE ......................................................9

ARTICLE 13 – BILINGUAL PAY .......................................................9

ARTICLE 14 – COURT STANDBY PAY..............................................10

ARTICLE 15 – HOLIDAY PAY ..........................................................10

ARTICLE 16 - LONGEVITY PAY .......................................................10

ARTICLE 17 – EDUCATION INCENTIVE AND POST CERTIFICATE PAY .....11

ARTICLE 18 - MERITORIOUS PAY ...................................................12

ARTICLE 19 - OVERTIME PAY .........................................................12

ARTICLE 20 – COMPENSATORY TIME OFF ....................................12

ARTICLE 21 - UNIFORM ALLOWANCE............................................12

ARTICLE 22 - SICK LEAVE ..............................................................13

ARTICLE 23 - VACATION .................................................................13

ARTICLE 24 – VACATION BUYBACK ...............................................14

ARTICLE 25 - BEREAVEMENT LEAVE ..............................................14

ARTICLE 26 - EXECUTIVE LEAVE ....................................................14

ARTICLE 28 – DISCIPLINE AND PERSONNEL FILES .........................14

ARTICLE 29 – WORK SCHEDULE ....................................................15

ARTICLE 30 - PREVAILING BENEFITS...............................................16

EXHIBIT 34
Page 2 of 17

**ARTICLE 31 – SAVINGS CLAUSE** ...............................................................................16

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE CITY OF UPLAND
## AND
## THE UPLAND POLICE MANAGEMENT ASSOCIATION
## July 1, 2015 – JUNE 30, 2017

### ARTICLE 1 - TERM OF AGREEMENT

Except where expressly stated otherwise herein, the City and Association agree that the provisions of this Memorandum of Understanding (MOU) shall be effective on July 1, 2015, and shall expire on June 30, 2017.

### ARTICLE 2 – PREAMBLE

It is the intent and purpose of this MOU to set forth the understanding of the parties reached as a result of meeting and conferring in good faith regarding, but not limited to, matters relating to the wages, hours, and terms and conditions of employment between the City of Upland (hereinafter referred to as "City") and the Upland Police Management Association (hereinafter referred to "Association").

### ARTICLE 3 – RECOGNITION

In 2015, the Upland Police Captains Association petitioned to join the Upland Police Management Association. The petition was approved by the Employee Relations Officer per the procedures outlined in the City's Employer–Employee Relations Resolution. The Association is the recognized employee organization for the personnel employed in the Police Department occupying the classifications of Police Sergeant, Police Lieutenant, and Police Captain,.

### ARTICLE 4 - MANAGEMENT RIGHTS

The City retains all management rights not explicitly and expressly relinquished by the City in this Agreement. Such rights shall include, but not limited to:

A. Decisions involving City policy,
B. The level and type of City services,
C. The merit, necessity and/or organization of the police service,
D. Matters of public safety and similar management decisions,
E. Determining the procedures and standards of selection for employment and promotion,

F.  Directing employees, taking disciplinary action, and relieving employees from duty because of lack of work or other legitimate reasons,

G.  Managing the efficiency of work

H.  Maintaining the efficiency of governmental operations determine the methods, means, and personnel by which government operations are to be conducted

I.  Determining the content of job classifications

J.  Taking all necessary actions to carry out the mission in emergencies

K.  Exercising the complete control and discretion over its organization and the technology used in performing work

The City's exercise of any management right is not subject to meeting and conferring except as to the impact such exercise has on matters within the scope of representation, as defined by applicable law.

### ARTICLE 5 – SALARIES

A.  Effective the first full pay period following MOU ratification by the UPMA and City Council approval, each unit employee shall receive a one-time distribution of $500.00.

B.  Effective January 1, 2016, all employees in this unit will receive a 1.5% increase in base salary.

C.  Effective the first full pay period following July 1, 2016, all employees in this unit will receive a 1.5% increase in base salary.

### ARTICLE 6 – RETIREMENT

A.  Classic Employees – The City of Upland provides its Police Sergeants and Lieutenants with membership in the California Public Employees' Retirement System (CalPERS), 3% @ 55 retirement formula.

Effective January 1, 2016, "Classic" employees defined by the Pension Reform Act of 2013 will pay the nine percent (9%) CalPERS employee/member contribution and an additional one and one-half percent (1.5%) "cost sharing" pension contribution. Total employee/member contribution to be ten and one-half percent (10.5%). This cost sharing pension contribution shall be implemented outside of a CalPERS contract amendment as authorized by Government Code Section 20516(f), and shall extend beyond the expiration of this MOU.

Effective the first full pay period following July 1, 2016, "Classic" employees defined by the Pension Reform Act of 2013 will pay the nine percent (9%) CalPERS employee/member contribution and an additional three percent (3%) "cost sharing" pension contribution. Total employee/member contribution to be twelve percent (12%). This cost sharing pension contribution shall be implemented outside of a CalPERS contract amendment as authorized by Government Code Section 20516(f), and shall extend beyond the expiration of this MOU.

The parties acknowledge that CalPERS mandates an election of unit members, separate from ratification of this MOU, to provide for this cost sharing pursuant to Government Code Section 20516. As soon as practicable after the effective date of this MOU, the City will initiate the contract amendment process. Upon approval and agreement from the bargaining unit and completion of the City's amendment to the CalPERS contract, employee "cost sharing" contributions will be made pursuant to Government Code Section 20516, Employee Cost Sharing of Additional Benefits.

The City contracts with CalPERS for the Single Highest Year Option for all employees who are not defined as "new members" pursuant to the Pension Reform Act of 2013 and the 1959 Survivor Benefit, 3rd level for all members of the bargaining unit. There is an employee cost of $2.00 per month for the 1959 Survivor Benefit. The agreement between the City and CalPERS allows for the buy-back of time served by the employee in the Military as defined under PERS Regulation, Section 21024.

The City, at the Police Chief's discretion, and in accordance with the law, will allow police officers who voluntarily retire from City service and who are at least 50 years of age at the time of retirement to be rehired as a contract service worker (CSW-Retiree) in his/her previous position for a period not to exceed 960 hours in the fiscal year of retirement and for an additional 960 hours in the fiscal year following retirement. The CSW-Retiree will be paid at the hourly rate earned and hold the same rank as on the last full day of employment. CSW-Retirees will receive one-third of the Cafeteria amount provided full-time officers and the same uniform allowance as received by full-time officers. CSW-Retirees are employed on an at-will basis and shall not be eligible for any layoff benefits.  All applicable PERS regulations and statutes regarding the employment of retirees shall apply.


B.   Pension Reform Act of 2013 –

1)   The parties agree that the provisions of AB 340 (The California Pension Reform Act of 2013) went into effect on January 1, 2013.  In addition, if there is any other clean up or other retirement legislation which goes into effect during this MOU and if there are provisions of that legislation which, by law automatically goes into effect, it shall do so. Either party may request to negotiate over the impact of such subsequent legislation.

2)   Two Tier Retirement:   Pursuant to the Act, for "new members" (as defined by the Act) who are employees hired after January 1, 2013, they will be hired pursuant to the 2.7% @ 57 retirement formula.

3)   For "new members" (as defined by the Act) who are employees hired after January 1, 2013, final compensation will be based on the highest annual average compensation earnable during the three consecutive years of employment immediately preceding the effective date of his or her retirement.

EXHIBIT 34
Page 6 of 17

4)  Employee Paid Retirement Contribution - For employees defined as "new members" by the Act hired after January 1, 2013, they shall pay the higher of the classic member contribution or one half of the total normal cost rate as defined by the Act as their employee retirement contribution.

## ARTICLE 7 - DEFERRED COMPENSATION

The City contributes five percent (5%) of base monthly salary to the City's deferred compensation plan on behalf of each employee in the unit.

## ARTICLE 8 – HEALTH INSURANCE – CAFETERIA PLAN

In accordance with "The City of Upland Cafeteria Plan", the city provides a 125 Flexible Benefit Plan ("the Plan"). The regular and intended effect of the Plan, under current law, is to enable employees to choose between (a) the receipt of benefits which may not be subject to either State or Federal income tax or (b) a cash benefit which is subject to tax, but is not included in the employee's hourly rate.

The details of Plan eligibility and operational requirements are set forth in the Plan documents. Once enrolled in a cafeteria distribution plan, employees will only be permitted to modify the plan on the same basis as changes are permitted in health insurance plans, that is, during open enrollment periods and when the employee's dependent status changes.

A.  The city shall make a monthly contribution as set forth below to each eligible member of the unit to be used toward the Section 125 Cafeteria Plan. These funds shall only be used for qualified benefits as provided for in IRC Section 125. Excess benefit dollars shall be added to each employee's taxable earnings.

B.  All employees must enroll in one of the CalPERS health program plans unless they submit to the city proof of comparable health coverage.

1)  Employees who fail to complete this requirement will be enrolled in the lowest cost health insurance plan the city offers through CalPERS.

2)  Employees who meet the requirement shall be allowed to utilize their Section 125 Flexible Benefit Plan contributions for any of the other qualified benefits as provided for in IRC Section 125.

C.  City Section 125 Benefit Contribution and Cash in Lieu – The City will make available to each covered employee a monthly amount for benefits, as specified in this MOU. If the employee has outside health coverage, such as through a spouse, domestic partner, or other acceptable alternate health coverage, the employee can take the unused portion of the amount allocated for the benefit as cash in lieu of receiving any or all of the actual benefit.

1) Employees hired prior to January 1, 2016 - The maximum amount of cash in lieu that an employee may receive is $1015.00.

2) Employees hired on or after January 1, 2016 – The maximum amount of cash in lieu that an employee may receive is the dollar amount equal to 100% of the premium amount for the lowest medical plan for employee only category.

D. Benefits Contribution – For employees hired prior to January 1, 2016, the city will contribute the following to the plan:

1) Effective January 1, 2016                    $1141.00

2) Effective January 1, 2017                    $1267.00

For employees hired on or after April 1, 2016, the city will contribute the following to the plan:

- Employee Only                    100% of lowest cost plans for health, dental, vision

- Employee plus one                100% of lowest cost plans for health, dental, vision

- Family                           100% of lowest cost plans for health, dental, vision To a maximum of $1267.00

The employee must pay the difference between the City's contribution and the actual premium of the plan selected, if any.  The City reserves the right to change medical carriers.  In the event of a change, the city agrees to meet and confer over the impact of the decision.

## ARTICLE 9 – RETIREE HEALTH INSURANCE REIMBURSEMENT

The City will provide retiree health insurance reimbursement in accordance with the following schedule for employees who retire from the City, have health insurance and are paying a premium which exceeds these amounts.  An additional $45 per month allowance is provided for a spouse if the spouse is covered under the employees insurance.

| 10 - 14  years of service | $  72.57 per month |
| 15 - 19  years of service | $  96.81 per month |
| 20 - 24  years of service | $121.05 per month |
| 25 +     years of service | $145.14 per month |

EXHIBIT 34
Page 8 of 17

*Upland Police Management Association*                          *7/1/2015 – 6/30/2017*

The provisions of this article above shall only apply to bargaining unit members hired on or before March 31, 2016. For bargaining unit members hired after April 1, 2016, the City's retiree health contribution will be limited to the CalPERS statutory minimum as provided each year in the Public Employees' Medical and Hospital Care Act (PEMHCA) for those retirees in enrolled in PEMHCA, only.

## ARTICLE 10 – RETIREE HEALTH SAVINGS ACCOUNTS

Effective January 1, 2007, Retirement Health Savings (RHS) accounts will be established through ICMA which will be payable to the employee only upon service or disability retirement with the City of Upland.  City contributions to the RHS accounts will be based upon years of service in accordance with the following schedule:

| Years of Service | Monthly City Contribution | Yearly City Contribution |
|---|---|---|
| 5 to 9.99 | $12.50 | $150.00 |
| 10 to 14.99 | $25.00 | $300.00 |
| 15 to 19.99 | $50.00 | $600.00 |
| 20 to 24.99 | $75.00 | $900.00 |
| 25 + | $100.00 | $1,200.00 |

Upon retirement, all UPMA members shall convert 50% of accrued sick leave, 100% of accrued vacation and 100% of compensatory time to cash and deposit into their Retiree Health Savings Account on a tax deferred basis (in accordance with IRS guidelines). Therefore the current options of cashing out half of accrued sick leave or using Personal Leave (½ of accrued sick leave) at retirement will no longer be allowable.

## ARTICLE 11 – PREVENTATIVE HEALTH BENEFIT

Police Captains may be reimbursed up to $180 annually for the purchase of items, classes, memberships or programs which contribute to physical fitness. This reimbursement shall be made in June of each year. Items which will be considered acceptable for reimbursement are defined in the City's policy on Preventative Health Benefits.

## ARTICLE 12 – LIFE INSURANCE

The City provides Association members with group life insurance in an amount equal to one times (1x) their annual salary.

## ARTICLE 13 – BILINGUAL PAY

The City will provide compensation in the amount of 2.5% of base salary for Police Sergeants and Lieutenants in the unit who successfully complete a fluency examination. Police Captains will

receive compensation in the amount of $50 per month upon successful completion of a fluency exam.

## ARTICLE 14 – COURT STANDBY PAY

Police Sergeants and Lieutenants in such on-call status will be paid 2.5 hours at the overtime rate in which there is any on-call time.

## ARTICLE 15 – HOLIDAY PAY

All Police Sergeants and Lieutenants covered by this MOU shall be compensated in cash for City designated holidays at the rate of 4.61 hours pay per pay period.

All Police Captains shall observe the following holidays, established by Resolution of the City Council:

| New Year's Day | (January 1) |
|---|---|
| Martin Luther King Day | (Third Monday in January) |
| President's Day | (Third Monday in February) |
| Memorial Day | (Last Monday in May) |
| Independence Day | (July 4) |
| Labor Day | (First Monday in September) |
| Thanksgiving Day | (Fourth Thursday in November) |
| Friday after Thanksgiving Day | (The Day After the Fourth Thursday in November) |
| Christmas Day | (December 25) |

All holidays shall be 10 hours unless otherwise noted.

If the holiday falls on a Friday or Saturday, Thursday shall be designated as the holiday and if the holiday falls on Sunday, Monday shall be designated as the holiday.

Police Captains shall receive 32 hours of Floating Holiday annually. Floating holiday hours must be used during the calendar year or they will be removed from the books on December 31st of each year.

## ARTICLE 16 - LONGEVITY PAY

Employees in the unit with ten (10) years or more of continuous City service will receive a two and one half percent (2.5%) increase in base salary, effective January 1, 2016.

EXHIBIT 34
Page 10 of 17

Employees in the unit with twenty (20) years or more of continuous City service will receive an additional two and one half percent (2.5%) increase in base salary, for a total of five percent (5%) longevity pay.

## ARTICLE 17 – EDUCATION INCENTIVE AND POST CERTIFICATE PAY

A.   Police Sergeants and Lieutenants –

   1)   Education Incentive Pay in the following amounts, effective January 1, 2006:

   2.5% of base salary for an Associates Degree (or equiv. college units)
   **OR**
   5% of base salary for a Bachelors Degree (or equiv. college units).

   2)   POST Certificate Pay in the following amounts, effective January 1, 2006:

   2.5% of base salary for an Intermediate POST Certificate
   **OR**
   5% of base salary for an Advanced POST Certificate.

Eligible Police Sergeants and Lieutenants may only receive one payment amount within each category of Incentive Pay, to a maximum allowable of ten percent (10%) of base salary.

Educational Incentive and POST Certificate Pay will take effect when employees in the unit reach Step D in the salary schedule. However, upon promotion from Detective to Sergeant, those receiving Educational Incentive and/or POST Certificate Pay shall maintain the benefit at the same compensation level.

Those employees who were receiving educational incentive and POST certificate pay prior to June 30, 1985 will continue to receive the same compensation and will not be affected by this change.

B.   Police Captains –

   1)   Eligible Police Captains will receive a 2.5% increase in base salary for a POST Management certificate.

   2)   Effective 1/1/09, Police Captains will receive a 2.5% increase in base salary for a Bachelor's Degree OR a 5% increase in base salary for a Master's Degree.

Eligible employees may only receive one payment amount within each category of Incentive Pay, to a maximum allowable of 7.5 percent (7.5%) of base salary.

EXHIBIT 34
Page 11 of 17

## ARTICLE 18 - MERITORIOUS PAY

It is recognized that certain employees will put forth the extraordinary efforts and produce outstanding results for the City. It is desired to reward these individuals. An incentive pay method has been established to encourage all employees to utilize fully their capabilities on behalf of the City. Employees recommended by their department heads and approved by the City Manager may be granted a five percent (5%) increase in salary for period of three months, six months, or one year. Department Head recommendations will be submitted annually on May 1. Payment of meritorious pay will be made in a lump sum annually on the first payday in June. Recommendations will contain the information required in Exhibit F of the Compensation Plan.

Any Police Sergeant or Lieutenant who uses 24 hours or less sick time in the period from December 1st through November 30th, and has at some time during that period accrued 1000 hours of sick leave, and has between 952 and 1000 hours of accrued sick leave as of December 1st will receive $200 ($500 effective 1/1/08). Computations will be made and payment will be in the form of a lump sum payable on the first payday in December of each year. Such payment will only be made to persons actually in the employ of the City on the date of payment.

## ARTICLE 19 - OVERTIME PAY

Police Sergeants and Lieutenants shall receive overtime at the rate of one and one-half (1 ½) times their regular rate of pay for time worked in excess of 40 hours in a 7 day work period. Paid vacation and sick leave and compensatory time off during a work period are counted as hours worked for overtime purposes.

Police Captains are exempt from the FLSA and are not eligible for overtime compensation.

## ARTICLE 20 – COMPENSATORY TIME OFF

Police Sergeants and Lieutenants may not accrue more than two hundred forty (240) hours of compensatory time off. Employees in this unit may convert twenty (20) hours of vacation into non-FLSA compensatory time off annually.

Police Sergeants and Lieutenants, at the time of the request for use of compensatory time off, provide the name of a replacement prior to the granting of the request for CTO.

## ARTICLE 21 - UNIFORM ALLOWANCE

Employees in the unit receive a uniform allowance in the amount of $829 per year for the purchase, maintenance and cleaning of uniforms after completion of 12 months of employment. Uniforms will be provided at the time of appointment. This allowance will be paid twice a year (½ in June and ½ in December).

## ARTICLE 22 - SICK LEAVE

Employees in the unit earn sick leave at the rate of 8 hours per month, up to a maximum accrual of 1250 hours. No sick leave may be granted during the first thirty days of employment with the City.

Bargaining unit members who use less than 40 hours of sick leave between November 1 and October 31 of each year (this, of course, covers two calendar years) may request to cash out twenty (20) hours of sick leave each year. Such request needs to be made in writing to the Human Resources Department during the month of November. If such a request is made, the payment will be made in the first pay period of December of every year. Employees in the unit who used less than 40 hours of sick leave between November 1 and October 31 are eligible to make the request for this cash out assuming that they do so by January 31.

## ARTICLE 23 - VACATION

Vacation shall accrue for Police Sergeants and Lieutenants based on the following schedule:

| 01 – 02 Years of service | 96 Hours per year |
|---|---|
| 03 – 05 Years of service | 120 Hours per year |
| 06 – 10 Years of service | 152 Hours per year |
| 11 – 13 Years of service | 160 Hours per year |
| 14 – 16 Years of service | 168 Hours per year |
| 17 +    Years of service | One additional day (8 hours) per year, up to a maximum of 176 hours per year |

Vacation shall accrue for Police Captains based on the following schedule:

| 01 – 02 Years of service | 96 Hours per year |
|---|---|
| 03 – 05 Years of service | 120 Hours per year |
| 06 – 16 Years of service | 152 Hours per year |
| 17 +    Years of service | One additional day (8 hours) per year, up to a maximum of 176 hours per year |

All employees may accrue vacation up to a maximum of three (3) years of entitlement.

EXHIBIT 34
Page 13 of 17

## ARTICLE 24 – VACATION BUYBACK

In December of every year, Police Sergeants and Lieutenants may be paid cash in lieu of unused vacation for up to 40 hours of vacation if they have used at least 40 hours of vacation during the preceding year.

In the month November of each calendar year, Police Captains who have used at least 40 hours of accrued vacation between the preceding November 1 and October 31 may cash out (by making a written request) up to 60 hours of their accrued vacation. Such request must be received by November 30 in Human Resources. If such a request is made, the payment will be made in the first pay period of December of every year.

## ARTICLE 25 - BEREAVEMENT LEAVE

Association members may use up to 5 consecutive days of accrued sick leave for the death of a spouse or blood relation up to 2 generations removed, including spouse's parents. Bereavement leave (5 days of accrued sick leave) may also be taken for the death of a dependent not related by blood who has lived within the employee's household for the preceding six months.

The City will consider a request for bereavement leave for the death of a member's aunt and uncle on a case by case basis.

Members may also take up to four hours per year to attend funeral services in the City of Upland for situations other than the above with Department Head approval.

## ARTICLE 26 - EXECUTIVE LEAVE

Police Sergeants receive 20 hours of Executive Leave annually. Police Lieutenants receive 30 hours of Executive Leave annually. Police Captains shall receive 32 hours of executive leave annually. This leave must be used within the calendar year, or it will be removed from the books as of December 31st of each year.

## ARTICLE 27 - NO STRIKE PROVISION

The Association agrees that it shall not authorize, instigate, aid, condone, or engage in any strike which will interrupt or interfere with the operation of the City. The City places the Association on notice of its intention and right to terminate any employee who instigates or engages in any strike or work stoppage which interrupts or interferes with the operation of the City.

## ARTICLE 28 – DISCIPLINE AND PERSONNEL FILES

The disciplinary appeal process shall culminate in an arbitration using a mutually selected arbitrator from the State Mediation and Conciliations Service, experienced in police disciplinary

EXHIBIT 34
Page 14 of 17

cases.  The arbitrator's decision in suspension, demotion and termination cases shall be final and binding.

Where the officer has not repeated similar misconduct, unit members shall have removed from his/her personnel file any disciplinary action for a minor offense after four years.  Also, after five years any major offenses shall also be removed.  A minor offense shall be defined as anything in which the officer receives a five day suspension or less.  A major offense shall be anything in which the officer receives more than a five day suspension, including demotion or pay reduction.

## ARTICLE 29 – WORK SCHEDULE

Effective January 21, 2001, the parties agree to convert the 4/10 work schedule to a combination of a 4/10 and 3/12.5 work schedule. The work schedule includes the following elements:

A. There are six shifts to select from. The 4/10 shift will have a day shift/swing shift and night shift. The 3/12.5 shift will have a day shift/night shift and a cover shift. Exhibit A attached hereto shows each of the shifts. Bargaining unit members working the 3/12.5 shift shall be required to work the following work shift: during a 28-day work period (which is permissible pursuant to Section 207(k) of the Fair Labor Standards Act), bargaining unit members would work twelve (12) 12.5 hour shifts and one 10 hour shift for a total of 160 hours. The twelve (12) 12.5 hour shift shall be worked three consecutive days per seven day period and the 10 hour shift shall be worked on the day either before or after the three consecutive days. As such, in the workweek when the 10 hour day is worked, the bargaining unit member will work four days in a row.

B. The 10 hour shift would be scheduled at the discretion of the shift's Watch Commander (ultimately at the discretion of the Chief of Police) as follows:  when bargaining unit members sign up for their 3/12.5 shift for six months in advance, the Watch Commander shall choose a particular day (e.g., the third Monday or second Friday) which will be the 10 hour workday for the entire six month period. The Watch Commander shall note the particular day he has selected for the 10 hour workday on the sign up sheet in advance of it being circulated.

C. A 28 day work period (pursuant to Section 7(k) of the FLSA) will be in effect for all sworn police employees of the City. However, notwithstanding the FLSA work period, all sworn personnel shall have wages computed each pay period. Payment of regular wages and overtime (i.e., for work in excess of the regularly assigned shift) shall be made to sworn personnel on each bi-weekly payday. Sworn police personnel shall be compensated with overtime for all hours worked in excess of their regularly assigned shift. Hours worked shall include all time when an employee is necessarily required to be on the employer's premises on duty or at a prescribed work place. Even though paid leave does not count as hours worked pursuant to the FLSA, paid vacation, sick leave and compensatory time off shall count as hours worked for overtime purposes to this Agreement.

D. All bargaining unit members working a 3/12.5 work schedule shall work a 12 ½ hour shift.

E. All bargaining unit members working the 3/12.5 or 4/10 work schedules shall be allowed a paid 45 minute lunch break.

F. Bargaining unit members shall sign up by seniority, unrestricted; 2) bargaining unit members assigned to special assignments, i.e., Detective Bureau, Special Services, Administration and Training, shall work from 7:00 a.m. to 5:00 p.m. Monday through Thursday.

G. Notwithstanding the foregoing, if the Chief of Police determines that a need exists to move a bargaining unit member from one plan to another (from 3/12.5 shift to a 4/10 shift or vice versa) or from one shift to another (e.g., day shift to swing shift) to meet minimum staffing and/or emergency needs, he will do the following: 1) He will first post 10 days prior to the need to modify a unit member's work plan or shift a volunteer sign-up sheet asking for individuals who wish to volunteer to have their work plan or shift modified from their current plan or shift to the opposite work plan or another shift; 2) if he does not receive a volunteer(s), he will modify the work plan or shift of the least senior unit member who is working the work plan or shift from which the Chief needs to move a unit member(s) by moving that individual(s) to the opposite work plan or another shift to meet department needs (i.e., moving the unit member's work plan from a 3/12.5 to a 4/10 or vice versa or moving the unit member's work shift to another work shift).

## ARTICLE 30 - PREVAILING BENEFITS

Except as provided herein, all wages, hours and other terms and conditions of employment presently enjoyed by employees in the unit shall remain in full force and effect during the term of this MOU, unless mutually agreed to by both parties.

## ARTICLE 31 - SAVINGS CLAUSE

Should any provision of this agreement or the application of such provision be rendered or declared invalid by any court action or by reason of any existing or subsequently enacted legislation, the City and Association shall meet and confer immediately upon what constitutes an equivalent benefit to that which was determined to be unlawful. Such equivalent benefit will be implemented retroactive to the date the old benefit ceased. The remaining parts or portions of the Agreement shall remain in full force and effect.

EXHIBIT 34
Page 16 of 17

*Upland Police Management Association*                                    *7/1/2015 – 6/30/2017*

## CITY OF UPLAND

_____                6-13-16
Jeannette Vagnozzi, Deputy City Manager          Date

_____                6-7-16
Tanya Bragg, Human Resources Manager             Date

## UPLAND POLICE MANAGEMENT ASSOCIATION

_____                6.7-16
Marc Simpson, Sergeant, UPMA Negotiator          Date

_____                6-1-16
Anthony Yoakum, Captain                          Date

JUN - 9 2016

17

EXHIBIT 34
Page 17 of 17

# EXHIBIT 35



**CITY OF UPLAND**
**invites applications for the position of:**

# Police Lieutenant

| | |
|---|---|
| **SALARY:** | $53.33 - $64.82 Hourly<br>$4,266.18 - $5,185.57 Biweekly<br>$9,243.40 - $11,235.41 Monthly<br>$110,920.80 - $134,824.92 Annually |
| **OPENING DATE:** | 08/01/16 |
| **CLOSING DATE:** | 08/19/16 11:59 PM |

## GENERAL PURPOSE:

**(CLOSED PROMOTIONAL - ONLY OPEN TO CURRENT CITY OF UPLAND EMPLOYEES)**

Under administrative direction, manages assigned police programs, personnel, and operations for a major bureau, administrative function, or work shift; prepares and evaluates field and staff reports; and performs related duties as assigned.

## ESSENTIAL DUTIES AND RESPONSIBILITIES:

*The duties listed below are intended only as illustrations of the various types of work that may be performed. The omission of specific statements of duties does not exclude them from the position if the work is similar, related or a logical assignment to this class. Other duties and responsibilities may be added, deleted or changed at any time at the discretion of management, either orally or in writing.*

1. Plans, coordinates, and oversees police services work performed by subordinate levels of personnel; sets work schedules and determines staffing deployment.
2. Oversees Records, Communications, Crime Analysis, Investigations, or Patrol Bureaus.
3. Responds to citizen complaints and inquiries by reviewing case histories; conducts citizen complaint investigations and reviews for corrective action.
4. Measures the effectiveness of the activities of assigned unit and subordinate personnel by reviewing and evaluating incident and service reports.
5. Monitors crime trends and statistical data to establish goals and objectives, and evaluate progress in reducing criminal offenses.
6. Participates in employee selection, assessing training needs, supervision and evaluation, and prepares related administrative and staffing reports.
7. Develops, implements, and evaluates programs, rules and procedures, and participates in the formulation of policies and procedures; and prepares news releases.
8. Establishes and maintains effective relationships with inter-divisional management, departmental employees, law enforcement agencies, and other public and private representatives.

EXHIBIT 35
Page 1 of 4

COU-00011104

9. Assists Chief of Police in preparing and administering department budget, and reports upon status of various accounts and expenditures to management.
10. Researches equipment, staffing and technology enhancements.
11. Attends professional meetings, training and conferences.
12. May represent department at community functions and special events on behalf of the Chief of Police.
13. May testify in court.
14. May function as Police Captain in the absence of the division commander.
15. May plan, coordinate, supervise and evaluate field enforcement and police services work performed by subordinate levels of personnel for patrol, parking enforcement, vehicle maintenance, and Emergency Response Team, and assess and evaluate divisional training requirements.
16. May oversee patrol, parking enforcement, vehicle maintenance, range training, and safety equipment maintenance.
17. May act as liaison officer with District Attorney and courts; reviews rejected arrest reports and major event reports such as homicides, fatal accidents, and incidents involving civic interests.
18. May develop, implement, and evaluate programs, rules and procedures for standards of conduct, training needs, officer safety, general employee safety, Field Training Officer (FTO) program, Emergency Response Team (ERT) program, weapons training and usage, report writing, and reduction of civil liability; and recommend policy changes.
19. Oversee and complete various grant applications, budgets, and reports.

## QUALIFICATION GUIDELINES:

### Knowledge of:

Thorough knowledge of police science principles and practices; management theory; department organization and administration; budgetary practices; personnel management and supervisory principles and techniques; community-based policing practices; contemporary patrol, traffic enforcement, criminal investigation, communications, police records management, and related services; laws and rules governing criminal evidence, search and seizure, and arrest and custody; penal code regulations and criminal procedures; Police Officer Bill of Rights, Risk Management and resources management; cultural diversity; POST standards and training.

### Ability to:

Operate standard office equipment, police vehicles, communications equipment, and Department weapons; plan, coordinate and manage the work of employees for an assigned shift or bureau; gather, analyze, and evaluate facts of evidence, draw sound conclusions, and prepare and present management reports; evaluate operational effectiveness; establish and maintain effective relationships with subordinates, police management, City departments, law enforcement agencies, community groups and the general public; communicate effectively, both orally and in writing; make presentations; participate in employee selection, training, supervision and evaluation; administer budget for assigned functions, activities and programs; analyze management problems and adopt effective courses of action.

### Education:

Graduation from a four-year college or university with a Bachelor's Degree in Administration of Justice or closely related field; or possession of POST Advanced Certificate.

EXHIBIT 35
Page 2 of 4

COU-00011105

**Training/Experience:**

Six years of progressively responsible local law enforcement experience; currently hold rank of Sergeant with probation completed.

**Licenses/ Certificates/ and Special Requirements:**

Possession of, or ability to obtain, a valid Class C California Driver's License, an acceptable driving record and evidence of insurability.

## PHYSICAL AND MENTAL DEMANDS:

The physical and mental demands described here are representative of those that must be met by employees to successfully perform the essential functions of this class. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**Physical Demands:**

While performing the duties of this job, the employee is frequently required to use hands to finger, handle, feel or operate objects, tools, or controls; reach with hands and arms; climb or scale walls, ladders, or steps; carry police safety gear; stoop, bend, kneel, crouch, squat or crawl, as well as walk, sit, and run. Sensory demands include talking, hearing, and using smell. The employee must be able to pull and carry persons in emergency situations, administer first aid, perform CPR, and push or pull gurneys to and from emergency vehicles. Employees are expected to grasp and carry power and hand tools; lift, carry, and move persons, and/or equipment; and push, pull or drag objects weighing up to 100 pounds or more.

**Mental Demands:**

While performing the duties of this class, employees are regularly required to use written and oral communication skills; read and interpret data, information and documents; analyze and solve problems; use math and mathematical reasoning; observe and interpret situations; learn and apply new information or skills; and interact with City staff, other organizations, police safety personnel, school representatives, residents and business representatives, and the public.

**SELECTION PROCESS:**

**Application Review: Applications will be screened based on the following elements:** *(Must attach copies of all applicable certificates and/or degrees/transcripts to your application. )*

- Application & Resume Completion: 25 points
- Years of Experience: 25 points
- Education and Special Training: 25 points
- Performance Standards and Attendance Review: 25 points

**Total Points Possible:100**

EXHIBIT 35
Page 3 of 4

COU-00011106

**Recruitment Process to include the following components:**
Oral Appraisal Interview with Chief of Police - 100% of overall score

*To be eligible to move on in the recruitment process, applicants must pass each element with a score of 70% or greater. An eligibility list will be established upon completion of the last testing element. Scores for each element will be available to the applicant upon completion of the entire recruitment process. The Chief of Police reserves the right to interview the top candidates from the eligibility list.*

## **Tentative Testing Dates:**

Oral Interview: TBD

*The City of Upland is committed to ensuring equal employment opportunities for all individuals, regardless of race, creed, color, national origin, religion, age, disability status, marital status, veteran status, gender or sexual orientation.*

APPLICATIONS MAY BE FILED ONLINE AT:
http://www.ci.upland.ca.us

460 N. Euclid Ave.
Upland, CA 91786

hr@ci.upland.ca.us

Position #2016-32
POLICE LIEUTENANT
KG

EXHIBIT 35
Page 4 of 4

COU-00011107

# EXHIBIT 36

1                    UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3    MARCUS SIMPSON,                )
                                    )
4                    Plaintiff,     )
                                    )
5       VS.                         ) Case No. 5:18-CV-01024
                                    )
6    CITY OF UPLAND, a Public       )
     Entity; CHIEF OF POLICE BRIAN  )
7    JOHNSON, individually and in   )
     his capacity as Chief of the   )
8    Upland Police Department;      )
     CITY MANAGER MARTIN            )
9    THOUVENELL, individually and   )
     in his capacity as City        )
10   Manager for the City of        )
     Upland; DOES 1-10, inclusive,  )
11                                  )
                     Defendants.    )
12   _____)

13

14

15

16

17

18                 DEPOSITION OF BRIAN JOHNSON

19           FRIDAY, AUGUST 23, 2019, 10:11 A.M.

20              HUNTINGTON BEACH, CALIFORNIA

21

22

23

24        Reported by Daniella Ware, CSR No. 13918
                      Job No. 154664

25

EXHIBIT 36

Page 1 of 41

1    Q    Mh-hm.

2    A    -- right?

3         You're dealing with budgets.  You're dealing

4    with grants.  You're dealing with, you know,

5    community and business groups.

6    Q    Mh-hm.

7    A    And you never really -- and myself

8    included -- you never really get that true

9    understanding and appreciation.

10        And so trying to develop Mark into an

11   individual that we all saw as somebody that was going

12   to be part of command staff and be promoted, I guess

13   trying to mold and develop some of those areas that

14   he had not been exposed to.

15   Q    Okay.  This is what?  Are we on Exhibit 3?

16        THE REPORTER:  Yes.

17        (Exhibit 3 marked)

18   BY MS. WISE:

19   Q    Does that look familiar to you?

20        Can you tell me what it is?

21   A    Yes, it's the ranking of the three

22   individuals for the promotion exam for lieutenant.

23   Q    Okay.  So this was -- there were a couple of --

24        While you were there, a couple of openings for

25   lieutenant took place; correct?

```
1        A    Yes.

2        Q    Okay.  So this is an eligibility list for

3    those, you would say?

4        A    Yes.

5        Q    And so the first one that came up, was that in

6    the fall of 2016?

7             Do you remember?

8        A    The first promotional --

9        Q    Mh-hm, for lieutenant.

10       A    I don't remember the time frame, but I know

11   who I promoted.

12       Q    Okay.  Can you -- and who did you promote?

13       A    Marcello Blanco.

14       Q    Okay.  And why did you pick him?

15       A    Marcello was doing an incredible job as it

16   related to some of the community engagement pieces

17   that we needed to -- that was virtually nonexistent

18   when I got there.

19       Q    And did you also see him as skilled in these

20   administrative aspects that you were discussing before?

21       A    Yes.  He wrote a lot of projects.

22       Q    Can you tell me -- does the rule of three mean

23   anything to you?

24       A    Yes.

25       Q    Can you explain what that is?
```

1     A     So, basically, for every one position that

2  is available, you have the ability to look at three

3  candidates.

4     Q     Okay.  And --

5     A     So I could have promoted any of the three,

6  if I wanted to.

7     Q     So you don't have to take -- maybe if you just

8  give a little bit of background about the promotion

9  process.

10          I understand they're scored.

11          There's certain interviews and applications,

12  and then they're scored and then ranked?

13          Is that how it goes?

14     A     Yes.  So, ultimately, they go through --

15          I don't remember exactly.  I think we did

16  kind of a hybrid assessment center for the

17  lieutenants exam.  I think it was a written and an

18  oral -- oral representation or exercise.

19          I don't remember, specifically.

20          I was not involved in the actual process,

21  obviously.

22          The only part that I was involved in was the

23  final step, which is a chief's interview, which is

24  common in small departments.

25          And, essentially, you're just validating if

1   top three.

2        Q    And that --

3        A    Unless there might -- I'd have to verify

4   this with HR, but let's just say, hypothetically, two

5   had identical scores.

6             I don't know if that would still invoke the

7   rule of three.

8             It probably would have, so I would have only

9   been able to pick -- so let's say, hypothetically,

10  two had a 96.

11            So I would have only been able to look at

12  those two and then the next score, if that makes

13  since.

14       Q    I see.  I see.

15            MS. HARPER:  But if the third -- if there had

16  been four people, and there was the 96, 95, and then two

17  94s, then the rule of three would allow you to go to the

18  fourth person, because of both the Number 3s.

19            THE WITNESS:  Yeah.

20            MS. CHUNG:  Incomplete hypothetical, but...

21            MS. WISE:  Noted.

22  BY MS. WISE:

23       Q    But, here, we were only dealing with three, in

24  this case.

25            You took the top one off the list for that

```
1     first lieutenant promotional.

2              Go ahead.

3     A     So I think it's important:

4              I selected who I felt was the most qualified

5     at the time to be promoted to lieutenant.

6              He just happened to be Number 1.

7     Q     Okay.  So you didn't feel any constraints in

8     selecting -- any constraints in picking anybody from

9     those three, the top three ranked?

10    A     Not back then.

11    Q     Okay.  Was it a close decision between Blanco

12    and Simpson, or was it clear to you that you wanted

13    Simpson?

14            MS. HARPER:  Objection.  Misstates testimony.

15            You said it was clear he wanted Simpson.

16            MS. WISE:  I'm sorry.

17    BY MS. WISE:

18    Q     Was it clear that you wanted to select

19    lieutenant -- Sergeant Blanco?

20    A     So I looked at all three of them equally and

21    made my decision based on who I felt was the best

22    person to be promoted at that time and what we were

23    trying to accomplish organizationally.

24            I believed he was the best fit.

25    Q     I guess, by far, or was it close?
```

1     Q     Had more experience, mh-hm.

2     A     Might have had more time on the job.

3     Q     Mh-hm. Okay. When you look for somebody in

4     your command staff, what qualities or what experience

5     are you looking for?

6     A     I'm really looking for someone who is

7     well-rounded; right?

8           Experience, time on the job is important;

9     right?

10    Q     Mh-hm.

11    A     Certainly, a level of maturity, somebody

12    that demonstrates leadership abilities, management

13    insight, somebody that has strong verbal and written

14    communication skills, formal education is important.

15          I really vow the formal education piece as

16    something that demonstrates an individual that has

17    decided to put a goal before themselves and complete

18    it; right?

19          We've all met people who are educated that

20    maybe don't have the best common sense when they do

21    their job.

22          So somebody that is very well-rounded,

23    experience in multiple areas of running a police

24    department.

25          And so you could say somebody has 20 years

1    Q    Yeah.  And how about Poole's experience?

2         Do you think it was the kind of experience you

3    were looking for in someone in your command staff?

4    A    Yes.

5    Q    And what was it about Poole's experience that

6    made you think that?

7    A    Like Mark, like Marcello, they all had

8    strengths and weaknesses, but when it came down to

9    promoting John Poole, his administrative ability was

10   superior to Mark's.

11   Q    Okay.  And what do you base that on?

12   A    Reviewing his completed staff work and

13   other, you know, administrative projects, grants that

14   he submitted or provided, you know, management

15   oversight.

16   Q    So was it his writing, his organization, his

17   ability to manage people?

18        All of the above?

19   A    It is all of the above.

20   Q    Mh-hm.

21   A    But the key deciding factor for me, at that

22   point in time, was his administrative ability -- he

23   was much stronger than Mark, and, as a lieutenant,

24   what are you reviewing?

25        Work of sergeants and officers, so that

1    <u>ability to have somebody that already has</u>

2    <u>demonstrated a strong administrative background.</u>

3        Q    Okay.  Let's go to that next -- since we're

4    already kind of there, let's just go to this next

5    lieutenant opening.  Because I understand there was the

6    one, and then where you chose Sergeant Blanco to be the

7    next lieutenant, but then -- let's see.

8            How much longer after that do you remember was

9    the next opening?

10       A    I don't, but, maybe, six months.

11       Q    Yeah.  So when you promote somebody --

12           So does the eligibility list last for a year or

13   so?

14       A    Generally, it's for a year, but I have the

15   ability to extend it for one additional year.

16       Q    But it was still within the eligibility list

17   time frame?

18       A    Yes.  Yes.

19       Q    Okay.  And so there -- so you're working off

20   the list.  Blanco is now off the list, so it's a choice

21   between Simpson and Poole a few months later.

22           How long had Simpson been in his CRO position

23   at that point?

24           I don't want you to guess, so if you don't

25   know...

1        A    I don't know.  He might not have been in CRO

2   when I --

3        Q    Oh.

4        A    I don't remember the timeline, because he

5   was only in CRO for a short period of time.

6        Q    Okay.  Was he put in CRO so he could get some

7   of that administrative experience?

8        A    Yes.  I mean, that's...

9        Q    Okay.  So however many months it was, your

10  assessment is the same in that Poole was superior

11  administratively?

12       A    So I really didn't have a, I guess, a good

13  understanding of the strengths and weaknesses of

14  Mark's administrative work until he went into CRO,

15  and that's when it became more apparent to me.

16       Q    Well, at the time you were choosing -- well,

17  then, let me approach this another way:

18            So when you had to choose for the next

19  lieutenants position between Poole and Simpson, and I

20  understand you selected Poole.

21            Why?

22       A    Because his administrative skills were

23  superior to Mark's.

24       Q    And I think you've explained why these

25  administrative skills are so critical to someone on your

1   command staff, but is there anything you want to add

2   that you haven't said yet, as far as why those skills

3   are so critical?

4       A    Well, obviously, they're creating reports

5   that, ultimately, I have to approve, and those

6   reports can go to City Counsel.

7           They can go outside the organization to

8   another law enforcement entity.

9           We submit grants that go out to the federal

10  and state government.

11          And so a lot of that administrative work is,

12  one, a reflection on the organization, so if there's

13  a lot of review in getting that, what we term

14  completed staff work, you know, that just -- there's

15  a lot of down time for command staff to be able to do

16  those projects in a timely manner.

17      Q    Mh-hm.

18      A    And so that development of those skills is

19  critical, particularly at the lieutenant rank and,

20  obviously, at the captain rank and above.

21      Q    So would it be fair to say that when you're

22  doing patrol, it's almost like a different toolbox that

23  you need, as far as becoming part of command and

24  management and being a lieutenant?

25          You have more responsibilities on the

1    administrative and management end?

2          But I don't want to put words in your mouth.

3          Yeah.

4     A    Look, the operation side is very important

5    and critical.

6     Q    Mh-hm.

7     A    But as you go up higher in the organization,

8    again, we're looking for skill sets across multiple

9    areas, and, you know, that management insight, that

10   just comes with being exposed and being in different

11   assignments.

12    Q    Okay.  Okay.  So then I understand you

13   ultimately selected Poole.

14          I've got another exhibit --

15          MS. WISE:  What are we on now?

16          THE REPORTER:  4.

17          (Exhibit 4 marked)

18   BY MS. WISE:

19    Q    Can you take a look at this, please?

20    A    Mh-hm.

21    Q    Is this familiar to you?

22    A    Yes, it is.

23    Q    Can you tell me what that is?

24    A    So you mentioned it earlier, but, prior to

25   promoting whoever I selected, I would sit down and

1   talk to the individuals first; right?

2          Because I didn't want them to hear through

3   the grapevine that they weren't being selected.

4          So Captain Yoakum and myself sat down with

5   Mark to explain to him that my decision was to

6   promote John Poole but to keep his head up.  He's

7   doing a great job.  All it is is a matter of time,

8   because we knew there was another lieutenant vacancy

9   within probably a few months, and he would,

10  obviously, be promoted.

11         I didn't tell him that, because you never

12  know what could happen.

13     Q    Mh-hm.

14     A    But in spite of that conversation, he still

15  felt like he was passed over, as he says in his text

16  message, and I just replied, "You were not passed

17  over."

18         And he knew what I meant; right?

19     Q    Mh-hm.

20     A    Because I never view these as passing

21  someone over.  It's who is the most qualified.

22         "So don't beat yourself up.  Continue to

23  grow and demonstrate your value to the organization

24  and you will be rewarded."

25     Q    Mh-hm.

1    A    So I was just attempting to reassure him,

2  you know, keep your head up.

3    Q    There's a date here, January 11.

4         Is that the same day you talked to him?

5    A    I would have to assume so, but it could have

6  been the next day, you know, without going back and

7  looking at my calendar.

8         But it would be safe to say that was the

9  same day.

10   Q    Well, the decision to -- the decision to

11 promote Sergeant Poole occurred before this date?

12   A    Before that, yes.

13   Q    Before these texts?

14   A    I hadn't told John Poole he was getting

15 promoted yet.

16        I always talk to the individuals before I

17 let the individual know, just because I didn't -- you

18 know, didn't want to have somebody hear something

19 through the grapevine.

20   Q    So it was made and communicated to Simpson --

21   A    Yes.

22   Q    -- by that date?

23   A    Yes.

24   Q    And that would have been 2017; correct?

25        Because it was a few months?

1    A    Yeah.   Probably, January 2017.

2    Q    Okay.   And this was addressed to --

3    A    Well, it came to both of us.

4    Q    Did it also come to you?

5    A    Yeah, because it says Yoakum.

6    Q    Oh.

7    A    "I want both of you to know."

8         He sent it to both of us.   This is just a

9    screen shot.

10        So it's my phone of a screen shot showing,

11   I'm assuming, Mark and Tony were the two threads in

12   the text message, if that makes sense.

13   Q    So -- but you saw this text message?

14   A    Yes, that's why I responded back to it.

15   Q    Okay.

16   A    So that's me responding to Mark.

17   Q    Pardon me.   I'm still a little -- I'm still a

18   little old school, you know, and so sometimes it --

19   yeah -- confuses me a little.

20        Okay.   And then continuing on to finish off

21   this lieutenant position:

22        So then a bit later at this time when you said,

23   "Oh, there will be other opportunities," and you knew

24   that another lieutenant opening was in the pipeline;

25   right?

```
1        A    I'd have to get the timing right.

2             At some point, I had -- so it must have been

3   that year.

4             So the end of that budget cycle, so previous

5   budget meetings start, really, probably,

6   March/April-ish time frame.

7        Q    Mh-hm.

8        A    In my initial review of the police

9   department, we had to absorb a $1.5 million budget

10  shortfall.

11       Q    So this was in March/April that you're learning

12  this?

13       A    Somewhere around that time; right?

14       Q    Okay.

15       A    Because the budget should go before Counsel

16  before, theoretically -- it didn't always happen that

17  way -- but it should go to Counsel well before

18  July 1st, because that's the start of the new fiscal

19  year.

20       Q    Okay.

21       A    So, probably -- I'm guessing -- but at least

22  March/April, you know, we would have been in budget

23  negotiations or discussions about the overall city

24  budget.

25       Q    So you would take part in budget negotiations.
```

1    2017, you've got this $1.5 million shortfall just for

2    the police department alone, and I believe you said you

3    met with other department heads on these issues.

4            So did other departments also have to absorb

5    major budget cuts?

6        A    Yes.  I don't think to the degree I did,

7    but, certainly, they all had shortfalls that they had

8    to gap.

9        Q    And would positions have been frozen in other

10   City departments too?

11       A    They could have.  I don't recall if they did

12   or not, but, depending, you know -- remember, a lot

13   of this is fluid in their projections; right?

14           You know, from those financial experts,

15   their consultants to kind of project what they

16   believe the shortfall is.

17           My 1.5 didn't ultimately end up being 1.5.

18       Q    Was it less or more?

19       A    It was less.

20       Q    But the shortfalls -- based on your discussions

21   with the others, the shortfalls in the other departments

22   were also significant; correct?

23       A    What do you mean by, "significant"?

24       Q    Well, big, big shortfalls.

25       A    What does big --

1    BY MS. WISE:

2        Q      Did you have any discussions or correspondence

3    with City Manager Thouvenell about freezing the

4    position, that you recall?

5        A      Yeah.   Again, at department head staff

6    meetings, we would talk about how we're going to

7    makeup these shortfalls, and I remember there was --

8    and I don't know who it was, but I know it was

9    probably Thouvenell, Vagnozzi, and Londa; right?

10               I know that number came down from that

11   initial 1.5.

12       Q      Mh-hm.

13       A      And I was not in those conversations of

14   re-reviewing budgets and maybe other projections of

15   things came in on, you know, that may have lighten

16   that projection of how much that shortfall was going

17   to be in the general fund.

18       Q      Okay.

19       A      But, ultimately, they, typically, I was --

20               What usually happens is you're told these

21   positions are being frozen.

22               That's, essentially, what happens.

23       Q      Okay.

24       A      Yeah.

25       Q      Okay.   So you didn't recommend that that

EXHIBIT 36
Page 18 of 41

1   position be frozen?

2        A    So no.   I recommended we will have to freeze

3   positions if we were going to have to come up with a

4   1.5 million shortfall, multiple positions.

5             Because I don't remember, but let's just

6   say, for example, I was going to buy $300,000 in

7   vehicles.

8        Q    Mh-hm.

9        A    Right?   That's not going to get us to

10  1.5 million.

11            The only way to get to 1.5 million is

12  freezing of positions.

13       Q    Okay.  Did you want to freeze the position?

14       A    Of course not.

15       Q    And you weren't trying to target Simpson in any

16  way by freezing or -- I know you didn't freeze it, but

17  you weren't trying to target Simpson in any way by

18  saying that positions might have to be frozen?

19       A    No.

20       Q    Okay.  And was the City having -- is it fair to

21  say the City was having severe budgetary problems at

22  this time?

23       A    I guess the simple answer is yes.

24       Q    Okay.  I believe the fire department was

25  annexed at some point.

1          Was that around this time?

2     A     Yes.

3     Q     Okay.

4          MS. WISE:  I'm ready for a break, if everybody

5     else is.

6          (Recess)

7          MS. WISE:  Back on.

8     BY MS. WISE:

9     Q     So we've gotten through the promotional issues,

10    so let's jump back a little bit in time back to

11    probation and parole sweep.

12         Do you remember giving Plaintiff Simpson some

13    instructions about a probation and parole sweep in the

14    end of 2016?

15    A     Yes.

16    Q     Okay.  So he was supposed to organize it;

17    correct?

18    A     Yes.

19    Q     Okay.  What is a probation and parole sweep?

20         What does that entail, just briefly?

21    A     Just, essentially, we'd work with probation

22    and parole to look for people that live in the

23    community that have search conditions, as a matter of

24    being on probation or parole, and then we would,

25    essentially, do compliance checks, just to check on

1    them to make sure that they're following the

2    conditions of their probation or parole.

3        Q    Okay.  And, often, a lot of -- or what happens

4    if they're not following the conditions?

5        A    They could be placed under arrest.

6             Often times, we may find someone in

7    possession of drugs, narcotics, or a number of other

8    things, and they would be subject to being placed

9    under arrest.

10       Q    Is it fairly common in a sweep like this to

11   arrest one or two people?

12       A    Yeah.  Yes.

13       Q    How often do you usually -- or did you used to

14   conduct these in Upland?

15       A    You know, maybe quarterly or semi-annually.

16            It just kind of depended.

17            My preference would have been to do them

18   more frequently, but they're labor intensive, so you

19   don't always get to do them as much as you'd like.

20       Q    Would the custom be always to coordinate with

21   other agencies when you're doing one of these sweeps?

22       A    Yes.

23       Q    And why is that?

24       A    Well, maybe.  I will say, generally, yes,

25   but you could do a modified one in-house, but,

1    generally, we would do them with multiple agencies.

2             That would be more common practice, I guess.

3    Q    And why would you want to do that?

4    A    Because you just have more resources

5    available to you, and you could do a lot more

6    searches.

7    Q    So is it, like, there's a list of people you're

8    supposed to checkup on, and you just needed the bodies

9    to do the checks?

10            Is that the idea?

11   A    Yeah.  Like, again, we'd coordinate with our

12   partners from either probation or parole because you

13   have to know who are on probation and parole and what

14   their search conditions are, and that's the purpose

15   of doing those sweeps.

16   Q    And is probation/parole, is that at the county

17   level or...

18   A    So probation is at the county level, and

19   parole is at the state level.

20   Q    So what would the surrounding agencies be in --

21   with Upland?

22   A    Who?

23   Q    Yeah, who would you coordinate with in Upland,

24   typically?

25   A    Generally, Montclair, Chino, Ontario, the

1    sheriff's department, and that would generally be

2    the -- because we're on the west end of the county,

3    there may have been times where people from the

4    entire county may have participated or helped out.

5           It just depended on, really, what we were

6    trying to do, but, generally, we'd pull from the west

7    end of the county, because it's such a big county.

8       Q    Okay.  So let me pull out another exhibit.

9           What are we on?  Exhibit 6 now?

10      A    Yeah.

11      Q    Here you go.

12          (Exhibit 6 marked)

13   BY MS. WISE:

14      Q    Okay.  So this is a document entitled

15   administrative staff meeting on December 6, 2016.

16          Can you describe the purpose of this?

17      A    It's just the agenda of topics that we would

18   go over during our staff meeting.

19      Q    Okay.  And do you remember whether the sweep

20   that Simpson was organizing was discussed at this

21   meeting?

22      A    Yes.

23      Q    Before you got to this meeting, how long does

24   it take to organize a sweep like this?

25      A    You know, generally, probably, I would say a

1     couple weeks to a month.

2              It just kind of depends.

3              If there was an urgent need, we could have

4     one planned in a day or two.

5        Q    Oh, okay.

6        A    But, generally, it would take a couple weeks

7     to a month.  It just kind of depended.

8        Q    Okay.  So do you remember this one -- how long

9     this one was in the works?

10       A    I don't recall specifically, but I would

11    estimate, probably, a couple months.

12       Q    And would you check in with Sergeant Simpson

13    about it?

14       A    Yeah.  I had asked him periodically how it

15    was coming along.

16       Q    And what would he say?

17       A    I don't remember, specifically.

18       Q    Mh-hm.

19       A    But he was working on it, essentially.

20       Q    Did he give you the impression that it was

21    under control and he was making normal progress on it?

22       A    Earlier on.

23       Q    Yeah.

24       A    In the couple months time frame.

25       Q    Okay.  So then on December -- okay.

1          So I'm going to give you another document too.

2          This is going to be Exhibit 7.

3          It's handwritten notes with December 6th on the

4   top.

5          (Exhibit 7 marked)

6   BY MS. WISE:

7     Q    Okay.  Can you tell me what these are, if you

8   know?

9     A    Yeah.  I recognize it as handwriting of my

10  administrative assistant Luz Barrett.

11    Q    Okay.  Do you know what these are?

12    A    Yeah.  She would take notes of the meeting

13  for us.

14    Q    Okay.  So this was -- were these the notes of

15  the meeting of December 6th?

16    A    Yes.

17    Q    Okay.  And would she have shown you these

18  notes?

19    A    Really, only if I asked.

20    Q    Okay.

21    A    I didn't generally go back and review them.

22    Q    Did you ask to see these?

23         Do you remember?

24    A    I don't remember if I asked, personally, to

25  see them.

1      Q    Okay.   And did Luz always take notes at these

2    meetings?

3           Was this one of her tasks?

4      A    Yeah.   She used to take notes and tape

5    record them, actually.

6      Q    Do you know if she tape recorded this meeting?

7      A    I don't -- I learned earlier on that we were

8    tape recording our meetings, and I didn't necessarily

9    see a need for it, so I told her -- you know, we

10   discussed it as command staff, and nobody had an

11   objection, and I told her, you know, I really didn't

12   see a need for her to tape record every meeting.

13     Q    So this one would not have been tape recorded?

14     A    I don't believe it was.

15     Q    And then so, at some point, you asked --

16          At this meeting, you asked Sergeant Simpson

17   about agencies that were participating.

18          What did you ask him exactly?

19          Or to the best of your recollection, of course.

20     A    Just if he had an update, and, you know, do

21   we have a date on when we were going to do the sweep.

22     Q    Okay.   And what did he say to that?

23     A    I don't remember verbatim, but, essentially,

24   he conveyed to me that he wasn't really getting any

25   cooperation from the surrounding agencies to be able

1    to participate, so he wanted to either cancel it or

2    postpone it.

3        Q    So what was your reaction to that?

4        A    I was a little perplexed.

5             You know, we were short-staffed, and,

6    whenever we had reached out for assistance of my

7    regional partners, I really never got a no.

8             It was always, "Yeah, whatever we can do to

9    help you."

10            So it kind of seemed odd that we were not

11   getting cooperation, if you will, to assist,

12   allegedly.

13       Q    Okay.  So on this second page of the document I

14   gave you, Bates number 0000 -- well, 63, at the bottom

15   right-hand corner, it says, "No participation from other

16   agencies SBSO, Chino, Montclair, Ontario, Claremont."

17            Do you know what that notation refers to?

18       A    No, I -- I'm only assuming that in our

19   conversation, she was documenting the fact that all

20   of these agencies were the ones I may have asked:

21            "So you're telling me the sheriff of Chino,

22   Montclair, Ontario, Claremont, can't participate in

23   the sweep?"

24       Q    Mh-hm.  Would Luz have taken these notes like

25   during the meeting?

1    Q    Yeah.  Do you remember seeing or have you

2   reviewed the transcripts of those interviews?

3    A    Yes.

4    Q    Okay.  And were they accurate, to the best of

5   your knowledge?

6    A    Yeah.

7    Q    Yeah?

8    A    They appeared to be.

9    Q    When you read them, was there anything that you

10   thought was needed, was wrong, or, you know, left out as

11   inaccurate?

12    A    I don't believe so.

13    Q    Okay.  Let me -- I'm going to show -- and

14   because I think you covered some of this ground in those

15   interviews, so if you're comfortable with the

16   transcripts of those interviews, we can maybe move

17   through a little more quickly.

18          So let's do the first one, and let's see.

19          Do you remember how -- you were interviewed a

20   number of times; correct?

21    A    Yeah.  There was follow-up questions, I

22   believe.

23    Q    Okay.

24    A    On different issues, I think.

25    Q    All right.  So we'll make this Exhibit 8, and

1    this is an interview transcript taken on May 4, 2017 at

2    4:22 p.m.

3            (Exhibit 8 marked)

4    BY MS. WISE:

5        Q    Just have a quick look and see if it rings a

6    bell and, you know, whether that looks like one you've

7    already reviewed and are comfortable with.

8        A    Okay.

9        Q    So I'm sure there's typos and things, but the

10   substance of it; is that accurate?

11       A    Yeah, generally.   I perused it.

12           I didn't read it word for word, line by

13   line, but, generally, I'd say it's accurate.

14       Q    The purpose of this, you know, asking you to

15   look through and seeing whether it's accurate or not is

16   because then we don't have to rehash everything that was

17   discussed in here.

18           So that's kind of why I'm asking you to do

19   this.

20           Okay.   How about this one?

21           MS. HARPER:   Can we go off the record?

22           MS. WISE:   Yeah.

23           (Discussion off the record)

24           MS. WISE:   Back on.

25   ///

1    BY MS. WISE:

2        Q    So you've now had the opportunity to review

3    every one of these five transcripts.

4             So just the first one I think you read

5    Exhibit 8.  We did that one, okay, and you said

6    Exhibit 8 was accurate.

7             Exhibit 9 was the transcript dated -- well, the

8    date on the first sentence is Thursday, May 4th at

9    3:50 p.m.

10            (Exhibit 9 marked)

11   BY MS. WISE:

12       Q    So that transcript is Exhibit 9.

13            Is that accurate?

14       A    How about if I just stipulate that

15   Exhibits 8 through 12 appear to be accurate?

16       Q    Okay.  And I'll read them off here:

17            So Exhibit 8 was 5/4/17 4:22; Exhibit 9 is

18   5/4/17 at 3:50; Exhibit 10 is 5/4/17 at 4:53; Exhibit 11

19   is 5/9/17 at 2:25; and Exhibit 12 was 5/9/17 at 2:45.

20            And all of them are accurate?

21       A    Yes.

22       Q    Okay.  Terrific.

23            (Exhibit 10, Exhibit 11, and

24            Exhibit 12 were marked)

25   ///

1    BY MS. WISE:

2        Q    We don't have to test your memory too much.

3             Okay.  Just a quick question:

4             The City of Montclair shares a border with

5    Upland?

6        A    Yes, to Upland's west.

7        Q    And, as we sit here today, do you remember

8    asking Simpson at that meeting whether Chino could

9    participate?

10       A    Yes.

11       Q    And he said?

12       A    That they could not.

13       Q    And do you have a distinct recollection of

14   Montclair?

15       A    No.

16       Q    Not as we sit here today, but what you said in

17   the interview would have been accurate?

18       A    Yes.

19       Q    Okay.  And then looking at exhibit -- what

20   should we call this one, the handwritten notes?

21       A    Luz's notes?

22       Q    Yeah, Luz's notes dated December 6th.

23            MS. HARPER:  We marked it as Exhibit 7.

24            MS. WISE:  Exhibit 7, okay.

25   ///

BY MS. WISE:

    Q    Down on the second page 63 on the bottom right-hand corner, there's a little notation that says, "County chief's meeting" -- or it says, "County chief's."

    A    Mh-hm.

    Q    Is that referring to the county chief's meeting that took place a couple days later --

    A    Yes.

    Q    -- where you spoke with Chief Compstock from Chino and the other chiefs?

    A    Yes.

    Q    Okay.  Okay.  And so do you have -- as you sit here today, do you have a distinct recollection of that conversation at the county chief's meeting with Chief Compstock of Chino?

    A    Well, it was Compstock, Kaylor, and Robert.

    Yes.

    Q    And Compstock was from Chino.

    And did she say Chino could participate?

    A    Yeah.  She didn't say there was any reason why they couldn't participate, but she had to check with her staff.

    Q    And Montclair?

    MS. HARPER:  No, she's from Chino.

EXHIBIT 36

Page 32 of 41

1    BY MS. WISE:

2        Q    Well, now, moving onto the Chief of Montclair,

3    do you also remember that conversation?

4        A    I think he said he could participate.

5             My recollection is Brad was the only one

6    that had conflict.

7        Q    And he was the one from Ontario?

8        A    Ontario.

9        Q    Okay.  Terrific.

10            MS. CHUNG:  Can we go off the record real

11   quick?

12            MS. HARPER:  Can we go off the record?

13            She asked.

14            MS. WISE:  Yes.

15            (Discussion off the record)

16            MS. WISE:  Okay.  Back on.

17            We're onto Exhibit 13; correct?

18            MS. HARPER:  Yes.

19            THE WITNESS:  Are we going to put all of that

20   on the record?

21            MS. CHUNG:  Not -- no.

22            MS. HARPER:  Not yet.

23            MS. WISE:  If we get into that, we can.

24            THE WITNESS:  13?

25            MS. WISE:  13.

1    BY MS. WISE:

2        Q    Okay.  So Exhibit 14 is a document where the

3    first page is typewritten, and it's labeled statement

4    April 12, 2017.  And the next two pages are handwritten

5    notes, and the first page on the handwritten notes says

6    April 12th on it.

7            Do you recognize these -- let's start with the

8    typewritten one.

9            Do you recognize this one?

10       A    Yes.

11       Q    Can you tell me what that is?

12       A    It's a statement that Luz Barrett typed out.

13       Q    Okay.  Did she type that out at your direction?

14       A    Yes.

15       Q    Can you tell me the circumstances that led to

16   you directing her to type that out?

17       A    She came to me.  She appeared to be very

18   distraught or upset, and she, essentially, said,

19   "Chief, I can't stand what they're trying to do to

20   you," and proceeded to tell me, kind of, some things

21   that had been going on the day before.

22       Q    Okay.  So when she talked to you, did she talk

23   to you in your office?

24       A    Yes.

25       Q    Door shut?

1        A       I don't -- probably.

2        Q       Do you remember was it beginning or the end of

3    the day?

4        A       I think it was in the afternoon.

5        Q       Okay.   And what did she tell you?

6        A       Essentially, what she wrote out in her

7    statement.

8        Q       What's in the statement, okay.

9                So on the next two pages, there's also these

10   notes.

11               Did she have those notes with her at the time,

12   or...

13       A       I don't remember if she had her notepad with

14   her or if she just came in and, kind of, told me what

15   happened.

16       Q       Do you remember her showing you these notes at

17   that time?

18       A       No, I don't recall if she showed them to me

19   or not.

20       Q       I think we've -- you addressed a lot of the

21   events in your interview transcript, so I'm not going to

22   go over the whole thing, but there are a few things.

23               So Luz first approached you by walking into

24   your office?

25       A       Essentially, yes.

1      Q      And was that on April 12th?

2      A      I think it was on the 11th.  I think it was

3   the day before.

4      Q      It looks like she signed the document on

5   April 13th.

6      A      Yeah, so maybe -- it was probably --

7             She probably did it on the 12th and then

8   provided them to me on the 13th.

9      Q      Okay.  So when she came to talk to you, how

10  long did you talk?

11     A      Maybe 15, 20, 30 minutes, maybe.

12     Q      And was there anything else said other than

13  what she told you here -- or I'm sorry -- except what

14  was written here?

15     A      She shared with me right around this time

16  that she had been treated pretty poorly in that

17  department, and she wanted me to know what some

18  people within that organization were capable of

19  doing.

20     Q      Okay.  On that day, the day she came in and

21  talked to you, was your interview for the investigation

22  into the MMD and the DVR, do you remember was that also

23  the same day?

24     A      I think so.

25             MS. HARPER:  I'm going to object again that

1    have a conversation together around that time?

2        A    No, I don't believe so.

3             I don't recall that.

4        Q    Okay.  Okay.  So mind as well get these all

5    out, at this point.

6             Exhibit 16 now?

7        A    Yeah.

8             (Exhibit 16 marked)

9             MS. WISE:  And I'll make this Exhibit 17.

10            (Exhibit 17 marked)

11   BY MS. WISE:

12       Q    Okay.  So there's three memos about three

13   different dates -- oh, okay.

14            So Exhibit 14 had a date on top of April 12th.

15            Exhibit...

16       A    Exhibit 17 is April 3rd.

17       Q    And Exhibit 16 is March 14th.

18            Now, these three typewritten memos, did she

19   prepare all three of these at your direction?

20       A    Yes.

21       Q    And did you discuss the substance of the events

22   of all three of these memos on April 12th?

23       A    My recollection is she came to me about

24   these three different incidents all at one time, and,

25   obviously, they occurred on different times.

1          And one, actually, occurred in March, and

2     two occurred in April, but I think she came to me on

3     or about April 13th or 12th with all of these

4     incidents, that, kind of, like, were -- she was just

5     upset, and I don't know what else to say.

6          Just beside herself at what was occurring.

7     Q    Now, at that point, you said, "write up memos

8     about them"?

9     A    Yes.

10    Q    And did you tell her which incidents to write

11    up memos about or which dates?

12    A    Just those three incidents that she

13    summarized to me.

14    Q    Okay.  Okay.  So you had the discussion with

15    Luz on April 12th.

16          You got the memos from her on April 13th; is

17    that correct, the next day?

18    A    Approximately.

19    Q    Yeah.

20    A    Yeah.

21    Q    And then you prepared this confidential

22    statement on April 13th?

23    A    Mh-hm.

24         MS. CHUNG:  Is that a yes?

25         THE WITNESS:  Yes.

1    you would tell him who to talk to regarding questions he

2    had?

3              THE WITNESS:  Yes.

4    BY MS. WISE:

5        Q    But only in response to his questions about

6    where information could be obtained?

7        A    That's correct.

8        Q    So after that discussion with Luz Barrett on

9    April 12th, did you talk to her about the investigation

10   again at all?

11       A    Maybe in -- just in trying to -- "relax and

12   we'll see what happens," and we'll -- you know, the

13   outcome -- we'll wait to see what the outcome is.

14            About the specific case?

15            No.

16       Q    Okay.  Not what to say in her interview?

17       A    Absolutely not.

18       Q    You didn't coach her about anything she should

19   bring up?

20       A    No.

21       Q    Okay.  And after this was handed off to

22   City Manager Thouvenell, did you have any further

23   discussions with him about the investigation?

24       A    I'm sure we probably had some, again,

25   superficial, you know, where the status of the case

1    is and what the timeline is looking like.

2        Q      Any discussion about the desired outcome?

3        A      No.

4        Q      Did you have a desired outcome?

5        A      Just that the truth and the facts came out.

6        Q      Did you ever discuss the investigation with

7    Jeanette Vagnozzi?

8        A      Yes.

9        Q      Can you remember when you did that, when that

10   took place?

11       A      After it was adjudicated.

12       Q      But nothing before it was adjudicated?

13       A      No.

14       Q      Did you know that she would be the decision

15   maker?

16       A      I think, at some point, I found out that the

17   City Manager also ended up getting interviewed.

18       Q      Mh-hm.

19       A      So it was kind of logical that, obviously,

20   he wouldn't be in a position to adjudicate.

21       Q      Okay.  So you never gave Jeannette Vagnozzi any

22   findings should be --

23       A      No.

24       Q      -- or what discipline, if any, should be

25   imposed?

```
 1        A      No.

 2        Q      Let me show you --

 3               MS. CHUNG:  That's all correct, what she's

 4    saying?

 5               THE WITNESS:  Yeah.

 6               MS. CHUNG:  So that's correct, yes?

 7               THE WITNESS:  Yes.

 8               MS. WISE:  Okay.  Are we on 18 now?

 9               MS. HARPER:  Yes.

10               (Exhibit 18 marked)

11    BY MS. WISE:

12        Q      This -- 18 is a document entitled notice of

13    proposed termination -- I think.  Yeah -- dated

14    8/30/2017 to Marcus Simpson from Jeannette Vagnozzi.

15               Had you seen this before this litigation?

16        A      No.

17        Q      Okay.  You had no input into it at all?

18        A      No.

19        Q      Didn't draft it?

20        A      No.

21        Q      Didn't draft any part of it?

22        A      No.

23        Q      Never shown to you?

24        A      No.

25        Q      Okay.  19 now.
```

# EXHIBIT 37

# GARY WEDGE
## *Upland*
## Officer Jacob Kirk (AB109) June 1, 2017

GARY WEDGE:  Okay, the day is Thursday, June 1st, 2017.  I am with Officer Jacob Kirk

00:00:06
OFFICER JACOB KIRK:  Yes.

GARY WEDGE:  Jacob Kirk, and Officer Kirk, thank you for being here. First of all I want to make sure that you are aware this is being recorded.

00:00:12
OFFICER JACOB KIRK:  Yes.

GARY WEDGE:  Okay, and you brought your form, your interview notice with you.  That's your signature on the back.

00:00:19
OFFICER JACOB KIRK:  Yes, it is.

GARY WEDGE:  All right.  Just to begin with, tell me a little bit about yourself as far as what your professional background is, how long you've been with Upland and if you've got prior law enforcement experience, things like that.

00:00:35

EXHIBIT 37
Page 1 of 3

COU-0000322

**GARY WEDGE - *Upland***                                                                                    **4**
**Officer Jacob Kirk (AB109) June 1, 2017**

probation parole sweep compliance check, whatever you want to call it,
AB109 sweep>

00:02:57
OFFICER JACOB KIRK:  Yes.

GARY WEDGE:  Do you remember if the other two officers, not you and
Officer McCullough, but if the other two officers were in CRO at the time?

00:03:05
OFFICER JACOB KIRK:  If that, if that's the dates that we did it, then
they were not.  It was just Officer McCullough and myself.

GARY WEDGE:  Do you recall how you guys, you and Officer McCullough
were tasked with setting up this sweep?

00:03:24
OFFICER JACOB KIRK:  Yeah, we, we were tasked with putting together
a list of parolees and probationers that are within our city, and then to
contact outside jurisdictions, our neighboring cities to see if they would
want to help out and, and be part of the operation.

GARY WEDGE:  Do you remember who asked you to do that?

00:03:42
OFFICER JACOB KIRK:  Sergeant Simpson.

GARY WEDGE:  Sergeant Simpson, okay.  And did he say that's
something that the Chief had requested or was this coming from
Sergeant Simpson on his own or do you know?

EXHIBIT 37
Page 2 of 3                                                                                    COU-0000325

00:03:52

OFFICER JACOB KIRK:  I don't recall.  I'm assuming it would come from
the Chief, but I don't know for sure.

GARY WEDGE:  Do you remember when you and Officer McCullough
were first tasked with that?  Was it in October?  Was it in November?
The sweep was on December 14th.

00:04:06

OFFICER JACOB KIRK:  I would say, I want to say we had about a
month to put it together.  So I would say my best estimation would be
the, would be the beginning of November or the middle of November if it
was on the 14th.

GARY WEDGE:  Okay.  So you were first made aware of this sweep when
you were asked to put it together when Sergeant Simpson asked you and
McCullough to put it together?

00:04:30

OFFICER JACOB KIRK:  To the best of my memory.

GARY WEDGE:  Okay.  Do you remember what your specific role was in
the planning of that?

00:04:37

OFFICER JACOB KIRK:  I contacted a probation officer and asked them
to send us over some, some potential targets so we can go do compliance
checks on.  I contacted the Montclair Police Department and I was
dealing with a probation officer who, who is now our assigned probation
officer to our, our department and tried to get him and some probation
officers to help us out putting some targets together that, that fell

EXHIBIT 37
Page 3 of 3                                                    COU-0000326

[INTENTIONALLY LEFT BLANK]

# EXHIBIT 38

# EXHIBIT 39

**GARY WEDGE**
***Upland***
**Captain Yoakum (AB109)**
**July 6, 2017**

GARY WEDGE:  We are on.  The date is Thursday July 6, 2017.  It's almost 11:15 in the morning.  This interview is being conducted at Upland City Hall.  My name is Gary Wedge.  I am a licensed private investigator and I've been contracted by the city of Upland to conduct an investigation into alleged workplace misconduct and you've been identified as a witness.  I'm conducting this investigation under the authority of Assistant City Manager Jeannette Vagnozzi.  Following individuals are present in the room.  If you could state your name for the record, please.

CAPTAIN YOAKUM:  Anthony Yoakum.

BRANDI HARPER:  Brandi Harper, Castillo Harper.

GARY WEDGE:  Thank you.  I will be recording the interview.  It looks like you are as well.  You'll have access to the recording if requested.  And before I forget, did you get the CD that I sent of the interview?

BRANDI HARPER:  Yes, I did.

GARY WEDGE:  Okay.  You may also record this interview yourself, obviously.  You have the option to have a representative present.  you've chosen to do so.  You're directed to answer any and all questions that are asked, completely and in a truthful manner, giving the information that might help determine what happened.  Failure to answer the questions

EXHIBIT 39
Page 1 of 6

COU-0000344

**GARY WEDGE - *Upland***
**Captain Yoakum (AB109) July 6, 2017**                                                    5

CAPTAIN YOAKUM:  Yes.

GARY WEDGE:  Okay.  And again, if you could, this air conditioner's really loud.  You know, you picked up very well last time.  I think you heard, but just keep that in mind.

CAPTAIN YOAKUM:  Okay.

GARY WEDGE:  On your questions.  During the discussion that you're thinking about, do you recall Sergeant Simpson saying that no agencies wanted to participate or no agencies were available to participate?  Anything similar?

CAPTAIN YOAKUM:  No.  I don't recall that.

GARY WEDGE:  Do you recall, at any of these meetings, where there was a discussion about the AB 109 sweep?  Do you recall Sergeant Simpson trying to get the chief to cancel or postpone the sweep?

CAPTAIN YOAKUM:  I mean, that sounds familiar, but I don't even remember why or what the details were around that.

GARY WEDGE:  Okay.

CAPTAIN YOAKUM:  But I could be wrong.  I... that sounds vaguely familiar.

GARY WEDGE:  Do you recall Sergeant Simpson saying... in that discussion, do you recall Sergeant Simpson saying that he contacted certain agencies?

EXHIBIT 39
Page 2 of 6                                                    COU-0000348

**GARY WEDGE - *Upland***
**Captain Yoakum (AB109) July 6, 2017**                                    6

CAPTAIN YOAKUM:  I mean, that would have been a topic that we would have discussed, you know, in his updates, but I don't remember him saying that specifically.

GARY WEDGE:  So, I may know the answer to this one, but so then, do you recall any specific agencies that he spoke about, agencies by name?

CAPTAIN YOAKUM:  No.  I mean, the... if I remember correctly, the direction to him was to contact the surrounding agencies, so would have been the ones that border Upland.

GARY WEDGE:  And what agencies are those?

CAPTAIN YOAKUM:  The Sheriff's Department in Rancho, Ontario, Montclair, Claremont.  Just those.

GARY WEDGE:  Okay.  I noticed on your map of there, San Antonio Heights, is that a neighborhood or is that an actual city?

CAPTAIN YOAKUM:  They like to think of themselves an actual city.  It's county.

GARY WEDGE:  Okay.

CAPTAIN YOAKUM:  Unincorporated area.

GARY WEDGE:  So, their sheriff's department covers them as well.

CAPTAIN YOAKUM:  Correct, yes.

EXHIBIT 39
Page 3 of 6

**GARY WEDGE - *Upland***                                          7
**Captain Yoakum (AB109) July 6, 2017**

GARY WEDGE:  Do you recall the chief ever saying something to Sergeant Simpson, this is about the AB 109 discussions, similar to, so you're telling me the agencies around here can't participate?

CAPTAIN YOAKUM:  No, I don't recall that.

GARY WEDGE:  Do you recall the chief asking Sergeant Simpson if he contacted anyone from Chino PD?

CAPTAIN YOAKUM:  I don't remember if it was in that specific meeting, but yes, that was a question that was asked.

GARY WEDGE:  Alright.  Do you remember anything about that?

CAPTAIN YOAKUM:  No.

GARY WEDGE:  Okay.  But you remember, you have some recollection of the chief asking Sergeant Simpson about Chino PD?

CAPTAIN YOAKUM:  Yes.

GARY WEDGE:  Okay.  Do you recall the chief asking Sergeant Simpson if he contacted anyone from the sheriff's department?

CAPTAIN YOAKUM:  I don't remember.  I don't recall that.

GARY WEDGE:  It would just be when you said, contact the surrounding agencies, sheriff's departments.

CAPTAIN YOAKUM: Yeah, I would assume he would have since that's part of the surrounding agencies.

EXHIBIT 39
Page 4 of 6
                                                           COU-0000350

**GARY WEDGE - *Upland***          **8**
**Captain Yoakum (AB109) July 6, 2017**

GARY WEDGE:  And I'm sorry.  Did you say Ontario also was one of
those surrounding agencies?

CAPTAIN YOAKUM:  Correct.

GARY WEDGE:  Okay.  Do you have any specific recollection of him
asking about Ontario?

CAPTAIN YOAKUM:  No.

GARY WEDGE:  And you said Montclair was in that group as well.

CAPTAIN YOAKUM:  Yes.

GARY WEDGE:  No specific recollection about Montclair.

CAPTAIN YOAKUM:  Or Claremont, too.

GARY WEDGE:  And Claremont, okay.  From what you recall of that
discussion, do you have an opinion whether or not Sergeant Simpson
contacted those agencies or do you not recall enough about that
discussion?

CAPTAIN YOAKUM:  I assume he did.  I... but I don't have... and I do
remember the sweep going off, but I don't remember the discussion
about that.

BRANDI HARPER:  And when you're saying, those agencies, are you only
referring to the surrounding...?

**GARY WEDGE -** *Upland*                                                                        **9**
**Captain Yoakum (AB109) July 6, 2017**

GARY WEDGE:  Well...

BRANDI HARPER:  What's identified as the surrounding, or are you also
including Chino?

GARY WEDGE:  Any agencies that were discussed, yeah, because he's...
Chino stands out in his mind as an individual agency being brought up.
The rest of them don't stand out in his mind.  So, my question is about
any agencies, either Chino or the ones that you say as part of a regular
project you would contact the surrounding agencies.  And those are my
words, obviously, but...

CAPTAIN YOAKUM:  What was the question again?

GARY WEDGE:  Yeah.  So, I think your attorney was asking if I was
referring to... the question was, based on the discussion between Chief
Johnson and Sergeant Simpson, did you believe that Simpson had
contacted the various agencies.  Your attorney was asking me, was I
referring to Chino PD or the other agencies that we had mentioned:
Ontario, Montclair sheriff's department, those.  And I said, all those
agencies.  I was referring to all the agencies.

CAPTAIN YOAKUM:  I would assume that he contacted the surrounding
ones and then when... if the chief had brought up Chino, which it later
was, then yeah, he probably would have contacted them, too.

GARY WEDGE:  Okay.  But I understand you to say previously you
remember the limited recollection of that meeting or a meeting where the
AB 109 sweep was discussed.  You remember the chief bringing up
Chino PD?

CAPTAIN YOAKUM:  In one of the many meetings, we talked about it.

EXHIBIT 39
Page 6 of 6

COU-0000352

# EXHIBIT 40

## GARY WEDGE
### *Upland*
### Sgt. Marc Simpson (1-2) June 7, 2017

**Sgt. Marc Simpson (1) June 7, 2017**

00:00:01

GARY WEDGE:  The date is Wednesday, June 7th, 2017 the time is about 1:58 in the afternoon, this interview is being conducted at Upland City Hall in one of their conference rooms. My name is Gary Wedge [PHONETIC] I'm a licensed private investigator and I've been contracted by the city of Upland, California to conduct an administrative investigation into allegations that you were dishonest during your staff meeting in September 2016, that you failed to follow a written directive ordering you to not discuss a confidential administrative investigation and that you tried to influence that investigation; and that you made statements and engaged in other conduct undermined and disparaged the chief of police. City Manager Martin Fuvenell [PHONETIC] is in charge of this investigation and I'm conducting the investigation under his authority.

00:00:47

SGT. MARC SIMPSON:  And again, this is an administrative investigation and interview. I will be in charge of the interview, all questions will be asked by me. The following individuals are present in the room if you could, for voice recognition purposes state your name and spell it.

00:00:59

SGT. MARC SIMPSON:  Sure first name is Marc, M-A-R-C, last name is Simpson, S-I-M-P-S-O-N.

00:01:05

EXHIBIT 40
Page 1 of 14

COU-00001242

**GARY WEDGE - *Upland***          2
**Sgt. Marc Simpson (1-2) June 7, 2017**

MICHAEL MCCOY:  Michael McCoy, M-C-C-O-Y, attorney, Castillo
Harper, representing Sergeant Simpson.

00:01:11

GARY WEDGE:  I will be recording this interview, you have the right to
access the recording prior to any further interviews and I see that your
attorney's recording it as well. You have the right to have representation
which you have chosen to do so. You have the right to take reasonable
breaks during the course of the interview, no offensive or threatening
language, promises or other inducements to answer questions, may or
will be used against you over the course of this interview. Again, as this
is an administrative investigation you are directed to answer any and all
questions that are asked completely and in a truthful manner, giving me
information that might help determine what happened.

00:01:49

GARY WEDGE:  Failure to answer the questions will be considered an act
of insubordination and/or failure to answer truthfully can be an
independent basis for disciplinary action including and of determination.
Do you understand these rights?

00:02:01

SGT. MARC SIMPSON:  I do.

00:02:02

GARY WEDGE:  And do you understand that you are required to answer
my questions for purposes of this administrative investigation?

00:02:07

SGT. MARC SIMPSON:  I do.

00:02:09

EXHIBIT 40
Page 2 of 14
COU-00001243

**GARY WEDGE - *Upland***                                                                                      **6**
**Sgt. Marc Simpson (1-2) June 7, 2017**

00:05:45

GARY WEDGE:  Thank you.


00:05:46

SGT. MARC SIMPSON:  Mm-hmm.


00:05:52

GARY WEDGE:  Okay, just to begin with, if you could give me a little of
your professional background. You've been with—has Upland been your
entire career?


00:06:00

SGT. MARC SIMPSON:  No, it's kinda complicated. I was hired for
Upland, with Upland December 1st, 1994. Worked with Upland PD until
August of 2000. From August of 2000 to May of 2008 I believe it was, I
was appointed to the city of San Bernardino. And in 2008 to current I've
been, I worked with the city again.


00:06:34

GARY WEDGE:  When were you promoted to sergeant?


00:06:36

SGT. MARC SIMPSON:  Jeez, about three years ago, roughly, I don't
know, I don't remember the date.


00:06:40

GARY WEDGE:  Okay, and you were a detective before then?


00:06:42

SGT. MARC SIMPSON:  Yes.


EXHIBIT 40
Page 3 of 14                                                    **COU-00001247**

**GARY WEDGE - *Upland***                                                                                15
**Sgt. Marc Simpson (1-2) June 7, 2017**

SGT. MARC SIMPSON:  Yes.

00:12:00

GARY WEDGE:  Do you recall a staff meeting in December, the specific
date was December 6th but I don't necessarily expect you to remember
that date, but in which the issue of the AB109 sweep came up?

00:12:13

SGT. MARC SIMPSON:  I recall a staff meeting where we discussed the
sweep.

00:12:18

GARY WEDGE:  Okay. The sweep was on, correct me if I'm wrong,
December 14th? Is that accurate?

00:12:26

SGT. MARC SIMPSON:  Yes.

00:12:28

GARY WEDGE:  So the staff meeting would've been before that and, and
actually the date of the staff meeting was December 6th so that would've
been what, eight days a week in a day. Do you remember where that staff
meeting was held?

00:12:40

SGT. MARC SIMPSON:  We have so many staff meetings I'm not sure if it
was, I don't know which staff meeting. I...I recall talking to the chief
about it, I'm not 100% sure which location it was at.

00:12:53

EXHIBIT 40
Page 4 of 14                                                              COU-00001256

GARY WEDGE:  Okay. You say you have a lot of staff meetings, so what, how often do you have, this was a meeting with just lieutenants, well actually lieutenants, sergeants, and civilian supervisors if that helps.

00:13:05
SGT. MARC SIMPSON:  Okay. Then I do remember. This occurred, it should have occurred in the downstairs training room.

00:13:11
GARY WEDGE:  Okay.

00:13:11
SGT. MARC SIMPSON:  We referred to it as the downstairs training room.

00:13:13
GARY WEDGE:  Thank you. Between the time the chief first asked you to put together a sweep and that staff meeting where this issue came up, did the chief ever ask you for the status of that sweep?

00:13:32
SGT. MARC SIMPSON:  I know we had discussions about it but I don't remember what the exact status was. I, I remember telling him that we had a bunch of, we had about 100 targets, that things were progressing but I don't remember the exact conversations.

00:13:47
MICHAEL MCCOY:  So you did have a conversation with the chief?

00:13:49
SGT. MARC SIMPSON:  Yes.

EXHIBIT 40
Page 5 of 14

COU-00001257

00:13:50

MICHAEL MCCOY:  About that?  Okay.


00:13:50

GARY WEDGE:  And were they actual formal meetings or was it kind of done in passing, or a combination of both, or do you know?


00:13:56

SGT. MARC SIMPSON:  I wouldn't say they were formal meetings. I...I was in his office, but they weren't, I don't think they were formal or notes were taken, or [UNINTELLIGIBLE].


00:14:06

GARY WEDGE:  Do you know how many times he asked you about the status of that?


00:14:12

SGT. MARC SIMPSON:  No, I don't.


00:14:13

GARY WEDGE:  Okay. Was it more than once?


00:14:16

SGT. MARC SIMPSON:  It may have been, I don't have a, I couldn't give you a good number on that.


00:14:19

GARY WEDGE:  Okay. When you were asked about this, the status of the sweep, did he ever, did you ever give him any indication that you didn't wanna conduct the sweep or that CRO didn't have the time to organize a

EXHIBIT 40
Page 6 of 14

COU-00001258

sweep or anything that would lead him to believe you guys weren't, didn't want to do it.

00:14:45
SGT. MARC SIMPSON:  No, not at all.

00:14:48
GARY WEDGE:  Did you personally do any planning for the sweep or did you assign your CRO officers to do that?

00:14:53
SGT. MARC SIMPSON:  I delegated it.

00:14:55
GARY WEDGE:  So did you personally do anything?

00:14:57
SGT. MARC SIMPSON:  No.

00:15:00
GARY WEDGE:  Did you personally contact any agencies to ask for their participation?

00:15:08
SGT. MARC SIMPSON:  Wait. I guess I should I...

00:15:09
GARY WEDGE:  For, for the, thank you. For the AB 1, AB109 sweep we're talking about from the time you were tasked with putting this together, until the sweep occurred on the 14th, did you personally contact any agencies?

EXHIBIT 40
Page 7 of 14                                                          COU-00001259

**GARY WEDGE - *Upland***
**Sgt. Marc Simpson (1-2) June 7, 2017**                                    26

GARY WEDGE:  Things had played out with the AB109 sweep?

00:21:15
SGT. MARC SIMPSON:  Exactly.

00:21:16
GARY WEDGE:  Okay. Did you have a, after the staff meeting did you
have a conversation with Kirk and McCulla asking them who they had
contacted?

00:21:24
SGT. MARC SIMPSON:  Yes.

00:21:26
GARY WEDGE:  And prior to that conversation, prior to the staff meeting,
maybe it's easier to remember that way, prior to the staff meeting had
Kirk or McCulla told you who they contacted?

00:21:36
SGT. MARC SIMPSON:  I had been in contact with them. We shared the
same office and I'd been keeping up on it, making sure that I know who
they had contacted, yes.

00:21:46
GARY WEDGE:  Okay. Now did they keep you posted kind of as they
were doing it, like "Hey Sarge, such and such PD is able to participate
but this PD cannot, or Probation is asking for more information," things
like that? Did they let you know about those milestones for lack of a
better term or those events as they happened, or was it in one, like one
collective update meeting?

EXHIBIT 40
Page 8 of 14                                                     COU-00001267

**GARY WEDGE - *Upland***                                                        **27**
**Sgt. Marc Simpson (1-2) June 7, 2017**

00:22:10

SGT. MARC SIMPSON:  I don't exactly remember how the updates
occurred but eventually I did, we got notification of who, who could
participate and reasons why or they couldn't. I don't remember exactly.

00:22:27

GARY WEDGE:  Going through your list, so there was Rancho
Cucamonga Sheriff's Department, were they able to participate?

00:22:33

SGT. MARC SIMPSON:  No.

00:22:34

GARY WEDGE:  Okay. When did you find out they could not participate?

00:22:38

SGT. MARC SIMPSON:  I don't remember the date.

00:22:39

GARY WEDGE:  Do you know when they were contacted?

00:22:41

SGT. MARC SIMPSON:  No.

00:22:41

GARY WEDGE:  Was it before the staff meeting, after the staff meeting?

00:22:44

SGT. MARC SIMPSON:  Oh well before the staff meeting.

00:22:46

EXHIBIT 40
Page 9 of 14                                                    COU-00001268

**GARY WEDGE - *Upland***
**Sgt. Marc Simpson (1-2) June 7, 2017**                                           **28**

GARY WEDGE:  What about Ontario?

00:22:48
SGT. MARC SIMPSON:  Same.

00:22:50
GARY WEDGE:  Could not participate?

00:22:52
SGT. MARC SIMPSON:  Refused to participate, yeah.

00:22:54
GARY WEDGE:  When you say refused, what do you mean?

00:22:56
SGT. MARC SIMPSON:  They said it didn't benefit their PD to help us.

00:23:02
GARY WEDGE:  And do you remember when that conversation took place?

00:23:04
SGT. MARC SIMPSON:  No.

00:23:05
GARY WEDGE:  Montclair PD, were they able to help?

00:23:07
SGT. MARC SIMPSON:  Yes.

00:23:10

EXHIBIT 40
Page 10 of 14                                             COU-00001269

GARY WEDGE:  When did you talk, when were they contacted? Do you
know?

00:23:12
SGT. MARC SIMPSON:  I don't know.

00:23:14
GARY WEDGE:  Okay. Claremont?

00:23:16
SGT. MARC SIMPSON:  They were contacted and they could not
participate. I believe because they said they had a Probation sweep. They
were either planning or, or having one at the same time.

00:23:30
GARY WEDGE:  And the other one was Pomona?

00:23:35
SGT. MARC SIMPSON:  Yes.

00:23:35
GARY WEDGE:  And that guy has never got a call back?

00:23:37
SGT. MARC SIMPSON:  Correct.

00:23:39
GARY WEDGE:  So consequently they did not help.

00:23:41
SGT. MARC SIMPSON:  Correct.

EXHIBIT 40
Page 11 of 14                                                     COU-00001270

**GARY WEDGE - *Upland***                                               30
Sgt. Marc Simpson (1-2) June 7, 2017

00:23:42

GARY WEDGE:  Okay. Did I miss anybody that officer McCulla
contacted?

00:23:50

SGT. MARC SIMPSON:  Not that I know of.

00:23:51

GARY WEDGE:  And Officer Kirk contacted Probation and you think
Parole but you're not sure. And, and this is one of those I'm gonna ask
you to sort of guess, but for Probation do you know, do you recall how
many times you said they seemed like they wanted you guys to jump
through hoops.

00:24:07

MICHAEL MCCOY:  It was Probation, not Parole.

00:24:09

GARY WEDGE:  Probation. Does it seem like, do you recall how many
times you guys had interactions with him?

00:24:15

SGT. MARC SIMPSON:  I don't know for sure how many times Officer
Kirk, but I know he had a long email chain and some phone
conversations with Probation.

00:24:22

GARY WEDGE:  Okay. And did they participate at all?

00:24:27

EXHIBIT 40
Page 12 of 14                                          COU-00001271

SGT. MARC SIMPSON:  No.


00:24:28

GARY WEDGE:  Now was there one Probation officer from some agency who was involved? And if you don't remember that's okay.


00:24:35

SGT. MARC SIMPSON:  Chino PD had a, has a Probation officer assigned to them and they assisted.


00:24:40

GARY WEDGE:  Okay.


00:24:41

SGT. MARC SIMPSON:  I believe...actually I think Chino does, I'm not sure if it's Chino or Montclair.


00:24:45

GARY WEDGE:  But somebody did?


00:24:45

SGT. MARC SIMPSON:  Yes.


00:24:46

GARY WEDGE:  And you had, so you had one Probation officer?


00:24:48

SGT. MARC SIMPSON:  Yes.


00:24:49

EXHIBIT 40
Page 13 of 14

COU-00001272

**GARY WEDGE -** *Upland*                                                                                  **55**
**Sgt. Marc Simpson (1-2) June 7, 2017**

OFF CAMERA

00:46:57
GARY WEDGE:   Okay, it looks like your actual, actual interview was on
February 28. Take a look at this notice. And is that your signature on the
2nd page?

00:47:16
SGT. MARC SIMPSON:  It is.

00:47:25
GARY WEDGE:  Do you remember if it was February 28 or would it have
been March 1st?

00:47:30
SGT. MARC SIMPSON:  I don't know.

00:47:31
GARY WEDGE:   Okay.

00:47:31
SGT. MARC SIMPSON:  The date says February 28 and I signed it the
28th.

00:47:34
GARY WEDGE:  Okay. So you signed that, you signed the notice on the
date you were interviewed, signed and dated.

00:47:45
MICHAEL MCCOY:  Yes, so this e-mail at 2:24, hard copy, provided day
of interview for signature. Okay?

EXHIBIT 40
Page 14 of 14                                                                    COU-00001296

# EXHIBIT 41

## GARY WEDGE
### *Upland*
## Chief Johnson (1) May 4, 2017 (AB109)
## 5/15/17

00:00:01

GARY WEDGE:  Okay, the date is Thursday, May 4th, it's about 3:50 PM, I'm with Chief Johnson in chief...the chief's conference room.  Okay, Chief, you are aware that this is being recorded?

CHIEF JOHNSON:  Yes.

00:00:15

GARY WEDGE:  I am going to ask you a series of questions about a staff meeting that happened in December of last year, specifically on December 6th, and you and I have already had some discussions about this and conversation about it during this meeting.  There was a discussion about it an AB109 sweep or probation parole sweep, however you want to refer to it.

CHIEF JOHNSON:  Yes.

00:00:35

GARY WEDGE:  Do you recall that meeting?

00:00:37

CHIEF JOHNSON:  Yes, I do.

00:00:38

GARY WEDGE:  And Sergeant Simpson was at the meeting, correct?

EXHIBIT 41
Page 1 of 2

COU-0000236

**GARY WEDGE -** *Upland*                                                            **4**
**Chief Johnson (1) May 4, 2017 (AB109)**

CHIEF JOHNSON:  And I re...I asked him something to the effect, well, so you're telling me the sheriff's not...can't play?  And he says, yeah, I can't get a hold of anybody from the sheriff's, and I said, well, who did you try to get a hold of?  Cause I said I just talked to the undersheriff.  And he, he told me he would make sure that his people could come and support us.  And then I remember specifically asking him about SOUNDS LIKE: Chino PD.  Karen SOUNDS LIKE: Comstock and me have a very close relationship, and I knew I was going to have a chiefs', County Chiefs' meeting in the either the next day or the day after, or the following day or two days after.

00:04:23

CHIEF JOHNSON:  And I said, so you're telling me all these other agencies around here said they can't participate and he said yes.  So, I went...at the chiefs' meeting I pulled my West End chiefs aside, Brad Calif from Ontario, Chief Abels from Montclair and Karen Comstock.  My recollection is Brad says, yeah, they, they couldn't help out ro...Robert from Montclair told me, no, we can participate, and Karen Comstock told me that she checked with her staff and they in fact never even were contacted by Sergeant Simpson.

00:05:01

GARY WEDGE:  So, when this came up at your staff meeting, was it...was it an agendaed (sic) item, or was it something that just came up during a round table discussion?  If you don't remember that's fine.

00:05:11

CHIEF JOHNSON:  I don't remember but typically I would write notes on my agenda, right, so I don't know, did...Luz should have been able to produce a copy of the agenda for that day?

00:05:22

EXHIBIT 41
Page 2 of 2                                                            COU-0000239

# EXHIBIT 42

**GARY WEDGE**
*Upland*
**Chief Johnson (2)**
**5/4/17**

00:00:01

GARY WEDGE: Okay. The day is Thursday, May 4th, 2017. It's about
4:22. I am with Chief Johnson in the chief's conference room. Hey, Chief.
I'm going to talk to you about a meeting that you had with Captain
Joachim and Sergeant Simpson. Based on a page or a calendar entry
from your calendar, it looks like the meeting happened on Tuesday,
January 31st at 4:00. And do you recall, I'm, I'm not expecting you to
remember the specific date but do you recall if it happened on the date
that this calendar entry was for like if it...

00:00:42

CHIEF JOHNSON:  Yes.

00:00:43

GARY WEDGE:  ... it didn't change?

CHIEF JOHNSON:  Yeah.

GARY WEDGE:  Was this is a recurring meeting or was this a –

00:00:45

CHIEF JOHNSON:  No. My recollection is that meeting was specific to an
email that he inadvertently sent to me, I believe.

00:00:54

GARY WEDGE:  Okay. And we'll get, we'll get to that as well.

00:00:56

CHIEF JOHNSON:  Yeah.



EXHIBIT 42
Page 1 of 3

COU-00001010

And so I pulled him into my office. I said, Mark, you're a Sergeant of police. The, the, ru..., I'm getting rumors back that you're undermining me. Chief, I would never do that. Absolutely not. I'm supporting you. I, I would never undermine you. I said, Okay. Mark, I'm taking you at your word. You know, everybody's telling me you're a top-notch guy. You wanna make Lieutenant but I gotta have people that are loyal on my team. And he assured me he was loyal.

00:07:43

CHIEF JOHNSON:  So fast forward to the lieutenant's exam, right? We go through the Lieutenant's process. We're promo..., I promote a lieutenant. Now the next per..., lieutenant promotion is gonna come up. In fact, I have it on my phone. I'll show it to you. He's number two and then, John pulls number three. But as I'm evaluating him now that he's not in patrol, he's in CRO, right, I'm starting to see that his administrative skills are lacking.

00:08:14

GARY WEDGE:  I remember you saying that. So I pulled him in with Tony and, and it may have been in this meeting or a different meeting, I don't remember, and, and we sat him down and I said, Mark, I want you to understand. I know you're gonna feel like you were passed over but you are not being passed over. I said, I have been told that you were a great tactician and I've got no reason to believe otherwise. I said, But I have seen John Poole out in the field and he's a great tactician, too. I said, What John has over you is administratively, he's a lot sounder than you. He's been doing grants for us for years and he understands the administrative process. You are learning it. You, and, and so when I look at you, John is better in that respect from an administrative standpoint.

00:08:59

CHIEF JOHNSON:  From a lieutenant reviewing sergeant's work, John is better than you are right now but that's why you're in CRO. We're

EXHIBIT 42
Page 2 of 3

COU-00001017

helping you to build that skill set. This is not about you not being passed over. I want you to understand that. This is about me believing John Poole is the right person at this time and, and Captain Joachim, we both agree John is the most prepared and qualified person to be a lieutenant. Not more than an hour later, sends me a text. Chief, I know you, I, I, I, I want you to know I'm gonna continue to work for you and uh, even though I was passed over. Right? Kind of his little dig.

00:09:39
GARY WEDGE:  Yeah.

00:09:39
CHIEF JOHNSON:  But the point I really wanted to make, so in that lieutenant's forum, this is what he told me. We were talking and he said, Chief, you know, I wanted to tell you, you know, things, we, we haven't always gotten along or you haven't always felt that I supported you and I want to, you know, me and my wife were talking and he said, You know, my wife said, you know, you always come home and you bitch and moan that the prior chief isn't doing anything. The organization is stagnant. We're not moving forward. Now this new guy comes in. He's making changes and you come home and you bitch and you moan about it. I didn't say a word but I thought to myself, if he's bitching and moaning to his wife, could he be bitching and moaning and undermining me to the staff, right?

00:10:25
CHIEF JOHNSON:  And so, I, but I didn't say anything about it and then I may have said it even in this meeting. And, and I believe I did say it in this meeting but I did say it to him. I said, Mark, remember what you told me, 'cause this got kinda heated because, when we get to the, the issue about making a false statement about me serving a search warrant, right, wherever it is in here.

EXHIBIT 42
Page 3 of 3

COU-00001018

# EXHIBIT 43

**EMPLOYMENT OFFER FOR:** Mr. Marc Simpson                      **DATE:** November 3, 2017
**EMPLOYEE ID NUMBER:** 012927187

**A. Terms of the Offer**

**Employing Department:**          University Police Department/ Administrative Affairs

**Position Classification Title:**  Police Officer
                                   (#00004749/ RU=726/ Job Code = 8350/RC=0)

**Type of Appointment:**           Full-time, probationary

**Effective Date of Appointment:** November 13, 2017

**Rate of Pay:**                   $6,453 per month

**FLSA Status:**                   Non-exempt.  Subject to provisions of the Fair Labor Standards Act.
                                   Authorized time worked in excess of a 40-hour work week shall be
                                   compensable by cash or compensatory time on a one and one-half (1½)
                                   time basis.

**Other:**                         Appointment via recruitment.  *You will receive an additional permanent
                                   monthly stipend of $100.00 for an intermediate certificate and $150.00
                                   for an advance certificate.

**B. General Information**

**Report to:**                     Patrol Sergeant

**HEERA Supervisor/Manager:**      Mr. Aaron J. Eaton, Lieutenant
                                   Bldg. 109, Ext. 3067

**Effective Dates of
Probationary Period:**             November 13, 2017 through November 12, 2018

**Performance Review Cycle:**      Evaluate by the end of the 3rd, 6th, and 11th month of the probationary
                                   period.

**Eligibility for
Permanent Status:**                November 13, 2018

**Collective Bargaining Designation:** Public Safety – Unit 8

**C. Acceptance of Offer**
I accept the offer of employment as outlined above:

_____                    _____
**Signature**                                        11-13-2017
                                                     **Date**

**Benefits Orientation:**  **Tuesday, November 21, 2017**   **9:00a.m. -11:30 a.m.**   **Bldg. 98, Room B1-31**
                           Date                             Time                        Location

EXHIBIT 43
Page 1 of 3

cc:   Jonna Lewis, Benefits, Budget, Human Resources, Payroll, (57-AD-17/60325 P) jg

COU-00013417



California State Polytechnic University, Pomona • 3801 West Temple Avenue, Pomona, CA 91768
phone  909.869.3019 • fax  909.869.4541 • www.cpp.edu/~adm_affairs/

**Office of the Vice President for Administrative Affairs**

November 3, 2017

Mr. Marc Simpson
1822 North Balboa Way
Upland, CA 91784

Dear Mr. Simpson:

On behalf of California State Polytechnic University, Pomona, I am pleased to extend you an offer of employment.  The outline on the reverse side of this letter contains the terms of the offer and information of general interest related to the position.

The Immigration Reform and Control Act of 1986 requires you to provide original documentation establishing your identity and eligibility to work in the country.  This documentation must be provided to Human Resource Services for review within 72 hours of the effective date of appointment for this offer to be valid.  Additionally, on your first day of employment, you will be required to take the Oath of Allegiance in accordance with the law and a California State University system wide policy; and present your original Social Security card to a Human Resource Services representative.

You will sign and date your offer letter during the New Hire Orientation.  A copy of this letter will be provided for your records. Please contact John I. Gungon at (909) 869-3160 or jigungon@cpp.edu if you have any questions regarding this information.

Sincerely,

Danielle L. Manning
Vice President and Chief Financial Officer
Administration, Finance and Strategic Development

EXHIBIT 43
Page 2 of 3

COU-00013418



California State Polytechnic University, Pomona • 3801 West Temple Avenue, Building 121, 2nd Floor West, Pomona, CA 91768
909.869.3733

Employee and Organizational Development and Advancement

| | |
|---|---|
| **Title of Action:** | Subpoena to Produce Documents<br>Marcus Simpson |
| **Date of Subpoena:** | July 24, 2019 |
| **Name of Business Subpoenaed:** | California State Polytechnic University, Pomona |
| **Civil Action No.:** | 5:18-CV-01024-PSG-SP |
| **Name of Party Obtaining Documents:** | The Zappia Law Firm, APC |

## DECLARATION

The undersigned declares:

That I am the duly authorized custodian of the employment/personnel records of the above named business.

That I have authority to certify those records.

That the following is true as to those records:

_____ (a)  The copies transmitted are true copies of all the original employment/personnel records described in the subpoena.

_____ (b)  No copies or records are transmitted, because the business has none of the records described in the subpoena.

__X__ (c)  The copies transmitted are true copies of part of the original records that are in part computer generated, typed and/or hand written as described in the subpoena, and the business does not have any other of the records described in the subpoena.

That the records referred to above were prepared by the personnel of the above-named business, in the ordinary course of business, at or near the time of the acts, conditions, or events recorded.

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on August 9, 2019 at Pomona, California.

Kimberly G. Allain
AVP, Employee & Organizational Development & Advancement

EXHIBIT 43
Page 3 of 3

COU-00013459

# EXHIBIT 44

1

1           UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3    MARCUS SIMPSON,                )
                                    )
4                   Plaintiff,      )
                                    )
5         VS.                       ) Case No. 5:18-CV-01024
                                    )
6    CITY OF UPLAND, a Public       )
     Entity; CHIEF OF POLICE BRIAN  )
7    JOHNSON, individually and in   )
     his capacity as Chief of the   )
8    Upland Police Department;      )
     CITY MANAGER MARTIN            )
9    THOUVENELL, individually and   )
     in his capacity as City        )
10   Manager for the City of        )
     Upland; DOES 1-10, inclusive,  )
11                                  )
                    Defendants.     )
12   _____)

13

14

15

16           DEPOSITION OF MARCUS SIMPSON

17        Tuesday, September 3, 2019, 10:03 a.m.

18           Huntington Beach, California

19

20

21

22     Reported by Daniella Ware, CSR No. 13918
                     Job No. 154666
23

24

25

EXHIBIT 44
Page 1 of 21

1    anymore, so I'll refer to him as Thouvenell.

2         First, that he denied ever giving us -- when

3    I say us; myself, Allen Ansara, Lon Tege, and

4    Marcello Blanco -- a directive to seek complaints and

5    to talk to other persons and that he had planned on

6    firing Johnson.

7         Q    So it's your recollection that chief -- or

8    let's say -- I'm calling him Chief Thouvenell, but we're

9    all talking about Marty Thouvenell -- had directed you

10   to do what?

11        A    Do you want his exact verbiage?

12        Q    Yes.

13        A    He told us since he was former police chief

14   and because he's now -- he was then the City Manager,

15   that people would feel uncomfortable talking to him,

16   so he told us -- meaning the four that I just

17   previously mentioned -- to go out and seek complaints

18   so that he can open up an investigation that was

19   going to be broad and about the marijuana dispensary.

20        Q    Did you happen to document that directive

21   anywhere?

22        A    No.

23             MS. HARPER:   I'm going to object insofar as

24   this calls for any attorney/client privileged

25   communication.

1          Other than that, go ahead and answer.

2          THE WITNESS:  No, I didn't write it down

3    anywhere.  No.

4    BY MR. ZAPPIA:

5      Q    You didn't confirm that with Chief Thouvenell,

6    "Per your directive, we're going to seek complaints

7    against Chief Johnson"?

8      A    We were very specific, because, when I was

9    in the meeting, it was brought up if we were not

10   worried about the chain of command.

11         So he said, "No, I'm not worried about that.

12   You guys are to go out and do this."

13         It was very specific.  There was nothing --

14   there was no question about it.

15         He was very direct about it.  There was

16   nothing to be confused for what his directive was.

17     Q    Okay.  So my question to you was:

18         Did you document that to Chief Thouvenell?

19     A    Did I write a letter to him?

20     Q    An e-mail or a letter saying anything to the

21   effect of, "Per your directive, we're to go seek

22   complaints about the chief"?

23     A    No.

24     Q    Would there be any writings, to your knowledge,

25   e-mails -- did you send e-mails to Ansara, Tege, or

1    anyone else to the effect, "City Manager Thouvenell has

2    directed us to go seek complaints about Chief Johnson"?

3           Any such e-mails or documents?

4           MS. HARPER:  Again, I'm going to object insofar

5    as this calls for any attorney/client privileged

6    communication.

7           Other than that, go ahead and answer.

8           THE WITNESS:  Not that I recall, no.

9    BY MR. ZAPPIA:

10   Q    Okay.  So as you sit here today, what is your

11   understanding, exactly, of what Chief Thouvenell said in

12   an interview that was a lie?

13   A    He denied ever telling us to seek

14   complaints.

15   Q    Do you recall -- not word-for-word -- but do

16   you recall, generally, what did he say in his interview

17   about that meeting of what he told you?

18   A    His interview or his meeting?

19   Q    Let's say in his interview.

20   A    No, not -- I don't know verbatim.

21   Q    Do you recall him saying any words --

22          So you recall a lie, but you don't recall what

23   he said in that interview, as we sit here?

24   A    Not verbatim.  I think I restated what he --

25          That he denied ever giving us a directive to

| | |
|---|---|
| 1 | go out and seek complaints or to talk to anyone about |
| 2 | the complaint. |
| 3 | Q    Okay.  But, as we sit here, you don't recall |
| 4 | what he actually said in his interview about his -- |
| 5 | about that meeting and what he said in the meeting? |
| 6 | A    I recall what I just told you. |
| 7 | Q    Okay.  Okay.  So this all started with me |
| 8 | asking you if you were actually terminated. |
| 9 | Were you terminated from Upland? |
| 10 | A    Not -- no.  No. |
| 11 | Q    In fact, you sent an e-mail resigning; correct? |
| 12 | A    Correct. |
| 13 | Q    And, to your knowledge, your personnel file at |
| 14 | Upland reflects you as having resigned and not been |
| 15 | terminated? |
| 16 | A    I don't know what it says. |
| 17 | Q    Okay.  Do you recall receiving a letter after |
| 18 | you resigned informing you of your payout benefits upon |
| 19 | resignation? |
| 20 | A    Yes. |
| 21 | Q    Okay.  Upon receipt of that letter, did you |
| 22 | make any response saying, "Hey, wait a minute.  I didn't |
| 23 | actually resigned.  I was forced to resign"? |
| 24 | Or that's not accurate? |
| 25 | A    No. |

1    Q    Okay.  Do you have a recollection there was

2    also another investigation into you disobeying a

3    directive not to talk about the matter and contacting

4    Luz Barrett?

5    A    I think I just said that.

6         MS. HARPER:  He said order not to talk.  That's

7    the same thing.

8         MR. ZAPPIA:  That's the same thing.  Okay.

9    BY MR. ZAPPIA:

10   Q    So let's start with the no talk order.

11        What about the investigation was farcical?

12   A    Well, the first thing was the order not to

13   talk was incorrect.

14        It wasn't -- there was no one within my

15   chain of command that gave me that.

16        I believe there was case law that says broad

17   overreaching orders not to talk are not okay by the

18   NLRB, and they have to be -- it has to be more

19   specific as to why, and it can't just use

20   generalizations.

21   Q    Okay.  So let me stop you.

22        What order were you given?

23   A    The order not to talk about Johnson's

24   interview was by Tanya Brag, I believe.

25        No, I don't remember her name.

1      Q      So you received an order not to talk about the

2   investigation?

3      A      Yes.

4      Q      Okay.  So, at that time, did you make your own

5   determination that you did not have to follow that

6   order?

7      A      No, it was --

8          MS. HARPER:  I'm going to object insofar as

9   this calls for any attorney/client privileged

10  communication.

11          Other than that, go ahead and answer.

12          THE WITNESS:  Prior to that, Thouvenell told us

13  to go do something, to go seek out complaints.

14          And, during the investigation, he told us to go

15  seek out complaints.  So Thouvenell is the chief

16  executive of the City so, whatever he says, goes.

17          He's in charge of everything.

18  BY MR. ZAPPIA:

19     Q      Okay.  So, at any point in time, then, did you

20  tell anyone, such as Chief Thouvenell or Tanya Brag,

21  that you now have conflicting orders?

22     A      No.

23     Q      What is your duty as a sergeant if you have

24  conflicting orders?

25     A      It's not -- it's not that simple to say

1    conflicting orders.

2           He was the boss.  He knows.  He's worked his

3    way up the ranks.  He knows how investigations work.

4           I shouldn't have to go clear up things with

5    him.  That's not my responsibility.

6           That's his responsibility to know what's

7    going on.

8       Q    How -- let me ask the question again:

9           As a police sergeant, what is your duty if you

10   receive conflicting orders?

11          MS. HARPER:  Objection.  Vague and ambiguous.

12          THE WITNESS:  You go with the last or the most

13   powerful order.

14   BY MR. ZAPPIA:

15      Q    At any point in time, would you tell either of

16   the individuals that you have conflicting orders?

17      A    Did I -- or I'm sorry.  Say that again.

18      Q    Well, let me ask you:

19          Did you -- did you tell Chief Thouvenell or

20   Tanya Brag that you had -- now had conflicting orders?

21      A    No.

22      Q    In your experience as a sergeant --

23      A    Is this for me?

24      Q    Yeah, you can have that.

25      A    Okay.  Thank you.

1    Q    -- should you tell someone that you have

2    conflicting orders?

3    A    Again, I don't know -- you're asking for

4    absolutes.  In this case, no, I don't think --

5         Thouvenell knew how an investigation works.

6    Q    Do you know if Thouvenell was aware of any

7    order that Tanya Brag gave you?

8    A    I don't know that.

9         No.

10   Q    Okay.  So I go back to:

11        If you receive conflicting orders, wouldn't it

12   seem prudent to tell at least one of the individuals

13   whose order you're not going to follow that you received

14   a superior order?

15   A    Not in this case, no.

16   Q    Why not in this case?

17   A    Thouvenell is a prior police chief.  He

18   should be familiar with pro bar.  He handles IAs.

19   He's handled Skelly hearings.  He handles

20   disciplinary hearings.  He knows the process.

21        I don't know him to be incompetent, which I

22   didn't think, at this point, he was.

23        He should know the process.

24   Q    Okay.  I understand that.

25   A    Right.

1      Q     But my question to you is:

2            If you receive conflicting orders, would you

3      customarily tell one individual, particularly if it's a

4      superior, that you're not going to follow that order

5      because you received a superior order?

6      A     I don't think we have one superior order.

7            I don't know how to answer your question,

8      because it doesn't -- it doesn't match up with the

9      investigation.

10           The superior order was from Thouvenell.  He

11     is in my chain of command.

12           Tanya Brag is not in my chain of command.

13           If she tells me to go arrest someone, I

14     don't have to go arrest someone.

15     Q     So you knowingly disregarded Tanya Brag's order

16     not to discuss the investigation?

17     A     I knowingly followed the order -- the last

18     order I had.

19     Q     And did you knowingly disregard Tanya Brag's

20     order not to discuss the investigation?

21     A     Yes.

22     Q     Okay.  And in so doing, did you inform anyone

23     that you intended to disregard Tanya Brag's order?

24     A     Yes.

25     Q     Who did you tell?

```
 1        A    When we talked to Thouvenell during the
 2   investigation, he knew that we were going out, and
 3   Alan Ansara asked him -- and I was in there --
 4             "Do we have to worry about the chain of
 5   command?"
 6             And he said, "Don't worry about that."
 7             I was there.  I listened.  I heard that
 8   statement.
 9             So, to me, he is the superior.  He is giving
10   us authority to do something that he's telling.
11        Q    But you didn't know if he had any awareness of
12   Tanya's order to you?
13        A    I don't know.  No, I do not know.
14        Q    Okay.  Now, you came back to your current job
15   as sergeant at Pomona -- Cal Poly Pomona?
16        A    That's correct.
17        Q    Okay.  Let me ask you:
18             Are you sworn?
19        A    I am.
20        Q    And how much time was there between the time
21   you resigned from Upland and the time you started work
22   at Cal Poly Pomona?
23        A    Roughly, a month.
24        Q    You understand as a police officer, you have to
25   be mentally fit under the Government Code to be a sworn
```

1    officer?

2        A    Yes.

3        Q    And so, at least a month after you resigned

4    from Upland, you felt mentally fit to serve as a sworn

5    officer at Cal Poly Pomona?

6        A    Yes.

7        Q    Is there any -- and you also said one of the

8    reasons you resigned was because of Chief Thouvenell and

9    knowing his ways, including not liking unions and lying

10   in the investigation.

11            Do you have any evidence or information that

12   Chief Thouvenell was involved, in any way, in the

13   investigation or either of the investigations against

14   you; either the investigation of the no talk order or

15   the investigation of you being dishonest about the

16   parole and probation sweep?

17       A    Well, he was a witness, so I would say he

18   has some involvement in it.

19       Q    Okay.  Other than a witness, are you aware if

20   Chief Thouvenell had any input in the -- let's start

21   with investigative findings or conclusions, other than

22   information he gave as a witness?

23       A    No, I do not know.

24       Q    Do you have any evidence or information that

25   Chief Thouvenell had any involvement in the decision to

1    propose your termination?

2        A    No.

3        Q    Okay.  Do you have any evidence or information

4    that former Chief Johnson had any involvement in the --

5    in either of the investigations, other than as a

6    witness?

7        A    No.

8        Q    Do you have any evidence or information if

9    Chief Johnson had any input in the decision to propose

10   your termination?

11       A    No.

12       Q    Okay.  As we sit here, do you have a

13   recollection as to who, actually, proposed your

14   termination?

15       A    Jeanette Vagnozzi.

16       Q    And how do you know that?

17       A    She -- I -- the letter she wrote or her

18   finding.

19       Q    And she, actually, signed the notice of

20   proposed termination to you?

21       A    Yes, I'll go with that.

22       Q    Let me ask you -- we started by saying you're a

23   plaintiff -- we established you're a plaintiff in this

24   case, and you're suing the City?

25       A    Yes.

1    A    I have no idea if Yoakum or Tege did that.

2    Q    Okay.  So the three of you approaching Luz on

3    the same day within seven minutes, if that occurred, was

4    just completely coincidental?

5    A    As strange as it seems, it was completely

6    coincidence.

7    Q    And, at the time, you were PMA president?

8    A    Yes.

9    Q    According to you, acting at

10    City Manager Thouvenell's directive?

11    A    Correct.

12    Q    And Tege was the POA president?

13    A    Yes.

14    Q    And do you believe he was acting at

15    Chief Thouvenell's directive?

16    A    I don't know what Tege did.

17    Q    Okay.  When you approached Luz, did you have an

18    understanding that Tanya Braq had told you not to

19    discuss the investigation?

20    A    Yes.

21    Q    And, at the time same time, you had

22    understanding that City Manager Thouvenell said, "Go

23    ahead and solicit complaints"; is that correct?

24    A    Yes.

25    Q    Did you ask Luz anything to the effect of:

1          "Do you have any complaints/concerns about

2    Chief Johnson?"

3        A    No.  No.

4             MR. ZAPPIA:  Do you mind if we take a

5    10-minute break?

6             MS. HARPER:  Sure.

7             (Recess)

8             MR. ZAPPIA:  Okay.  We're back on the record.

9    BY MR. ZAPPIA:

10       Q    I'm just going to keep this part short, but let

11   me do what I must.

12            You understand you're still under oath today?

13       A    Yes.

14       Q    And that everything you say will be taken down

15   into a booklet to be referred to later, if need be?

16       A    Yes.

17       Q    And the whole point of that, just so you know,

18   is, if you have an answer today and at a later time you

19   have a different answer, one way or another, I can

20   specifically point out what you said today to impeach

21   your credibility.

22            Do you understand that?

23       A    I understand.

24       Q    Okay.  And any reason you can't give your best

25   testimony today?

1    A    The original promotional list was Blanco

2  first, myself second, John Poole third.

3         There's only three people tested, only three

4  people on the promotional list.

5    Q    Okay.  So then you had said, in a meeting,

6  Chief Johnson told you that you were going to be passed

7  over for lieutenant.

8         Was that referencing the first promotional or

9  the second promotional?

10   A    Second.

11   Q    Okay.  Now, when Chief Johnson said that, did

12 he say anything else, like why?

13        Or, you know, did he say it was because he

14 thought you were lacking somewhere where Poole was good,

15 or Poole was --

16   A    I'll give you the whole scope.

17        He said I was a much better -- I had better

18 troop support, that I motivated the troops much

19 better.  I was much more tactically proficient than

20 him -- him being Poole -- but he thought Poole had

21 better administrative skills.

22   Q    Okay.  Is the substantial part of the

23 lieutenants duties administrative?

24   A    Both.  You're still -- if you're a good

25 lieutenant, you should still be out there leading

1    tactical situations, motivating police officers.

2         Q    Okay.  Do you -- let me ask you this:

3              Did you have an understanding if Poole had

4    better administrative or more administrative skills and

5    experience than you?

6         A    No.

7         Q    So you didn't agree with that part?

8         A    No, I did not.

9         Q    Do you know how long Poole had been employed by

10   the City?

11        A    Probably, close to 30 years.

12        Q    Do you know how long Poole had been a sergeant?

13        A    Over 20 years.

14        Q    How long had you been employed by the City at

15   the time, let's say in 2017, as a sworn officer, let's

16   say?

17        A    Tolled?  Or in my -- the reason I ask you is

18   because I was first employed by Upland, left, and

19   then came back.

20             Do you want all tolled or just from my

21   second stint or all tolled?

22        Q    Why don't you tell me all tolled, when were you

23   first employed with the City of Upland?

24        A    December of '94.

25        Q    Okay.  And in what capacity?

1   to sergeant?

2       A    No, to detective.

3       Q    I'm sorry.  2010 you were promoted to

4   detective?

5       A    Roughly, yes.

6       Q    How long were you in the detective rank?

7       A    I think 21 months.

8       Q    Okay.  So I'm going to say you were promoted to

9   sergeant then --

10      A    Yes.

11      Q    -- about 2012?

12      A    Roughly.

13      Q    Okay.  So you had been a sergeant then for,

14  let's say, five years at the time of the 2017

15  promotional?

16      A    Correct.

17      Q    And you had had, I guess, about 17 -- about

18  23 years on in Upland?

19      A    Sounds good.  Yes, 23 all tolled.

20      Q    Right.  Right.  And then let me go back to:

21           What, if anything else, about the

22  promotional -- the second promotional, that leads you to

23  believe it was Poole was promoted -- again, not just for

24  disagreeing over skills -- but for wrong or improper

25  reasons by Johnson?

1    issue with you?

2        A    Well, I would say that that would be a

3    mitigating -- so, no, I don't have anything that --

4    where she came out, and said, "I hate you," or told

5    anyone she dislikes me.

6        Q    Okay.

7        A    Or that said she influenced her

8    investigation.

9        Q    Okay.  Or any conduct by her in the preceding

10   year directed at you that was unfair or...

11       A    I haven't had any contact with her.

12       Q    Okay.  Do you have any evidence or information

13   if Jeannette had any awareness of any participation you

14   had in either trying to get the chief fired or bring

15   forward complaints about the chief?

16       A    No.  I don't know how she would know,

17   though.

18       Q    Okay.  And do you have any information, by the

19   way, if Jeanette Vagnozzi had any particular favoritism

20   towards Chief Johnson?

21       A    She said she liked him, and she went to some

22   leadership conference with him over one of these

23   leadership motivational -- I forget what his name is.

24            Maxwell, I think John Maxwell.  That's the

25   guy.

1   being promoted over you.

2          You didn't have an issue with Poole, but he was

3   promoted over you, and Blanco had also been involved, to

4   a certain extent, in the bringing forward complaints

5   about Johnson; is that correct?

6      A    Correct.

7      Q    Okay.  Those were the only lieutenants at the

8   time?

9      A    I believe so.  Yes.

10     Q    Okay.  Do you know who else was sergeants at

11  the time?

12     A    Rainwater, Dote, Cheney, Kobian, Duran,

13  Steederson.

14         Off the top of my head, that's all I can

15  think of.

16     Q    And, at least as we sit here, those are all

17  individuals you listed as individuals who are critical

18  of Chief Johnson?

19     A    Yes.

20     Q    Okay.  Then at the time you forwarded your

21  e-mail resigning, did you have an awareness that, if you

22  had not resigned but been terminated, that you would

23  have had a right to binding arbitration to challenge the

24  termination?

25     A    Yes.

1        Q     Okay.  And same thing -- I don't want to waive

2   any attorney/client privilege, but did you consider that

3   you, personally, in your decision to resign, that you

4   would be waiving a right to binding arbitration?

5        A     Yes.

6              MR. ZAPPIA:  Okay.  That's all I have.

7              MS. CHUNG:  Hold on one second.

8              MR. ZAPPIA:  Sorry I don't have longer time to

9   buy for you.

10             MS. CHUNG:  That's okay.  I think I got it.

11                      FURTHER EXAMINATION

12  BY MS. CHUNG:

13       Q     Earlier you testified that you believe that Luz

14  had a meeting with Chief Johnson, and Johnson directed

15  her to write some memos.

16             Do you recall that testimony?

17       A     Yes.

18       Q     And why do you think that Chief Johnson

19  directed Luz to write these memos?

20       A     One, I think it's in the investigation.

21       Q     And aside from reading it in the investigation,

22  do you have any independent information as to why you

23  believe that Chief Johnson directed Luz to write these

24  memos?

25       A     No.

EXHIBIT 44
Page 21 of 21

# EXHIBIT 45

Home  >  City Departments  >  City Council  >

# Council Duties

The City Council is elected to represent the interests of the citizenry and is responsible for establishing policy for the delivery of services necessary to meet the needs of the community.

The Council determines service levels and revenue obligations through the adoption of an annual budget, authorizes City contracts and expenditures, establishes City service and operating policies, and enacts local laws as necessary for the benefit of the community.

For suggestions and comments about the City of Upland, please contact the City Council at (909) 931-4122 or to contact the City Council directly, please email citycouncil@ci.upland.ca.us.

Copyright © 2019 . All Rights Reserved. - Legal Disclaimer

SITE BY CCSINTERACTIVE

EXHIBIT 45
Page 1 of 1

**CERTIFICATE OF SERVICE**

**COURT:  UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CA**

**CASE NAME:  MARCUS SIMPSON V. CITY OF UPLAND, ET AL**

**CASE NUMBER:  5:18-cv-011024-PSG-SP**

I am employed in the County of ORANGE, State of California.  I am over the age of 18 and not a party to the within action; my business address is THE ZAPPIA LAW FIRM, A Professional Corporation, located at 7777 Center Avenue, Suite 625, Huntington Beach, CA 92647.  On September 9, 2019, I served following document on the parties in this action listed below in the manner designated below:

**COMPENDIUM OF DECLARATIONS AND EXHIBITS IN SUPPORT OF DEFENDANTS CITY OF UPLAND AND MARTIN THOUVENELL'S MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Brandi L. Harper | Dennis J. Walsh, Esq. |
| brandi@castilloharper.com | dwalsh@walshlawyers.com |
| Joseph N. Bolander | Alice Chung, Esq. |
| joe@castilloharper.com | ahchung@walshlawyers.com |
| CASTILLO HARPER, APC | WALSH & ASSOCIATES, APC |
| 6848 Magnolia Ave., St. 100 | 16633 Ventura Boulevard, Suite 800 |
| Riverside, CA 92506 | Encino, CA 91436 |
| | |
| Additional Emails: | Additional Emails: |
| joe@gchattorneys.com, | gordonez@walshlawyers.com,apitts@walshl |
| nancy@gchattorneys.com | awyers.com, aarjang@walshlawyers.com, |
| | dzryd@walshlawyers.com, |
| | arutter@walshlawyers.com,mwallin@walshl |
| | awyers.com, |
| | |
| Attorneys for Plaintiff, | Attorneys for Defendant, |
| MARCUS SIMPSON | BRIAN JOHNSON |

**[XX]  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONICFILING (NEF):** Pursuant to controlling General Orders and LR, the foregoing document will be served by the court via NEF and hyperlink to the document. On September 9, 2019, I checked the CM/ECF docket for this case and determined that the persons listed above are on the Electronic Mail Notice List to receive NEF transmission at the email addresses listed above.

**[XX]  FEDERAL:**  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 9, 2019 at Huntington Beach, California.

_____
Linnda Hing